**No. 24-2251**

---

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

---

UNITED STATES OF AMERICA,
*Plaintiff - Appellee,*

KUSKOKWIM RIVER INTER-TRIBAL FISH COMMISSION; ASSOCIATION
OF VILLAGE COUNCIL PRESIDENTS; BETTY MAGNUSON; IVAN M.
IVAN; AHTNA TENE NENE; AHTNA, INC.; ALASKA FEDERATION OF
NATIVES,
*Intervenor-Plaintiffs - Appellees,*

v.

STATE OF ALASKA; STATE OF ALASKA DEPARTMENT OF FISH AND
GAME; DOUG VINCENT-LANG, in his official capacity as Commissioner of the
Alaska Department of Fish & Game,
*Defendants - Appellants.*

_____

On appeal from the U.S. District Court
For the District of Alaska, Anchorage
No. 1:22-cv-54-SLG
Hon. Sharon L. Gleason

---

## APPELLANTS' OPENING BRIEF

---

TREG TAYLOR
   ATTORNEY GENERAL

Margaret Paton-Walsh
Aaron C. Peterson
   Assistant Attorneys General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
(907) 269-5232
margaret.paton-walsh@alaska.gov
aaron.peterson@alaska.gov

J. Michael Connolly
Steven C. Begakis
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
steven@consovoymccarthy.com

*Attorneys for the State of Alaska, et al.*

# TABLE OF CONTENTS

TABLE OF CONTENTS ................................................................................ i

TABLE OF AUTHORITIES ...................................................................... iii

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION .......................................................... 5

STATEMENT OF THE ISSUES ................................................................ 6

CONSTITUTIONAL AND STATUTORY PROVISIONS ........................ 6

STATEMENT OF THE CASE .................................................................... 7

    A.   The State's Regulation of Fishing in Its Navigable Waters ........................... 7

    B.   The State's Protection of Salmon and Subsistence Fishing on the Kuskokwim River ........................................................................ 9

    C.   The Federal Government's Limited Power to Regulate "Public Lands" in Alaska ........................................................ 11

        1.   The Alaska National Interest Lands Conservation Act (ANILCA) ..... 11

        2.   The Federal Subsistence Board ................................................ 12

    D.   The *Katie John* Trilogy ......................................................... 15

    E.   *Sturgeon v. Frost* ............................................................... 19

    F.   The State's Protection of Salmon and Subsistence Fishing on the Kuskokwim River in 2021 and 2022 ........................... 22

    G.   Procedural History ................................................................ 25

SUMMARY OF THE ARGUMENT .......................................................... 27

STANDARD OF REVIEW .......................................................................... 28

ARGUMENT ................................................................................................ 29

    I.   The State's orders regulating the Kuskokwim River are not preempted because the river is not "public land" under ANILCA. ................................. 29

        A.   *Katie John* is no longer controlling because its theory and reasoning are "clearly irreconcilable" with *Sturgeon.* ................ 29

        B.   *Loper Bright* and *Sackett* confirm that the *Katie John* decisions are no longer good law. ........................... 33

        C.   Footnote two in *Sturgeon* does not bind this Court to *Katie John.* ........... 36

    II.   The State's orders regulating the Kuskokwim River are not preempted because the FSB members were not properly appointed. ............................. 40

A.  Orders from officers that were not properly appointed are invalid and have no effect. ................................................................. 40

B.  The FSB members are "officers of the United States." ........................ 42

C.  Congress did not establish the FSB members' offices "by Law." ........ 43

D.  The FSB members are "principal" officers who were not appointed by the President with the advice and consent of the Senate. ................ 49

CONCLUSION ................................................................................................. 54

STATEMENT OF RELATED CASES .......................................................... 55

CERTIFICATE OF COMPLIANCE ............................................................. 56

CERTIFICATE OF SERVICE ...................................................................... 57

# TABLE OF AUTHORITIES

**CASES**

*Alaska v. Babbitt,*
  72 F.3d 698 (9th Cir. 1995) ......................................................... *passim*

*Alfa Int'l Seafood v. Ross,*
  264 F. Supp. 3d 23 (D.D.C. 2017) ...................................................... 43

*Americredit Fin. Servs., Inc. v. Lyons,*
  2022 WL 135420 (M.D. Tenn. Jan. 13, 2022) ........................................... 40

*Amoco Prod. Co. v. Vill. of Gambell,*
  480 U.S. 531 (1987) ..................................................................... 37

*Baker v. Nelson,*
  409 U.S. 810 (1972) ..................................................................... 39

*Beal v. United States,*
  182 F.2d 565 (6th Cir. 1950) ........................................................... 47

*Becerra v. Empire Health Found.,*
  597 U.S. 424 (2022) ..................................................................... 35

*Buckley v. Valeo,*
  424 U.S. 1 (1976) ................................................................... 42, 43

*Carlucci v. Doe,*
  488 U.S. 93 (1988) ...................................................................... 15

*CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.,*
  601 U.S. 416 (2024) ..................................................................... 45

*Chevron, USA, Inc. v. NRDC,*
  467 U.S. 837 (1984) ................................................................. 17, 34

*Cincinnati Soap Co. v. United States,*
  301 U.S. 308 (1937) ..................................................................... 45

*Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB,*
  51 F.4th 616 (5th Cir. 2022) ........................................................... 41

*Cody v. Kijakazi,*
  48 F.4th 956 (9th Cir. 2022) ........................................................... 41

*Collins v. Yellen,*
  141 S.Ct. 1761 (2021) .................................................................. 42

*Digit. Realty Tr., Inc. v. Somers,*
  583 U.S. 149 (2018) ..................................................................... 37

iii

*Edmond v. United States*,
   520 U.S. 651 (1997) ............................................................. *passim*

*Ellins v. City of Sierra Madre*,
   710 F.3d 1049 (9th Cir. 2013) ......................................... 28

*Esparraguera v. Dep't of the Army*,
   981 F.3d 1328 (Fed. Cir. 2020) ....................................... 15

*FDA v. Brown & Williamson Tobacco Corp.*,
   529 U.S. 120 (2000) ........................................................... 48

*Flors v. Bowen*,
   790 F.2d 740 (9th Cir. 1986) ........................................... 44

*Free Enter. Fund v. PCAOB*,
   561 U.S. 477 (2010) ..................................................... 40, 53

*Freytag v. Comm'r*,
   501 U.S. 868 (1991) ........................................................... 43

*In re Benny*,
   812 F.2d 1133 (9th Cir. 1987) ......................................... 47

*In re Nichols*,
   10 F.4th 956 (9th Cir. 2021) ........................................... 30

*John v. United States*,
   247 F.3d 1032 (9th Cir. 2002) ..................................... 2, 17

*John v. United States*,
   720 F.3d 1214 (9th Cir. 2013) ......................... 2, 12, 17, 18

*Langere v. Verizon Wireless Servs., LLC*,
   983 F.3d 1115 (9th Cir. 2020) ......................................... 30

*Latta v. Otter*,
   771 F.3d 456 (9th Cir. 2014) ........................................... 39

*Le Vick v. Skaggs Cos., Inc.*,
   701 F.2d 777 (9th Cir. 1983) ........................................... 29

*Loper Bright Enters. v. Raimondo*,
   144 S.Ct. 2244 (2024) ...................................... *passim*

*Lucia v. SEC*,
   585 U.S. 237 (2018) ...................................... 41, 42, 43, 50

*McDowell v. State*,
   785 P.2d 1 (Alaska 1989) ................................................... 9

iv

*Miller v. Gammie,*
   335 F.3d 889 (9th Cir. 2003) ................................................................ *passim*

*Morrison v. Olson,*
   487 U.S. 654 (1988) ........................................................................ 50, 52

*NYSE LLC v. SEC,*
   962 F.3d 541 (D.C. Cir. 2020) .................................................................. 48

*Obergefell v. Hodges,*
   576 U.S. 644 (2015) ........................................................................ 38, 39

*OPM v. Richmond,*
   496 U.S. 414 (1990) .............................................................................. 45

*Rodriguez v. AT&T Mobility Servs. LLC,*
   728 F.3d 975 (9th Cir. 2013) ................................................................... 30

*Sackett v. EPA,*
   598 U.S. 651 (2023) .............................................................. 4, 28, 35, 36

*Samuels, Kramer & Co. v. CIR,*
   930 F.2d 975 (2d Cir. 1991) .................................................................... 43

*Seila Law LLC v. CFPB,*
   591 U.S. 197 (2020) ................................................... 46, 50, 52, 53

*State v. Kenaitze Indian Tribe,*
   894 P.2d 632 (Alaska 1995) ...................................................................... 8

*Sturgeon v. Frost,*
   577 U.S. 424 (2016) ......................................................................... 5, 12

*Sturgeon v. Frost,*
   587 U.S. 28 (2019) ........................................................................ *passim*

*Sturgeon v. Frost,*
   872 F.3d 927 (9th Cir. 2017) ...................................................... 3, 19, 20, 37

*SWANCC v. USACE,*
   531 U.S. 159 (2001) ............................................................................... 7

*Totemoff v. State,*
   905 P.2d 954 (Alaska 1995) .......................................................... 1, 16, 20, 32

*Trump v. United States,*
   144 S.Ct. 2312 (2024) ............................................................ 44, 46, 47, 48

*United States v. Arthrex, Inc.,*
   594 U.S. 1 (2021) .......................................................................... *passim*

*United States v. Donziger,*
    38 F.4th 290 (2d Cir. 2022) ......................................................... 42

*United States v. Germaine,*
    99 U.S. 508 (1879) ....................................................................... 42

*United States v. Janssen,*
    73 M.J. 221 (C.A.A.F. 2014)................................................... 48, 49

*United States v. Lindsey,*
    634 F.3d 541 (9th Cir. 2011) ........................................................ 30

*United States v. Maurice,*
    26 F. Cas. 1211 (C.C. Va. 1823)................................................... 46

*United States v. Trump,*
    2024 WL 3404555 (S.D. Fla. July 15, 2024) ....................... 44, 47, 48, 49

*United States v. Windsor,*
    570 U.S. 744 (2013) ..................................................................... 38

*Weiss v. United States,*
    510 U.S. 163 (1994) ..................................................................... 45

*West v. State, Bd. of Game,*
    248 P.3d 689 (Alaska 2010) ........................................................... 7

## STATUTES

16 U.S.C. §3102................................................................... *passim*

16 U.S.C. §3113................................................................... 12

16 U.S.C. §3114................................................................... 6, 12

16 U.S.C. §3115................................................................... 49

16 U.S.C. §3124................................................................... 26, 47

16 U.S.C. §3162................................................................... 37

16 U.S.C. §835c................................................................... 50

28 U.S.C. §1291................................................................... 6

28 U.S.C. §1331................................................................... 5

28 U.S.C. §1345................................................................... 5

43 U.S.C. §1311................................................................... 31

AS §16.05.258................................................................... 7, 8

AS §16.05.940................................................................... 8

Pub. L. 96-487, 94 Stat. 2371 (1980) ................................................. 12

**OTHER AUTHORITIES**

Alaska Amicus Br., *Sturgeon II* (U.S. Aug. 14, 2018) ......................... 21

Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L.Rev. 1175 (1989)........ 29

Br. of Amici Curiae Alaska Native Subsistence Users, *Sturgeon II*
  (U.S. Sept. 18, 2018) ..................................................................... 21

C. Warren, The Making of the Constitution (1937) ........................ 45

Declaration of Independence ........................................................ 46

E. Garrett West, *Congressional Power Over Office Creation*, 128 Yale L.J. 166
  (Oct. 2018) ........................................................................... 44, 45

Kevin Sholette, *The American Czars*, 20 Cornell J.L. & Pub. Pol'y 219 (2010) ............. 46

*Limitations on Presidential Power to Create a New Executive Branch Entity*,
  9 Op. O.L.C. 76 (1985) .......................................................... 46, 47

*Officers of the United States Within the Meaning of the Appointments Clause*,
  31 Op. O.L.C. 73 (2007) ................................................................ 47

Press Release, *Forest Service Chief Moore Announces New Regional Forester
  for the Alaska Region*, USFS (Apr. 26, 2024), perma.cc/6DT6-LEDP ................. 13, 14

Reply Br., *Sturgeon II* (U.S. Oct. 11, 2018) ..................................... 21

Sage Smiley, *A Conversation With The New BIA Alaska Regional Director,
  Jolene John*, KYUK (Dec. 20, 2023) ................................................ 13

Steven G. Calabresi & Gary Lawson, *Why Robert Mueller's Appointment
  as Special Counsel Was Unlawful*, 95 Notre Dame L. Rev. 87 (2019)............... 45, 46, 47

*The Constitution of the United States of America, Analysis and Interpretation*,
  92d Cong., 2d Sess. 523 (1973) ...................................................... 46

U.S. Dep't of Interior, *Federal Subsistence Board Members*,
  perma.cc/M3N6-RJV8 ................................................................ 13

United States Br. in Opp., *Sturgeon II* (U.S. May 7, 2018) ......................... 21, 38

United States Br., *Sturgeon II* (U.S. Sept. 11, 2018) .............................. 4, 21, 37

**RULES**

Fed. R. App. Proc. 4 ..................................................................... 6

vii

## REGULATIONS

36 C.F.R. §242.1 ........................................................................................ 14

36 C.F.R. §242.10 ...................................................................................... 14

5 AAC 07.365 ....................................................................................... 10, 11

5 AAC 39.222 ............................................................................................ 11

50 C.F.R. §100.22 ...................................................................................... 14

50 C.F.R. §100.1 ........................................................................................ 14

50 C.F.R. §100.10 ................................................................................. *passim*

50 C.F.R. §100.13 .................................................................................. 14, 51

50 C.F.R. §100.19 .................................................................................. 14, 51

50 C.F.R. §100.20 .................................................................................. 14, 51

50 C.F.R. §100.3 .................................................................................... 17, 18

57 Fed. Reg. 22940 (1992) ...................................................................... 1, 15

85 Fed. Reg. 74796 (Nov. 23, 2020) ..................................................... 51, 52

89 Fed. Reg. 14008 (Feb. 26, 2024) ........................................................... 53

## CONSTITUTIONAL PROVISIONS

Alaska Const. art. VIII, §4 ............................................................................ 7

U.S. Const. art. I, §9, cl.7 ........................................................................... 45

U.S. Const. art. II, §1 ................................................................................. 40

U.S. Const. art. II, §2, cl.2 ................................................................... *passim*

**INTRODUCTION**

This case raises an issue of vital importance to the State of Alaska that the Ninth Circuit got wrong for decades: Does the Alaska National Interest Lands Conservation Act (ANILCA) authorize the federal government to regulate fishing on State-owned navigable waters? This Court previously held that ANILCA gives the federal government this authority. But the Supreme Court recently eviscerated that opinion's reasoning, making clear that the federal government cannot regulate State-owned navigable waters. This Court now has no choice but to follow Supreme Court precedent.

ANILCA instructs the federal government to give a priority for rural subsistence hunting and fishing on "public lands," which are defined as "lands, waters, and interests therein … the title to which is in the United States." 16 U.S.C. §3102(1)-(3). Under ANILCA's plain text, navigable waters are not "public lands." Because the State of Alaska owns the lands beneath its navigable waters, the United States has no "title" to any "lands, waters, [or] interests" in navigable rivers. The federal government and the Alaska Supreme Court both reached this common-sense conclusion in the early 1990s. 57 Fed. Reg. 22940, 22942, 22952 (1992); *Totemoff v. State*, 905 P.2d 954, 965 (Alaska 1995).

But in 1995, in a 2-1 decision known as *Katie John I*, this Court deferred under *Chevron* to a new agency interpretation and held that ANILCA's definition of "public lands" includes those "navigable waters in which the United States has an interest by

1

virtue of the reserved water rights doctrine." *Alaska v. Babbitt*, 72 F.3d 698, 701-04 (9th Cir. 1995). As the dissent correctly recognized, navigable waters could not be "public lands" under the reserved water rights doctrine because "*Alaska* has title to its navigable waters under the Submerged Lands Act." *Id.* at 706 (Hall, J., dissenting) (emphasis in original). Even the panel majority called its holding "inherently unsatisfactory" because it gave no "meaning to the term 'title' in the definition of the phrase 'public lands.'" *Id.* at 704. Yet the panel dismissed these concerns in favor of so-called "congressional intent." *Id.*

*Katie John I* did not get better with age. Six years later, in *Katie John II*, a majority of the judges sitting en banc rejected the reasoning behind *Katie John I. See John v. United States*, 247 F.3d 1032, 1034, 1038 (9th Cir. 2001) (Tallman, J., concurring in the judgment); *id.* at 1046-47 (Kozinski, J., dissenting). As Judge Kozinski explained, navigable waters are not "public lands" because the reserved water rights doctrine creates only a "usufructuary right to waters" and "a usufructuary right does not give the United States *title* to the waters or the lands beneath those waters." *Id.* at 1046-47 (emphasis in original). Another twelve years later, in *Katie John III*, this Court called *Katie John I* "novel," "problematic," and "ill-fitted," and lamented that it "remain[ed] the law of this circuit." *John v. United States*, 720 F.3d 1214, 1226, 1245 (9th Cir. 2013). And four years after that, two more judges found it "unfortunate" that the *Katie John* decisions were binding precedent because reserved water rights do not confer "title" but merely

2

"the right to a sufficient *volume* of water" for a federal purpose. *Sturgeon v. Frost*, 872 F.3d 927, 937 (9th Cir. 2017) (Nguyen, J., concurring) (emphasis added).

But the state of the law changed in 2019 when the Supreme Court of the United States addressed the meaning of "public land" in *Sturgeon v. Frost*, 587 U.S. 28 (2019) (*Sturgeon II*). In a unanimous opinion, the Supreme Court held that navigable waters were *not* "public land" under the reserved water rights doctrine. As the Court explained, the United States cannot have "title" to a reserved water right, and even if it could, such a right would not give the United States "plenary authority over the waterway," but only the right to protect the "amount" or "volume" of water needed to accomplish the reservation's purpose. *Id.* at 44-45.

Fast forward to 2021, when the United States, through the Federal Subsistence Board, began issuing orders regulating fishing on the Kuskokwim River in Alaska. When the United States sued Alaska to enjoin the State from regulating fishing on the Kuskokwim, the district court should have followed *Sturgeon*, not *Katie John*. But the district court clung to the *Katie John* decisions. The district court's sole justification was a lone footnote in *Sturgeon* where the Supreme Court stated that it was not "disturb[ing]" the *Katie John* decisions because ANILCA's subsistence-use provisions were "not at issue" in *Sturgeon*. But the Supreme Court made this unremarkable observation simply to note that ANILCA's subsistence-use provisions were not at issue in *Sturgeon*. Because these provisions *are* at issue here, the district court below needed to decide whether *Sturgeon* "undercut[s] the theory [and] reasoning underlying [*Katie John*] in such a way

3

that the cases are clearly irreconcilable." *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003).

But the district court didn't even attempt this analysis, likely because it is impossible to reconcile *Sturgeon*'s holding ("public land" does not include navigable waters) with *Katie John*'s ("public land *does* include navigable waters). As the United States once explained, because ANILCA "contains a definitional section that sets out the meaning of 'public lands' throughout [the Act]," the statute "forecloses" any argument that the term "public lands" can be given "one meaning in the context of the subsistence-use-related sections of ANILCA and a different meaning" elsewhere. United States Br. 49, *Sturgeon II* (U.S. Sept. 11, 2018).

Two recent Supreme Court decisions further confirm that the *Katie John* decisions are no longer good law. Last month, the Supreme Court in *Loper Bright Enterprises v. Raimondo* overruled *Chevron*, holding that courts "must exercise their independent judgment in deciding whether an agency has acted within its statutory authority" and thus cannot "defer to an agency interpretation of the law simply because a statute is ambiguous." 144 S.Ct. 2244, 2273 (2024). Yet *Katie John I* did the opposite—deferring to the agencies' recently changed interpretation merely because it was "reasonable." 72 F.3d at 703-04. In addition, last year in *Sackett v. EPA*, the Court held that Congress must "'enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power'" by impinging on the "core of traditional state authority" to "[r]egulat[e] land and water use." 598 U.S. 651, 679-80 (2023). But

4

ANILCA has no "exceedingly clear language" authorizing the federal government to regulate navigable waters; indeed, *Katie John I* itself recognized that ANILCA "makes no reference to navigable waters" at all. 72 F.3d at 702.

The United States' attempt to regulate fishing along the Kuskokwim River is unlawful for a second reason. Although ANILCA charges the Secretaries of the Interior and Agriculture with implementing the rural subsistence priority, they have delegated their responsibility to an entity they created called the Federal Subsistence Board. But under the Appointments Clause, all officers (whether principal or inferior) must have their positions established "by Law," *i.e.*, through a statute. U.S. Const. art. II, §2, cl.2. But the FSB was created through a regulation. Moreover, given the FSB's enormous powers, FSB members are classic "principal" officers. Yet they assumed their positions without being nominated by the President and confirmed by the Senate. Because the FSB's orders were tainted with this Appointments Clause violation, they are void and cannot preempt the State's orders.

This case implicates "vital issues of state sovereignty." *Sturgeon v. Frost*, 577 U.S. 424, 441 (2016) (*Sturgeon I*). Because the Kuskokwim River is not "public land" and the FSB members were not properly appointed under the Appointments Clause, the State's orders were not preempted. This Court should reverse.

## STATEMENT OF JURISDICTION

The district court had jurisdiction under 28 U.S.C. §1331 and 28 U.S.C. §1345. The district court granted the United States' motion for summary judgment on

March 29, 2024, and entered final judgment on April 1, 2024. 1-ER-2. The State

Defendants timely appealed on April 3, 2024, under Federal Rule of Appellate

Procedure 4(a). 3-ER-414. This Court has jurisdiction under 28 U.S.C. §1291.

## STATEMENT OF THE ISSUES

1.      Is the Kuskokwim River "public land" under 16 U.S.C. §3102(1)-(3) of

the Alaska National Interest Lands Conservation Act?

2.      Are the members of the Federal Subsistence Board unconstitutionally

appointed under the Appointments Clause of the U.S. Constitution?

## CONSTITUTIONAL AND STATUTORY PROVISIONS

Section 102 of ANILCA (16 U.S.C. §3102(1)-(3)) provides:

As used in this Act …

(1) The term "land" means lands, waters, and interests therein.

(2) The term "Federal land" means lands the title to which is in the
United States after December 2, 1980.

(3) The term "public lands" means land situated in Alaska which, after
December 2, 1980, are Federal lands….

Section 804 of ANILCA (16 U.S.C. §3114) provides:

Except as otherwise provided in this Act and other Federal laws, the
taking on public lands of fish and wildlife for nonwasteful subsistence
uses shall be accorded priority over the taking on such lands of fish and wildlife
for other purposes.

The Appointments Clause of the Constitution of the United States (art. II, §2,

cl.2) provides:

[The President] shall nominate, and by and with the Advice and Consent
of the Senate, shall appoint … all … Officers of the United States, whose
Appointments are not herein otherwise provided for, and which shall be

6

established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone … or in the Heads of Departments.

## STATEMENT OF THE CASE

### A.    The State's Regulation of Fishing in Its Navigable Waters

Alaska, like all States, has "traditional and primary power" over its waters. *SWANCC v. USACE*, 531 U.S. 159, 174 (2001). This regulatory power extends to the State's navigable waters, such as the Kuskokwim River. Alaska has "regulatory authority over 'navigation, fishing, and other public uses'" in navigable waters because Alaska received "'title to and ownership of the lands beneath navigable waters'" when it joined the Union. *Sturgeon II*, 587 U.S. at 34-35.

Protecting fish for future generations is the State's highest priority. Alaska is "one of the most bountiful fishing regions in the world," containing more than three million lakes, 12,000 rivers, and 6,640 miles of coastline. 2-ER-41. To preserve this heritage, Alaska's constitution requires that all fish be "utilized, developed, and maintained on the sustained yield principle." Alaska Const. art. VIII, §4; *see West v. State, Bd. of Game*, 248 P.3d 689, 696 (Alaska 2010) (article VIII ensures the "'continued availability [of natural resources] to future generations'"). Alaska's fisheries "are among the best-managed, most sustainable in the world." 2-ER-46, 3-ER-314.

A second State priority is to provide subsistence fishing opportunities for all Alaskans. *See* AS §16.05.258. "More than the residents of any other state, Alaska's residents rely on subsistence uses of fish, wildlife, and plant life for their daily nutritional

needs." 2-ER-65. Subsistence uses include "noncommercial, customary[,] and traditional uses of wild, renewable resources" for, among other things, "direct personal or family consumption as food, shelter, fuel, clothing, tools, or transportation." AS §16.05.940(34). This subsistence priority is "especially important for most rural families, who depend on subsistence hunting and fishing as sources of nutrition and cultural practices." 2-ER-88.

For many Alaskans, "the role of subsistence uses is about more than food consumption and economics; it is directly tied to their history and central to their customs and traditions." 2-ER-65. Alaska Natives "have depended on the harvest and use of natural resources for food, shelter, clothing, transportation and handicrafts, trade, barter and sharing for thousands of years." 3-ER-242. These subsistence practices are "interwoven with their unique cultural identities and social ways of life." *Id.* In more recent history, "non-Native peoples living in rural Alaska have come to rely on natural resources for their social and economic livelihoods as well." *Id.*

The people of Alaska have given subsistence fishing a statutory priority over other uses, such as commercial, sport, and personal-use fishing. *State v. Kenaitze Indian Tribe*, 894 P.2d 632, 633 (Alaska 1995); *see* AS §16.05.258(b). Thus, when a fish population is "insufficient to supply all consumptive uses consistent with the sustained yield principle, nonsubsistence uses must be restricted," and "when a population is sufficient only to supply subsistence uses, nonsubsistence uses must be eliminated." *Kenaitze Indian Tribe*, 894 P.2d at 633.

Importantly, the Alaska constitution guarantees that *all* Alaskans (not just rural residents) may engage in subsistence fishing. *McDowell v. State*, 785 P.2d 1, 9 (Alaska 1989). While most subsistence fishing is done by rural residents, "some who are domiciled in other parts of Alaska return annually to assist family or friends [who] harvest or process salmon." 2-ER-106; 3-ER-314–15, 324–25; *e.g.*, 3-ER-306 (former FSB member was "stationed in Anchorage" but would return to the Kuskokwim River to assist in subsistence fishing); *McDowell*, 785 P.2d at 4 ("[S]ome urban residents … have lived a subsistence lifestyle and desire to continue to do so"). Many Alaskans have cultural ties to rural fisheries but have been displaced to urban areas of the state for health, education, economic, or other reasons. 2-ER-106; 3-ER-314–15, 325, 410. As of 2016, "more than 52.4 percent of Alaska Native peoples [were] living in non-subsistence areas of Alaska." 3-ER-285. Alaska law thus provides greater subsistence fishing rights than federal law by ensuring that displaced individuals can return "home" to practice their culture and traditions.

## B. The State's Protection of Salmon and Subsistence Fishing on the Kuskokwim River

Running more than 700 miles in southwest Alaska before it ends in the Bering Sea, the Kuskokwim River is the longest free-flowing river in the United States that is contained entirely within one state. Dkt. 11 at 2. About 180 miles of the Kuskokwim River runs within the Yukon Delta National Wildlife Refuge beginning at the mouth of the river. *Id.* The "entire length of the Kuskokwim River [is] navigable from its mouth

9

to the confluence of its North and South Forks." 2-ER-152. Accordingly, "[t]itle to the bed of the river"—including within the Yukon Delta National Wildlife Refuge—"transferred to the State of Alaska" when it entered the Union. 2-ER-156. The United States thus "claims no real property interest in the lands underlying the water body comprising the Kuskokwim River." 2-ER-157.

There are five species of salmon that are harvested in the Kuskokwim River: chum, sockeye, coho, chinook, and pink. All salmon go through the same lifecycle. Salmon begin their life as a fertilized egg in gravel in freshwater. When the eggs hatch, the fish grow and mature in the river before migrating to the ocean. After spending their adult years in the ocean, the salmon return to the river to spawn (reproduce). Each species of salmon enters the Kuskokwim at different times of the year (between May and October) to begin the journey upriver to reach their spawning ground. When the salmon reach their spawning grounds, the female deposits her eggs in gravel and the male fertilizes them. After spawning, the salmon die, completing their lifecycle. 2-ER-159–60; 3-ER-316.

The State has been managing and protecting salmon in the Kuskokwim River since statehood. 3-ER-318, 332. The State manages salmon today through its "Kuskokwim River Salmon Management Plan." 5 AAC 07.365; 3-ER-319–21. Under the Plan, the State manages salmon stocks "in a conservative manner" so the State can achieve three primary objectives: (1) maintain the salmon population by meeting "escapement goals," (2) provide a subsistence priority for all Alaskans, and (3) offer

commercial, sport, and personal-use fishing opportunities when harvestable surpluses exist. 5 AAC 07.365; 3-ER-353. An "escapement goal" is the number of salmon in a particular stock the State intends will "escape" fisheries and thus return to their spawning ground to provide future yields. 3-ER-318.

To determine whether its escapement goals are being achieved, the State measures salmon run strength through multiple methods, including sonar, aerial studies, test fisheries, computer modeling, and subsistence-harvest reports from rural fisherman. 3-ER-319–20, 353, 366; 2-ER-163–66. The State also regularly consults with the Kuskokwim River Salmon Management Working Group, a 14-member advisory board that includes "elders, subsistence fishermen, processors, commercial fishermen, sport fishermen, [and the] Kuskokwim River Inter-Tribal Fish Commission." 2-ER-166; 3-ER-313–14; *e.g.*, 3-ER-346. Based on these data, analyses, and feedback, the State limits the dates, methods, and locations of salmon fishing to ensure that its priorities are met. 5 AAC 07.365; *see also* 5 AAC 39.222.

## C. The Federal Government's Limited Power to Regulate "Public Lands" in Alaska

### 1. The Alaska National Interest Lands Conservation Act (ANILCA)

The United States is the largest landowner in Alaska, owning about 60% of the total area (more than 200 million acres). 2-ER-169. These lands include, among others, national parks, wildlife refuges, national forests, and more. *Id.* Most of the federally owned lands in Alaska have been set aside for public use. *Id.*

In 1980, Congress passed the Alaska National Interest Lands Conservation Act (ANILCA), which "set aside 104 million acres of land in Alaska for preservation purposes" and "creat[ed] ten new national parks, preserves, and monuments," including the Yukon Delta National Wildlife Refuge. *Sturgeon I*, 577 U.S. at 431. Title VIII of ANILCA provides a priority to rural Alaska residents for subsistence hunting and fishing on "public lands." 16 U.S.C. §§3113, 3114. ANILCA defines "public lands" as "lands, waters, and interests therein … the title to which is in the United States." *Id.* §3102(1)-(3). ANILCA orders the Secretaries of Agriculture and Interior to "restrict the taking of populations of fish and wildlife" on "public lands" when necessary to "protect the continued viability of such populations, or to continue [subsistence] uses." 16 U.S.C. §3114.

### 2. The Federal Subsistence Board

Although ANILCA "charges the Secretaries with implementing its rural subsistence priority," *Katie John III*, 720 F.3d at 1219, the Secretaries do not, in fact, implement the priority. Instead, the Secretaries have "establish[ed] a Federal Subsistence Board" and "assign[ed] it responsibility" to enforce the priority. 50 C.F.R. §100.10(a). ANILCA neither contemplates nor creates the FSB. *See generally* Pub. L. 96-487, 94 Stat. 2371 (1980).

The FSB is composed of eight members. A Chair and two "public members" are appointed by the Secretary of the Interior, with the concurrence of the Secretary of the

Agriculture. 50 C.F.R. §100.10(b)(1). The remaining five members are appointed automatically based on their positions within the Departments. *See id.*

The FSB currently has the following members:

- **Anthony Christianson**, *Chair of the Board.*
  - Christianson was appointed to the FSB in November 2016 by Secretary Jewell, with Secretary Vilsack concurring. 2-ER-170, 174–77.

- **Charles Brower**, *Public Member of the Board.*
  - Brower was appointed to the FSB in February 2012 by Secretary Salazar, with Secretary Vilsack concurring. 2-ER-171, 181.

- **Rhonda Pitka**, *Public Member of the Board.*
  - Pitka was appointed to the FSB in January 2017 by Secretary Jewell, with Secretary Vilsack concurring. 2-ER-171, 187.

- **Jolene John**, *Alaska Regional Director for the Bureau of Indian Affairs.*
  - John was appointed as the Regional Director in November 2023, replacing Acting Regional Director Glenn Chen. *See* Sage Smiley, *A Conversation With The New BIA Alaska Regional Director, Jolene John*, KYUK (Dec. 20, 2023), perma.cc/A5HK-FHD2; U.S. Dep't of Interior, *Federal Subsistence Board Members*, perma.cc/M3N6-RJV8; 2-ER-171.

- **Steven M. Cohn**, *Alaska State Director for the Bureau of Land Management.*
  - Cohn was appointed as the State Director in May 2022 by agency staff. 2-ER-171, 197.

- **Sarah S. Creachbaum**, *Alaska Regional Director for the National Park Service.*
  - Creachbaum was appointed as the Regional Director in December 2021 by agency staff. 2-ER-171, 199–200.

- **Sara D. Boario**, *Alaska Regional Director for the U.S. Fish & Wildlife Service.*
  - Boario was appointed as the Regional Director in March 2022 by agency staff. 2-ER-171, 3-ER-203.

- **Chad VanOrmer**, *Alaska Regional Forester for the U.S. Forest Service.*
  - VanOrmer was appointed as the Regional Forester in April 2024 by agency staff. *See* Press Release, *Forest Service Chief Moore*

*Announces New Regional Forester for the Alaska Region*, USFS (Apr. 26, 2024), perma.cc/6DT6-LEDP.

The Secretaries have given the FSB enormous powers. 50 C.F.R. §100.10(d)(4); 36 C.F.R. §242.10(d)(4).[1] The FSB can, among other things, issue regulations managing subsistence uses, determine which communities or areas qualify for the rural subsistence priority, close public lands to nonsubsistence uses, establish priorities for subsistence taking, regulate hunting and fishing, and more. *Id.* Through this delegation, the FSB has promulgated extensive regulations on subsistence fishing and hunting in Alaska. *See* 50 C.F.R. §§100.22-100.28. The FSB also claims regulatory power to issue orders in "emergency situation[s]" to, among other things, "open or close public lands for the taking of fish and wildlife for subsistence uses, or modify the requirements for take for subsistence uses." 50 C.F.R. §100.19(a).

The FSB's regulations are the "final administrative authority." 50 C.F.R. §100.13(a)(2); *see also id.* §100.19(e) (emergency and temporary special actions are "final administrative action"). Any requests for reconsideration must go to the FSB alone, and "[i]f the request is denied, the decision of the [FSB] represents the final administrative action." 50 C.F.R. §100.20(g). The regulations contain no mechanism for affected parties to ask the Secretaries to review or overrule the FSB's decision. The Chair and the two public members can be removed only by joint action of the Secretaries. *See*

---

[1] The Secretaries have each adopted similar regulations governing the FSB. *See* 36 C.F.R. §§242.1-242.28; 50 C.F.R. §§100.1-100.28.

14

*Carlucci v. Doe*, 488 U.S. 93, 95 (1988). The other five members can be removed only for cause.[2]

## D.    The *Katie John* Trilogy

The United States initially recognized that ANILCA's definition of "public lands" did not extend to Alaska's navigable waters, such as the Kuskokwim River. According to the United States, "public lands" include only those lands "the title to which is in the United States," and the United States "does not generally own title to the submerged lands beneath navigable waters in Alaska." 57 Fed. Reg. at 22942, 22952. But the United States reversed its position in the 1990s, asserting during litigation that it could regulate navigable waters "in which the federal government has an interest under the reserved water rights doctrine." *Katie John I*, 72 F.3d at 701. Under the reserved water rights doctrine, "when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Sturgeon II*, 587 U.S. at 43 (cleaned up). For example, when the federal government reserves land for an Indian tribe, it may

---

[2] Because the regulations require that the individuals in these five positions must serve on the FSB, *see* 50 C.F.R. §100.10(b)(1), the only way to remove them from the FSB is to remove them from their primary positions. Each of these positions is designated as a career "Senior Executive Service" role. 2-ER-216, 218–19, 222–26. Such individuals can be removed from their positions only for cause. *See Esparraguera v. Dep't of the Army*, 981 F.3d 1328, 1330-31 (Fed. Cir. 2020).

"impliedly reserve[] sufficient water from a nearby river to enable the tribe to farm the area." *Id.*

In 1995, the Alaska Supreme Court similarly held that ANILCA "does not give the federal government power to regulate hunting and fishing in navigable waters." *Totemoff*, 905 P.2d at 965. ANILCA's definition of "public lands" excluded navigable waters because the Submerged Lands Act "gives Alaska ownership of, title to, and management power over … lands beneath the navigable waters of Alaska, the navigable waters themselves, and … marine life located in Alaska's navigable waters." *Id.* at 964. The court rejected the argument that the federal government could regulate navigable waters under the reserved water rights doctrine because "reserved water rights are not the type of property interests to which title can be held." *Id.* at 965.

But two months later, in *Katie John I*, the Ninth Circuit deferred to the federal government's new interpretation of ANILCA under *Chevron*. 72 F.3d at 703-04. When the case began, "the federal agencies agreed with the state" that "public lands exclude navigable waters," but "at oral argument, those agencies modified their position, arguing that public lands include those navigable waters in which the federal government has an interest under the reserved water rights doctrine." *Id.* at 701. The Ninth Circuit held that the agencies' new interpretation was "reasonable" and "a permissible construction of the statute" under *Chevron*. *Id.* at 702-04. In doing so, the Court never held that the agencies' interpretation was the "best reading" of the statute—*i.e.*, "'the reading the court would have reached' if no agency were involved."

*Loper Bright*, 144 S.Ct. at 2266 (quoting *Chevron, USA, Inc. v. NRDC*, 467 U.S. 837, 843 n.11 (1984)). In dissent, Judge Hall found that navigable waters were not "public lands," rejecting the majority's reliance on the reserved water rights doctrine. Because "[t]he federal government can only reserve waters running over land that it owns" and "*Alaska* has title to its navigable waters under the Submerged Lands Act," the United States "cannot reserve these waters." *Katie John I*, 72 F.3d at 706.

In *Katie John II*, the Ninth Circuit, sitting en banc, declined to reconsider *Katie John I*, even though a majority of the en banc court rejected the use of the reserved water rights doctrine to identify "public lands" under ANILCA. *Katie John II*, 247 F.3d at 1034, 1038 (Tallman, J., concurring in the judgment); *id.* at 1046-47 (Kozinski, J., dissenting). Writing for the dissent, Judge Kozinski concluded that navigable waters were not "public lands" because the reserved water rights doctrine created only a "usufructuary right to waters" and "a usufructuary right does not give the United States *title* to the waters or the lands beneath those waters." *Id.* at 1046-47 (emphasis in original).

Finally, in *Katie John III*, the Ninth Circuit upheld federal regulations identifying which waters in Alaska were "public lands" because of reserved waters rights. 720 F.3d at 1218. Relevant here, the regulations stated that ANILCA's rural subsistence priority applied to navigable waters within the Yukon Delta National Wildlife Refuge (*i.e.*, the Kuskokwim River). *See id.* at 1232 & n.107; 50 C.F.R. §100.3(b)(4). In upholding the Secretaries' regulations, the Court recognized that *Katie John I* applied the reserved water

17

rights doctrine in a "novel way" because "previous applications of the federal reserved water rights doctrine … focused on the amount of water needed for a specific federal reservation, rather than the locations of water sources that might generally be needed for subsistence living from many such reservations." *Id.* at 1226. And the Secretaries' regulations were not "purport[ing] to assert rights over a particular amount of water." *Id.* at 1227. *Katie John I* was a "problematic solution" that "sanctioned the use of a doctrine ill-fitted to determining which Alaskan waters are 'public lands' to be managed for rural subsistence priority under ANILCA." *Id.* at 1245. The Court lamented that because "*Katie John I* remains the law of this circuit, … [we] must apply it as best we can." *Id.*

The *Katie John* cases led to a balkanized regulatory regime. For example, the federal government claimed authority to regulate fisheries in the Kuskokwim River within the Yukon Delta National Wildlife Refuge, but the State remained responsible for sustaining yield (since most of the spawning occurs above the Refuge) and for protecting subsistence uses for the entire Kuskokwim River, including hundreds of miles of river upstream from the Refuge. *See* 50 C.F.R. §100.3(b)(4); 3-ER-229–30, 321–22. This regime created a serious conflict when salmon populations were low and the State was forced to implement restrictions. During periods of low salmon in the Kuskokwim, "the State must limit early fishing opportunities for lower Kuskokwim subsistence fishers [in the Refuge] … to preserve subsistence fishing opportunities for those residents living in the upper Kuskokwim above the Refuge." 3-ER-322. But the

federal government was not required to "take those factors into consideration," which "led to overfishing within federal preserves and corresponding harms to those living upstream." *Id.*

**E.**    *Sturgeon v. Frost*

Two decades after *Katie John I*, the Supreme Court decided *Sturgeon*. Whereas *Katie John* held that navigable waters could be "public land" under the reserved water rights doctrine, the Supreme Court in *Sturgeon* held the opposite: Navigable waters are *not* "public lands" under the reserved water rights doctrine.

In *Sturgeon*, the United States threatened to fine an Alaskan hunter, John Sturgeon, for using a hovercraft on the Nation River (a navigable river) within the Yukon-Charley Rivers National Preserve. Sturgeon sued, arguing that the United States had no power to punish him because "the Federal Government does not own the Nation River" and so the river is not "public land" under ANILCA. *Sturgeon II*, 587 U.S. at 32. The district court ruled for the United States and the Ninth Circuit affirmed, holding that it was "bound under [its] *Katie John* precedent" to find that the Nation River was "public land." *Sturgeon*, 872 F.3d at 934. Because "ANILCA's definition of 'public lands' applies throughout the statute," the Ninth Circuit explained, it would be "anomalous" if the definition of "public lands" in Title VIII of ANILCA "employ[ed] a different construction of 'public lands' than applicable elsewhere in ANILCA." *Id.*

Concurring in the judgment, Judges Nguyen and Nelson wrote that it was "unfortunate" that the court was "bound by [its] *Katie John* decisions to analyze this case

19

under the reserved water doctrine." *Id.* at 937. In their view, *Katie John I* was wrong because a "reserved water right" is only "the right to a sufficient *volume* of water for … [a] federal purpose." *Id.* They preferred to abandon *Katie John* "[r]ather than continuing to shove a square peg into a hole we acknowledge is round." *Id.* at 938.

The Supreme Court granted certiorari and ruled for Sturgeon, holding that the Nation River was not "public land" under the reserved water rights doctrine. The Court found "no evidence that the Congress enacting ANILCA" intended to allow the United States to "hold 'title' … to reserved water rights." *Sturgeon II*, 587 U.S. at 43-44 (quoting 16 U.S.C. §3102(2)). These rights instead are "'usufructuary' in nature, meaning that they are rights for the Government to use—whether by withdrawing or maintaining—certain waters it does not own." *Id.* at 43. Pointing to the Alaska Supreme Court's decision in *Totemoff*, the Court emphasized the "common understanding" that "'reserved water rights are not the type of property interests to which title can be held.'" *Id.* at 44 (quoting *Totemoff*, 905 P.2d at 965). Moreover, even if it were possible to hold "title" to reserved water rights, the interest would "merely enabl[e] the Government to take or maintain the specific 'amount of water'—and 'no more'—required to 'fulfill the purpose of [its land] reservation.'" *Id.* But hovercrafts do not "deplete or divert any water," and the hovercraft rule was designed to address "concerns not related to safeguarding the water." *Id.* at 45. So even if the United States could hold "title to a reserved water right," it still could not prevent Sturgeon from using his hovercraft on

the river. *Id.* ANILCA thus "changed nothing" for navigable waters and imposed no "new regulation[s]" on the Nation River. *Id.* at 58.

Before the Supreme Court, the United States repeatedly argued that Sturgeon's position was irreconcilable with the *Katie John* precedent. Because ANILCA "contains a definitional section that sets out the meaning of 'public lands' throughout ANILCA," the United States explained, the statute "forecloses" the argument that the term "public lands" can be given "one meaning in the context of the subsistence-use-related sections of ANILCA and a different meaning" elsewhere. United States Br. 49, *Sturgeon II* (U.S. Sept. 11, 2018); *see also* United States Br. in Opp. 17, *Sturgeon II* (U.S. May 7, 2018) (same). The United States' *amici* similarly argued that a ruling for Sturgeon would "undermine the foundation on which the *Katie John* rulings stand" because any "attempt to distinguish the definition of 'public lands' for subsistence and other purposes is not persuasive." Br. of Amici Curiae Alaska Native Subsistence Users 22-23, *Sturgeon II* (U.S. Sept. 18, 2018).

In response to these arguments, both Sturgeon and the State of Alaska (participating as *amicus curiae*) argued that there was "no need for th[e] Court to address the *Katie John* line of decisions" because it was "beyond the scope of the question presented." Reply Br. 20-21, *Sturgeon II* (U.S. Oct. 11, 2018); *see* Alaska Amicus Br. 29, *Sturgeon II* (U.S. Aug. 14, 2018) ("The *Katie John* decisions are not at issue in this appeal" and so "this Court need not directly address the prior circuit holdings in order to resolve this appeal."). The Supreme Court agreed with Sturgeon and the State and declined to

address the issue, stating in a footnote that ANILCA's subsistence-fishing provisions were "not at issue in this case" and so the Court was "not disturb[ing] the Ninth Circuit's holdings." *Sturgeon II*, 587 U.S. at 45 n.2.

Following *Sturgeon*, the United States continued to assert authority over Alaska's navigable waters, including the Kuskokwim River. 3-ER-322. This legal issue never reached a breaking point, however, because it was "[f]ederal policy to defer to State management of the federal portion of the Kuskokwim River whenever possible." 3-ER-254; *see* 3-ER-322.

## F. The State's Protection of Salmon and Subsistence Fishing on the Kuskokwim River in 2021 and 2022

This cooperation ended in the spring of 2021. In May 2021, as the salmon season approached, the State projected that the Chinook salmon run in the Kuskokwim River would be below average. 3-ER-346. Consistent with its management plan, the State was preparing to issue orders that would restrict most fishing along the Kuskokwim River to ensure escapement of salmon throughout the river but also provide subsistence fishing opportunities for all Alaskans. 3-ER-323.

But on May 7, 2021, before the State issued its orders, the Refuge Manager for the Yukon Delta National Wildlife Refuge—operating "[b]y delegation from the Federal Subsistence Board"—issued an "emergency special action" prohibiting fishing with gillnets along the Kuskokwim River within the Refuge starting June 1. 3-ER-343–45. The order created an exception for "Federally qualified subsistence users" under

ANILCA, authorizing them to harvest salmon with gillnets on five dates in June. *Id.* The State took a more conservative approach, waiting for additional salmon-run data before issuing its orders. 3-ER-323–24. On May 11, the State issued similar orders prohibiting fishing with gillnets along parts of the Kuskokwim River but allowing subsistence fishing with gillnets on only three days in June. 3-ER-323–24, 346–50. Unlike the Refuge Manager's orders, the State authorized subsistence fishing for all Alaskans (not just "rural" residents) who met the requirements to engage in subsistence fishing, as required by the Alaska constitution. *Id.*

After the State issued its orders, the FSB accused the State of putting "non-federally qualified fishers at legal risk" because the Refuge Manager's orders "tak[e] precedence" over the State's. 3-ER-351–52. The State, in response, explained that it had a legal obligation "to provide for the subsistence needs of Alaskans when harvestable surpluses allow," and that, based on the State's data and assessments, "there [were] sufficient resources to provide subsistence opportunities for all Alaskans while still managing Chinook salmon stocks conservatively." 3-ER-353. The State "never received any evidence from the federal government showing that [the State's] orders had any meaningful impact on subsistence fishing for rural residents." 3-ER-324.

Similar conflicts between the State and the FSB arose in June and July 2021. 3-ER-325–27. The State issued orders based on its "up-to-date science, biology, and experience" that allowed only limited subsistence fishing for all Alaskans, and the

Refuge Manager issued conflicting orders limiting subsistence fishing only to "federally qualified subsistence users." *Id.*

The following spring, in April 2022, the United States sent a letter to the State threatening legal action if the State continued to "authorize subsistence harvest by all Alaskans … contrary to the [FSB's] actions." 3-ER-408–09. In response, Alaska wrote that protecting subsistence fishing for all qualified Alaskans was critical because "many of the users who are not federally qualified have cultural ties to the Kuskokwim fishery but have been displaced to urban areas of the state," and the State was legally required "to provide a subsistence opportunity for [these] users when a harvestable surplus exists." 3-ER-410; *see* 3-ER-327–28, 332–33.

Around that time, the State was preparing to issue new orders restricting fishing on the Kuskokwim River because of the "historically low levels" of chum salmon. 3-ER-328, 394. Yet on May 2, the Refuge Manager inexplicably issued an order authorizing "federally qualified subsistence users" to fish using gillnets on parts of the Kuskokwim River on five days in June. 3-ER-334–36. The State strongly opposed this order. 3-ER-328. The State warned that opening fishing on certain days "prior to any inseason assessment" was "premature," "highly illogical and scientifically unsupportable," and "irresponsible management," because "run strength … [was] still highly uncertain." 3-ER-388–90; *see* 3-ER-328–29. The State asked the FSB to provide a "biological justification" for its actions. 3-ER-390. The FSB never responded. 3-ER-329. On May 13, after receiving more salmon-run data, the State authorized

24

subsistence fishing in the Refuge for all qualified Alaskans on only three days in June. 3-ER-329, 338–42.

## G.    Procedural History

On May 17, the United States sued the State of Alaska. 3-ER-425. The United States sought a declaration that the State's 2021 and 2022 orders were "invalid, null, and void" and an injunction preventing the State "from taking similar actions interfering with or in contravention of federal orders addressing ANILCA Title VIII and applicable regulations." Dkt. 1 at 24. Four sets of plaintiffs intervened in support of the United States. 3-ER-428–30, 433. On cross-motions for summary judgment, the State argued that its orders were not preempted because (1) the Kuskokwim River is not "public land" under ANILCA as established by *Sturgeon* and (2) the FSB members were not properly appointed under the Appointments Clause. Dkt. 73 at 27-43.

The district court granted summary judgment to the United States and the Intervenors. 3-ER-436. The court easily rejected various procedural arguments raised by the United States and the Intervenors, finding that the State's ANILCA arguments were not barred by waiver, issue preclusion, judicial estoppel, or the federal statute of limitations. 1-ER-16–19 & n.56. On the merits, even though *Sturgeon* found that navigable rivers were not "public land" under the reserved water rights doctrine, the district court concluded that it was "bound by the *Katie John* trilogy of cases" to find that the Kuskokwim River was "public land" under the reserved water rights doctrine. 1-ER-21. The district court made no attempt to harmonize the reasoning of *Sturgeon*

with *Katie John*. 1-ER-19–21. Instead, the court relied solely on footnote two in *Sturgeon*. *Id*. Because the Supreme Court said that it was "'not disturb[ing] the Ninth Circuit's holdings [in the *Katie John* trilogy] that the Park Service may regulate subsistence fishing on navigable waters,'" the district court believed that *Sturgeon* and *Katie John* must not be "clearly irreconcilable." 1-ER-19–21 (quoting *Sturgeon II*, 587 U.S. at 45 n.2).

Turning to the Appointments Clause, the district court suggested that the State's arguments might be barred by claim preclusion, even though the State—as the defendant—brought no "claims." 1-ER-22–23. Yet the court declined to reach the issue because it found that the FSB members were properly appointed. *Id*. The FSB offices were established "by Law," U.S. Const. art. II, §2, cl.2, because Section 814 of ANILCA gives the Secretary a general power to "'prescribe such regulations as are necessary and appropriate to carry out his responsibilities under' ANILCA." 1-ER-25 (quoting 16 U.S.C. §3124). This general rulemaking provision, the district court believed, authorized the Secretaries to "creat[e] the FSB by promulgating federal regulations." 1-ER-24–25. And the FSB members were properly appointed inferior officers (not principal officers) because their duties are outlined in a regulation, the Secretaries could theoretically overrule the FSB (even if they never had), and five of the FSB members had other jobs in which they were supervised "'at some level'" by principal officers. 1-ER-27–30.

The State timely appealed. 3-ER-436.

26

## SUMMARY OF THE ARGUMENT

*Sturgeon*, not *Katie John*, controls this case. ANILCA authorizes the United States to implement a rural subsistence priority only on "public lands," which are "lands, waters, and interests therein … the title to which is in the United States." *Katie John* held that navigable waters could be "public land" under the reserved water rights doctrine. But *Sturgeon* rejected this precise reasoning. The United States cannot have "title" to reserved water rights, and even if it could, that would give it the power only to take or maintain a specific "amount of water," which has no application here.

The district court could not explain how *Sturgeon* and *Katie John* were reconcilable—because they are not. That is why the district court's only rationale was a footnote in *Sturgeon*, where the Supreme Court said it was not "disturb[ing]" this Court's opinions because ANILCA's subsistence-use provisions were "not at issue in [the] case." *Sturgeon II*, 587 U.S. at 45 n.2. But that footnote cannot bear the weight the district court put on it. The Supreme Court merely clarified that it was not addressing an issue that was not before it. But this Court now must decide whether the "theory or reasoning" of *Katie John* can survive after *Sturgeon*. *Miller*, 335 F.3d at 900. They can't. The same definition of "public land" applies throughout ANILCA. Simply put, if the Nation River is not "public land" under *Sturgeon*, then the Kuskokwim River cannot be "public land" here.

That the *Katie John* decisions are no longer good law is confirmed by *Loper Bright* and *Sackett*. For good reason, this Court in *Katie John I* could not hold that its

interpretation was the "best reading" of ANILCA; the Court reached its holding only by deferring to the agency's "reasonable" interpretation. *Loper Bright*, 144 S.Ct. at 2266; *Katie John I*, 72 F.3d at 703-04. Yet the Supreme Court last month in *Loper Bright* flatly rejected this mode of analysis. And the Supreme Court last year in *Sackett* held that Congress must enact "exceedingly clear language" before it impinges on states' authority to regulate state waters. 598 U.S. at 679-80. But *Katie John I* gave the federal government power to regulate Alaska's navigable waters even though it acknowledged that ANILCA "makes no reference to navigable waters." 72 F.3d at 702.

Even if the United States could lawfully regulate the Kuskokwim, it has not done so here. Although ANILCA charges the Secretaries of the Interior and Agriculture with implementing the rural subsistence priority, they have delegated their responsibility to the FSB. Under the Appointments Clause, all officers (whether principal or inferior) must have their positions established "by Law," *i.e.*, through a statute. But the FSB was created through a regulation, not through an act of Congress. Additionally, even if the FSB were established "by Law," FSB members are "principal" officers. Yet they assumed their positions without ever being nominated by the President and confirmed by the Senate. Because the Refuge Manager's orders were tainted with this Appointments Clause violation, they are void and cannot preempt the State's orders.

## STANDARD OF REVIEW

This Court reviews a district court's grant of summary judgment de novo. *See Ellins v. City of Sierra Madre*, 710 F.3d 1049, 1056 (9th Cir. 2013).

## ARGUMENT

### I.    The State's orders regulating the Kuskokwim River are not preempted because the river is not "public land" under ANILCA.

ANILCA authorizes the United States to implement a rural subsistence priority on "public lands," which are "lands, waters, and interests therein … the title to which is in the United States." 16 U.S.C. §3102(1)-(3). But as *Sturgeon* makes clear, the Kuskokwim River is not "public land" because the United States has no "title" over "lands, waters, [or] interests" in the river. *Sturgeon II*, 587 U.S. at 42-45. Accordingly, the district court erred in finding that the United States can issue orders imposing a rural subsistence priority on the Kuskokwim River.

#### A.    *Katie John* is no longer controlling because its theory and reasoning are "clearly irreconcilable" with *Sturgeon*.

This Court typically seeks "to preserve the consistency of circuit law." *Miller*, 335 F.3d at 900. But this objective "must not be pursued at the expense of creating an inconsistency between [its] circuit decisions and the reasoning of" the Supreme Court. *Id.* This Court is "bound not only by the holdings of [Supreme Court] decisions but also by [its] 'mode of analysis.'" *Id.* (quoting Antonin Scalia, *The Rule of Law as a Law of Rules*, 56 U. Chi. L.Rev. 1175, 1177 (1989)). Thus, "the issues decided by [the Supreme Court] need not be identical in order to be controlling." *Id.*; *see Le Vick v. Skaggs Cos., Inc.*, 701 F.2d 777, 778 (9th Cir. 1983) ("[W]hen existing Ninth Circuit precedent has been undermined by subsequent Supreme Court decisions, this court may reexamine that precedent without the convening of an *en banc* panel.").

A Supreme Court opinion is controlling when it "undercut[s] the *theory or reasoning* underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable." *Miller*, 335 F.3d at 900 (emphasis added); *see, e.g.*, *United States v. Lindsey*, 634 F.3d 541, 548-50 (9th Cir. 2011) (declining to apply Ninth Circuit precedent because "the case's *reasoning* has been fatally undercut by the Supreme Court" (emphasis in original)). Under this "flexible approach," the intervening authority need not "expressly overrule" prior circuit precedent. *Miller*, 335 F.3d at 899. So long as "the Supreme Court ha[s] taken an 'approach that [is] fundamentally inconsistent with the reasoning of [this Court's] earlier circuit authority,'" *Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (quoting *Miller*, 335 F.3d at 889, 990), that "[i]s enough to render them" irreconcilable with one another, *Langere v. Verizon Wireless Servs., LLC*, 983 F.3d 1115, 1121 (9th Cir. 2020)). This Court thus "'ha[s] not hesitated to overrule [its] own precedents when their underlying reasoning could not be squared with the Supreme Court's more recent pronouncements.'" *In re Nichols*, 10 F.4th 956, 962 & n.6 (9th Cir. 2021) (listing cases).

That is precisely what has occurred here. Because *Sturgeon* "undercut[s] the theory [and] reasoning underlying" *Katie John*, the decisions are "clearly irreconcilable" and so this Court cannot follow *Katie John*. *Miller*, 335 F.3d at 900. Instead, the Court must follow *Sturgeon* and hold that the Kuskokwim River is not "public land" under ANILCA.

Under *Sturgeon*, the Kuskokwim River does not qualify as "public land." To begin, all agree that the Kuskokwim River is not "lands" or "waters" the "title to which is in the United States." 16 U.S.C. §3102(1)-(3). The United States does not have "title" to "the lands beneath" the navigable waters because "the Submerged Lands Act gives each State 'title to and ownership of the lands beneath [its] navigable waters.'" *Sturgeon II*, 587 U.S. at 42 (quoting 43 U.S.C. §1311). Because the Kuskokwim is a navigable river, 2-ER-152, 156–58, "[t]hat means Alaska, not the United States, has title to the lands beneath the [Kuskokwim] River." *Sturgeon II*, 587 U.S. at 42. Nor does the United States have "title" to the river itself because "running waters cannot be owned—whether by a government or by a private party." *Id.*

That leaves the question of whether the United States has "title" to "interests" in the Kuskokwim River. In *Katie John I*, this Court held that certain navigable waters are "public land" because the United States "has interests in some navigable waters" under the reserved water rights doctrine. *See* 72 F.3d at 703-04. But the Supreme Court rejected this reasoning in *Sturgeon*.

In *Sturgeon*, the United States argued that it could regulate hovercraft boating on the Nation River (a navigable river) because the river was "public land" under ANILCA. *Sturgeon II*, 587 U.S. at 32-33. According to the United States, it "ha[d] 'title' to an 'interest' in the Nation River" under the reserved-water-rights doctrine. *Id.* at 43. But the Supreme Court disagreed. *Id.* at 43-44. Reserved water rights are "'usufructuary' in nature, meaning that they are rights for the Government to use—whether by

31

withdrawing or maintaining—certain waters it does not own." *Id.* at 43. Reserved water rights "'are not the type of property interests to which title can be held'; rather, 'the term 'title' applies' to 'fee ownership of property' and (sometimes) to 'possessory interests' in property like those granted by a lease." *Id.* at 44 (quoting *Totemoff*, 905 P.2d at 965). The Court found "no evidence" that Congress intended "to use the term ['title'] in any less customary and more capacious sense." *Id.*

Moreover, even if the United States could somehow hold "title" in reserved water rights, *Sturgeon* makes clear that the Kuskokwim River still would not be "public land." *Id.* at 44-45. Under ANILCA, the "public land" at issue would "consist only of the Federal Government's specific 'interest' in the River—that is, its reserved water right." *Id.* at 44 (quoting 16 U.S.C. §3102(1), (3)). And "that reserved right, by its nature, is limited. It does not give the Government plenary authority over the waterway to which it attaches." *Id.* Instead, "the interest merely enables the Government to take or maintain the specific 'amount of water'—and 'no more'—required to 'fulfill the purpose of [its land] reservation.'" *Id.* For example, the United States "could control only the volume of water necessary for the tribe to farm or the fish to survive." *Id.*

Here, that means the United States "could protect 'only th[e] amount of water' in the [Kuskokwim] River needed to 'accomplish the purpose of the [Yukon Delta] reservation.'" *Id.* But "whatever that volume, the Government's (purported) reserved right could not justify applying [the Refuge Manager's orders] on the [Kuskokwim] River." *Id.* That right "would support a regulation preventing the 'depletion or

diversion' of waters in the River (up to the amount required to achieve [the Refuge's] purposes)." *Id.* at 44-45. But the Refuge Manager's orders in 2021 and 2022 did "nothing of that kind." *Id.* at 45. Gillnet fishing takes salmon out of the river; it does not "deplete or divert any water." *Id.* (cleaned up). Nor has the United States explained the Refuge Manager's orders "as an effort to protect the [Kuskokwim] River from pollution or other similar harm." *Id.* To the contrary, the United States' orders address subsistence fishing—"concerns not related to safeguarding the water." *Id.*

ANILCA thus "changed nothing" for the State's navigable waters, including the Kuskokwim River. *Id.* at 58. The Kuskokwim River "did not become subject to new regulation by the happenstance of ending up within a national park." *Id.* Because the Kuskokwim River is not "public land," the United States "cannot enforce" ANILCA's rural subsistence priority on the river. *Id. Sturgeon*, not *Katie John*, controls.

**B.   *Loper Bright* and *Sackett* confirm that the *Katie John* decisions are no longer good law.**

Two recent Supreme Court opinions—*Loper Bright* and *Sackett*—further confirm that the *Katie John* decisions are no longer good law.

***Loper Bright***. In *Katie John I*, this Court based its holding entirely on *Chevron* deference, concluding that navigable waters were "public lands" because the agencies' recently changed interpretation of ANILCA was "reasonable." 72 F.3d at 703-04. The Court did not hold that the agencies' interpretation was the best reading of ANILCA.

*See id.* But last month in *Loper Bright*, the Supreme Court overruled *Chevron* and repudiated *Katie John I*'s entire mode of analysis. 144 S.Ct. at 2273.

The "judicial practice dating back to *Marbury*" has been that "courts must exercise independent judgment in determining the meaning of statutory provisions." *Id.* at 2261-62. But "*Chevron*, decided in 1984 by a bare quorum of six Justices, triggered a marked departure from the traditional approach." *Id.* at 2264. *Chevron* instructed courts to "set aside the traditional interpretive tools and defer to the agency if it had offered 'a permissible construction of the statute,' even if not 'the reading the court would have reached if the question initially had arisen in a judicial proceeding.'" *Id.* (quoting *Chevron*, 467 U.S. at 843 & n.11). Through this command, *Chevron* required "a court to *ignore*, not follow, the reading the court would have reached had it exercised its independent judgment." *Id.* at 2265 (cleaned up).

The Supreme Court in *Loper Bright* rejected this deference to agencies. Courts "routinely confront statutory ambiguities in cases having nothing to do with *Chevron*—cases that do not involve agency interpretations or delegations of authority." *Id.* at 2266. When faced with these situations, courts "do not throw up their hands because Congress's instructions have supposedly run out." *Id.* (cleaned up). Courts "understand that such statutes, no matter how impenetrable, do—in fact, must—have a single, best meaning." *Id.* Instead of "declaring a particular party's reading 'permissible' in such a case, courts use every tool at their disposal to determine the best reading of the statute and resolve the ambiguity." *Id.* Courts thus "must exercise their independent judgment

34

in deciding whether an agency has acted within its statutory authority." *Id.* at 2273. This mode of analysis requires "deploying [the] full interpretive toolkit" to determine the "best meaning" of the statute. *Id.* at 2271. Simply put: If an interpretation "is not the best, it is not permissible." *Id.* at 2266.

*Loper Bright* thus is flatly inconsistent with *Katie John*. The panel majority in *Katie John I* made no attempt to ascertain the "single, best meaning" of ANILCA. *Id.* Indeed, the Court's textual analysis finding that the reserved water rights doctrine applies was wafer thin. *See Katie John I*, 72 F.3d at 703-04. The Court *never* used its "full interpretive toolkit," *Loper Bright*, 144 S.Ct. at 2271—*i.e.*, examining the "[t]ext, context, and structure" of ANILCA, *Becerra v. Empire Health Found.*, 597 U.S. 424, 445 (2022). Instead, the Court simply "thr[e]w up [its] hands," *Loper Bright*, 144 S.Ct. at 2266, and declared that the agencies' recently changed interpretation of ANILCA was "reasonable" under *Chevron*, *see Katie John I*, 72 F.3d at 703-04. *Loper Bright*'s repudiation of *Katie John I*'s "'mode of analysis'" further confirms that the *Katie John* decisions are no longer good law. *Miller*, 335 F.3d at 900.

**Sackett v. EPA.** The Supreme Court's recent decision in *Sackett v. EPA* also confirms that "public lands" do not include navigable waters. In *Sackett*, the Supreme Court rejected an "overly broad interpretation of the [Clean Water Act's] reach" that would have "impinge[d] on" the "core of traditional state authority" to "[r]egulat[e] land and water use." 598 U.S. at 679-80. In so holding, the Court emphasized that Congress

must "'enact exceedingly clear language if it wishes to significantly alter the balance between federal and state power.'" *Id.* at 679.

Here, as in *Sackett*, there is no "'exceedingly clear language'" in ANILCA authorizing the federal government to impose a rural subsistence priority on State-owned navigable waters. Indeed, as the Court in *Katie John I* recognized, ANILCA "makes no reference to navigable waters" at all. 72 F.3d at 702. *Katie John*'s "overly broad interpretation" of ANILCA's reach thus plainly "impinge[s] on [the State's traditional] authority." *Sackett*, 598 U.S. at 679-80.

## C.    Footnote two in *Sturgeon* does not bind this Court to *Katie John*.

The district court never explained how the Kuskokwim River could be "public land" under the reserved water rights doctrine while the Nation River (in *Sturgeon*) was not. And it never even mentioned *Sackett*. Instead, the court concluded that it remained bound by the *Katie* John decisions based on a single footnote in *Sturgeon*. 1-ER-19–21. The district court reasoned that because *Sturgeon* did not "disturb the Ninth Circuit's holdings that the Park Service may regulate subsistence fishing on navigable waters," *Sturgeon II*, 587 U.S. at 45 n.2, then *Katie John* and *Sturgeon* must not be "clearly irreconcilable," 1-ER-19–21. That argument fails.

To begin, the district court failed to apply the proper test for determining whether this Court's caselaw is "clearly irreconcilable" with Supreme Court precedent. *Miller*, 335 F.3d at 900. This Court asks whether the Supreme Court opinion "undercut[s] the *theory* or *reasoning* underlying the prior circuit precedent in such a way

that the cases are clearly irreconcilable." *Id.* (emphasis added). But the district court never attempted to reconcile the theory or reasoning of *Katie John* with *Sturgeon.*

The district court omitted this analysis for good reason—the cases are clearly irreconcilable. The only possible way to distinguish *Sturgeon* is one attempted by the Appellees below—that "public lands" can mean one thing for Title I of ANILCA (in *Sturgeon*) and a different thing for Title VIII of ANILCA (here). But as the United States and its *amici* repeatedly explained in *Sturgeon*, ANILCA "forecloses" this argument. United States Br. 49, *Sturgeon II* (U.S. Sept. 11, 2018); *see* p.21, *supra.* Section 103 of ANILCA defines terms "[a]s used in this Act." 16 U.S.C. §3102; *compare with* 16 U.S.C. §3162 (defining terms "[f]or purposes of this subchapter"). When a statute says how its definition applies, that instruction "[l]eav[es] no doubt as to the definition's reach." *Digit. Realty Tr., Inc. v. Somers*, 583 U.S. 149, 160 (2018). Section 103 thus sets out the meaning of "public lands" *throughout* ANILCA, including Title I and Title VIII.

In *Amoco Production Co. v. Village of Gambell*, the Supreme Court recognized that "the same definition of 'public lands' which defines the scope of Title VIII"— ANILCA's subsistence-use provisions—"applies as well to the rest of the statute." 480 U.S. 531, 550-51 (1987); *see also id.* at 546 n.13. This Court, too, in *Sturgeon* concluded that "ANILCA's definition of 'public lands' applies throughout the statute," and so "[i]t would be anomalous … [to] emplo[y] a different construction of 'public lands'" in different sections of ANILCA. *Sturgeon*, 872 F.3d at 934. Simply put, any argument that the term "public lands" can mean one thing in Title I of ANILCA and a

different thing in Title VIII of ANILCA "cannot be squared with ANILCA's single definition of 'public lands' that applies across the Act's subsistence-use and conservation provisions." United States Br. in Opp. 17, *Sturgeon II* (U.S. May 7, 2018).

The district court ignored these obvious inconsistencies, believing that footnote two in *Sturgeon* somehow harmonized all these problems. But footnote two did not hold that the *Katie John* opinions were correct or reconcilable with *Sturgeon*. The Supreme Court simply avoided addressing whether "the Park Service may regulate subsistence fishing on navigable waters" because "ANILCA's subsistence-fishing provisions" were "not at issue in [the] case." *Sturgeon II*, 587 U.S. at 45 n.2.

This footnote in *Sturgeon* was not unusual. The Supreme Court regularly declines to comment on issues that are not before it. But lower courts do not interpret these reservations as a license to ignore the rest of the Court's opinion. Consider *United States v. Windsor*, 570 U.S. 744 (2013). There, the Supreme Court found that the federal Defense of Marriage Act violated "basic due process and equal protection principles.'" *Id.* at 752, 769. In doing so, the Supreme Court stressed that its "opinion and its holding [were] confined to those lawful [same-sex] marriages" recognized by states where same-sex marriages were legal. *Id.* at 775; *see id.* at 776 (Roberts, C.J., dissenting) (the Court went "out of its way" to not address an issue that it "does not have before it"). Despite this explicit reservation, nearly every court of appeals in the country soon applied *Windsor*'s reasoning to hold that "excluding same-sex couples from marriage violates the Constitution." *Obergefell v. Hodges*, 576 U.S. 644, 663 (2015). Indeed, this Court in

*Latta v. Otter* refused to follow earlier Supreme Court precedent that was directly on point because of *Windsor*'s reasoning. 771 F.3d 456, 466, 473 (9th Cir. 2014) (citing *Baker v. Nelson*, 409 U.S. 810 (1972)). This Court put little stock in the Supreme Court's reservation in *Windsor*, correctly recognizing that the Supreme Court "did not reach the question we decide here because it was not presented to it." *Id.* at 466 n.6. And the Supreme Court later agreed, relying on *Windsor* to find state laws prohibiting same-sex marriage unconstitutional. *Obergefell*, 576 U.S. at 668.

The same result applies here. *Sturgeon* did not "disturb the Ninth Circuit's holdings that the Park Service may regulate subsistence fishing on navigable waters" because "th[e] [subsistence-fishing] provisions [were] not at issue in [the] case." *Sturgeon II*, 587 U.S. at 45 n.2. But those provisions are at issue here, so this Court must determine whether *Sturgeon*'s reasoning is reconcilable with *Katie John*. Because the cases are irreconcilable, this Court must apply *Sturgeon*.

Under *Sturgeon*, the outcome is clear. The Kuskokwim River is not "public land" because it is not "lands, waters, and interests therein … the title to which is in the United States." 16 U.S.C. §3102(1)-(3); *see Sturgeon II*, 587 U.S. at 43-45. Accordingly, the State's orders regulating fishing on the Kuskokwim River—a navigable water that the State owns—cannot be preempted by contrary federal orders.

## II.    The State's orders regulating the Kuskokwim River are not preempted because the FSB members were not properly appointed.

The Refuge Manager's orders were issued "[b]y delegation from the Federal Subsistence Board." *E.g.*, 3-ER-345; *see* pp.22-24, *supra*. But the FSB members are officers who were not properly appointed under the Constitution. The Refuge Manager's orders thus have no effect and cannot preempt the State's orders. The district court's holding to the contrary was wrong.[3]

### A.    Orders from officers that were not properly appointed are invalid and have no effect.

The Constitutions vests "[t]he executive Power" solely in the President. U.S. Const. art. II, §1. Today, "thousands of officers wield executive power on behalf of the President." *United States v. Arthrex, Inc.*, 594 U.S. 1, 11 (2021). But "[t]hat power acquires its legitimacy and accountability to the public" only when there is a "'a clear and effective chain of command' down from the President, on whom all the people vote." *Id.* (quoting *Free Enter. Fund v. PCAOB*, 561 U.S. 477, 498 (2010)). The appointment of these "Officers" is governed by the Appointments Clause:

> [The President] shall nominate, and by and with the Advice and Consent of the Senate, shall appoint … all … Officers of the United States, whose

---

[3] The district court suggested that the State's Appointments Clause arguments might be barred by claim preclusion, but it never reached the issue. 1-ER-22–23. Claim preclusion doesn't apply for multiple reasons. Most obvious, the State is a defendant and has brought no *claims*. The State instead raises *arguments* for why the Appellees cannot prevail on their claims. Claim preclusion "acts *defensively*, to preclude … [a] claim," not offensively to "*prevail on* [a] claim." *Americredit Fin. Servs., Inc. v. Lyons*, 2022 WL 135420, at *5 (M.D. Tenn. Jan. 13, 2022) (emphasis in original). Neither the district court nor any of the Appellees ever identified a single case holding that claim preclusion applies in this context.

> Appointments are not herein otherwise provided for, and which shall be established by Law: but the Congress may by Law vest the Appointment of such inferior Officers, as they think proper, in the President alone … or in the Heads of Departments.

U.S. Const. art. II, §2, cl.2.

Under the Appointments Clause, "[o]nly the President, with the advice and consent of the Senate, can appoint noninferior officers, called 'principal' officers as shorthand in [the Court's] cases." *Arthrex*, 594 U.S. at 12. The Clause "permits Congress to dispense with joint appointment, but only for inferior officers." *Id.* In addition, no officer (principal or inferior) may be appointed unless Congress has first established the position "by Law." U.S. Const. art. II, §2, cl.2.

The Appointments Clause is "more than a matter of 'etiquette or protocol'; it is among the significant structural safeguards of the constitutional scheme." *Edmond v. United States*, 520 U.S. 651, 659 (1997). Violations of the Appointments Clause "erode political accountability" by giving power to "unelected and insulated lower-level officials." *Cody v. Kijakazi*, 48 F.4th 956, 960 (9th Cir. 2022). "Given its importance within our Constitution's structure," *id.*, orders that are "tainted with an appointments violation" are invalid and have no effect, *Lucia v. SEC*, 585 U.S. 237, 251 (2018). Thus, if the FSB's members were appointed in violation of the Appointments Clause, then the FSB's orders—which were issued by delegation through the Refuge Manager—are invalid and cannot preempt the State's orders. *See id.*; *see also Cmty. Fin. Servs. Ass'n of Am., Ltd. v. CFPB*, 51 F.4th 616, 642 (5th Cir. 2022) ("actions taken by an unlawfully

appointed official" are "invalid[]"), *rev'd on other grounds*, 601 U.S. 416 (2024) (citing *Collins v. Yellen*, 141 S.Ct. 1761, 1787-88 (2021)).

### B. The FSB members are "officers of the United States."

The district court correctly found that the FSB members are "officers" and not mere "employees." 1-ER-26. The Appointments Clause "prescribes the exclusive means of appointing 'Officers.'" *Lucia*, 585 U.S. at 244 (quoting U.S. Const. art. II, §2, cl.2). The Supreme Court has identified two considerations for determining whether an individual is an officer: (1) whether the individual's duties are "'continuing and permanent,'" rather than "'occasional or temporary,'" *Lucia*, 585 U.S. at 245 (quoting *United States v. Germaine*, 99 U.S. 508, 511-12 (1879)); and (2) whether the individual "'exercis[es] significant authority pursuant to the laws of the United States.'" *Id.* (quoting *Buckley v. Valeo*, 424 U.S. 1, 126 (1976)). The FSB members are "officers" under these considerations.

*First*, the FSB positions are "'continuing and permanent,'" not "'occasional or temporary.'" *Lucia*, 585 U.S. at 245. Because the FSB positions are set by regulation, they are each an "institution distinct from the person holding it" and will "persis[t] beyond an individual's incumbency." *United States v. Donziger*, 38 F.4th 290, 297 n.3 (2d Cir. 2022) (cleaned up). The FSB members have no term limits. *See* 50 C.F.R. §100.10. Indeed, the current FSB members have been collectively appointed under multiple presidencies (with one member serving for more than a decade). *See* pp.13-14, *supra*.

*Second*, the FSB members "'exercis[e] significant authority pursuant to the laws of the United States.'" *Lucia*, 585 U.S. at 245. The Secretaries' regulations give the FSB enormous powers "to implement Title VIII of ANILCA." 50 C.F.R. §100.10(d)(4). The FSB can, among other things, "[i]ssue regulations for the management of subsistence"; "[d]etermine which communities" qualify for the rural subsistence priority; "[a]llocate subsistence uses"; "[r]estrict the taking of fish … for nonsubsistence uses or close public lands … for nonsubsistence uses"; and much more. *Id.*

The FSB thus unquestionably "exercise[s] a great deal of discretion and perform[s] important functions." *Samuels, Kramer & Co. v. CIR*, 930 F.2d 975, 986 (2d Cir. 1991); *see Freytag v. Comm'r*, 501 U.S. 868, 881-82 (1991) (officers "perform more than ministerial tasks"). Indeed, the FSB's power to "[i]ssue regulations" is dispositive. 50 C.F.R. §100.10(d)(4)(i). "The Supreme Court has held that … only 'Officers' … issue rules." *Alfa Int'l Seafood v. Ross*, 264 F. Supp. 3d 23, 41 (D.D.C. 2017) (citing *Buckley*, 424 U.S. at 141). "[R]ulemaking" is too "significant [of a] governmental duty" to be done by employees. *Buckley*, 424 U.S. at 140-41. And the FSB's decisions are not just "significant"; they are also the "las[t] word." *Lucia*, 585 U.S. at 246-49. Simply put, if "a postmaster first class … and the clerk of a district court" are officers, then "surely" the FSB members are too. *Buckley*, 424 U.S. at 126.

## C.    Congress did not establish the FSB members' offices "by Law."

Although the district court correctly found that FSB members were "officers," it incorrectly found that the FSB members' offices were properly created. "By requiring

that Congress create federal offices 'by Law,' the Constitution imposes an important check against the President—he cannot create offices at his pleasure." *Trump v. United States*, 144 S.Ct. 2312, 2348 (2024) (Thomas, J., concurring). The Appointments Clause provides that both principal and inferior offices shall be established "by Law"—*i.e.*, by a statute. U.S. Const. art. II, §2, cl.2. It is undisputed that no law (including ANILCA) establishes the FSB. Instead, "the Secretaries creat[ed] the FSB by promulgating federal regulations." 1-ER-25; *see also* Dkt. 21 at 8 (United States admitting that the FSB was "[c]reated solely by regulation rather than statute"). That should have been the end of the matter. Because the FSB was not established "by Law," the FSB members' offices were not properly created and so the FSB members have no constitutional authority to act as officers.

The district court recognized that the Secretaries—not Congress—created the FSB, but it found this creation permissible because "'properly enacted regulations have the force of law.'" 1-ER-25 (quoting *Flors v. Bowen*, 790 F.2d 740, 742 (9th Cir. 1986)). But when the Founders used the term "by Law," they meant "'by statute,'" not by regulation. *Trump*, 144 S.Ct. at 2348 (Thomas, J., concurring) (citing cases); *see* E. Garrett West, *Congressional Power Over Office Creation*, 128 Yale L.J. 166, 180 & nn.59-60 (Oct. 2018) (listing examples). Indeed, the United States has elsewhere recognized that the Appointments Clause's reference to "Law" means "statutory law." *See United States v. Trump*, 2024 WL 3404555, at *7 (S.D. Fla. July 15, 2024) (noting that "all parties rightly agree" with this proposition).

44

Consider the Appropriations Clause. That provision similarly states that "[n]o Money shall be drawn from the Treasury, but in Consequence of Appropriations made *by Law*." U.S. Const. art. I, §9, cl.7 (emphasis added). The Supreme Court has repeatedly recognized the "unmistakable" meaning of the Appropriations Clause—"'no money can be paid out of the Treasury unless it has been appropriated by *an act of Congress*.'" *CFPB v. Cmty. Fin. Servs. Ass'n of Am., Ltd.*, 601 U.S. 416, 425 (2024) (emphasis added) (quoting *Cincinnati Soap Co. v. United States*, 301 U.S. 308, 321 (1937)); *OPM v. Richmond*, 496 U.S. 414, 424 (1990) ("Money may be paid out only through an appropriation made by law; in other words, the payment of money from the Treasury must be *authorized by a statute*." (emphasis added)). The district court made no effort to distinguish this precedent, stating only that it was "a different constitutional clause." 1-ER-25.

That the Appointments Clause requires offices to be created by statute fits the structure of the Constitution. The Constitution "does not give the President or the heads of executive departments the power to create any offices." Steven G. Calabresi & Gary Lawson, *Why Robert Mueller's Appointment as Special Counsel Was Unlawful*, 95 Notre Dame L. Rev. 87, 101 (2019). Indeed, "the Framers added language to both halves of the Appointments Clause specifically to address the concern that the President might attempt unilaterally to create and fill federal offices." *Weiss v. United States*, 510 U.S. 163, 187 n.2 (1994) (Souter, J., concurring) (citing C. Warren, The Making of the Constitution 642 (1937)); *see also* West, 128 Yale L.J. at 179-85 (discussing the text, structure, and drafting history of the Appointments Clause). Chief Justice Marshall long

45

ago "rejected the idea that the president could create offices, stating that … 'the creation of office [is a] legislative powe[r].'" Kevin Sholette, *The American Czars*, 20 Cornell J.L. & Pub. Pol'y 219, 240 (2010) (quoting *United States v. Maurice*, 26 F. Cas. 1211, 1213 (C.C. Va. 1823)). "[N]ew offices of the United States must be created … [by] legislation." *Limitations on Presidential Power to Create a New Executive Branch Entity*, 9 Op. O.L.C. 76, 76 (1985); *see Seila Law LLC v. CFPB*, 591 U.S. 197, 266 (2020) (Kagan, J., concurring in the judgment in part and dissenting in part) ("what kinds of officers … the Executive Branch requires" is a "decision[] in the legislature's hands"); Calabresi & Lawson, 95 Notre Dame L. Rev. at 101 ("Congress has the *exclusive* constitutional power to create federal offices."); 9 Op. O.L.C. at 77 (the Constitution "'distinguishes between the *creation* of an office and *appointment* thereto'" (quoting *The Constitution of the United States of America, Analysis and Interpretation*, 92d Cong., 2d Sess. 523 (1973) (emphasis added))).

"The limitation on the President's power to create offices grew out of the Founders' experience with the English monarchy," where the "King could wield significant power by both creating and filling offices as he saw fit." *Trump*, 144 S.Ct. at 2349 (Thomas, J., concurring). "In fact, one of the grievances raised by the American colonists … was that the King 'ha[d] erected a multitude of New Offices.'" *Id.* (quoting Declaration of Independence ¶12). The Founders "broke from the monarchial model by giving the President the power to *fill* offices (with the Senate's approval), but not the power to *create* offices." *Id.* (emphasis in original). "By keeping the ability to create

46

offices out of the President's hands, the Founders ensured that no President could unilaterally create an army of officer positions to then fill with his supporters." *Id.*; *see also Trump*, 2024 WL 3404555, at *7 (discussing history of the Appointments Clause).

Maintaining this "dichotomy … is consistent with the historic view of the Executive and Legislative Branches" and "respects the proper division of constitutional responsibility." 9 Op. O.L.C. at 77. In short, an "appointment" is "'to an *existing* office … [that] owes its existence to an act of Congress.'" *Id.* "If there is no establishment of an office by statute, there is no office to which someone can be appointed." Calabresi & Lawson, 95 Notre Dame L. Rev. at 102; *see also In re Benny*, 812 F.2d 1133, 1143 (9th Cir. 1987) (Norris, J., concurring in the judgment) ("[P]ublic *offices* [are] 'established by Law'—that is, by Act of Congress—while the *officers* are [appointed]."); *Beal v. United States*, 182 F.2d 565, 568 (6th Cir. 1950) ("[A]n office … is created by some specific Act of the Congress."); *see also Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 117 (2007) ("The Appointments Clause … lodg[es] in Congress … the creation of most offices."); Calabresi & Lawson, 95 Notre Dame L. Rev. at 101-02 & n.79 ("The 'law' that establishes the office must be a statute.").

The district court found it sufficient that Section 814 of ANILCA "accords to the Secretaries the authority to 'prescribe such regulations as are necessary and appropriate to carry out his responsibilities under' ANILCA." 1-ER-25 (quoting 16 U.S.C. §3124). But Section 814 creates no offices; nor does it even mention the FSB. And Section 814 certainly does not "clearly create[]" the FSB, as separation-of-powers

principles require. *Trump*, 144 S.Ct. at 2350 (Thomas, J., concurring); *see Trump*, 2024 WL 3404555, at *8-9 (suggesting, but not reaching, that "application of a clear statement rule would apply to the interpretation of statutes" involving the Appointments Clause). The FSB thus was not established "by Law."

The district court appeared to believe that the Appointments Clause permits Congress to delegate its authority to the executive branch to establish officer positions. That argument fails, as explained above. But even if such a delegation were permissible, Congress didn't do that here.

"An agency's general rulemaking authority does not mean that the specific rule the agency promulgates is a valid exercise of that authority." *NYSE LLC v. SEC*, 962 F.3d 541, 546 (D.C. Cir. 2020) (cleaned up). An agency "may not exercise its authority 'in a manner that is inconsistent with the administrative structure that Congress enacted into law.'" *FDA v. Brown & Williamson Tobacco Corp.*, 529 U.S. 120, 125 (2000). Here, nothing in the structure of ANILCA supports the district court's conclusion that Congress gave the Secretaries blanket authority to create and appoint officers to implement ANILCA.

On the contrary, Congress "se[t] out in great detail the officials who" will implement ANILCA and "the procedures to be employed for their appointment." *United States v. Janssen*, 73 M.J. 221, 225 (C.A.A.F. 2014). In Section 805 of ANILCA, Congress ordered that "the Secretary … shall establish" (1) "at least six Alaska subsistence resource regions"; (2) "local advisory committees within each region"; and

48

(3) "a regional advisory council in each … region." 16 U.S.C. §3115(a). This administrative structure "raises the obvious question of why Congress would go to the trouble of enshrining [these] positions in statute and providing for their appointment if, as the [United States] argues, the Secretary already has the authority under [Section 804] to do so." *Janssen*, 73 M.J. at 225. The United States' argument "makes no sense in the face of the statutory structure that Congress has enacted." *Id.* Indeed, Congress "knows how to speak clearly in the appointment context." *Trump*, 2024 WL 34045555, at *9 n.17; *id.* at *15, 23-24. It did not do so here. Because the FSB members are "officers" whose positions were not established "by Law," they were not properly appointed.

### D. The FSB members are "principal" officers who were not appointed by the President with the advice and consent of the Senate.

Even if Congress had established the FSB "by Law," the FSB members were not properly appointed. The Appointments Clause requires that all principal officers must be "nominate[d]" by the President and confirmed through the "Advice and Consent" of the Senate. U.S. Const. art. II, §2, cl.2. The "starting point" for determining whether someone is an "inferior" officer is "'whether he has a superior' other than the President." *Arthrex*, 594 U.S. at 13 (quoting *Edmond*, 520 U.S. at 662). An inferior officer must be "'directed and supervised at some level by others who were appointed by Presidential nomination with the advice and consent of the Senate.'" *Id.* (quoting *Edmond*, 520 U.S. at 663).

Here, because the FSB members are not "directed and supervised" by the Secretaries, they are "principal" officers who must be appointed by the President with the advice and consent of the Senate. FSB members are principal officers for at least three reasons.

*First*, the Secretaries do not "'exercis[e] administrative oversight'" over the FSB by "formulating policies" for the FSB to implement. *Id.* (quoting *Edmond*, 520 U.S. at 664-65); *see Morrison v. Olson*, 487 U.S. 654, 671 (1988) (officer was inferior because he could not "formulate policy for the Government or the Executive Branch"). To the contrary, the FSB has unfettered discretion to "[i]ssue regulations for the management of subsistence" as it sees fit to "implement … ANILCA." 50 C.F.R. §100.10(d)(4)(i). And it has many other wide-ranging and independent "duties." *Lucia*, 585 U.S. at 244-50; *Edmond*, 520 U.S. at 661 (officer was inferior in part because he "performed only limited duties" (citing *Morrison*, 487 U.S. at 671-72)); *see* 50 C.F.R. §100.10(d)(4).

That the Secretaries' regulations lay out "the FSB's responsibilities, the scope of its authority, and the objectives of the FSB's actions," 1-ER-24, does not make them inferior officers. After all, countless statutes similarly define the responsibilities, scope, and objectives of principal officers. *See, e.g.*, 16 U.S.C. §835c (identifying the "duties of [the] Secretary of the Interior"); *see Arthrex*, 594 U.S. at 14-18. Because the FSB has "policymaking [and] administrative authority" and "the sole responsibility to administer" Title VIII of ANILCA, "[e]veryone [should] agre[e]" that the FSB members are principal officers. *Seila Law*, 591 U.S. at 219; *see* 50 C.F.R. §100.10(a) ("The Secretary

of the Interior and Secretary of Agriculture hereby establish a Federal Subsistence Board, and *assign it responsibility* for administering … subsistence taking and uses of fish and wildlife on public lands." (emphasis added)).

*Second*, the FSB has the "'power to render a final decision on behalf of the United States'" without any "review by [a] nominal superior or any other principal officer in the Executive Branch." *Arthrex*, 594 U.S. at 14 (quoting *Edmond*, 520 U.S. at 665). The FSB's decisions are final and cannot be appealed to the Secretaries, 50 C.F.R. §§100.13(a)(2), 100.19(e), 100.20(b), (g). This "unreviewable authority wielded by [the FSB]" is simply "incompatible with their appointment by the Secretar[ies] to an inferior office." *Arthrex*, 594 U.S. at 23.

The district court found that in practice "the Department of the Interior routinely reviews—and, in fact, approves—proposed regulatory changes approved by the FSB, demonstrating that the Secretary of the Interior in fact provides final review of the FSB's regulatory actions pursuant to subparts C and D." 1-ER-29 n.112 (quoting 3-ER-414–15). But the record doesn't support these sweeping findings, which were based not on declarations from the Secretaries, but on a single email from an agency official who was observing that a final rule promulgated by the FSB had not yet been published in the federal register. 3-ER-414–15. And it's just as likely that this delay was caused by the many procedural certifications required for rules, not the Secretaries "approv[ing]" and "supervis[ing]" the FSB's actions. 1-ER-29 n.112; *see* 85 Fed. Reg. 74796, 74799-800 (Nov. 23, 2020). Indeed, the final rule made no mention of any such

51

approval or supervision. *See* 85 Fed. Reg. at 74800 ("[T]he Federal Subsistence Board amends … the Code of Federal Regulations as set forth below."). Regardless, *Arthrex* makes clear that any behind-the-scenes oversight is irrelevant. The Appointments Clause "demand[s]" clear "lines of accountability" because there must be a "transparent decision for which a politically accountable officer must take responsibility." *Arthrex*, 594 U.S. at 16. Here, the regulations say that *the FSB* is in charge of implementing ANILCA, not the Secretaries. *See* 50 C.F.R. §100.10(a).

*Finally*, the FSB members "occupy a permanent office" and most can be removed only "for cause." *Arthrex*, 594 U.S. at 22; *Edmond*, 520 U.S. at 661 (officer was inferior in part because he was "subject to removal by a higher officer" and his "tenure was limited" (citing *Morrison*, 487 U.S. at 671-72)). Because most FSB members are automatically appointed based on their other career SES positions, the only way to remove them from the FSB is to remove them from their other positions. 50 C.F.R. §100.10(b)(1). But all five members have for-cause removal protection. *See* p.15 & n.2, *supra*. Because most of the FSB can be removed only for cause, neither the sitting President nor his Secretaries can "meaningfully contro[l]" the Board members. *Seila Law*, 591 U.S. at 224-25.

Whether five of the FSB members are "supervised 'at some level'" by Senate-confirmed officers in their *other* positions is irrelevant. 1-ER-29. The Secretaries have no statutory or regulatory authority to supervise these individuals in their capacity as FSB members. Thus, when they are acting as FSB members, they have free rein to

implement ANILCA. Indeed, FSB members regularly stay in their positions for years and across multiple presidencies. *See* pp.13-14, *supra*. Accordingly, "an unlucky President might get elected" on a certain environmental or conservation "platform and enter office only to find herself saddled with … holdover [members] from a competing political party who [are] dead set *against* that agenda." *Seila Law*, 591 U.S. at 225. This regime violates the constitutional structure. *See Free Enter. Fund*, 561 U.S. at 496.[4]

Accordingly, even if the FSB had been established "by Law," the FSB members are still principal officers who must be appointed by the President with the advice and consent of the Senate. But none were appointed through this process: three were appointed by the Secretaries, and five were appointed by agency staff. *See* pp.13-14, *supra*. Because none of them were properly appointed, they had no lawful authority to direct the Refuge Manager to implement ANILCA, and so his orders were ultra vires and void.

---

[4] On February 26, 2024, the Secretaries proposed to amend their rules to state, among other things, that they "retain[] authority to (at any time) stay, modify, or disapprove any action taken by the Board" and to authorize "[t]he Secretaries [to] establish term limits for service of Board members in such circumstances as the Secretaries deem appropriate." 89 Fed. Reg. 14008, 14015 (Feb. 26, 2024). Although this proposed rule was an obvious attempt to address the State's arguments—and a tacit admission that FSB members are principal officers—the United States never told the district court about the proposed rule. Nor would these amendments correct the constitutional problems, even if they were adopted. To date, the Secretaries have adopted no final rule. If they do, the State will address the amendments in its reply brief or in supplemental briefing.

## CONCLUSION

The court should reverse the district court and vacate the permanent injunction.

Dated: July 26, 2024

Respectfully Submitted,

TREG TAYLOR
  ATTORNEY GENERAL

 /s/ J. Michael Connolly
J. Michael Connolly
Steven C. Begakis
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
steven@consovoymccarthy.com

 /s/ Margaret Paton-Walsh
Margaret Paton-Walsh
Aaron C. Peterson
    Assistant Attorneys General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
(907) 269-5232
margaret.paton-walsh@alaska.gov
aaron.peterson@alaska.gov

*Attorneys for the State of Alaska, et al.*

54

## STATEMENT OF RELATED CASES

Under Circuit Rule 28-2.6, I certify that I am unaware of any related cases currently pending in this Court.


Dated: July 26, 2024

*/s/ J. Michael Connolly*
J. Michael Connolly

## CERTIFICATE OF COMPLIANCE

Under Fed. R. App. P. 32(g), I certify that:

This brief complies with the type-volume limits of Circuit Rule 32-1(a) because it contains 13,967 words, excluding the parts of the brief exempted by Circuit Rule 32-1(c) and Fed. R. App. Proc. 32(f).

This brief complies with the typeface requirements of Fed. R. App. Proc. 32(a)(5) and the type style requirements of Fed. R. App. Proc. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word Version 16.84 in 14-point Garamond font.


Dated: July 26, 2024

_/s/ J. Michael Connolly_
J. Michael Connolly

## CERTIFICATE OF SERVICE

I certify that on July 26, 2024, I electronically filed this brief with the Clerk of

the Court using the CM/ECF system, serving all counsel of record.


Dated: July 26, 2024

*/s/ J. Michael Connolly*
J. Michael Connolly
