No. 24-2251

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES,

*Plaintiff-Appellee*,

KUSKOKWIM RIVER INTER-TRIBAL FISH COMMISSION, et al.,

*Intervenor-Plaintiffs-Appellees*,

v.

STATE OF ALASKA, et al.,

*Defendants-Appellants.*

On Appeal from the United States District Court
for the District of Alaska
No. 1:22-cv-00054-SLG
Hon. Sharon L. Gleason, Chief Judge

## KUSKOKWIM RIVER INTER-TRIBAL FISH COMMISSION'S
## ANSWERING BRIEF

Nathaniel Amdur-Clark
Whitney A. Leonard
Sonosky, Chambers, Sachse,
    Miller & Monkman, LLP
510 L Street, Suite 310
Anchorage, AK  99501
Telephone: 907-258-6377

*Attorneys for Intervenor-Plaintiff-Appellee*
*Kuskokwim River Inter-Tribal Fish*
*Commission*

**RULE 26.1 DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, the Kuskokwim River Inter-Tribal Fish Commission hereby states that it is an inter-tribal consortium representing the federally recognized Indian Tribes of the Kuskokwim River watershed. As such, the Fish Commission has no parent corporation, and no publicly held corporation owns 10% or more of its stock.

DATED this 25th day of October 2024 at Anchorage, Alaska.

SONOSKY, CHAMBERS, SACHSE
  MILLER & MONKMAN, LLP
*Counsel for Intervenor-Plaintiff*
*Kuskokwim River Inter-Tribal Fish Commission*

By:  _s/ Nathaniel Amdur-Clark_     

Nathaniel Amdur-Clark, AK Bar No. 1411111

i

# TABLE OF CONTENTS

INTRODUCTION ................................................................................1

JURISDICTIONAL STATEMENT ........................................................4

ISSUES PRESENTED.........................................................................5

STATUTES AND REGULATIONS......................................................5

STATEMENT OF THE CASE.............................................................5

SUMMARY OF ARGUMENT ...........................................................10

STANDARD OF REVIEW ................................................................13

ARGUMENT .....................................................................................14

    I. THE KUSKOKWIM RIVER CONSTITUTES "PUBLIC
       LANDS" FOR PURPOSES OF THE TITLE VIII
       SUBSISTENCE PROVISIONS. .................................................14

       A. The *Katie John* Decisions Remain Good Law and Control
          Here. ...............................................................................14

       B. The State's Reading of "Public Lands" Is Inconsistent with
          Title VIII.........................................................................20

       C. Congress Ratified the Secretary's Interpretation of Title
          VIII. ................................................................................30

       D. The State's Arguments Are Also Barred for Procedural
          Reasons............................................................................38

    II. THE FEDERAL SUBSISTENCE BOARD IS
       CONSTITUTIONALLY PROPER. ...........................................40

       A. The Board Is both Statutorily Authorized and Constitutional. ...............40

       B. Claim Preclusion Bars the State from Litigating Issues it
          Chose Not to Raise in *Katie John*. .........................................44

C. The Six-Year Statute of Limitations Also Bars the State's
Challenges to the Board..............................................................49

CONCLUSION ......................................................................................53

STATUTORY ADDENDUM

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Federal Cases**

*Alaska v. Babbitt* (*Katie John I*), 72 F.3d 698 (9th Cir. 1995) ...................... *passim*

*Ariz. St. Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003 (9th Cir. 2006) ................................................................................25

*Borja v. Nago*, 115 F.4th 971(9th Cir. 2024)............................................13

*Brown v. Felsen*, 442 U.S. 127 (1979)....................................................45

*City of Saint Paul v. Evans*, 344 F.3d 1029 (9th Cir. 2003) ............................ 51, 52

*Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833 (1986) .................................................................. 12, 31, 37, 38

*Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440 (2024). ..............................................................................50

*Crum v. Mt. Shasta Power Corp.*, 220 Cal. 295, 30 P.2d 30 (1934) ......................26

*Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884 (9th Cir. 2017) ........................31

*Env't Def. v. Duke Energy Corp.*, 549 U.S. 561 (2007) ........................................21

*Fed. Trade Comm'n v. Consumer Def., LLC*, 926 F.3d 1208 (9th Cir. 2019).............................................................................. 17, 18

*Gundy v. United States*, 588 U.S. 128 (2019)........................................21

*In re Greenberg*, 626 B.R. 554 (S.D. Cal. 2021).....................................48

*John v. United States* (*Katie John II*), 247 F.3d 1032 (9th Cir. 2001) ........... *passim*

*John v. United States* (*Katie John III*), 720 F.3d 1214 (9th Cir. 2013)........... *passim*

*Johnson & Mendenhall*, 355 F.3d 1140 (9th Cir. 2004)........................................39

*Lair v. Bullock*, 697 F.3d 1200 (9th Cir. 2012) .....................................18

iv

*Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198 (1949) ...................................22

*Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244 (2024) .......... 13, 28, 29, 30

*Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405 (2020) ................................................................................... 13, 45, 47

*United States v. Mendoza*, 464 U.S. 154 (1984) ..........................................12, 39, 45

*Metlakatla Indian Cmty. v. Egan*, 369 U.S. 45 (1962). ...........................................23

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) ........................................... 10, 17

*Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985 (9th Cir. 2005) ............... 45, 46

*N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512 (1982) ...............................................37

*Native Village of Quinhagak v. United States*, 35 F.3d 388 (9th Cir. 1994)..................................................................................................................23

*New Hampshire v. Maine*, 532 U.S. 742 (2001)......................................................40

*Radcliff's Ex'rs v. Mayor of Brooklyn*, 4 N.Y. 195 (1850) ...................................26

*Sandoval v. County of Sonoma*, 912 F.3d 509 (9th Cir. 2018)...............................13

*Segal v. Am. Tel. & Tel. Co.*, 606 F.2d 842 (9th Cir. 1979) ............................ 12, 39

*Skidmore v. Swift & Co.*, 323 U.S. 134 (1944) ........................................................14

*Sturgeon v. Frost*, 587 U.S. 28 (2019)................................................................ *passim*

*Sturgeon v. Frost*, 872 F.3d 927 (9th Cir. 2017) .....................................................20

*Tex. Dep't of Housing & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015) .........................................................................37

*Totemoff v. State*, 905 P.2d 954, 965 (Alaska 1995) ...............................................26

*United States v. Alaska*, 608 F. Supp. 3d 802 (D. Alaska 2022) ....................... 2, 49

*United States v. Alexander*, 938 F.2d 942 (9th Cir. 1991).......................................25

*United States v. LKAV*, 712 F.3d 436 (9th Cir. 2013) ............................................25

v

*United States v. Olson*, 856 F.3d 1216 (9th Cir. 2017) .............................. 22, 24, 25

*Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 320 (2014) .....................................21

**State Cases**

*McDowell v. State*, 785 P.2d 1 (Alaska 1989) ........................................... 10, 31, 32

**Federal Constitution and Statutes**

U.S. Const. art. II, § 2, cl. 2 ............................................................. 13, 41

Alaska National Interest Lands Conservation Act, 16 U.S.C. §§ 3101 *et seq.*

    16 U.S.C. § 3101 ...................................................................... 3, 10

    16 U.S.C. § 3102 ..................................................................... 15, 25

    16 U.S.C. § 3111 .................................................................... *passim*

    16 U.S.C. § 3112 ............................................................. 1, 19, 22, 23

    16 U.S.C. § 3115 ...........................................................................35

    16 U.S.C. § 3124 ...........................................................................34

    Pub. L. No. 96-487, § 303, 94 Stat. 2371 (1980) ................................27

28 U.S.C. § 1291 .................................................................................4

28 U.S.C. § 2401 ........................................................................... 13, 49

28 U.S.C. § 1331 .................................................................................4

28 U.S.C. § 1345 .................................................................................4

Department of the Interior and Related Agencies Appropriations Act,
    1998, § 13, Pub. L. No. 105–83, 111 Stat 1543, 1592 (Nov. 14,
    1997)................................................................. 32, 33, 34, 35

Omnibus Consolidated and Emergency Supplemental Appropriations
    Act, 1999, Div. A, § 339(a), Pub. L. No. 105–277, 112 Stat 2681
    (Oct. 21, 1998)......................................................... 12, 36

Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 317, 110 Stat 3009-222 (Sept. 30, 1996) ................................................36

Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No. 104-134, § 336, 110 Stat. 1321 (Apr. 26, 1996) .............................36

**State Statutes**

Alaska Statutes §16.05.258 ........................................................................9

**Federal Rules and Regulations**

36 C.F.R. pt. 242 .....................................................................................15

50 C.F.R. § 100.3 ....................................................................................32

50 C.F.R. § 100.10 ..................................................................................50

50 C.F.R. § 100.14 ....................................................................................7

Subsistence Management Regulations for Public Lands in Alaska, 76 Fed. Reg. 56109 (Sept. 12, 2011) ...........................................................48

Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, C, and D, Redefinition to Include Waters Subject to Subsistence Priority, 64 Fed. Reg. 1276-01 (Jan. 8, 1999) .......................... *passim*

Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, C, and D, Redefinition To Include Waters Subject to Subsistence Priority, 62 Fed. Reg. 66216-01 (Dec. 17, 1997) ......... 35, 36, 43, 44

Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, and C, 57 Fed. Reg. 22940-01 (May 29, 1992) ................... *passim*

Temporary Subsistence Management Regulations for Public Lands in Alaska, 55 Fed. Reg. 27114-01 (June 29, 1990) ....................................42

**Other Authorities**

Jacki Cleveland, Quinhagak, Alaska, *quoted in* In-Season Management, Kuskokwim River Intertribal Fish Commission, https://www.kuskosalmon.org/inseason-management ..........................................1

State of Alaska FAQs on the Kuskokwim Case,
https://law.alaska.gov/press/releases/2023/090123-FAQ.html.............................7

## INTRODUCTION

"Every decision we make as In-Season Managers means caring for the whole river, and its drainage, its tributaries, its people, the people's survival and food security, and the whole Yup'ik [and Athabaskan] culture." [1]

Since time immemorial, the Alaska Native communities of the Kuskokwim River Drainage have taken responsibility for stewardship of the fisheries that are critical for the continued survival of their subsistence ways of living. In recent years, that responsibility has included co-management, with the United States government, of the Chinook and chum salmon fisheries of the Kuskokwim River Drainage within the Yukon Delta National Wildlife Refuge ("Refuge").[2] In doing so, the United States and the Alaska Native communities implement the rural subsistence priority of Title VIII of the Alaska National Interest Lands Conservation Act ("ANILCA")[3] as reflected by this Court's *Katie John* line of cases.[4]

---

[1] Jacki Cleveland, Quinhagak, Alaska, *quoted in* In-Season Management, Kuskokwim River Intertribal Fish Commission, https://www.kuskosalmon.org/inseason-management (last accessed Oct. 24, 2024) [hereinafter In-Season Management].

[2] 3-JSER-646.

[3] 16 U.S.C. §§ 3112(2), 3114.

[4] *Alaska v. Babbitt* (*Katie John I*), 72 F.3d 698 (9th Cir. 1995); *John v. United States* (*Katie John II*), 247 F.3d 1032 (9th Cir. 2001); *John v. United States* (*Katie John III*), 720 F.3d 1214 (9th Cir. 2013).

1

For years, the United States and the State of Alaska ("State") were in accord about management of the subsistence salmon fishery on the Kuskokwim. But the State upended the situation during the 2021 fishing season and in the lead-up to the 2022 fishing season. For the first time, the State issued fishing orders through its Department of Fish and Game ("ADF&G") that purported to override federal regulations and allow fishing specifically prohibited by federal orders.

As the district court explained, the State has "not contested ANILCA's rural subsistence priority nor explained how the State's emergency order[s] do[] not both violate the federal orders and stand as an obstacle to the congressional intent of ANILCA."[5] Instead, the State now disavows the position it took just a few years ago at all stages in the *Sturgeon* litigation,[6] including before the United States Supreme Court, and argues that the United States has no authority to regulate subsistence fishing on the Kuskokwim within the Refuge because navigable waters like the Kuskokwim cannot be "public lands" for purposes of Title VIII of ANILCA.[7]

---

[5] *United States v. Alaska*, 608 F. Supp. 3d 802, 808 (D. Alaska 2022) (internal quotations omitted).

[6] *Sturgeon v. Frost*, 587 U.S. 28 (2019).

[7] Appellants' Opening Brief at 29, ECF No. 13.1 ("Opening Br.").

The State's reversal of its prior position is both improper and wrong. When Congress passed ANILCA, its "intent and purpose" was "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so."[8] Congress recognized that "the continuation of the opportunity for subsistence uses by rural residents of Alaska," is "essential" to both Native and non-Native "physical, economic, traditional, and cultural existence."[9] For the Alaska Native people of the Kuskokwim River, as it has been for Native people across Alaska since time immemorial, the "subsistence way of life" Congress identified is synonymous with salmon and salmonid fishing. Over the last three decades, "village residents in the Kuskokwim region have annually harvested over 360 pounds of wild foods per person for human consumption, with fish comprising up to 85% of the total poundage of subsistence harvests, and salmon contributing up to 53% of subsistence harvests."[10]

Here, the State of Alaska asks this Court to hold that Congress penned a statute intended to effectuate the continuation of subsistence ways of life, but omitted from its scope the very waters necessary to do so. As this Court held nearly three decades ago—without relying on *Chevron* deference—"Congress spoke to th[is] precise

---

[8] 16 U.S.C. § 3101(c).

[9] 16 U.S.C. § 3111(1).

[10] 3-JSER-665.

3

question," and because "subsistence fishing has traditionally taken place in navigable waters . . . Congress intended that public lands include at least some navigable waters."[11]  The Supreme Court specifically left that holding undisturbed in *Sturgeon*; as the district court correctly concluded, "the two cases [*Katie John* and *Sturgeon*] are not clearly irreconcilable."[12]  This Court's *Katie John* decisions remain good law, and control this case.

The State also challenges the regulatory structure implementing Title VIII of ANILCA and argues that the Federal Subsistence Board ("Board") is unconstitutional.  These arguments are procedurally barred and fail on the merits.

## JURISDICTIONAL STATEMENT

The district court had jurisdiction over this case pursuant to 28 U.S.C. §§ 1331 and 1345.  The district court issued final judgment against the State on April 1, 2024.[13]  The State appealed on April 3, 2024.[14]  This Court has jurisdiction pursuant to 28 U.S.C. § 1291.

---

[11] *Katie John I*, 72 F.3d at 702.

[12] 1-ER-21.

[13] 1-ER-2.

[14] 3-ER-417.

4

## ISSUES PRESENTED

Since 1990, pursuant to its statutory authority and three opinions from this Court, the Federal Subsistence Board has implemented ANILCA's rural subsistence priority in navigable waters within federal conservation system units such as the Yukon Delta National Wildlife Refuge. The issues presented by this appeal are:

(1)     Whether the Kuskokwim River within the Refuge constitutes "public lands" within the meaning of ANILCA section 102, such that the federal rural subsistence priority applies; and

(2)     Whether the membership and authority of the Board, whose role has been ratified by Congress twice, nonetheless violates the Appointments Clause of the Constitution.

## STATUTES AND REGULATIONS

The pertinent statutory and regulatory provisions are reproduced in the addendum to this brief.

## STATEMENT OF THE CASE

This Court is well-versed in the history and development of the federal fish and wildlife management regime created under Title VIII of ANILCA.[15]  The United States and the other Intervenors have also described this development in great detail,

---

[15] *See, e.g.*, *Katie John III*, 720 F.3d at 1218-23.

5

as well as the course of the *Sturgeon* litigation and the procedural posture of this case.[16]  The Fish Commission will not duplicate this briefing.

Instead, the Fish Commission addresses several misstatements in the State's presentation of the events and regulatory actions that took place in the 2021 and 2022 fishing seasons.  First, the State suggests that during the years leading up the 2021 fishing season, the question of whether the Board or the State had authority to regulate subsistence Chinook and chum salmon fishing within the Refuge had not come to a head "because it was federal policy to defer to State management of the federal portion of the Kuskokwim River whenever possible."[17]  This simply is not true.  For the six fishing seasons leading up to 2021, the fishery had been managed by the federal in-season manager.[18]  Throughout this time, ADF&G had issued emergency fishing orders that "mirrored" the federal orders; it was only starting in 2021 that ADF&G issued emergency orders contravening them.[19]

The State's claim that, prior to 2021, the federal government "deferred" to State management decisions appears to come from the statement of former Fish

---

[16] Appellee United States Answering Brief ("U.S. Br.") at 4-20; Intervenor Ass'n of Village Council Presidents et al. Answering Brief at 5-27 ("AVCP Br."); Intervenor Alaska Fed'n of Natives Answering Br. at 4-18 ("AFN Br."); Intervenor Ahtna Tene Nené et al. Answering Br. at 6-22 ("Ahtna Br.").

[17] Opening Br. at 22 (cleaned up).

[18] 3-JSER-629.

[19] *Id.*

6

Commission Executive Director Mary Peltola that "it is Federal policy to defer to State management of the federal portion of the Kuskokwim River whenever possible."[20]   The State's reliance is misplaced.   This statement is simply a straightforward reference to 50 C.F.R. § 100.14(a) ("State fish and game regulations apply to public lands and such laws are hereby adopted and made a part of the regulations in this part *to the extent they are not inconsistent with, or superseded by, the regulations in this part.*").[21]   That provision has remained unchanged since 1992.[22]   The *only* thing that changed in 2021 is that, for the first time since the *Katie John* decisions, the State issued emergency orders that directly conflicted with federal orders.   Although the State suggests otherwise,[23] the State picked the fight that led to this case.

Second, the State's contention that the 2021 and 2022 federal emergency special actions were somehow unscientific or "inexplicabl[e]"[24] is an unsupported assault on the work of those who have stewarded the waters and fish at issue in this

---

[20] 3-ER-254.

[21] Emphasis added.

[22] 57 Fed. Reg. 22955.

[23] Opening Br. at 22; *see also*, State of Alaska FAQs on the Kuskokwim Case, https://law.alaska.gov/press/releases/2023/090123-FAQ.html (last accessed Oct. 24, 2024).

[24] *See, e.g.*, Opening Br. at 24.

7

case for thousands of years. As the United States has explained, federal management of the Kuskokwim salmon fisheries is a collaborative undertaking that includes a co-stewardship "fisheries management partnership" with the Alaska Native Tribes of the Kuskokwim River Drainage.[25] The Fish Commission's "33 Tribally appointed Fish Commissioners, 7 Executive Council members, and 4 In-Season Managers combine Traditional Knowledge and western science to conservatively manage Kuskokwim fisheries according to Yupik and Athabascan Dené values, subsistence harvest needs, and escapement targets aimed at rebuilding depleted salmon populations."[26] In doing so—and in the context of a historic collapse of the Chinook and chum runs that "threatens food security and the foundation of the subsistence economy in Kuskokwim River communities"[27]—the Fish Commission's managers and biologists worked hand-in-hand with the Refuge in-season manager "to create a management and harvest strategy for Kuskokwim River Chinook and chum salmon before and during the 2021 fishing season."[28] Each of the federal emergency special actions at issue here implemented that strategy "[b]ased on decision-making in collaboration with the Commission that combines…Traditional Indigenous

---

[25] 3-JSER-636.

[26] 3-JSER-663.

[27] 3-JSER-665 (cleaned up).

[28] 3-JSER-629; *see also* 3-JSER-562.

8

Knowledge" [29] with Western science, including local observations, data from the Bethel Test Fish Project and Bethel Sonar Project, and Community-Based Harvest Data.[30] The State's decision to issue emergency orders contravening federal fishing regulations was a politically-motivated rejection of federal authority—not the adoption of better fisheries management.

Finally, although the State praises itself for the "sustained yield" principle under the Alaska Constitution and the "priority for subsistence fishing" described in Alaska Statutes §16.05.258,[31] the State ignores its own role in the wholesale collapse of the Kuskokwim River Chinook and chum runs at issue:

> Since at least 2009, subsistence-dependent communities in the Kuskokwim drainage have ... suffered because of significant and sudden drops in salmon populations, beginning with Chinook salmon and now including chum salmon. The Kuskokwim River is experiencing a catastrophic multi-species salmon decline not seen in living memory.[32]

And further:

> ADF&G prosecuted fisheries that harvested 50 to 60 percent of the total Chinook salmon run in 2010, 2011 and 2013, which were three of the last four years that the [ADF&G] was the sole management agency responsible for management decisions for the entire Kuskokwim River Chinook salmon runs. ADF&G's actions in 2010, 2011 and 2013

---

[29] 3-JSER-629.

[30] *See* In-Season Management.

[31] Opening Br. at 8. Critically, the subsistence priority under state law is not a *rural* subsistence priority.

[32] 3-JSER-665.

resulted in extremely high and demonstrably unsustainable total harvest rates on a declined population that constituted over-harvest. These years are among the lowest runs on record.[33]

Congress enacted a subsistence priority in ANILCA Title VIII expressly to protect rural and Alaska Native subsistence fishing rights, and this Court vindicated those rights in the *Katie John* trilogy. In contrast, the State has been unwilling to protect them and has repeatedly sought to undermine them.[34] This case marks another chapter in that unfortunate history.

## SUMMARY OF ARGUMENT

Title VIII of ANILCA was enacted "to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so."[35] In the *Katie John* cases, this Court recognized that the best reading of the statute—indeed, the *only* reading that would "give meaning to [this] purpose"[36]—is that the "public lands" subject to Title VIII's rural subsistence priority must include at navigable waters.[37] Nothing in the Supreme Court's *Sturgeon* decision is "clearly irreconcilable"[38] with this holding. Rather, the Supreme Court took the State at its

---

[33] 3-JSER-626 to 627.

[34] *McDowell v. State*, 785 P.2d 1 (Alaska 1989).

[35] 16 U.S.C. § 3101(c).

[36] *Katie John I*, 72 F.3d at 702 n.9.

[37] *Id.*

[38] *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003).

10

word that "public lands" could have a different meaning for purposes of Title VIII than in other portions of the statute, and the Court expressly chose to leave the *Katie John* cases undisturbed. The *Katie John* cases are still good law, and they control here.

But even if existing Circuit Precedent were insufficient to dispose of the State's contention that "public lands" exclude navigable waters, that interpretation of ANILCA is foreclosed by basic principles of statutory construction. This Court reads statutory provisions—including definitions—in context, and does not interpret them in such a way as to "destroy . . . major congressional purposes."[39] As this Court has repeatedly recognized, subsistence fishing in navigable waters is the lifeblood of Title VIII's subsistence protections.[40] The State's interpretation, in contrast, would destroy Congress's primary purpose in enacting Title VIII.

Significantly, Congress twice ratified this Court's interpretation of the "public lands" definition as applied to Title VIII. In 1997 and again in 1998, Congress enacted contingent amendments to ANILCA.[41] In these acts, Congress specifically

---

[39] *United States v. Olson*, 856 F.3d 1216, 1223 (9th Cir. 2017) (cleaned up).

[40] *Katie John I*, 72 F.3d at 702; *see also Native Village of Quinhagak v. United States*, 35 F.3d 388, 393 (9th Cir. 1994) ("Most subsistence fishing (and most of the best fishing) is in the large navigable waterways rather than in the smaller non-navigable tributaries upstream and lakes where fisherman [sic] have access to less fish.").

[41] Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. No. 105–83, § 316(b), 111 Stat. 1543, 1592-95 (1997); Omnibus Consolidated

considered the Secretary's interpretation of "public lands" as including navigable waters—directly addressing this Court's *Katie John* decision—and chose to leave them in place. Such a ratification through "positive legislation" is "virtually conclusive" that the agency interpretation at issue in those cases is correct.[42]

The State's arguments are also procedurally barred. Because the State was a party in the Katie John litigation, it is precluded from raising issues that were decided in those cases.[43] Nothing in *Sturgeon*, which specifically disavowed any impact on the *Katie John* decisions, constitutes "a change in the applicable legal context."[44] Alaska is not entitled to yet another bite at the apple to relitigate an issue it has already lost multiple times.[45]

The State's arguments regarding the constitutionality of the Federal Subsistence Board are similarly barred as procedural matter and wrong on the merits. First, even if the members of the Board are officers for the purposes of the Appointments Clause, both the establishment of the Board and process for

---

and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105–277, Div. A, § 339(a), 112 Stat. 2681, 2681-295 to -296 (1998).

[42] *Commodity Futures Trading Comm'n v. Schor*, 478 U.S. 833, 846 (1986).

[43] *United States v. Mendoza*, 464 U.S. 154, 158 (1984).

[44] *Segal v. Am. Tel. & Tel. Co.*, 606 F.2d 842, 845 (9th Cir. 1979) (citation omitted).

[45] *See, e.g.*, *Katie John II*, 247 F.3d at 1050 (Rymer, J.) ("Alaska has had two bites at the same apple. . . ."); the State got yet another bite in *Katie John III*.

appointment of its members were authorized by law.[46]   Second, just as Congress ratified the inclusion of navigable waters within "public lands," it ratified the agency regulations that implement that title—including those that created the Board and specified the appointment of its members.[47]   Third, the State could have raised its Appointments Clause claims in the *Katie John* litigation; because it did not do so, the State is precluded from raising them here.[48]   And finally, the State's challenge to the Board's structure and authority is also barred by the six-year statute of limitations on claims against the federal government.[49]

## STANDARD OF REVIEW

"This case presents questions of law, which [this Court] review[s] *de novo*."[50] Similarly, this Court "review[s] a grant of summary judgment de novo."[51]   In evaluating questions of statutory interpretation, such as those at issue here, courts determine the "best reading" of the statute,[52] while "according due respect to

---

[46] U.S. Const. art. II, § 2, cl. 2.

[47] § 316(b), 111 Stat. at 1592-95; § 339(a), 112 Stat. at 2681-295 to -206.

[48] *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 412 (2020).

[49] 28 U.S.C. § 2401(a).

[50] *Katie John III*, 720 F.3d at 1228.

[51] *Borja v. Nago*, 115 F.4th 971, 977 (9th Cir. 2024) (alteration omitted) (quoting *Sandoval v. County of Sonoma*, 912 F.3d 509, 515 (9th Cir. 2018)).

[52] *Loper Bright Enterprises v. Raimondo*, 144 S. Ct. 2244, 2266 (2024).

Executive Branch interpretations of federal statutes" and considering "the agency's 'body of experience and informed judgment.'"[53] "[W]hen a particular statute delegates authority to an agency consistent with constitutional limits, courts must respect the delegation, while ensuring that the agency acts within it."[54]

## ARGUMENT

I. **THE KUSKOKWIM RIVER CONSTITUTES "PUBLIC LANDS" FOR PURPOSES OF THE TITLE VIII SUBSISTENCE PROVISIONS.**

### A. The *Katie John* Decisions Remain Good Law and Control Here.

Although the State refuses to accept it, the *Katie John* cases remain good law. Accordingly, they are binding on this panel.[55]

In the *Katie John* trilogy, this Court answered the *precise* question at issue here. *Katie John I* addressed "the meaning of the definition of public lands in § 102 of ANILCA," namely "whether navigable waters fall within the statutory definition of public lands and are thus subject to federal management to implement ANILCA's subsistence priority."[56] Section 102 of ANILCA defines "public lands" as most

---

[53] *Id.* at 2257, 2267 (quoting *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)).

[54] *Id.* at 2273.

[55] *See Katie John III*, 720 F.3d at 1223 ("*Katie John I* remains controlling" because the en banc court in *Katie John II* "determined that the judgment rendered by the [*Katie John I*] panel . . . should not be disturbed or altered by the en banc court.") (alteration in original).

[56] *Katie John I*, 72 F.3d at 700.

"federal lands," which in turn are defined as "lands, waters, and interests therein" the "title to which is in the United States."[57] In *Katie John I*, this Court concluded that "public lands subject to subsistence management under ANILCA include certain navigable waters" and upheld "the federal agencies' conclusion that the definition of public lands includes those navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine."[58] Those waters included "appurtenant navigable waters" flowing over and through federal lands.[59] This Court, sitting en banc, affirmed that conclusion in *Katie John II*.[60]

Finally, *Katie John III* upheld the 1999 Final Rule promulgated by the Secretaries of Agriculture and Interior that implemented *Katie John I* and identified the bodies of water in which the federal government held reserved water rights.[61] At that point, the State no longer disputed that the federal government had authority to implement ANILCA's rural subsistence priority in navigable waters within federal

---

[57] 16 U.S.C. § 3102(1)-(3).

[58] *Katie John I*, 72 F.3d at 703-04.

[59] *Id.* at 703.

[60] *Katie John II*, 247 F.3d at 1033.

[61] *Katie John III*, 720 F.3d at 1245. Identical regulations implementing Title VIII are promulgated by the Secretary of the Interior, at 50 C.F.R. pt. 100, and by the Secretary of Agriculture, at 36 C.F.R. pt. 242. For simplicity, and because the waters at issue here are managed by the Secretary of the Interior, this brief refers to the Secretary of the Interior and the Interior regulations.

lands; rather, it argued that "federal reserved water rights arising by implication exist *only* within the borders of federal reservations, not beyond them."[62]  This Court rejected that argument, concluding that the 1999 Final Rule properly asserted federal authority over navigable waters within *and adjacent to* federally reserved lands.

The State does not—and cannot—contend that it is raising a new issue here. Instead, it raises an issue that it has already litigated and lost, attempting to revive its long-dead argument that navigable waters within federal reservations do not constitute "public lands" for purposes of the *Title VIII* subsistence provisions.[63]  It contends that the Supreme Court's decision in *Sturgeon v. Frost*[64] abrogated the *Katie John* decisions because *Sturgeon* concluded that the definition of "public lands" for purposes of *Title I* of ANILCA does *not* include navigable waters.  That argument fails.

*Sturgeon* addressed whether the definition of "public lands" included navigable waters for purposes of federal authority over certain non-subsistence activities.[65]  It did not address the scope of "public lands" under Title VIII.  In fact,

---

[62] *Katie John III*, 720 F.3d at 1229 (emphasis added).

[63] For this reason, as discussed in Section I.D, the State's arguments are not only meritless but also barred by issue and claim preclusion.

[64] 587 U.S. 28 (2019).

[65] *Id.*

the *Sturgeon* Court expressly stated that it was *not* disturbing the *Katie John* decisions regarding the scope of federal authority in Title VIII:

> As noted earlier, the Ninth Circuit has held in three cases—the so-called *Katie John* trilogy—that the term "public lands," when used in ANILCA's subsistence-fishing provisions, encompasses navigable waters like the Nation River. See *Alaska v. Babbitt*, 72 F.3d 698 (1995); *John v. United States*, 247 F.3d 1032 (2001) (en banc); *John v. United States*, 720 F.3d 1214 (2013); *supra*, at 1078. Those provisions are not at issue in this case, and we therefore do not disturb the Ninth Circuit's holdings that the Park Service may regulate subsistence fishing on navigable waters. See generally Brief for State of Alaska as *Amicus Curiae* 29–35 (arguing that this case does not implicate those decisions); Brief for Ahtna, Inc., as *Amicus Curiae* 30–36 (same).[66]

The State cites *Miller v. Gammie* for the proposition that Circuit precedent can be abrogated by a Supreme Court decision "when it 'undercut[s] the *theory or reasoning* underlying the prior circuit precedent in such a way that the cases are clearly irreconcilable.'"[67] But the State comes nowhere near carrying its burden to show that this "high standard" has been met here.[68] As this Court has explained, "[i]t is not enough for there to be 'some tension' between the intervening higher authority and prior circuit precedent, or for the intervening higher authority to 'cast

---

[66] *Id.* at 45 n.2.

[67] Opening Br. at 30 (quoting *Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) (alteration and emphasis in Opening Br.)).

[68] *See Fed. Trade Comm'n v. Consumer Def., LLC*, 926 F.3d 1208, 1213 (9th Cir. 2019) (quotation omitted).

17

doubt' on the prior circuit precedent."[69]  Rather, "if [the court] can apply [its] precedent consistently with that of the higher authority, [it] must do so."[70]  Here, by expressly leaving the *Katie John* decisions undisturbed, the Supreme Court *itself* indicated that *Sturgeon* and *Katie John* are not irreconcilable.  The *Katie John* decisions therefore remain good law and bind this panel.[71]

The Supreme Court's own assessment that the *Katie John* cases may coexist with *Sturgeon* suffices to resolve this case.  But even if the Supreme Court had been silent on this issue, the State is wrong that *Sturgeon*'s reasoning is inconsistent with the *Katie John* precedent.  In fact, the State itself argued precisely the opposite in *Sturgeon*, contending that the definition of "public lands" for purposes of Title I need not affect the definition of "public lands" for purposes of the Title VIII subsistence provisions—and, significantly, the State convinced the Supreme Court that it was correct.  The State now tries to spin its *Sturgeon* briefing as arguing that *Katie John* was "not at issue," so the Supreme Court need not address it.[72]  In truth, however, the State argued that *Katie John* was not at issue *precisely because* the definition of

---

[69] *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (citations omitted).

[70] *FTC*, 926 F.3d at 1213.

[71] *See Katie John III*, 720 F.3d at 1226 (explaining that the panel was bound by the en banc court's decision in *Katie John II*); *see also Miller*, 335 F.3d at 899 (confirming that unless a prior decision has been "effectively overruled" by a higher authority, "a three-judge panel may not overrule a prior decision of the court").

[72] Opening Br. at 21-22.

18

"public lands" for purposes of Title I need not implicate the definition of "public lands" for the very different purposes of Title VIII. In its brief here, the State cites the United States' *Sturgeon* brief as arguing that the term "public lands" must be given the same meaning throughout ANILCA.[73] But what is important is that *the State itself argued the opposite*, and it was the State's approach that carried the day.

Broad swaths of the State's brief to the Supreme Court in *Sturgeon* directly refute the State's current arguments.[74] In explaining why the *Katie John* and *Sturgeon* decisions should *not* be "tied together," the State explained:

> Title VIII stands apart from the rest of ANILCA with its own findings, 16 U.S.C. § 3111, its own statement of policy, 16 U.S.C. § 3112, and - unlike any other part of the legislation - specific invocations of congressional authority under the Commerce Clause, the Property Clause, and Congress's "constitutional authority over Native affairs." 16 U.S.C. § 3111(4).[75]

The State explained that "reading 'public lands' according to its plain meaning in non-subsistence contexts effectuates the statute's purposes," while effectuating the purpose of Title VIII requires a reading that encompasses navigable waters.[76] The State even added "prudential and policy reasons why [the] Court should

---

[73] *Id.* at 21.

[74] *See* Brief of Amicus Curiae State of Alaska in Support of Petitioner at 29-35, *Sturgeon v. Frost*, 587 U.S. 28 (2019) (No. 17-949), 2018 WL 4063284 ("Alaska *Sturgeon* Amicus Br.").

[75] *Id.* at 30-31.

[76] *Id.*

19

preserve the *Katie John* precedents."[77]   The State had made the same argument before this Court, asserting that "Alaska is not seeking to overturn *Katie John I* or otherwise interfere with the regulatory infrastructure surrounding the rural subsistence fishing preference."[78]

In now asking this Court to find that *Sturgeon* overruled *Katie John*, the State attempts to rewrite history.  The State's own arguments have clearly demonstrated that *Katie John* and *Sturgeon* are not "clearly irreconcilable."  The *Katie John* cases therefore remain the law of this Circuit.

## B.     The State's Reading of "Public Lands" Is Inconsistent with Title VIII.

Equally fatal, the State's interpretation of "public lands" would entirely eliminate the subsistence fishing protections enshrined in Title VIII.  That cannot be correct.  Instead, as the State argued in *Sturgeon*, and this Court held in *Katie John I* and *II*, the best reading of Title VIII is that public lands *must* encompass navigable waters and the fishing rights they support, even if "public lands" carries a different definition in other titles of ANILCA.

---

[77] *Id*. at 31-32.

[78] State of Alaska's Opposition to Mentasta Traditional Council et al.'s Motion to Intervene at 2, *Sturgeon v. Frost*, 872 F.3d 927 (9th Cir. 2017) (No. 13-36165), ECF No. 101 (footnote omitted).

The State's new and contrary argument here rests heavily on the idea that the term "public lands" must carry precisely the same meaning throughout ANILCA— a position the State rejected in *Sturgeon*. But there is *overwhelming* indication that the term "public lands" carries a broader meaning in Title VIII than in the rest of the statute—precisely because Congress intended Title VIII to protect continued subsistence fishing across Alaska. As the State correctly argued before the Supreme Court, "in the unique context of Title VIII, in fact, the 'natural presumption that identical words used in different parts of the same act are intended to have the same meaning' is not controlling."[79] Rather, "the presumption of consistent usage 'readily yields' to context, and a statutory term—even one defined in the statute—'may take on distinct characters from association with distinct statutory objects calling for different implementation strategies.'"[80] This principle flows from the "fundamental canon of statutory construction that the words of a statute must be read in their context and with a view to their place in the overall statutory scheme."[81] Thus, "[i]f interpreting a term consistently with its statutory definition would, for instance, lead

---

[79] Alaska *Sturgeon* Amicus Br. at 33–34, 2018 WL 4063284 (quoting *Env't Def. v. Duke Energy Corp.*, 549 U.S. 561, 574 (2007)).

[80] *Util. Air Regul. Grp. v. E.P.A.*, 573 U.S. 302, 320 (2014) (quoting *Duke Energy*, 549 U.S. at 574)).

[81] *Gundy v. United States*, 588 U.S. 128, 141 (2019) (quoting *Nat'l Assn. of Home Builders v. Defs. of Wildlife*, 551 U.S. 644, 666 (2007)).

21

to 'obvious incongruities' or would 'destroy one of the major congressional purposes,' the statutory definition may yield to context."[82]

That is precisely the case when it comes to Title VIII, in which both the language and purpose present uniquely compelling reasons to give "public lands" a broader interpretation encompassing navigable waters. To begin, Title VIII contains not only its own congressional findings and statement of policy,[83] but also expressly draws on specific sources of constitutional power for enactment of the subsistence provisions, citing Congress's plenary power over Native affairs and its powers under the Property Clause and the Commerce Clause.[84] At the outset, these distinctions from the rest of ANILCA indicate that ANILCA'S statutory terms carry a different meaning within Title VIII.

Moreover, Title VIII's *express* purpose was the "continuation of the opportunity for a subsistence way of life by residents of rural Alaska."[85] Subsistence fishing—an integral and central part of the subsistence way of life—had occurred in

---

[82] *Olson*, 856 F.3d at 1223 (alteration omitted) (quoting *Lawson v. Suwannee Fruit & S.S. Co.*, 336 U.S. 198, 201 (1949); and citing *Util. Air Regul. Grp.*, 573 U.S. at 319–20).

[83] 16 U.S.C. §§ 3111, 3112.

[84] *Id.* § 3111(4).

[85] 16 U.S.C. § 3111(5).

Alaska's navigable waters for millennia,[86] and ANCSA's extinguishment of aboriginal fishing and hunting rights compelled Congress in Title VIII to act to protect the *continuation* of that way of life.[87]  Congress specifically provided in ANILCA that "the purpose of [Title VIII] is to provide the opportunity for rural residents engaged in a subsistence way of life to do so," and that "nonwasteful subsistence uses of fish and wildlife and other renewable resources shall be the priority consumptive uses of all such resources on the public lands of Alaska."[88]  The Congressional findings, too, emphasize the importance of "food supplies and other items gathered from fish and wildlife," specifically mentioning fish five times in five paragraphs.[89]

The State recognized all of this throughout the *Sturgeon* litigation, pointing to the congressional findings and emphasizing the importance of the subsistence priority, explaining that "in the nearly twenty years since the federal government

---

[86] "Long before the white man came to Alaska, the annual migrations of salmon from the sea into Alaska's rivers to spawn served as a food supply for the natives." *Metlakatla Indian Cmty. v. Egan*, 369 U.S. 45, 46 (1962).  "Most subsistence fishing (and most of the best fishing) is in the large navigable waterways rather than in the smaller non-navigable tributaries upstream and lakes where fisherman [sic] have access to less fish."  *Native Village of Quinhagak*, 35 F.3d at 393.

[87] Congress refers to its actions as protecting the "continuation" of the subsistence way of life, "continued" subsistence activities, and the need to "continue" the subsistence way of life numerous times in Title VIII.

[88] 16 U.S.C § 3112(1)-(2).

[89] 16 U.S.C. § 3111(2); *see generally* 16 U.S.C. § 3111.

23

assumed management of subsistence activities on federal lands in Alaska, rural Alaskans have depended on this subsistence priority to effectuate those values and preserve their way of life."[90] The State described the significant volume of wild foods harvested by Alaskans each year, as well as the lack of access to packaged and processed foods in rural Alaska.[91] It even underscored that "to many Alaska Natives, subsistence is not a recreational or purely practical activity, but rather a way of life, the lifeblood of cultural, spiritual, economic, and physical well-being."[92] Protecting this way of life was the very reason driving the enactment of Title VIII.[93] Yet the State now asks this Court to eliminate these subsistence fishing protections altogether.

Where Congress has articulated such a clear purpose for a statute, key terms are not to be interpreted in a way that would "destroy one of the major congressional purposes."[94] The State thus errs in seeking to reinterpret Title VIII in a way that would destroy Congress's *primary* purpose of continuing subsistence hunting and fishing. As this Court has observed in connection with Title VIII, "[i]f [Alaska

---

[90] Alaska *Sturgeon* Amicus Br. at 31-32, 2018 WL 4063284.

[91] *Id.*

[92] *Id.* at 32.

[93] *See* 16 U.S.C. § 3111.

[94] *See Olson*, 856 F.3d at 1223 (alteration omitted) (quoting *Lawson*, 336 U.S. at 201; and citing *Util. Air Regul. Grp.*, 573 U.S. at 319-20).

Natives'] right to fish is destroyed, so too is their traditional way of life."[95]  Under these circumstances, a "statutory definition may yield to context."[96]  In fact, both the text and the purpose point in the same direction: the term "public lands" (including "lands, waters, and interests therein") is capacious enough to encompass navigable waters, and all the relevant textual indications indicate that Title VIII *must* be interpreted to include the rivers carrying the salmon runs that are the lifeblood of Alaska Native communities.

The State's contrary interpretation would produce the absurd result of eviscerating Title VIII's protections for subsistence fishing in a statute that mentions fish (or variations of the word) an astounding 49 times in Title VIII alone.[97]  The State's construction would also render meaningless the term "waters, and interests therein" in the definition of "public lands" as applied to Title VIII.[98]  In other words, an interpretation that does not protect subsistence fishing would do violence to both the text and stated purpose of Title VIII.  This Court rejected that outcome as untenable 30 years ago, when the State first made this argument in *Katie John I.*  The

---

[95] *United States v. Alexander*, 938 F.2d 942, 945 (9th Cir. 1991).

[96] *Olson*, 856 F.3d at 1223 (citing *Util. Air Regul. Grp.*, 573 U.S. at 319-20).

[97] *United States v. LKAV*, 712 F.3d 436, 440 (9th Cir. 2013) ("Statutory interpretations which would produce absurd results are to be avoided." (alteration omitted) (quoting *Ariz. St. Bd. for Charter Schs. v. U.S. Dep't of Educ.*, 464 F.3d 1003, 1008 (9th Cir. 2006))).

[98] *See* 16 U.S.C. § 3102(1).

Court explained that if it adopted "the state's position, that public lands exclude navigable waters, . . . [it] would undermine congressional intent to protect and provide the opportunity for subsistence fishing."[99]  It rejected that approach, and it should do so again here.  Try as it might, the State cannot point to anything in *Sturgeon* that mandates such an extreme—and illogical—reading of Title VIII.

Contrary to the State's interpretation of *Sturgeon*, the Supreme Court's analysis of the reserved water rights doctrine leaves room for a different reading of Title VIII.  The Court in *Sturgeon* acknowledged that some cases indicate that "a person can hold 'title' to . . . usufructuary interests" such as a reserved water right,[100] even though "the more common understanding" is that "reserved water rights are not the type of property interests to which title can be held."[101]  The Court therefore asked whether there was "evidence that the Congress enacting ANILCA meant to use the term in any less customary and more capacious sense."[102]  Although the

---

[99] *Katie John I*, 72 F.3d at 704.

[100] 587 U.S. at 43-44 (citing *Fed. Power Comm'n v. Niagara Mohawk Power Corp.*, 347 U.S. 239, 246 (1954); *Crum v. Mt. Shasta Power Corp.*, 30 P.2d 30, 36 (Cal. 1934); *Radcliff's Ex'rs v. Mayor of Brooklyn*, 4 N.Y. 195, 196 (N.Y. 1850)).

[101] *Id.* at 44 (quoting *Totemoff v. State*, 905 P.2d 954, 965 (Alaska 1995)).  The Court did not assess the extent to which the Federal government's navigational servitude is an additional "interest" in navigable waters.  *Cf. Katie John II*, 247 F.3d at 1039-40 (Tallman, J., concurring).

[102] *Sturgeon*, 587 U.S. at 44.

26

Court found no such evidence with respect to ANILCA generally,[103] Title VIII presents a different story: there is overwhelming evidence that Congress intended a broader meaning with the specific goal of protecting the continuation of subsistence fishing.

To the extent the Supreme Court suggested that the powers flowing from reserved water rights must be linked to the purpose of the reservation, that is no obstacle here: section 303(7) of ANILCA, which established the Yukon Delta National Wildlife Refuge, specifies that "[t]he purposes for which the Yukon Delta National Wildlife Refuge is established and shall be managed include . . . to provide . . . the opportunity for continued subsistence uses by local residents," as well as "to conserve fish and wildlife populations and habitats in their natural diversity," including a non-exhaustive list of fish and wildlife that specifically includes salmon.[104]  Thus, the purpose of the reservation squarely encompasses management and protection of subsistence salmon fishing, and the associated reserved water rights include such authority.

_____

[103] *Id.*

[104] Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, § 303(7)(B)(i), (iii), 94 Stat. 2371, 2392-93 (1980).

Finally, in enacting Title VIII Congress invoked multiple sources of constitutional authority.[105] Each of those sources of power—the Property Clause, the Commerce Clause, and Congress's plenary authority over Native affairs—is independently sufficient to establish federal authority over subsistence fishing in navigable waters. And by invoking these sources of power together, Congress indicated that it was fully exercising these powers to accomplish the purposes set out in Title VIII. The Fish Commission adopts the United States' and the other Intervenors' arguments regarding Congress's use of those sources of authority,[106] including its broad authority over navigable waters.[107] Congress's unmistakable intent was to protect subsistence fishing in navigable waters, and Title VIII cannot be read otherwise.

---

[105] 16 U.S.C. § 3111(4) ("[I]t is necessary for the Congress to invoke its constitutional authority over Native affairs and its constitutional authority under the property clause and the commerce clause to protect and provide the opportunity for continued subsistence uses on the public lands by Native and non–Native rural residents.").

[106] U.S. Br. Argument § I.A; AVCP Br., Argument § II; Ahtna Br., Argument § II; AFN Br., Argument § II. For all of the reasons discussed here, this Court need not reconsider the *Katie John* trilogy. If it does so, however, the Fish Commission agrees with the other Intervenors' arguments that the navigational servitude and the other sources of constitutional power invoked in Title VIII provide alternate grounds on which to find that "public lands" include the navigable waters at issue here.

[107] *See Katie John II*, 247 F.3d at 1034 (Tallman, J., concurring) ("We believe that Congress invoked its powers under the Commerce Clause to extend federal protection of traditional subsistence fishing to *all* navigable waters within the State of Alaska, not just to waters in which the United States has a reserved water right.").

For all of the same reasons (and contrary to the State's contentions), the Supreme Court's decision in *Loper Bright* does nothing to undermine the *Katie John* cases' wholesale rejection of the argument that Title VIII does not apply in navigable waters.[108] The best reading of the statute—and the only logical reading—is that Title VIII of ANILCA protects rural subsistence fishing (which occurs almost exclusively in navigable waters).[109] Thus, even viewed under the *Loper Bright* framework, "public lands" must be interpreted to encompass navigable waters for purposes of Title VIII. The State asserts, erroneously, that this Court based its decision in *Katie John I* "entirely on *Chevron* deference."[110] But a fair and close reading of the decision reveals that this Court in *Katie John I* did not rely on *Chevron* deference to determine that the term "public lands" must include navigable waters. To the contrary, this Court concluded that "Congress spoke to the precise question of whether *some* navigable waters may be public lands."[111] Because the statute and its history "clearly indicate that subsistence uses include subsistence fishing," and because "subsistence fishing has traditionally taken place in navigable waters," this Court "ha[d] no doubt that Congress intended that public lands include at least some

---

[108] *See Katie John I*, 72 F.3d at 702; *Katie John II*, 247 F.3d at 1033.

[109] *See Loper Bright*, 144 S. Ct. at 2266.

[110] Opening Br. at 33.

[111] *Katie John I*, 72 F.3d at 702.

navigable waters."[112]  This Court's unmistakable message in *Katie John I* was that the best reading of Title VIII includes navigable waters within the definition of public lands.  By contrast, under the State's reading, *no* navigable waters would be public lands.  This Court has already concluded that this interpretation is foreclosed by the statute's text, purpose and history, without regard to *Chevron*.

Finally, even if *Loper Bright* shifted the framework for analysis in future cases, the Supreme Court cautioned that this decision "do[es] not call into question prior cases that relied on the *Chevron* framework," which "are still subject to statutory *stare decisis*."[113]  For that reason, too, the State is wrong that *Loper Bright* gives this Court reason to depart from its longstanding precedent in the *Katie John* cases.

## C.    Congress Ratified the Secretary's Interpretation of Title VIII.

Even if the text of Title VIII left any doubt, Congress subsequently spoke to these very issues—citing the *Katie John* litigation by name—and ratified the Secretary's interpretation of "public lands" as encompassing navigable waters for purposes of Title VIII.

---

[112] *Id.*  The court employed *Chevron* deference only on the question of "*which* navigable waters are public lands," concluding that the Secretaries' delineation of particular waters was reasonable.  *Id.*

[113] *Loper Bright*, 144 S. Ct. at 2273.

"[W]hen Congress revisits a statute giving rise to a longstanding administrative interpretation without pertinent change, the congressional failure to revise or repeal the agency's interpretation is persuasive evidence that the interpretation is the one intended by Congress."[114]  This is a textbook case for application of that rule.

When ANILCA was originally enacted, Congress envisioned that the State would manage subsistence hunting and fishing on public lands and implement ANILCA's rural subsistence priority.  But Congress included a Plan B:  If the State did not implement the rural subsistence priority, the federal government would step in.  And so, after the Alaska Supreme Court found the rural preference unconstitutional under state law,[115] and after the Alaska Legislature then failed to approve a corrective constitutional amendment for presentation to Alaska's citizens, the federal government promulgated regulations governing subsistence hunting and fishing on public lands.[116]  Among other things, those regulations established the Federal Subsistence Board and delegated to it "responsibility for[] administering the subsistence taking and uses of fish and wildlife on public lands, and the related

---

[114] *Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884, 889 (9th Cir. 2017) (alteration in original) (quoting *Commodity Futures Trading Comm'n*, 478 U.S. at 846.)

[115] *McDowell v. State*, 785 P.2d 1 (Alaska 1989).

[116] Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, and C, 57 Fed. Reg. 22940-01 (May 29, 1992).

promulgation . . . [of] regulations."[117]  Although the initial regulations generally excluded navigable waters, in *Katie John I* the Ninth Circuit concluded that "public lands" at least includes navigable waters in which the United States holds a reserved water right.[118]

Congress was aware of this history when, in 1997, it enacted contingent amendments to ANILCA.[119]  In its findings, Congress carefully explained that although the State had initially implemented a law "providing subsistence use opportunities for rural residents of Alaska," that "law was challenged in Alaska courts, and the rural preference requirement in the law was found in 1989 by the Alaska Supreme Court in *McDowell v. State of Alaska* . . . to violate the Alaska Constitution."[120]  Therefore, Congress explained, "in accordance with title VIII of [ANILCA], the Secretary of the Interior is required to manage fish and wildlife for subsistence uses on all public lands in Alaska because of the failure of State law to

_____

[117] *Id.* at 22953 (subpt. B § __.10(a) (sic)); *see* 50 C.F.R. § 100.10.

[118] 72 F.3d at 703-04.  The Secretary subsequently promulgated regulations specifying the sections of river in which it held reserved water rights, and thus exercised Title VIII authority.  *See* 50 C.F.R. § 100.3.

[119] Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. No. 105–83, § 316(b), 111 Stat. 1543, 1592-95 (1997).  These amendments were enacted as a carrot to persuade the State to amend its own constitution and to thereby resume management of the subsistence priority as a matter of state law.  This, of course, never occurred.

[120] *Id.* § 316(b)(3)(B) (ANILCA § 801 amended subsections (b)(1)-(2)).

provide a rural preference."[121]   Congress then directly addressed the *Katie John* litigation, noting:

> [T]he Ninth Circuit Court of Appeals determined in 1995 in *State of Alaska v. Babbitt* (73 F.3d 698) that the subsistence priority required on public lands under section 804 of this Act *applies to navigable waters* in which the United States has reserved water rights as identified by the Secretary of the Interior.[122]

This 1997 enactment shows that Congress understood and approved the legal context and the lay of the land—specifically, that the Secretary was managing subsistence hunting and fishing on public lands in Alaska, and that "public lands" included "navigable waters in which the United States has reserved water rights" (like the Kuskokwim River within the Refuge).

Congress explained that it was enacting amendments aimed at giving the State a chance to restore the originally contemplated system, in which ANILCA would protect the same rural subsistence uses "through the management of the State of Alaska."[123]   In doing so, however, Congress was unwavering on the rural subsistence priority.   And Alaska could not implement that priority unless the Alaska Constitution were amended.   Congress therefore chose to make the ANILCA amendments contingent on the State's action, effectively giving the State a chance

---

[121] *Id.* (amended subsection (b)(4)).

[122] *Id.* (amended subsection (b)(5)) (emphasis added).

[123] *Id.* (amended subsection (b)(7)).

to amend its Constitution and resume management of subsistence hunting and fishing, but expressly providing that if the State did *not* do so, the amendments would sunset and the existing federal management scheme would remain in place:

> Unless and until laws are adopted in the State of Alaska which provide for the definition, preference, and participation specified in sections 803, 804, and 805 of the Alaska National Interest Lands Conservation Act [i.e., rural subsistence preference], the amendments made by subsection (b) of this section shall be effective only for the purposes of determining whether the State's laws provide for such definition, preference, and participation. The Secretary shall certify before December 1, 1998 if such laws have been adopted in the State of Alaska. Subsection (b) *shall be repealed on such date if such laws have not been adopted*.[124]

In other words, if the State did not adopt a constitutional amendment allowing it to implement a rural subsistence priority consistent with federal law, the existing federal regulations governing management of subsistence hunting and fishing— including fishing in navigable waters in which the United States held reserved water rights—would remain in place.

Even in the contingent amendments, Congress emphasized the importance of the rural subsistence priority in the provisions addressing regulations. While 16 U.S.C. § 3124 generally gives the Secretary the authority to promulgate "such regulations as are necessary" to implement various responsibilities under Title VIII, Congress temporarily amended this provision to give the *State* regulatory power "at

---

[124] *Id.* § 316(d) (emphasis added) (internal citation omitted).

any time the State has complied with [16 U.S.C. § 3115(d)]"—that is, when the State "enacts and implements laws" providing for the rural subsistence priority.[125] And the amendments prohibited the Secretary from making or enforcing her own regulations, but only "[d]uring any time" when the State had complied with § 3115(d) by implementing a rural subsistence priority.[126] Ultimately, the State was unable to pass a constitutional amendment permitting it to implement the rural priority by the December 1998 deadline, and so—according to Congress's explicit instruction—these amendments were automatically repealed.[127]

In 1998, Congress gave the State yet another chance to manage the rural subsistence priority in federal lands and waters. By then the Secretary had issued a proposed rule defining "public lands" to include waters in which the United States held a reserved water right (including in the Kuskokwim River), and was preparing to issue the corresponding final rule.[128] Those proposed regulations also specifically

---

[125] *Id.* § 316(b)(8)(A), 111 Stat. at 1594 (ANILCA § 814 amended); *see* ANILCA § 805(d), 16 U.S.C. § 3115(d).

[126] Pub. L. No. 105–83, § 316(b)(8)(B), 111 Stat. at 1594 (ANILCA § 814 amended).

[127] *Id.* § 316(d).

[128] Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, C, and D, Redefinition To Include Waters Subject to Subsistence Priority, 62 Fed. Reg. 66216-01, 66217-18 (Dec. 17, 1997) (proposed rule). Congress had already delayed this rulemaking twice, providing in the 1996 and 1997 appropriations bills that none of the Department of the Interior's funds could be used to issue or implement rules or regulations asserting federal control over navigable waters. Omnibus Consolidated Rescissions and Appropriations Act of 1996, Pub. L. No.

"provide[d] the Federal Subsistence Board with clear authority to administer the subsistence priority in these waters."[129]  The 1998 contingent amendments temporarily froze the regulatory definition of public lands and delayed implementation of the final rule until December 1, 2000.[130]  Here again, Congress held the rural subsistence priority paramount: if the State could not implement the rural priority, Congress would leave the federal management scheme in place and allow the pending rule to be finalized.  Congress also required the Secretary of the Interior to certify whether the Alaska Legislature had passed a resolution to amend the Alaska Constitution to allow a rural preference, and provided that the ANILCA amendments "shall be repealed on October 1, 1999, unless prior to that date the Secretary of the Interior makes such a certification."[131]  Again the State did not act.[132]  So again, in accordance with Congress's direction, the amendments were

---

104-134, § 336, 110 Stat. 1321, 1321-210 (Apr. 26, 1996); Omnibus Consolidated Appropriations Act, 1997, Pub. L. No. 104-208, § 317, 110 Stat 3009-222 (Sept. 30, 1996).

[129] 62 Fed. Reg. at 66216.

[130] 1999 Omnibus Appropriations Act § 339(a), 112 Stat. at 2681-295.

[131] *Id.* § 339(b)(1)-(2), 112 Stat. at 2681-296.

[132] *See* AVCP Br. at 19.

automatically repealed, and Congress allowed the Secretary to implement the regulation that brought navigable waters within the definition of "public land."[133]

That "Congress revisit[ed] a statute giving rise to a longstanding administrative interpretation"—twice—and ultimately chose not "to revise or repeal the agency's interpretation" serves as a double ratification and provides "persuasive evidence that the interpretation is the one intended by Congress."[134] The case for congressional ratification is exceptionally strong here, given that Congress specifically mentioned the *Katie John* litigation and the agency's regulatory response. "Where 'an agency's statutory construction has been fully brought to the attention of the public and the Congress, and the latter has not sought to alter that interpretation although it has amended the statute in other respects, then presumably the legislative intent has been correctly discerned.'"[135] Not only was the agency's

---

[133] *See* Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, C, and D, Redefinition to Include Waters Subject to Subsistence Priority, 64 Fed. Reg. 1276-01 (Jan. 8, 1999).

[134] *Douglas*, 875 F.3d at 889 (quoting *Commodity Futures Trading Comm'n*, 478 U.S. at 846).

[135] *N. Haven Bd. of Educ. v. Bell*, 456 U.S. 512, 535 (1982) (quoting *United States v. Rutherford*, 442 U.S. 544, 554 n.10 (1979) (internal quotation marks omitted)); *see also Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 536-37 (2015) (where a term has been interpreted by the courts, "a later version of that act perpetuating the wording is presumed to carry forward that interpretation" (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 322 (2012))).

37

interpretation "brought to [Congress's] attention"; Congress looked directly at the proposed regulations, put them on hold, and then chose to let the agency proceed with promulgating the final rule.  It is hard to imagine a clearer case for ratification—when Congress acts by "positive legislation," as it did here, the agency interpretation that Congress ratified is "virtually conclusive."[136]

### D.    The State's Arguments Are Also Barred for Procedural Reasons.

The State's arguments also fail on procedural grounds.  As discussed in further detail in Section II.B, the arguments raised by the State here are identical to the claims brought by the State in the *Katie John* litigation, where the State argued that navigable waters should be excluded altogether from the definition of "public lands" for purposes of Title VIII.[137]  The Fish Commission fully agrees with and adopts the United States' arguments that issue preclusion therefore bars the State from relitigating this question.[138]  Under issue preclusion, "once a court has decided an

---

[136] *Commodity Futures Trading Comm'n*, 478 U.S. at 846.  Since the regulations did not assert that the navigational servitude provides an additional federal "interest" in navigable waters, Congress's actions in 1998 and 1999 should not be read as taking a position on that unaddressed issue.  Rather, Congress simply affirmed that the Secretary's actions were within the scope of her authority under Title VIII.

[137] *See Katie John I*, 72 F.3d at 700 ("[T]he parties dispute whether navigable waters fall within the statutory definition of public lands and are thus subject to federal management to implement ANILCA's subsistence priority."); *Katie John III*, 720 F.3d at 1218 ("[T]he State of Alaska argues that the 1999 Rules sweep too broadly, in that they include as 'public lands' . . . waters in which no federal interest exists.").

[138] U.S. Br., Argument § I.B.

issue of fact or law necessary to its judgment, that decision is conclusive in a subsequent suit . . . involving a party to the prior litigation" regardless of whether the later suit involves the same cause of action.[139]  For the reasons explained in the United States' brief, that standard is easily satisfied here.

The district court was wrong to conclude that *Sturgeon* constitutes intervening precedent that would defeat preclusion.[140]  As discussed above, the *Sturgeon* decision expressly disavowed any impact on the *Katie John* cases, and thus it does not constitute a "change in the applicable legal context" with regard to this issue.[141] Because this Court "may affirm a grant of summary judgment on any ground supported by the record,"[142] it can affirm the grant of summary judgment below on the ground that issue preclusion bars the State from relitigating issues it has already litigated and lost multiple times.

---

[139] *Mendoza*, 464 U.S. at 158.

[140] 1-ER-18.

[141] *See id.* (quoting *Segal v. Am. Tel. & Tel. Co.*, 606 F.2d 842, 845 (9th Cir. 1979)).

[142] *U.S. ex rel. Ali v. Daniel, Mann, Johnson & Mendenhall*, 355 F.3d 1140, 1144 (9th Cir. 2004).

The district court was also wrong to reject the theory of judicial estoppel[143] on the basis that the State was not a party to *Sturgeon* in the Supreme Court.[144] The State was a party in multiple rounds of the *Sturgeon* litigation—including before this Court, where it made the very same arguments that it now disavows. Although nominally an amicus in the Supreme Court, the State was granted permission to present oral argument, and the Court even cited the State's briefing in concluding that the Court's decision need not implicate *Katie John*.[145] Under these circumstances, the State should be held to its word.

## II. THE FEDERAL SUBSISTENCE BOARD IS CONSTITUTIONALLY PROPER.

### A. The Board Is both Statutorily Authorized and Constitutional.

The State's constitutional arguments challenging the structure and authority of the Federal Subsistence Board, which it raised for the first time in this litigation, fail for many of the same reasons as its "public lands" arguments.

---

[143] *See New Hampshire v. Maine*, 532 U.S. 742, 749–50 (2001) (judicial estoppel "protect[s] the integrity of the judicial process by prohibiting parties from deliberately changing positions according to the exigencies of the moment" (internal quotations and citations omitted)).

[144] 1-ER-19.

[145] *See Sturgeon*, 587 U.S. at 45 n.2 (citing Brief for State of Alaska as Amicus Curiae as "arguing that this case does not implicate [the *Katie John*] decisions").

40

Under the Appointments Clause, positions held by officers of the United States must be established "by Law."[146] Although principal officers must be appointed by the President with the advice and consent of the Senate, inferior officers may be appointed by "Heads of Departments" when authorized "by Law."[147] The Fish Commission agrees with and adopts the United States' arguments that the establishment of the Board was properly authorized and that the process for appointment of Board members—assuming they are officers at all—is constitutionally proper."[148]

In addition, the State's arguments ignore the fact that Congress itself ratified the regulatory scheme creating the Board through the 1997 and 1998 contingent amendments. When Congress enacted the 1997 and 1998 amendments discussed above, the Secretary's implementation of federal authority through the Board was by then a well-established and integral part of the regulatory scheme. The Board was first established in 1990 through a Final Temporary Rule issued by the Secretary to implement her federal subsistence management duties after the State lost the ability to do so.[149] That rule provided that "[t]he Board will broadly execute the

---

[146] U.S. Const. art. II, § 2, cl. 2.

[147] *Id.*

[148] U.S. Br., Argument § II.

[149] Temporary Subsistence Management Regulations for Public Lands in Alaska, 55 Fed. Reg. 27114-01 (June 29, 1990).

Secretaries' subsistence responsibilities" and established the membership structure comprised of "the regional or state directors of the Fish and Wildlife Service, National Park Service, USDA-Forest Service, Bureau of Land Management, and Bureau of Indian Affairs," which remains the core of the Board's membership today.[150] The 1990 Temporary Rule was replaced by a 1992 Final Rule that retained the same structure and elaborated on the Board's authority. The 1992 Final Rule provided:

> The Secretary of the Interior and Secretary of Agriculture hereby establish, and delegate responsibility for, administering the subsistence taking and uses of fish and wildlife on public lands, and the related promulgation and signature authority for regulations of Subparts C and D [regarding rural determinations, customary and traditional use determinations, seasons, and bag limits] to the Board.[151]

The 1992 Final Rule retained the same Board membership structure as the Temporary Rule.[152]

This was the backdrop against which Congress legislated when it enacted the 1997 temporary amendments. Its decision to leave this regulatory scheme undisturbed (unless the State could step back in and implement the rural subsistence

---

[150] *Id.* at 27118 (discussing subpt. B § __.10).

[151] 57 Fed. Reg. at 22953 (subpt. B § __.10(a)).

[152] *Id.* at 22954 (subpt. B § __.10(b)).

priority, which did not occur) therefore ratifies the creation, duties, and membership of the Board.

The ratification in 1998 was even more direct. By the time Congress considered the 1998 amendments, the Secretary had issued a proposed rule defining "public lands" in accordance with *Katie John I*.[153] In addition to addressing the issue of federally reserved water rights, those proposed regulations again spelled out the structure and role of the Board—reaffirming duties and membership that had been in place since 1990—and specifically "provide[d] the Federal Subsistence Board with clear authority to administer the subsistence priority in these waters."[154] Significantly, in the 1998 temporary amendments, Congress *directly* addressed this rulemaking, mandating that implementation of the Final Rule be delayed until after December 1, 2000, to give the State one more chance to implement a rural subsistence priority.[155] But because the State failed to act, the amendments expired and Congress allowed the 1999 Final Rule to go into effect.

That Final Rule mentions the Board *several hundred* times.[156] Like the proposed rule that Congress considered in the 1998 amendments, the 1999 Final

---

[153] 62 Fed. Reg. at 66217-18.

[154] *Id.* at 66216.

[155] 1999 Omnibus Appropriations Act § 339(a), 112 Stat. at 2681-295.

[156] 64 Fed. Reg. at 1276-1313.

43

Rule explained that "[t]he Federal Subsistence Board assumed subsistence management responsibility for public lands in Alaska in 1990."[157] It then clearly spelled out the Board's structure and membership[158] and "provide[d] the Federal Subsistence Board with clear authority to administer the subsistence priority in [federal] waters."[159] The district court correctly concluded that the establishment of the Board through regulation was sufficient to satisfy the "by law" standard of the Appointments Clause.[160] But even if the Secretary's regulations themselves were insufficient, Congress's direct ratification of those regulations removes any doubt that the Board was properly created, and that the appointment of Board members was properly delegated, "by law."

## B. Claim Preclusion Bars the State from Litigating Issues it Chose Not to Raise in *Katie John*.

The State's Appointments Clause arguments also fail for an entirely separate reason: claim preclusion bars the State from challenging the existence and function of the Board under the Appointments Clause, an argument that it could have raised— but did not—in *Katie John III*.

---

[157] *Id.* at 1276; *see* 62 Fed. Reg. at 66216 (proposed rule with identical language).

[158] 64 Fed. Reg. at 1289 (subpt. B § __.10); *see* 62 Fed. Reg. at 66224 (subpt. B § __.10).

[159] 64 Fed. Reg. at 1276; *see* 62 Fed. Reg. at 66216.

[160] 1-ER-24 to -26.

Claim preclusion (sometimes called res judicata) bars a party from relitigating a claim where an earlier suit "(1) involved the same 'claim' or cause of action as the later suit, (2) reached a final judgment on the merits, and (3) involved identical parties or privies."[161] Not only does claim preclusion bar a party from relitigating issues that have actually been adjudicated; it also "prevents parties from raising issues that *could have been* raised and decided in a prior action—even if they were not actually litigated."[162] Claim preclusion applies against a government if the parties to the prior litigation were the same, as they are here.[163] It also applies even if the precluded claim asserts a constitutional theory.[164]

In determining whether "two suits involve the same claim," courts look at four criteria:

> (1) whether the two suits arise out of the same transactional nucleus of facts; (2) whether rights or interests established in the prior judgment

---

[161] *Mpoyo v. Litton Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005).

[162] *Lucky Brand Dungarees, Inc. v. Marcel Fashions Grp., Inc.*, 590 U.S. 405, 412 (2020) (emphasis added); *see also id.* ("[T]he earlier suit's judgment 'prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding.'" (quoting *Brown v. Felsen*, 442 U.S. 127, 131 (1979); and citing 18 Charles Alan Wright, Arthur R. Miller, & Edward H. Cooper, Federal Practice and Procedure § 4407 (3d ed. 2016)).

[163] *Mendoza*, 464 U.S. at 163 ("The doctrine of res judicata, of course, prevents the government from relitigating the same cause of action against the parties to a prior decision."). Alaska and the United States were parties in all three *Katie John* cases.

[164] *See Alaska Legis. Council v. Babbitt*, 15 F. Supp. 2d 19, 22-23 (D.D.C. 1998), *aff'd*, 181 F.3d 1333 (D.C. Cir. 1999).

would be destroyed or impaired by prosecution of the second action;
(3) whether the two suits involve infringement of the same right; and
(4) whether substantially the same evidence is presented in the two
actions.[165]

These criteria are not applied "mechanistically."[166]

Here, where the federal government's claims are the mirror image of the claims brought by the State in the *Katie John* litigation, under these criteria they are the same claims.[167] First, the core facts are the same in both sets of litigation: Both address subsistence salmon fishing by rural users in navigable waters that run through federally reserved lands. In the *Katie John* cases, the State challenged federal authority to manage such subsistence fishing; here, the federal government challenges the State's failure to recognize that same authority. Second, it is self-evident that the "rights or interests" established in *Katie John* would be destroyed by a ruling for the State in this action—the State is specifically asking this Court to discard the entire *Katie John* line of cases. And third, both suits involve the State's

---

[165] *Mpoyo*, 430 F.3d at 987.

[166] *Id.*

[167] *See Katie John I*, 72 F.3d at 704 (rejecting the State's claim "that public lands exclude navigable waters" and holding instead "that public lands include some specific navigable waters as a result of reserved water rights"); *Katie John II*, 247 F.3d at 1033 (following entry of judgment by the district court on remand, addressing the same issues and declining to disturb *Katie John I*); *Katie John III*, 720 F.3d at 1218 (rejecting the State's claim that by defining "public lands" to include navigable waters subject to reserved water rights, the 1999 regulations "swe[pt] too broadly").

infringement of the federal government's authority to manage—and rural subsistence users' right to access—subsistence fisheries in navigable waters. (The fourth criterion is inapplicable here because this dispute centers on a legal issue rather than factual issues.) Taken together, these criteria demonstrate the requisite identity of claims between the *Katie John* litigation and this case. The other two elements necessary for claim preclusion—final judgment on the merits and the presence of the same parties—are plainly satisfied.[168]

Because claim preclusion "prevents parties from raising issues that *could have been* raised and decided in a prior action,"[169] the State is barred from challenging the constitutionality of the Board here. The 1999 Final Rule that the State challenged in *Katie John III* expressly spelled out the structure and role of the Board, including specifying its voting members, "assign[ing] them responsibility for[] administering the subsistence taking and uses of fish and wildlife on public lands, and the related promulgation and signature authority for regulations," and enumerating the Board's other powers.[170] Indeed, the introduction to the 1999 Final Rule expressly noted the

---

[168] *Katie John I*, 72 F.3d 698; *Katie John II*, 247 F.3d 1032; *Katie John III*, 720 F.3d 1214 (all involving the State of Alaska as a party adverse to the United States).

[169] *Lucky Brand Dungarees, Inc.*, 590 U.S. at 412 (emphasis added).

[170] 64 Fed. Reg. at 1289-90 (subpt. B § __.10); . The only significant changes to the Board in the intervening years were the addition of several "public" members. *See* Subsistence Management Regulations for Public Lands in Alaska, 76 Fed. Reg. 56109-01, 56114 (Sept. 12, 2011) (adding two public members); Subsistence

47

Board's role in implementing Title VIII in navigable waters, explaining that the Rule "provide[d] the Federal Subsistence Board with clear authority to administer the subsistence priority in [the] waters" identified in the Rule.[171] If the State believed there were legal flaws in the structure of the Board, *Katie John III* was its opportunity to raise them.[172]

Contrary to the State's assertion,[173] it makes no difference that the State is attempting to challenge federal authority as a defense rather than an affirmative claim. "Defense preclusion" may apply so long as the conditions "satisfy the strictures of issue preclusion or claim preclusion," as they do here.[174] And the State is flatly wrong that no party has cited a case showing that claim preclusion may bar

---

Management Regulations for Public Lands in Alaska-Subpart B, Federal Subsistence Board Membership, 89 Fed. Reg. 83622-01, 83623 (Oct. 17, 2024) (adding three more public members nominated by tribal governments).

[171] 64 Fed. Reg. at 1276.

[172] The State also could have raised these constitutional arguments in either *Katie John I* or *II*, both of which challenged federal management authority implemented through the Board. Throughout multiple decades of the *Katie John* litigation, the State never indicated that it believed the Board to be unconstitutional.

[173] *See* Opening Br. at 40 n.3.

[174] *See Lucky Brand Dungarees, Inc.*, 590 U.S. at 412; *see also In re Greenberg*, 626 B.R. 554, 561-65 (S.D. Cal. 2021), *reconsideration denied*, No. 20-CV-00506-GPC-MDD, 2021 WL 1515575 (S.D. Cal. Apr. 16, 2021), *and appeal dismissed*, No. 21-55184, 2021 WL 3876949 (9th Cir. Aug. 12, 2021) (applying this rule to preclude a defense).

a defense—the Fish Commission cited these very cases in its district court briefing.[175]

Because the State in *Katie John III* directly challenged other elements of the 1999 Final Rule but elected *not* to challenge the Board's existence or structure, claim preclusion bars the State from doing so now.[176]

### C. The Six-Year Statute of Limitations Also Bars the State's Challenges to the Board.

Even if the State were not barred by claim preclusion, the six-year statute of limitations on claims against the federal government[177] bars the State from challenging the Board's structure and authority now.

The State's attempt to challenge the creation of the Board is a facial attack on the 1999 Final Rule.[178]  The 1999 Rule replaced several earlier versions of the Final Rule dating back to 1992, all of which clearly spelled out the structure and role of

---

[175] Fish Commission Reply Br. at 19-20 n.69, *United States v. State of Alaska*, No. 1:22-cv-00054-SLG (Nov. 3, 2023) (ECF No. 109).

[176] Even if *Sturgeon* had impacted the *Katie John* holdings, as the State contends, there is no viable argument that *Sturgeon* addressed the Board's role or constitutionality in any way.  Thus, there has been no intervening precedent on this issue that would defeat claim preclusion.

[177] 28 U.S.C. § 2401(a).

[178] *See, e.g.*, 3-JSER-604 (affirmative defense in State's Answer, alleging that "[t]he Federal Subsistence Board violates the Appointments Clause of the United States Constitution and therefore its regulations are invalid and cannot preempt state law").

the Board and gave it authority to oversee subsistence hunting and fishing.[179]  As the

Supreme Court recently held, the statute of limitations begins to run when a plaintiff

"suffers an injury from final agency action."[180]  In other words, "a claim accrues

when the plaintiff has the right to bring suit in court."[181]  In a case involving a dispute

over the validity of a regulation, a party's cause of action is "complete and present

[when] it was injured by [the] Regulation . . . ."[182]

By any measure, the State's interests were affected by the 1999 Final Rule the

moment the Rule was implemented.  The 1999 Final Rule—and all regulations

implementing Title VIII, going back to the initial 1992 regulations—apply *only* in

Alaska.[183]  Not only did Alaska have "the right to bring suit in court" starting in

1999,[184] it actually *did* bring suit.  The State's own conduct, initiating the *Katie John*

*III* lawsuit to challenge the 1999 Final Rule, unequivocally demonstrates that the

---

[179] 64 Fed. Reg. at 1279, 1289 (subpt. B § __.10); 50 C.F.R. § 100.10.

[180] *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 144 S. Ct. 2440, 2450 (2024).

[181] *Id.* at 2457.

[182] *Id.* at 2453.

[183] This fact is evident from the very first line of the 1999 Final Rule, which explains: "This rule amends the scope and applicability of the Federal Subsistence Management Program *in Alaska* to include subsistence activities occurring on inland navigable waters in which the United States has a reserved water right and to identify specific Federal land units where reserved water rights exist."  64 Fed. Reg. at 1276 (emphasis added).

[184] *See Corner Post*, 144 S. Ct. at 2457.

State believed it had been injured by the Rule. Since the 1999 Rule went into effect on October 1, 1999,[185] the six-year statute of limitations expired September 30, 2005. Indeed, Alaska filed its challenge to the 1999 Final Rule on January 6, 2005, indicating that the State knew the regulations were being applied to Alaska, and time was running out.[186] This is not a case of an unwitting party suddenly finding itself subjected to regulations it knew nothing about.

The State can be expected to argue that statutes of limitations typically apply to claims, not defenses—this may be why the State dropped its time-barred counterclaims.[187] But this Court does not permit this type of procedural maneuvering; a party "cannot engage in a subterfuge to characterize a claim as a defense in order to avoid a temporal bar."[188]

In *City of St. Paul*, a case that similarly involved both claims and counterclaims, this Court held that the original plaintiff, whose claims were time-barred, could not raise those same claims as defenses.[189] The court placed "emphasis

---

[185] 64 Fed. Reg. at 1276.

[186] *See John v. United States*, No. 3:05-CV-0006-HRH, 2007 WL 9637058, at *1 (D. Alaska May 17, 2007), *aff'd*, 720 F.3d 1214 (9th Cir. 2013) (citing *Alaska v. Norton*, No. 05-cv-0012-RMC (D.D.C.)).

[187] *See* Joint Stipulation of Dismissal of State Defendants' Counterclaims, *United States v. State of Alaska*, No. 1:22-cv-00054-SLG (Apr. 5, 2023) (ECF No. 64).

[188] *City of Saint Paul v. Evans*, 344 F.3d 1029, 1035 (9th Cir. 2003).

[189] *Id.*

on the respective roles of the parties in the litigation as a whole," and explained that "whether affirmative defenses are exempt from statutes of limitations largely hinges on a realistic assessment of the parties' litigation posture."[190]   In reaching this conclusion, the court looked to a Second Circuit decision which found that the party seeking to establish a defense against future claims was the "aggressor," where the other party had "done nothing concrete to change the basic relations between the parties as they ha[d] existed for over ten years."[191]   The court applied that same principle to bar the City of St. Paul's assertion of defenses that it had previously raised as affirmative claims:  "No matter what gloss the City puts on its defenses, they are simply time-barred claims masquerading as defenses and are likewise subject to the statute of limitations bar."[192]

The same is true of the State's affirmative defenses here.  Although the United States is the plaintiff, a "realistic assessment" of the litigation reveals that the State was the initial actor that sought to "change the basic relations between the parties as they ha[d] existed" since the promulgation of the 1999 regulations.[193]   It had been

---

[190] *Id.*; *see also id.* ("It is important that the party asserting the defense is not, simultaneously or in parallel litigation, seeking affirmative recovery on an identical claim.").

[191] *Id.* (quoting *118 East 60th Owners, Inc. v. Bonner Props., Inc.*, 677 F.2d 200, 204 (2d Cir. 1982)).

[192] *Id.* at 1035-36.

[193] *See id.* at 1035 (quoting *118 East 60th Owners*, 677 F.2d at 204).

established since the 1999 regulations—or, at the very latest, since the conclusion of *Katie John III* in 2013—that the Board has authority to implement ANILCA Title VIII's rural subsistence priority in navigable waters subject to the reserved water right. During the 2021 and 2022 fishing seasons, the State simply refused to accept this legal reality and instead engaged in self-help, forcing the federal government to sue to enforce the rule of law. Under *City of St. Paul*, the State may not seek to resurrect barred claims by couching them as defenses.

Whether styled as claims or defenses, the statute of limitations bars the State's arguments challenging the Board's structure and authority.

## CONCLUSION

For the foregoing reasons, and those presented in the briefs of the United States and the other Intervenors, this Court should affirm the district court's judgment.

DATED this 25th day of October 2024 at Anchorage, Alaska.

SONOSKY, CHAMBERS, SACHSE
  MILLER & MONKMAN, LLP
*Counsel for Intervenor-Plaintiff*
*Kuskokwim River Inter-Tribal Fish Commission*

By: *s/ Nathaniel Amdur-Clark*

Nathaniel Amdur-Clark, AK Bar No. 1411111
Whitney A. Leonard, AK Bar No. 1711064

## CERTIFICATE OF COMPLIANCE

Pursuant to Fed. R. App. P. 32(a)(7)(C), I certify that:

This brief complies with the type-volume limitation of Cir. R. 32-1 because this brief contains 12,454 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionately spaced typeface using Microsoft Word for Office 365 Times New Roman 14-point font.

DATED this 25th day of October 2024 at Anchorage, Alaska.

SONOSKY, CHAMBERS, SACHSE
 MILLER & MONKMAN, LLP
*Counsel for Intervenor-Plaintiff*
*Kuskokwim River Inter-Tribal Fish Commission*

By: _ s/ Nathaniel Amdur-Clark_____

Nathaniel Amdur-Clark, AK Bar No. 1411111

## CERTIFICATE OF SERVICE

I hereby certify that on October 25, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system.

Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

DATED this 25th day of October 2024 at Anchorage, Alaska.

SONOSKY, CHAMBERS, SACHSE
  MILLER & MONKMAN, LLP
*Counsel for Intervenor-Plaintiff*
*Kuskokwim River Inter-Tribal Fish Commission*

By: _s/ Nathaniel Amdur-Clark_

Nathaniel Amdur-Clark, AK Bar No. 1411111

**STATUTORY ADDENDUM**

# TABLE OF CONTENTS

Statutes

Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. No. 105–83, § 316 (b), 111 Stat 1543, 1592-95 (1997) ..............................1a

Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. No. 105–277, Div. A, § 339 (a), 112 Stat 2681, 2681-295 (1998) ..........6a

16 U.S.C. § 3101 (ANILCA § 101) - Congressional statement of purpose ...........9a

16 U.S.C. § 3102 (ANILCA § 102) - Definitions. ..................................................9a

16 U.S.C. § 3111 (ANILCA § 801) - Congressional declaration of findings .......10a

16 U.S.C. § 3112 (ANILCA § 802) - Congressional statement of policy.............11a

16 U.S.C. § 3114 (ANILCA § 804) - Preference for subsistence uses .................11a

16 U.S.C. § 3115 (ANILCA § 805) - Local and regional participation ...............12a

16 U.S.C. § 3116 (ANILCA § 806) - Federal monitoring; reports to State and Congressional committees .......................................................................................14a

16 U.S.C. § 3124 (ANILCA § 814) - Regulations ...............................................14a

28 U.S.C. § 2401. Time for commencing action against United States ...............14a

Regulations

50 C.F.R. § 100.10. Federal Subsistence Board ..................................................16a

50 C.F.R. § 100.14. Relationship to State procedures and regulations ................20a

PUBLIC LAW 105–83—NOV. 14, 1997 111 STAT. 1543

*Public Law 105–83
105th Congress

## An Act

Making appropriations for the Department of the Interior and related agencies
for the fiscal year ending September 30, 1998, and for other purposes.

Nov. 14, 1997
[H.R. 2107]

*Be it enacted by the Senate and House of Representatives of
the United States of America in Congress assembled*, That the
following sums are appropriated, out of any money in the Treasury
not otherwise appropriated, for the fiscal year ending September
30, 1998, and for other purposes, namely:

Department of
the Interior and
Related Agencies
Appropriations
Act, 1998.

### TITLE I—DEPARTMENT OF THE INTERIOR

#### BUREAU OF LAND MANAGEMENT

##### MANAGEMENT OF LANDS AND RESOURCES

For expenses necessary for protection, use, improvement,
development, disposal, cadastral surveying, classification, acquisi-
tion of easements and other interests in lands, and performance
of other functions, including maintenance of facilities, as authorized
by law, in the management of lands and their resources under
the jurisdiction of the Bureau of Land Management, including the
general administration of the Bureau, and assessment of mineral
potential of public lands pursuant to Public Law 96–487 (16 U.S.C.
3150(a)), $583,270,000, to remain available until expended, of which
$2,043,000 shall be available for assessment of the mineral potential
of public lands in Alaska pursuant to section 1010 of Public Law
96–487 (16 U.S.C. 3150); and of which $3,000,000 shall be derived
from the special receipt account established by the Land and Water
Conservation Act of 1965, as amended (16 U.S.C. 460l–6a(i)); and
of which $1,500,000 shall be available in fiscal year 1998 subject
to a match by at least an equal amount by the National Fish
and Wildlife Foundation, to such Foundation for challenge cost
share projects supporting fish and wildlife conservation affecting
Bureau lands; in addition, $27,650,000 for Mining Law Administra-
tion program operations, to remain available until expended, to
be reduced by amounts collected by the Bureau and credited to
this appropriation from annual mining claim fees so as to result
in a final appropriation estimated at not more than $583,270,000;
and in addition, not to exceed $5,000,000, to remain available
until expended, from annual mining claim fees; which shall be
credited to this account for the costs of administering the mining
claim fee program, and $2,000,000 from communication site rental
fees established by the Bureau for the cost of administering commu-
nication site activities: *Provided*, That appropriations herein made

---

*Note: This law contains items that were cancelled by the President pursuant to the Line
Item Veto Act. For more information, see the **Federal Register** entry under "LEGISLATIVE
HISTORY" at the end of this law.


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

111 STAT. 1592     PUBLIC LAW 105–83—NOV. 14, 1997

16 USC 3102
note.

SEC. 316. SUBSISTENCE HUNTING AND FISHING IN ALASKA. (a) MORATORIUM ON FEDERAL MANAGEMENT.—None of the funds made available to the Department of the Interior or the Department of Agriculture by this or any other Act hereafter enacted may be used prior to December 1, 1998 to issue or implement final regulations, rules, or policies pursuant to title VIII of the Alaska National Interest Lands Conservation Act to assert jurisdiction, management, or control over the navigable waters transferred to the State of Alaska pursuant to the Submerged Lands Act of 1953 or the Alaska Statehood Act of 1959.

(b) AMENDMENTS TO ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT.—

(1) AMENDMENT OF ANILCA.—Except as otherwise expressly provided, whenever in this subsection an amendment or repeal is expressed in terms of an amendment to, or repeal of, a section or other provision, the reference shall be considered to be made to a section or other provision of the Alaska National Interest Lands Conservation Act (16 U.S.C. 3101 et seq.).

(2) DEFINITIONS.—Section 102(2) (16 U.S.C. 3102(2)) is amended to read as follows:

"(2) The term 'Federal land' means lands the title to which is in the United States after December 2, 1980. 'Federal land' does not include lands the title to which is in the State, an Alaska Native corporation, or other private ownership.".

(3) FINDINGS.—Section 801 (16 U.S.C. 3111) is amended—

(A) by inserting "(a)" immediately before "The Congress finds and declares"; and

(B) by inserting at the end the following new subsection:

"(b) The Congress finds and declares further that—

"(1) subsequent to the enactment of this Act in 1980, the subsistence law of the State of Alaska (AS 16.05) accomplished the goals of Congress and requirements of this Act in providing subsistence use opportunities for rural residents of Alaska, both Alaska Native and non-Alaska Native;

"(2) the Alaska subsistence law was challenged in Alaska courts, and the rural preference requirement in the law was found in 1989 by the Alaska Supreme Court in McDowell v. State of Alaska (785 P.2d 1, 1989) to violate the Alaska Constitution;

"(3) since that time, repeated attempts to restore the validity of the State law through an amendment to the Alaska Constitution have failed, and the people of Alaska have not been given the opportunity to vote on such an amendment;

"(4) in accordance with title VIII of this Act, the Secretary of the Interior is required to manage fish and wildlife for subsistence uses on all public lands in Alaska because of the failure of State law to provide a rural preference;

"(5) the Ninth Circuit Court of Appeals determined in 1995 in State of Alaska v. Babbitt (72 F.3d 698) that the subsistence priority required on public lands under section 804 of this Act applies to navigable waters in which the United States has reserved water rights as identified by the Secretary of the Interior;

"(6) management of fish and wildlife resources by State governments has proven successful in all 50 States, including Alaska, and the State of Alaska should have the opportunity

to continue to manage such resources on all lands, including public lands, in Alaska in accordance with this Act, as amended; and

"(7) it is necessary to amend portions of this Act to restore the original intent of Congress to protect and provide for the continued opportunity for subsistence uses on public lands for Alaska Native and non-Alaska Native rural residents through the management of the State of Alaska.".

(4) TITLE VIII DEFINITIONS.—Section 803 (16 U.S.C. 3113) is amended—

(A) by striking "and" at the end of paragraph (1);

(B) by striking the period and inserting a semicolon at the end of paragraph (2); and

(C) by inserting at the end the following new paragraphs:

"(3) 'customary and traditional uses' means the noncommercial, long-term, and consistent taking of, use of, or reliance upon fish and wildlife in a specific area and the patterns and practices of taking or use of that fish and wildlife that have been established over a reasonable period of time, taking into consideration the availability of the fish and wildlife;

"(4) 'customary trade' means, except for money sales of furs and furbearers, the limited noncommercial exchange for money of fish and wildlife or their parts in minimal quantities; and

"(5) 'rural Alaska resident' means a resident of a rural community or area. A 'rural community or area' means a community or area substantially dependent on fish and wildlife for nutritional and other subsistence uses.".

(5) PREFERENCE FOR SUBSISTENCE USES.—Section 804 (16 U.S.C. 3114) is amended—

(A) by inserting "(a)" immediately before the first sentence; and

(B) by inserting at the end the following new subsection:

"(b) The priority granted by this section is for a reasonable opportunity to take fish and wildlife. For the purposes of this subsection, the term 'reasonable opportunity' means an opportunity, consistent with customary and traditional uses (as defined in section 803(3)), to participate in a subsistence hunt or fishery with a reasonable expectation of success, and does not mean a guarantee that fish and wildlife will be taken.".

(6) LOCAL AND REGIONAL PARTICIPATION.—Section 805 (16 U.S.C. 3115) is amended—

(A) in subsection (a) by striking "one year after the date of enactment of this Act,"; and

(B) by amending subsection (d) to read as follows:

"(d)(1) Upon certification by the Secretary that the State has enacted and implemented laws of general applicability which are consistent with, and which provide for the definition, preference, and participation specified in sections 803, 804, and 805, the Secretary shall not implement subsections (a), (b), and (c) of this section, and the State may immediately assume management for the taking of fish and wildlife on the public lands for subsistence uses pursuant to this title. Upon assumption of such management by the State, the Secretary shall not implement subsections (a), (b), and (c) of this section unless a court of competent jurisdiction

determines that such laws have been repealed, modified, or implemented in a way that is inconsistent with, or does not provide for, the definition, preference, and participation specified in sections 803, 804, and 805, or that the State has failed to cure any such inconsistency after such determination. The State laws shall otherwise supercede such sections insofar as such sections govern State responsibility pursuant to this title for the taking of fish and wildlife on the public lands for subsistence uses. The Secretary may bring a judicial action to enforce this subsection.

"(2)(A) Laws establishing a system of local advisory committees and regional advisory councils consistent with section 805 shall provide that the State rulemaking authority shall consider the advice and recommendations of the regional councils concerning the taking of fish and wildlife populations on public lands within their respective regions for subsistence uses. The regional councils may present recommendations, and the evidence upon which such recommendations are based, to the State rulemaking authority during the course of the administrative proceedings of such authority. The State rulemaking authority may choose not to follow any recommendation which it determines is not supported by substantial evidence presented during the course of its administrative proceedings, violates recognized principles of fish and wildlife conservation or would be detrimental to the satisfaction of rural subsistence needs. If a recommendation is not adopted by the State rulemaking authority, such authority shall set forth the factual basis and the reasons for its decision.

"(B) The members of each regional advisory council established under this subsection shall be appointed by the Governor of Alaska. Each council shall have ten members, four of whom shall be selected from nominees who reside in the region submitted by tribal councils in the region, and six of whom shall be selected from nominees submitted by local governments and local advisory committees. Three of these six shall be subsistence users who reside in the subsistence resource region and three shall be sport or commercial users who may be residents of any subsistence resource region. Regional council members shall have staggered terms of three years in length, with no limit on the number of terms a member may serve. A quorum shall be a majority of the members of the council.".

(7) JUDICIAL ENFORCEMENT.—Section 807 (16 U.S.C. 3117) is amended by inserting the following as subsection (b):

"(b) State agency actions may be declared invalid by the court only if they are arbitrary, capricious, or an abuse of discretion, or otherwise not in accordance with law. When reviewing any action within the specialized knowledge of a State agency, the court shall give the decision of the State agency the same deference it would give the same decision of a comparable Federal agency.".

(8) REGULATIONS.—Section 814 (16 U.S.C. 3124) is amended—

(A) by inserting ", and the State at any time the State has complied with section 805(d)" after "Secretary"; and

(B) by adding at the end the following new sentence: "During any time that the State has complied with section 805(d), the Secretary shall not make or enforce regulations implementing section 805(a), (b), or (c).".

(9) LIMITATIONS, SAVINGS CLAUSES.—Section 815 (16 U.S.C. 3125) is amended—

PUBLIC LAW 105–83—NOV. 14, 1997     111 STAT. 1595

(A) by striking "or" at the end of paragraph (3);

(B) by striking the period at the end of paragraph (4) and inserting in lieu thereof a semicolon and "or"; and

(C) by inserting at the end the following new paragraph:

"(5) prohibiting the Secretary or the State from entering into co-management agreements with Alaska Native organizations or other local or regional entities when such organization or entity is managing fish and wildlife on public lands in Alaska for subsistence uses.".

(c) SAVINGS CLAUSE.—No provision of this section, amendment made by this section, or exercise of authority pursuant to this section may be construed to validate, invalidate, or in any way affect—

16 USC 3102 note.

(1) any assertion that an Alaska Native organization (including a federally recognized tribe, traditional Alaska Native council, or Alaska Native council organized pursuant to the Act of June 18, 1934 (25 U.S.C. 461 et seq.), as amended) has or does not have governmental authority over lands (including management of, or regulation of the taking of, fish and wildlife) or persons within the boundaries of the State of Alaska;

(2) any assertion that Indian country, as defined in section 1151 of title 18, United States Code, exists or does not exist within the boundaries of the State of Alaska;

(3) any assertion that the Alaska National Interest Lands Conservation Act, as amended (16 U.S.C. 3101 et seq.) is or is not Indian law; or

(4) the authority of the Secretary of the Interior under section 1314(c) of the Alaska National Interest Lands Conservation Act (16 U.S.C. 3202(c)).

(d) EFFECTIVE DATE.—Unless and until laws are adopted in the State of Alaska which provide for the definition, preference, and participation specified in sections 803, 804, and 805 of the Alaska National Interest Lands Conservation Act (16 U.S.C. 3111 et seq.), the amendments made by subsection (b) of this section shall be effective only for the purposes of determining whether the State's laws provide for such definition, preference, and participation. The Secretary shall certify before December 1, 1998 if such laws have been adopted in the State of Alaska. Subsection (b) shall be repealed on such date if such laws have not been adopted.

16 USC 3102 note.

Certification.
Alaska.

SEC. 317. Section 909(b)(2) of division II, title IX of Public Law 104–333 is amended by striking the following: "For technical assistance pursuant to section 908, not more than $50,000 annually.".

16 USC 461 note.

SEC. 318. No part of any appropriation contained in this Act shall be expended or obligated to fund the activities of the western director and special assistant to the Secretary within the Office of the Secretary of Agriculture that exceeds the funding provided for these activities from this Act during fiscal year 1997.

SEC. 319. Notwithstanding any other provision of law, for fiscal year 1998 the Secretaries of Agriculture and the Interior are authorized to limit competition for watershed restoration project contracts as part of the "Jobs in the Woods" component of the President's Forest Plan for the Pacific Northwest to individuals and entities in historically timber-dependent areas in the States of Washington,

PUBLIC LAW 105–277—OCT. 21, 1998          112 STAT. 2681

*Public Law 105–277
105th Congress

## An Act

Making omnibus consolidated and emergency appropriations for the fiscal year ending September 30, 1999, and for other purposes.

Oct. 21, 1998
[H.R. 4328]

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,*

Omnibus
Consolidated and
Emergency
Supplemental
Appropriations
Act, 1999.

### DIVISION A—OMNIBUS CONSOLIDATED APPROPRIATIONS

That the following sums are appropriated, out of any money in the Treasury not otherwise appropriated, for the several departments, agencies, corporations and other organizational units of the Government for the fiscal year 1999, and for other purposes, namely:

SEC. 101. (a) For programs, projects or activities in the Agriculture, Rural Development, Food and Drug Administration, and Related Agencies Appropriations Act, 1999, provided as follows, to be effective as if it had been enacted into law as the regular appropriations Act:

AN ACT Making appropriations for Agriculture, Rural Development, Food and Drug Administration, and Related Agencies programs for the fiscal year ending September 30, 1999, and for other purposes.

Agriculture,
Rural
Development,
Food and Drug
Administration,
and Related
Agencies
Appropriations
Act, 1999.

### TITLE I

### AGRICULTURAL PROGRAMS

#### PRODUCTION, PROCESSING, AND MARKETING

#### OFFICE OF THE SECRETARY

#### (INCLUDING TRANSFERS OF FUNDS)

For necessary expenses of the Office of the Secretary of Agriculture, and not to exceed $75,000 for employment under 5 U.S.C. 3109, $2,836,000: *Provided,* That not to exceed $11,000 of this amount, along with any unobligated balances of representation funds in the Foreign Agricultural Service, shall be available for official reception and representation expenses, not otherwise provided for, as determined by the Secretary: *Provided further,* That none of the funds appropriated or otherwise made available by this Act may be used to pay the salaries and expenses of personnel of the Department of Agriculture to carry out section 793(c)(1)(C) of Public Law 104–127: *Provided further,* That none of the funds made available by this Act may be used to enforce section 793(d) of Public Law 104–127.

---

*Note: This is a typeset print of the original hand enrollment as signed by the President on October 21, 1998. The text is printed without corrections.


AUTHENTICATED
U.S. GOVERNMENT
INFORMATION
GPO

112 STAT. 2681–295     PUBLIC LAW 105–277—OCT. 21, 1998

(c) PRESERVATION OF EXISTING RIGHTS OF ACCESS.—Nothing in this section shall impair any existing rights of access in favor of the public or any owner of adjacent lands over, under or across the lands which are referred to in subsection (a).

(d) MINERALS.—The United States disclaims any and all right of surface entry to the mineral estate of lands described in subsection (b).

16 USC 3503 note.

SEC. 335. The final set of maps entitled "Coastal Barrier Resources System", dated "October 24, 1990, revised November 12, 1996", and relating to the following units of the Coastal Barrier Resources System: P04A, P05/P05P; P05A/P05AP, FL-06P; P10/P10P; P11; P11AP; P11A; P18/P18P; P25/P25P; and P32/P32P (which set of maps were created by the Department of the Interior to comply with section 220 of Public Law 104–333, 110 Stat. 4115, and notice of which was published in the Federal Register on May 28, 1997) shall have the force and effect of law and replace and substitute for any other inconsistent Coastal Barrier Resource System map in the possession of the Department of the Interior. This provision is effective immediately upon enactment of this Act and the Secretary of the Interior or his designee shall immediately make this ministerial substitution.

25 USC 1645.

SEC. 336. Section 405(c)(2) of the Indian Health Care Improvement Act (42 U.S.C. 1645(c)(2)) is amended by striking "September 30, 1998" and inserting "September 30, 2000".

SEC. 337. Section 3003 of the Petroleum Overcharge Distribution and Restitution Act of 1986 (15 U.S.C. 4502) is amended by adding after subsection (d) the following new subsection:

"(e) Subsections (b), (c), and (d) of this section are repealed, and any rights that may have arisen are extinguished, on the date of the enactment of the Department of the Interior and Related Agencies Appropriations Act, 1999. After that date, the amount available for direct restitution to current and future refined petroleum product claimants under this Act is reduced by the amounts specified in title II of that Act as being derived from amounts held in escrow under section 3002(d). The Secretary shall assure that the amount remaining in escrow to satisfy refined petroleum product claims for direct restitution is allocated equitably among the claimants.".

25 USC 2717 note.

16 USC 3102 note.

SEC. 338. Section 123(a)(2)(C) of the Department of the Interior and Related Agencies Appropriations Act, 1998 (111 Stat. 1566), is amended by striking "self-regulated tribes such as".

SEC. 339. (a) RESTRICTION ON FEDERAL MANAGEMENT UNDER TITLE VIII OF THE ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT.—

(1) Notwithstanding any other provision of law, hereafter neither the Secretary of the Interior nor the Secretary of Agriculture may, prior to December 1, 2000, implement or enforce any final rule, regulation, or policy pursuant to title VIII of the Alaska National Interest Lands Conservation Act to manage and to assert jurisdiction, authority, or control over land, water, and wild, renewable resources, including fish and wildlife, in Alaska for subsistence uses, except within—

(A) areas listed in 50 C.F.R. 100.3(b) (October 1, 1998) and

(B) areas constituting "public land or public lands" under the definition of such term found at 50 C.F.R. 100.4 (October 1, 1998).

PUBLIC LAW 105–277—OCT. 21, 1998     112 STAT. 2681–296

(2) The areas in subparagraphs (A) and (B) of paragraph (1) shall only be construed to mean those public lands which as of October 1, 1998, were subject to federal management for subsistence uses pursuant to Title VIII of the Alaska National Interest Lands Conservation Act.

(b) SUBSECTION (a) REPEALED.—

(1) The Secretary of the Interior shall certify before October 1, 1999, if a bill or resolution has been passed by the Alaska State Legislature to amend the Constitution of the State of Alaska that, if approved by the electorate, would enable the implementation of state laws of general applicability consistent with, and which provide for the definition, preference, and participation specified in sections 803, 804, and 805 of the Alaska National Interest Lands Conservation Act.

(2) Subsection (a) shall be repealed on October 1, 1999, unless prior to that date the Secretary of the Interior makes such a certification described in paragraph (1).

(c) TECHNICAL AMENDMENTS TO THE ALASKA NATIONAL INTEREST LANDS CONSERVATION ACT.—Section 805 of the Alaska National Interest Lands Conservation Act (16 U.S.C. 3115) is amended—

(1) in subsection (a) by striking "one year after the date of enactment of this Act,"

(2) in subsection (d) by striking "within one year from the date of enactment of this Act,".

(d) EFFECT ON TIDAL AND SUBMERGED LAND.—Nothing in this section invalidates, validates, or in any other way affects any claim of the State of Alaska to title to any tidal or submerged land in Alaska.

SEC. 340. None of the funds made available in this Act may be used to establish a national wildlife refuge in the Kankakee River watershed in northwestern Indiana and northeastern Illinois.

SEC. 341. Upon the condition that Skamania County conveys title acceptable to the Secretary of Agriculture to all right, title and interest in lands identified on a map dated September 29, 1998 entitled "Skamania County Lands to be Transferred", such lands being located on Table Mountain lying within the Columbia River Gorge National Scenic Area, there is hereby conveyed to Skamania County, notwithstanding any other provision of law, the Wind River Nursery Site lands and facilities and all interests therein, except for the corridor of the Pacific Crest National Scenic Trail, as depicted on a map dated September 29, 1998, entitled "Wind River Conveyance", which is on file and available for public inspection in the Office of the Chief, USDA Forest Service, Washington, D.C.

*16 USC 544g note.*

The conveyance of lands to Skamania County shall become automatically effective upon a determination by the Secretary that Skamania County has conveyed acceptable title to the United States to the Skamania County lands. Lands conveyed to the United States shall become part of the Gifford Pinchot National Forest and shall have the status of lands acquired under the Act of March 1, 1911, (commonly called the Weeks Act) and shall be managed in accordance with the laws and regulations applicable to the National Forest System.

SEC. 342. (a) BOUNDARY ADJUSTMENTS.—

(1) LAKE CHELAN NATIONAL RECREATION AREA.—The boundary of the Lake Chelan National Recreation Area, established

*16 USC 90a–1 note.*

**16 U.S.C. § 3101 (ANILCA § 101) - Congressional statement of purpose**

. . .

(c) Subsistence way of life for rural residents

It is further the intent and purpose of this Act consistent with management of fish and wildlife in accordance with recognized scientific principles and the purposes for which each conservation system unit is established, designated, or expanded by or pursuant to this Act, to provide the opportunity for rural residents engaged in a subsistence way of life to continue to do so.

. . .

**16 U.S.C. § 3102 (ANILCA § 102) - Definitions.**

As used in this Act (except that in titles IX and XIV the following terms shall have the same meaning as they have in the Alaska Native Claims Settlement Act, and the Alaska Statehood Act)--

(1) The term "land" means lands, waters, and interests therein.

(2) The term "Federal land" means lands the title to which is in the United States after December 2, 1980.

(3) The term "public lands" means land situated in Alaska which, after December 2, 1980, are Federal lands, except--

(A) land selections of the State of Alaska which have been tentatively approved or validly selected under the Alaska Statehood Act and lands which have been confirmed to, validly selected by, or granted to the Territory of Alaska or the State under any other provision of Federal law;

(B) land selections of a Native Corporation made under the Alaska Native Claims Settlement Act which have not been conveyed to a Native Corporation, unless any such selection is determined to be invalid or is relinquished; and

(C) lands referred to in section 19(b) of the Alaska Native Claims Settlement Act.

. . .

**16 U.S.C. § 3111 (ANILCA § 801) - Congressional declaration of findings.**

The Congress finds and declares that--

(1) the continuation of the opportunity for subsistence uses by rural residents of Alaska, including both Natives and non-Natives, on the public lands and by Alaska Natives on Native lands is essential to Native physical, economic, traditional, and cultural existence and to non-Native physical, economic, traditional, and social existence;

(2) the situation in Alaska is unique in that, in most cases, no practical alternative means are available to replace the food supplies and other items gathered from fish and wildlife which supply rural residents dependent on subsistence uses;

(3) continuation of the opportunity for subsistence uses of resources on public and other lands in Alaska is threatened by the increasing population of Alaska, with resultant pressure on subsistence resources, by sudden decline in the populations of some wildlife species which are crucial subsistence resources, by increased accessibility of remote areas containing subsistence resources, and by taking of fish and wildlife in a manner inconsistent with recognized principles of fish and wildlife management;

(4) in order to fulfill the policies and purposes of the Alaska Native Claims Settlement Act and as a matter of equity, it is necessary for the Congress to invoke its constitutional authority over Native affairs and its constitutional authority under the property clause and the commerce clause to protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents; and

(5) the national interest in the proper regulation, protection, and conservation of fish and wildlife on the public lands in Alaska and the continuation of the opportunity for a subsistence way of life by residents of rural Alaska require that an administrative structure be established for the purpose of enabling rural residents who have personal knowledge of local conditions and requirements to have a meaningful role in the management of fish and wildlife and of subsistence uses on the public lands in Alaska.

**16 U.S.C. § 3112 (ANILCA § 802) - Congressional statement of policy.**

It is hereby declared to be the policy of Congress that--

(1) consistent with sound management principles, and the conservation of healthy populations of fish and wildlife, the utilization of the public lands in Alaska is to cause the least adverse impact possible on rural residents who depend upon subsistence uses of the resources of such lands; consistent with management of fish and wildlife in accordance with recognized scientific principles and the purposes for each unit established, designated, or expanded by or pursuant to titles II through VII of this Act, the purpose of this subchapter is to provide the opportunity for rural residents engaged in a subsistence way of life to do so;

(2) nonwasteful subsistence uses of fish and wildlife and other renewable resources shall be the priority consumptive uses of all such resources on the public lands of Alaska when it is necessary to restrict taking in order to assure the continued viability of a fish or wildlife population or the continuation of subsistence uses of such population, the taking of such population for nonwasteful subsistence uses shall be given preference on the public lands over other consumptive uses; and

(3) except as otherwise provided by this Act or other Federal laws, Federal land managing agencies, in managing subsistence activities on the public lands and in protecting the continued viability of all wild renewable resources in Alaska, shall cooperate with adjacent landowners and land managers, including Native Corporations, appropriate State and Federal agencies, and other nations.

**16 U.S.C. § 3114 (ANILCA § 804) - Preference for subsistence uses.**

Except as otherwise provided in this Act and other Federal laws, the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes. Whenever it is necessary to restrict the taking of populations of fish and wildlife on such lands for subsistence uses in order to protect the continued viability of such populations, or to continue such uses, such priority shall be implemented through appropriate limitations based on the application of the following criteria:

(1) customary and direct dependence upon the populations as the mainstay of livelihood;

(2) local residency; and

(3) the availability of alternative resources.

## 16 U.S.C. § 3115 (ANILCA § 805) - Local and regional participation.

(a) Establishment of subsistence resources regions, local advisory committees, and regional advisory councils; membership, duties, and authority of regional advisory councils

Except as otherwise provided in subsection (d) of this section, the Secretary in consultation with the State shall establish--

(1) at least six Alaska subsistence resource regions which, taken together, include all public lands. The number and boundaries of the regions shall be sufficient to assure that regional differences in subsistence uses are adequately accommodated;

(2) such local advisory committees within each region as he finds necessary at such time as he may determine, after notice and hearing, that the existing State fish and game advisory committees do not adequately perform the functions of the local committee system set forth in paragraph (3)(D)(iv) of this subsection; and

(3) a regional advisory council in each subsistence resource region.

Each regional advisory council shall be composed of residents of the region and shall have the following authority:

(A) the review and evaluation of proposals for regulations, policies, management plans, and other matters relating to subsistence uses of fish and wildlife within the region;

(B) the provision of a forum for the expression of opinions and recommendations by persons interested in any matter related to subsistence uses of fish and wildlife within the region;

(C) the encouragement of local and regional participation pursuant to the provisions of this subchapter in the decisionmaking process affecting the taking of fish and wildlife on the public lands within the region for subsistence uses;

(D) the preparation of an annual report to the Secretary which shall contain--

(i) an identification of current and anticipated subsistence uses of fish and wildlife populations within the region;

12a

(ii) an evaluation of current and anticipated subsistence needs for fish and wildlife populations within the region;

(iii) a recommended strategy for the management of fish and wildlife populations within the region to accommodate such subsistence uses and needs; and

(iv) recommendations concerning policies, standards, guidelines, and regulations to implement the strategy. The State fish and game advisory committees or such local advisory committees as the Secretary may establish pursuant to paragraph (2) of this subsection may provide advice to, and assist, the regional advisory councils in carrying out the functions set forth in this paragraph.

(b) Assignment of staff and distribution of data

The Secretary shall assign adequate qualified staff to the regional advisory councils and make timely distribution of all available relevant technical and scientific support data to the regional advisory councils and the State fish and game advisory committees or such local advisory committees as the Secretary may establish pursuant to paragraph (2) of subsection (a).

(c) Consideration of reports and recommendations of regional advisory councils

The Secretary, in performing his monitoring responsibility pursuant to section 3116 of this title and in the exercise of his closure and other administrative authority over the public lands, shall consider the report and recommendations of the regional advisory councils concerning the taking of fish and wildlife on the public lands within their respective regions for subsistence uses. The Secretary may choose not to follow any recommendation which he determines is not supported by substantial evidence, violates recognized principles of fish and wildlife conservation, or would be detrimental to the satisfaction of subsistence needs. If a recommendation is not adopted by the Secretary, he shall set forth the factual basis and the reasons for his decision.

(d) Supersedure by enactment and implementation of State laws governing State responsibility; consideration of recommendations by State rulemaking authority

The Secretary shall not implement subsections (a), (b), and (c) of this section if the State enacts and implements laws of general applicability which are consistent with, and which provide for the definition, preference, and participation specified in, sections 3113, 3114, and 3115 of this title, such laws, unless and until repealed, shall supersede such sections insofar as such sections govern State responsibility pursuant to this subchapter for the taking of fish and wildlife on the public lands

13a

for subsistence uses. Laws establishing a system of local advisory committees and regional advisory councils consistent with this section shall provide that the State rulemaking authority shall consider the advice and recommendations of the regional councils concerning the taking of fish and wildlife populations on public lands within their respective regions for subsistence uses. The regional councils may present recommendations, and the evidence upon which such recommendations are based, to the State rulemaking authority during the course of the administrative proceedings of such authority. The State rulemaking authority may choose not to follow any recommendation which it determines is not supported by substantial evidence presented during the course of its administrative proceedings, violates recognized principles of fish and wildlife conservation or would be detrimental to the satisfaction of rural subsistence needs. If a recommendation is not adopted by the State rulemaking authority, such authority shall set forth the factual basis and the reasons for its decision. . . .

**16 U.S.C. § 3116 (ANILCA § 806) - Federal monitoring; reports to State and Congressional committees.**

The Secretary shall monitor the provisions by the State of the subsistence preference set forth in section 3114 of this title and shall advise the State and the Committees on Natural Resources and on Merchant Marine and Fisheries of the House of Representatives and the Committees on Energy and Natural Resources and Environment and Public Works of the Senate annually and at such other times as he deems necessary of his views on the effectiveness of the implementation of this subchapter including the State's provision of such preference, any exercise of his closure or other administrative authority to protect subsistence resources or uses, the views of the State, and any recommendations he may have.

**16 U.S.C. § 3124 (ANILCA § 814) - Regulations.**

The Secretary shall prescribe such regulations as are necessary and appropriate to carry out his responsibilities under this subchapter.

**28 U.S.C. § 2401. Time for commencing action against United States**

(a) Except as provided by chapter 71 of title 41, every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues. The action of any person under legal

disability or beyond the seas at the time the claim accrues may be commenced within three years after the disability ceases.

## REGULATIONS

**50 C.F.R. § 100.10. Federal Subsistence Board**
[Text of regulation currently in effect through November 17, 2024]

(a) The Secretary of the Interior and Secretary of Agriculture hereby establish a Federal Subsistence Board, and assign it responsibility for administering the subsistence taking and uses of fish and wildlife on public lands, and the related promulgation and signature authority for regulations of subparts C and D of this part. The Secretaries, however, retain their existing authority to restrict or eliminate hunting, fishing, or trapping activities which occur on lands or waters in Alaska other than public lands when such activities interfere with subsistence hunting, fishing, or trapping on the public lands to such an extent as to result in a failure to provide the subsistence priority.

(b) Membership.

(1) The voting members of the Board are: A Chair to be appointed by the Secretary of the Interior with the concurrence of the Secretary of Agriculture; two public members who possess personal knowledge of and direct experience with subsistence uses in rural Alaska to be appointed by the Secretary of the Interior with the concurrence of the Secretary of Agriculture; the Alaska Regional Director, U.S. Fish and Wildlife Service; Alaska Regional Director, National Park Service; Alaska Regional Forester, U.S. Forest Service; the Alaska State Director, Bureau of Land Management; and the Alaska Regional Director, Bureau of Indian Affairs. Each Federal agency member of the Board may appoint a designee.

(2) [Reserved]

(c) Liaisons to the Board are: a State liaison, and the Chairman of each Regional Council. The State liaison and the Chairman of each Regional Council may attend public sessions of all Board meetings and be actively involved as consultants to the Board.

(d) Powers and duties.

(1) The Board shall meet at least twice per year and at such other times as deemed necessary. Meetings shall occur at the call of the Chair, but any member may request a meeting.

(2) A quorum consists of five members.

(3) No action may be taken unless a majority of voting members are in agreement.

(4) The Board is empowered, to the extent necessary, to implement Title VIII of ANILCA, to:

(i) Issue regulations for the management of subsistence taking and uses of fish and wildlife on public lands;

(ii) Determine which communities or areas of the State are rural or non-rural;

(iii) Determine which rural Alaska areas or communities have customary and traditional subsistence uses of specific fish and wildlife populations;

(iv) Allocate subsistence uses of fish and wildlife populations on public lands;

(v) Ensure that the taking on public lands of fish and wildlife for nonwasteful subsistence uses shall be accorded priority over the taking on such lands of fish and wildlife for other purposes;

(vi) Restrict the taking of fish and wildlife on public lands for nonsubsistence uses or close public lands to the take of fish and wildlife for nonsubsistence uses when necessary for the conservation of healthy populations of fish or wildlife, to continue subsistence uses of fish or wildlife, or for reasons of public safety or administration. The Board may also reopen public lands to nonsubsistence uses if new information or changed conditions indicate that the closure is no longer warranted;

(vii) Restrict the taking of a particular fish or wildlife population on public lands for subsistence uses, close public lands to the take of fish and wildlife for subsistence uses, or otherwise modify the requirements for take from a particular fish or wildlife population on public lands for subsistence uses when necessary to ensure the continued viability of a fish or wildlife population, or for reasons of public safety or administration. As soon as conditions warrant, the Board may also reopen public lands to the taking of a fish and wildlife population for subsistence users to continue those uses;

(viii) Establish priorities for the subsistence taking of fish and wildlife on public lands among rural Alaska residents;

(ix) Restrict or eliminate taking of fish and wildlife on public lands;

(x) Determine what types and forms of trade of fish and wildlife taken for subsistence uses constitute allowable customary trade;

17a

(xi) Authorize the Regional Councils to convene;

(xii) Establish a Regional Council in each subsistence resource region and recommend to the Secretaries, appointees to the Regional Councils, pursuant to the FACA;

(xiii) Establish Federal Advisory Committees within the subsistence resource regions, if necessary, and recommend to the Secretaries that members of the Federal Advisory Committees be appointed from the group of individuals nominated by rural Alaska residents;

(xiv) Establish rules and procedures for the operation of the Board, and the Regional Councils;

(xv) Review and respond to proposals for regulations, management plans, policies, and other matters related to subsistence taking and uses of fish and wildlife;

(xvi) Enter into cooperative agreements or otherwise cooperate with Federal agencies, the State, Native organizations, local governmental entities, and other persons and organizations, including international entities to effectuate the purposes and policies of the Federal subsistence management program;

(xvii) Develop alternative permitting processes relating to the subsistence taking of fish and wildlife to ensure continued opportunities for subsistence;

(xviii) Evaluate whether hunting, fishing, or trapping activities which occur on lands or waters in Alaska other than public lands interfere with subsistence hunting, fishing, or trapping on the public lands to such an extent as to result in a failure to provide the subsistence priority, and after appropriate consultation with the State of Alaska, the Regional Councils, and other Federal agencies, make a recommendation to the Secretaries for their action;

(xix) Identify, in appropriate specific instances, whether there exists additional Federal reservations, Federal reserved water rights or other Federal interests in lands or waters, including those in which the United States holds less than a fee ownership, to which the Federal subsistence priority attaches, and make appropriate recommendation to the Secretaries for inclusion of those interests within the Federal Subsistence Management Program; and

(xx) Take other actions authorized by the Secretaries to implement Title VIII of ANILCA.

18a

(5) The Board may implement one or more of the following harvest and harvest reporting or permit systems:

(i) The fish and wildlife is taken by an individual who is required to obtain and possess pertinent State harvest permits, tickets, or tags, or Federal permit (Federal Subsistence Registration Permit);

(ii) A qualified subsistence user may designate another qualified subsistence user (by using the Federal Designated Harvester Permit) to take fish and wildlife on his or her behalf;

(iii) The fish and wildlife is taken by individuals or community representatives permitted (via a Federal Subsistence Registration Permit) a one-time or annual harvest for special purposes including ceremonies and potlatches; or

(iv) The fish and wildlife is taken by representatives of a community permitted to do so in a manner consistent with the community's customary and traditional practices.

(6) The Board may delegate to agency field officials the authority to set harvest and possession limits, define harvest areas, specify methods or means of harvest, specify permit requirements, and open or close specific fish or wildlife harvest seasons within frameworks established by the Board.

(7) The Board shall establish a Staff Committee for analytical and administrative assistance composed of members from the U.S. Fish and Wildlife Service, National Park Service, U.S. Bureau of Land Management, Bureau of Indian Affairs, and USDA Forest Service. A U.S. Fish and Wildlife Service representative shall serve as Chair of the Staff Committee.

(8) The Board may establish and dissolve additional committees as necessary for assistance.

(9) The U.S. Fish and Wildlife Service shall provide appropriate administrative support for the Board.

(10) The Board shall authorize at least two meetings per year for each Regional Council.

(e) Relationship to Regional Councils.

(1) The Board shall consider the reports and recommendations of the Regional Councils concerning the taking of fish and wildlife on public lands within their respective regions for subsistence uses. The Board may choose not to follow any Regional Council recommendation which it determines is not supported by

19a

substantial evidence, violates recognized principles of fish and wildlife conservation, would be detrimental to the satisfaction of subsistence needs, or in closure situations, for reasons of public safety or administration or to assure the continued viability of a particular fish or wildlife population. If a recommendation is not adopted, the Board shall set forth the factual basis and the reasons for the decision, in writing, in a timely fashion.

(2) The Board shall provide available and appropriate technical assistance to the Regional Councils.

**50 C.F.R. § 100.14. Relationship to State procedures and regulations.**

(a) State fish and game regulations apply to public lands and such laws are hereby adopted and made a part of the regulations in this part to the extent they are not inconsistent with, or superseded by, the regulations in this part.