No. 24-2251

## IN THE UNITED STATES COURT OF APPEALS
## FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff-Appellee*,

KUSKOKWIM RIVER INTER-TRIBAL FISH COMMISSION; ASSOCIATION
OF VILLAGE COUNCIL PRESIDENTS; BETTY MAGNUSON; IVAN M.
IVAN; AHTNA TENE NENE; AHTNA, INC.; ALASKA FEDERATION OF
NATIVES
*Intervenor-Plaintiffs-Appellees*,

v.

STATE OF ALASKA; STATE OF ALASKA DEPARTMENT OF FISH AND
GAME; DOUG VINCENT-LANG, in his official capacity as Commissioner of the
Alaska Department of Fish & Game
*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Alaska
No. 1:22-CV-54-SLG
Hon. Sharon L. Gleason

## ANSWERING BRIEF OF INTERVENOR-PLAINTIFF-APPELLEE
## ALASKA FEDERATION OF NATIVES

Scott M. Kendall (AK Bar 0405019)
Cashion Gilmore & Lindemuth
510 L Street, Suite 601
Anchorage, Alaska 99501
Phone: (907) 222-7932
scott@cashiongilmore.com

Jahna M. Lindemuth (AK Bar 9711068)
Cashion Gilmore & Lindemuth
510 L Street, Suite 601
Anchorage, Alaska 99501
Phone: (907) 222-7932
jahna@cashiongilmore.com

*Attorneys for Intervenor-Plaintiff-Appellee*
Alaska Federation of Natives

# DISCLOSURE STATEMENT

Pursuant to Rule 26.1 of the Federal Rules of Appellate Procedure, Alaska Federation of Natives hereby states that it is a nonprofit organization. As such, Alaska Federation of Natives hereby certifies that there is neither a parent corporation nor any publicly held corporation that owns 10% or more of the above-mentioned entity.

Date: October 25, 2024

CASHION GILMORE & LINDEMUTH

*/s/ Jahna M. Lindemuth*
Jahna M. Lindemuth

*Attorneys for Intervenor-Plaintiff-Appellee*
Alaska Federation of Natives

i

# TABLE OF CONTENTS

**Page**

DISCLOSURE STATEMENT ......................................................................i

TABLE OF CONTENTS ..........................................................................iv

TABLE OF AUTHORITIES ....................................................................iv

INTRODUCTION.....................................................................................1

CONSTITUTIONAL AND STATUTORY AUTHORITIES ...................................3

ISSUES PRESENTED ...............................................................................3

STATEMENT OF THE CASE ...................................................................4

    A.    Statehood, ANCSA, ANILCA, and Congress's Intent to Protect Alaska Native Subsistence...................................................................4

    B.    *McDowell* Holds that the Rural Subsistence Priority Violates the Alaska Constitution. ...........................................................................11

    C.    The *Katie John* Trilogy and the State's Repeated Efforts to Undermine Title VIII's Subsistence Protections. ...............................12

    D.    The Supreme Court Interprets an Exception in ANILCA Section 103(c) in *Sturgeon v. Frost*.................................................................15

    E.    Eliminating the Rural Subsistence Priority for Fishing in Title VIII Would Have Grave Consequences. ....................................................17

SUMMARY OF THE ARGUMENT.....................................................................19

STANDARD OF REVIEW .........................................................................21

ARGUMENT ..........................................................................................21

I.    *KATIE JOHN* IS CONTROLLING PRECEDENT. ......................................21

A. The State Cannot Meet Its High Burden To Have This Court Overrule *Katie John* As Clearly Irreconcilable with *Sturgeon*. .......................... 22

B. *Katie John* and the Reserved Water Rights Doctrine Cases it Relies on Remain Good Law. ............................................................. 23

C. The State's Reliance on "Title" to Constrain the Waters Subject to the Rural Subsistence Fishing Priority Is Misplaced. ............................... 30

II. ALTERNATIVELY, CONGRESS INVOKED A TRIFECTA OF CONSTITUTIONAL POWERS IN TITLE VIII THAT REINFORCE THE FEDERAL GOVERNMENT'S AUTHORITY TO MANAGE SUBSISTENCE FISHERIES. ..................................................... 40

A. The Federal Government Has The Authority to Provide A Rural Subsistence Priority to Fish Under The Property Clause. ................. 41

B. The Commerce Clause and the Navigational Servitude Provide Authority to Regulate Subsistence Fishing in All Navigable Waters in Alaska Regardless of Ownership of Submerged Lands. .................... 44

C. Congress Invoked its Trust Responsibility and Authority Over Native Affairs in Enacting Title VIII. ............................................ 49

III. FEDERAL LAW PREEMPTS CONFLICTING STATE LAW. .................. 55

CONCLUSION ..................................................................... 56

STATEMENT OF RELATED CASES ................................................ 58

CERTIFICATE OF COMPLIANCE ................................................. 59

CERTIFICATE OF SERVICE...................................................... 60

## TABLE OF AUTHORITIES

**Cases**                                                                     **Page(s)**

*Adams v. Vance*, 570 F.2d 950 (D.C. Cir. 1978)......................................................52

*Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 849 F.3d 1262 (9th Cir. 2017)................................................................................................33

*Alaska Pacific Fisheries v. United States*, 248 U.S. 78 (1918)...............................34

*Alaska v. Babbitt (Katie John I)*, 72 F.3d 698 (9th Cir. 1995).......................*passim*

*Alaska v. Babbitt*, 516 U.S. 1036 (1996)....................................................................13

*Alaska v. Jewell*, 572 U.S. 1042 (2014) ...................................................................15

*Alaska v. United States*, 545 U.S. 75 (2005) .......................................................34, 44

*Amoco Production Co. v. Village of Gambell,* 480 U.S. 531 (1987) ......................33

*Antoine v. Washington*, 420 U.S. 194 (1975)...........................................................50

*Aquilar v. Kleppe*, 424 F. Supp. 433 (D. Alaska 1976) ................................5, 35, 49

*Arizona v. California,* 373 U.S. 546 (1963) ..............................................................39

*Avilez v. Garland*, 69 F.4th 525 (9th Cir. 2023).......................................................23

*Cappaert v. United States,* 426 U.S. 128 (1976)..................................................26, 28

*Cassidy v. United States,* 875 F. Supp. 1438 (E.D. Wash. 1994) ...........................48

*Cherokee Nation v. Georgia,* 30 U.S. 1 (1831).........................................................52

*Close v. Sotheby's, Inc.*, 894 F.3d 1061 (9th Cir. 2018) .........................................22

*Commodity Futures Trading Com'n v. Schor*, 478 U.S. 833 (1986) ......................24

*Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163 (1989)...............................50

*Dick v. United States*, 208 U.S. 340 (1908) .............................................................50

*Douglas v. Seacoast Prods., Inc.,* 431 U.S. 265 (1977)..........................................45

*Edwardsen v. Morton*, 369 F. Supp. 1359 (D.D.C. 1973).........................................4

iv

*Eric v. Secretary of U.S. Dep't of Housing and Urban Development*, 464 F. Supp. 44 (D. Alaska 1978) ....................................................................................52

*Gilman v. Philadelphia*, 70 U.S. 713 (1866) ..........................................................45

*Haaland v. Brackeen*, 599 U.S. 255 (2023) ....................................................*passim*

*Hibbs v. Winn*, 542 U.S. 88 (2004) ......................................................................32

*Hynes v. Grimes Packing Co.*, 337 U.S. 86 (1949) ...............................................34

*Idaho v. United States*, 533 U.S. 262 (2001) ...................................................36, 37

*Ill. Brick Co.* v. *Illinois*, 431 U.S. 720 (1977) ......................................................21

*In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239 (9th Cir. 2020) ...........................................................................21

*John v. United States (Katie John II)*, 247 F.3d 1032 (9th Cir. 2001) ............*passim*

*John v. United States (Katie John III)*, 720 F.3d 1214 (9th Cir. 2013) ..........*passim*

*John v. United States*, 1994 WL 487830 (D. Alaska Mar. 30, 1994) .........10, 11, 12

*Kaiser Aetna v. United States*, 444 U.S. 164 (1979) ..............................................46

*Kenaitze Indian Tribe v. Alaska*, 860 F.2d 312 (9th Cir. 1988) ........................9, 31

*Kleppe v. New Mexico*, 426 U.S. 529 (1976) ...................................................41, 42

*Lair v. Bullock*, 697 F.3d 1200 (9th Cir. 2012) ....................................................22

*Loper Bright Enterprises v. Raimondo,* 144 S. Ct. 2244 (2024) ............................21

*McDowell v. State*, 785 P.2d 1 (Alaska 1989) ................................................11, 12

*McGirt v. Oklahoma*, 591 U.S. 894 (2020) ...........................................................54

*Metlakatla Indian Cmty. v. Dunleavy*, 2024 U.S. Dist. LEXIS 102138 (D. Alaska June 7, 2024) .....................................................................................29, 51

*Metlakatla Indian Cmty. v. Dunleavy*, 58 F.4th 1034 (9th Cir. 2023) ...................29

*Metlakatla Indian Community v. Egan*, 369 U.S. 45 (1962)..................................37

*Miller v. Gammie*, 335 F.3d 889 (9th Cir. 2003) ..................................................22

*Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172 (1999)............54

*Organized Village of Kake v. Egan*, 369 U.S. 60 (1962) ....................................36, 49

*Parravano v. Babbitt*, 70 F.3d 539 (9th Cir. 1995) ....................................................53

*People of Togiak v. United States,* 470 F. Supp. 423 (D.D.C. 1979)...............32, 53

*Perez v. Campbell*, 402 U.S. 637 (1971).....................................................................56

*PPL Montana, LLC v. Montana*, 565 U.S. 576 (2012) ..........................................47

*Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975 (9th Cir. 2013) ...............22

*Sackett v. EPA,* 598 U.S. 651 (2023) ........................................................................47

*San Francisco Herring Ass'n v. U.S. Dep't of the Interior*, 33 F.4th 1146 (9th Cir. 2022) .................................................................................................................25

*Sturgeon v. Frost*, 577 U.S. 424 (2016) ..........................................................*passim*

*Sturgeon v. Frost (Sturgeon II)*, 587 U.S. 28 (2019) .......................................*passim*

*Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519 (2015).................................................................................................24

*United States v. Certain Parcels of Land*, 666 F.2d 1236 (9th Cir. 1982)..............46

*United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700 (1987)...................45

*United States v. Craft*, 535 U.S. 274 (2002) .........................................................35

*United States v. Eckford*, 77 F.4th 1228 (9th Cir. 2023).......................................23

*United States v. Fei Ye*, 436 F.3d 1117 (9th Cir. 2006) .........................................31

*United States v. Gallegos*, 613 F.3d 1211 (9th Cir. 2010).....................................31

*United States v. Gardner*, 107 F.3d 1314 (9th Cir. 1997).....................................42

*United States v. Heredia*, 483 F.3d 913 (9th Cir. 2007) ........................................21

*United States v. Jicarilla Apache Nation*, 564 U.S. 162 (2011) ...........................50

*United States v. Milner,* 583 F.3d 1174 (9th Cir. 2009)........................................37

*United States v. Mitchell*, 463 U.S. 206 (1983).....................................................50

*United States v. Orm Hieng*, 679 F.3d 1131 (9th Cir. 2012) ................................22

*United States v. Rands*, 389 U.S. 121 (1967)..................................................45, 46

vi

*United States v. Virginia Elec. & Power Co.*, 365 U.S. 624 (1961) ......................46

*United States v. Winans*, 198 U.S. 371 (1905)........................................................33

*Utah Div. of State Lands v. United States*, 482 U.S. 193 (1987) ....................41, 47

*Valdez v. Rosenbaum*, 302 F.3d 1039 (9th Cir. 2002) ...........................................21

*Vasquez v. Hillery*, 474 U.S. 254 (1986)................................................................22

*Washington State Dep't of Licensing v. Cougar Den, Inc.*, 586 U.S. 347 (2019) ..53

*Winters v. United States*, 207 U.S. 564 (1908) ......................................................28

*Yellen v. Confederated Tribes of the Chehalis Reservation*, 594 U.S. 338 (2021) ................................................................................................................49

**Statutes**

16 U.S.C. § 3102 ..............................................................................................31, 32

16 U.S.C. § 3103 ....................................................................................................24

16 U.S.C. § 3111 ...............................................................................................*passim*

16 U.S.C. §§ 3111-3114 ........................................................................................31

16 U.S.C. §§ 3111-3126 .....................................................................................9, 25

16 U.S.C. §3112 .....................................................................................................31

16 U.S.C. § 3113 ....................................................................................................26

16 U.S.C. § 3115 ...............................................................................................10, 15

16 U.S.C. §3122 .....................................................................................................32

16 U.S.C. §3123 .....................................................................................................32

16 U.S.C. § 3125 ....................................................................................................31

16 U.S.C. §3126 .....................................................................................................31

16 U.S.C. § 3202 ....................................................................................................48

43 U.S.C. § 1314 ...............................................................................................*passim*

43 U.S.C. § 1601 ......................................................................................................6

43 U.S.C. § 1603 ....................................................................................7, 51

43 U.S.C. § 1618 ....................................................................................7, 32

54 U.S.C. § 100755 ....................................................................................25

1884 Alaska Organic Act, 23 Stat. 24 .......................................................4

Act of June 6, 1900, 31 Stat. 321 ................................................................4

Act of May 1, 1936, 49 Stat. 1250 ..............................................................4

Alaska National Interest Lands Conservation Act, Pub. L. No. 96-487, 94 Stat. 2371 (1980) .............................................................................*passim*

Alaska Statehood Act, Pub. L. No. 85-508, § 4, 72 Stat. 339 (1958) .............*passim*

Submerged Lands Act of 1953 ................................................................*passim*

## Regulations

Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, and C, 57 Fed. Reg. 22 (May 29, 1992) .......................................12

Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, C, and D, Redefintion to Include Waters Subject to Subsistence Priority, 64 Fed. Reg. 1276 (Jan. 8, 1999) .....................................13

Temporary Subsistence Management Regulations for Public Lands in Alaska, 55 Fed. Reg. 27 (June 29, 1990) .......................................12

## Other Authorities

125 Cong. Rec. 9904 (1979) .......................................................................8

126 Cong. Rec. 29 (1980) ...............................................................7, 8, 9,10

Alaska National Interest Lands-Part I: Hearings on H.R. 39 and H.R. 2219 Before the H. Subcomm. on Fisheries and Wildlife Conservation & the Env't of the Comm. on Merch. Marine and Fisheries, 96th Cong. 670 (1979) ...............17

Cohen's Handbook of Federal Indian Law (Nell Jessup Newton ed., 2012) ......6, 53

David Case & David Voluck, Alaska Natives and American Laws 179     (3d ed. 2012) ....................................................................................6, 53

viii

H. Conf. Rep. No. 92-746 (1971) ...................................................7, 52

S. Rep. No. 1929, 81st Cong., 2d Sess. 2 (1950) ....................................37

Treaty Concerning the Cession of the Russian Possessions in North America, Mar. 30, 1867, 15 Stat. 539 .......................................................4

## Constitutional Provisions

Alaska Const. art. XII, § 12 ................................................5, 35

Ariz. Const., art. XX, par. 4 (1910) .........................................36

Mont. Const., Ordinance I (1889) ............................................36

N. M. Const., art. XXI, § 2 (1910) ..........................................36

N.D. Const., art. 16, § 2 (1889) ............................................36

Okla. Const., art. I, § 3 (1906) ............................................36

S.D. Const., art. XXII, § 18 (1889) .........................................36

U.S. Const. art. I, § 8, cl. 3 ..........................................*passim*

U.S. Const. art. IV, cl. 2 ..................................................55

U.S. Const. art. IV, § 3, cl. 2 .........................................*passim*

Utah Const., art. III (1894) ................................................36

Wash. Const., art. XXVI, § 2 (1889) .........................................36

Wyo. Const., Ordinance § 3 (1889) ...........................................36

## INTRODUCTION

As reflected in both the Alaska Statehood Act and the Alaska Constitution, the United States reserved fishing rights to hold in trust for Alaska Natives, and the State of Alaska ("State") explicitly disclaimed its interest in those property rights upon Statehood. Although Congress believed that the State and the Secretary of Interior could work together to ensure that Alaska Natives had opportunities for subsistence fishing after the enactment of the Alaska Native Claims Settlement Act ("ANCSA"), conflicts over fishing resources only intensified, leading Congress to enact Title VIII of the Alaska National Interest Lands Conservation Act ("ANILCA") to fulfill its trust responsibility. After finding that access to subsistence resources is "essential to Native physical, economic, traditional, and cultural existence," Congress enacted the rural subsistence priority in Title VIII because it was necessary "to protect and provide the opportunity for continued subsistence uses" and "to fulfill the policies and purposes of the Alaska Native Claims Settlement Act and as a matter of equity," invoking its authority over Native affairs, as well as its powers under the Commerce Clause and Property Clause, to carry out this purpose. 16 U.S.C. § 3111.

The State does not acknowledge the findings or purposes of Title VIII, nor that the United States reserved title to fishing rights to hold in trust for Alaska Natives. Instead, throughout decades of litigation, the State has systematically

1

sought to erode Alaska Native subsistence rights under the false flag of opposing "federal overreach." Despite Congress establishing a clear path for the State to manage the rural subsistence priority established in ANILCA, the State failed to do so, necessitating federal implementation of the rural subsistence priority it now challenges. Instead of complying with the law, the State shamelessly advances the paternalistic argument that its "all Alaskans" policy is best for Alaska Natives and superior to the rural priority enacted by Congress.

Accepting the State's arguments would void the rural subsistence priority to fish under Title VIII of ANILCA. The State not only asks this Court to overrule *Katie John*, but also to conclude that Congress either lacked the power to enact Title VIII or, astonishingly, never intended to grant a rural subsistence priority to fish despite provisions in Title VIII doing so. After repeatedly losing this argument across three decades of litigation, the State now tries for a fourth bite at the apple.

These matters have been finally resolved by this Court for decades and *stare decisis* counsels against overturning such longstanding precedent. Furthermore, the State has failed to show that the *Katie John* decisions are "clearly irreconcilable" with *Sturgeon* based on its superficial and conclusory analysis. As held in the *Katie John* cases, Congress both intended and had the power to enact the Title VIII subsistence fishing priority under the federal reserved water rights doctrine. The Supreme Court in *Sturgeon* did not hold otherwise. The State's focus on "title" both

2

ignores that "public lands" includes "waters, and interests therein" and that the State took its title under the Submerged Lands Act subject to these very reservations.

Additionally, if not under the reserved water rights doctrine, Congress otherwise invoked its constitutional authority under the Property Clause, Commerce Clause, and its plenary power to manage Native affairs in enacting Title VIII, providing further constitutional authority for federal management of the subsistence fishing priority in navigable waters in Alaska—and not just in those navigable rivers running through federal lands or waters appurtenant thereto. This Court should affirm the district court's decision granting summary judgment against the State and in favor of the United States and Intervenor-Plaintiffs. Alternatively, if this Court reconsiders *Katie John*, this Court should conclude that the rural subsistence priority in Title VIII applies to *all* navigable waters in Alaska.

## CONSTITUTIONAL AND STATUTORY AUTHORITIES

All relevant statutory and constitutional authorities appear in the Addendum to this brief.

## ISSUES PRESENTED

(1)    Are the *Katie John* decisions, which are controlling precedent regarding the rural subsistence fishing priority in Title VIII of ANILCA, "clearly irreconcilable" with *Sturgeon v. Frost*, in which the Supreme Court declined to disturb *Katie John* and did not address Title VIII?

(2)    Does Congress's invocation of its authority under the Property Clause, Commerce Clause, and its plenary authority over Native affairs in Title VIII

3

of ANILCA provide additional authority for the federal government to regulate the taking of fish on navigable waters pursuant to the rural subsistence priority?

## STATEMENT OF THE CASE

**A.    Statehood, ANCSA, ANILCA, and Congress's Intent to Protect Alaska Native Subsistence.**

Title VIII of ANILCA[1] "did not emerge from a vacuum." *Haaland v. Brackeen*, 599 U.S. 255, 297 (2023) (Gorsuch, J., concurring). Alaska Natives, as the original occupants, held aboriginal title to all the lands that are now Alaska, and had the right to hunt, fish, and gather on the lands and waters. *E.g.*, *Edwardsen v. Morton*, 369 F. Supp. 1359, 1373 (D.D.C. 1973). Those rights were largely left intact by Russia, which originally claimed Alaska as a territory and later sold its interests to the United States.[2] The federal government recognized the existence of tribes in Alaska in 1936. *See* Act of May 1, 1936, ch. 254, 49 Stat. 1250.

In the Alaska Statehood Act ("Statehood Act"), which incorporated the Submerged Lands Act of 1953 ("SLA"), the State did not receive exclusive or

---

[1]  16 U.S.C. §§ 3101-3233, Pub. L. No. 96-487, 94 Stat. 2371 (1980) (Title VIII codified at 16 U.S.C. §§ 3111-3126).

[2] *See* Treaty Concerning the Cession of the Russian Possessions in North America, Mar. 30, 1867, 15 Stat. 539. The 1884 Alaska Organic Act provided that Alaska Natives "shall not be disturbed in the possession of any lands actually in their use or occupation." Act of May 17, 1884, 23 Stat. 24, 26. Later statutes contained similar provisions. *E.g.*, Act of June 6, 1900, 31 Stat. 321, 330.

plenary authority over navigable waters or fishing rights in those waters. Instead, in the Statehood Act, the United States recognized its trust responsibility to Alaska Natives, and reserved "right or title . . . to any lands or other property (including fishing rights), the right or title to which may be held by any Indians, Eskimos, or Aleuts (hereinafter called natives) or is held by the United States in trust for said natives." Pub. L. No. 85-508, § 4, 72 Stat. 339, 339 (1958). In Article XII, Section 12 of the Alaska Constitution,[3] the State "disclaimed any interest in property rights held by Alaska Natives or the federal government." *Aquilar v. Kleppe*, 424 F. Supp. 433, 435-36 (D. Alaska 1976). And in Section 6 of the SLA, the United States further "retains all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce [and] navigation." 43 U.S.C. § 1314(a).

The Statehood Act further did not "determine the rights of the Alaska Natives, who asserted aboriginal title to much of the same land now claimed by the State." *Sturgeon v. Frost (Sturgeon I)*, 577 U.S. 424, 429 (2016). Soon after entering the

---

[3]     Alaska Const. art. XII, § 12 ("The State and its people further disclaim all right or title in or to any property, including fishing rights, the right or title to which may be held by or for any Indian, Eskimo, or Aleut, or community thereof, as that right or title is defined in the act of admission. The State and its people agree that, unless otherwise provided by Congress, the property, as described in this section, shall remain subject to the absolute disposition of the United States.").

union, the State's land selection efforts began intruding on traditional Alaska Native hunting and fishing grounds. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 4.07[3][b], at 329 (Nell Jessup Newton ed., 2012) [hereinafter COHEN'S HANDBOOK]. The State also began asserting management over hunting and fishing, quickly closing many traditional Alaska Native subsistence fisheries. *Alaska v. Babbitt (Katie John I)*, 72 F.3d 698, 700 (9th Cir. 1995). In 1968, the discovery of vast oil reserves at Prudhoe Bay further intensified the State's demands to select and receive land pending the settlement of Native claims. *See* COHEN'S HANDBOOK § 4.07[3][b], at 329. After years of negotiation between Alaska Natives, the State, and the federal government, a grand compromise was reached, and Congress enacted ANCSA in 1971. 43 U.S.C. § 1601 *et seq.* Although the 227 federally recognized tribes in Alaska are on the same legal footing as Native American tribes in the lower-48, ANCSA was "a novel and experimental approach in the settlement of Native claims." DAVID CASE & DAVID VOLUCK, ALASKA NATIVES AND AMERICAN LAWS 179 (3d ed. 2012) [hereinafter CASE & VOLUCK]; *see also* COHEN'S HANDBOOK § 4.07[3][a], at 326 ("Alaska Natives . . . have the same legal status as members of Indian tribes singled out as political entities in the commerce clause of the United States Constitution."). ANCSA provided for the creation of state-chartered Alaska Native Corporations ("ANCs") to select approximately 40 million acres of land and receive $960 million in federal funds. *Sturgeon I*, 577 U.S. at 430. Furthermore,

ANCSA extinguished all existing reservations in Alaska except the Annette Islands Reserve of the Metlakatla Indian Community. 43 U.S.C. § 1618(a).

When Congress extinguished aboriginal title in ANCSA, 43 U.S.C. § 1603(b), but not the United States' trust responsibility to Alaska Native peoples, there were discussions of expressly including Alaska Native subsistence provisions. "[A]fter careful consideration," however, the conference committee stated its belief "that all Native interest in subsistence resource lands can and will be protected" by the Secretary of the Interior and State. H. CONF. REP. NO. 92-746, at 37 (1971), *as reprinted in* 1971 U.S.C.C.A.N. 2247, 2250. In doing so, Congress made clear that it "expect[ed] both the Secretary and the State to take any action necessary to protect the subsistence needs of [Alaska] Natives." *Id.* The recognition of that responsibility "to protect Alaska Native subsistence activities is consistent with the historic trust responsibility of the Federal Government to the Alaska Native people, a responsibility which transcends the termination of aboriginal hunting and fishing rights by [ANCSA]" and which is "consistent with [Congress's] well recognized constitutional authority to manage Indian affairs."[4]

---

[4]  126 CONG. REC. 29,278 (1980) (statement of Rep. Udall). In the context of examining ANILCA's legislative history, *Katie John I* notes that Representative Udall's statement came "after the Senate had passed ANILCA, after the House had finished debating it, and shortly before the House voted on it" and concluded that therefore "[h]is views deserve little weight." 72 F.3d at 703. Representative Udall's

"Unfortunately . . . neither the Secretary nor the State [took] completely adequate or timely steps to meet th[ose] responsibilities" and "[t]he reluctance of the State to act aggressively to protect the economy and culture of rural residents, the majority of whom are Native people, [was] compounded by Alaska's rapid population growth."[5] Simultaneously, the State once again began restricting the subsistence hunting and fishing activities of Alaska Natives—further compromising their food security—for the benefit of the urban non-Native majority who wished to hunt and fish, primarily for sport.[6] Congress, reacting to the State's treatment of Alaska Native subsistence users, recognized that it needed to "fulfill the policies and purposes of [ANCSA]," 16 U.S.C. § 3111(4), and "ma[k]e good on [its] promise" to protect Alaska Native subsistence. 126 CONG. REC. 29,278 (1980) (statement of Rep. Udall). In 1980, Congress fulfilled its promise through Title VIII of ANILCA,

---

statements, however, did not occur in a vacuum, and as a principal author of ANILCA and as the Congressman who introduced H.R. 39, he was well-suited to summarize both the circumstances necessitating Title VIII and Congressional hearings leading up to ANILCA's passage.

[5] 125 CONG. REC. 9904 (1979) (statement of Rep. Udall). Between the enactments of ANCSA and ANILCA, the State's population grew by 36%. 2-JSER-353.

[6] 2-JSER-353; *see also* 125 CONG. REC. 9904 (1979) ("Both the State and the Secretary have been reluctant . . . to take timely steps to protect subsistence resources and uses from overpowering competition from the urban population centers. In several instances this reluctance already has led to overharvest of crucial subsistence resources with resulting hardship upon rural communities which are dependent upon those resources.").

8

16 U.S.C. §§ 3111-3126, which gives a user priority to customary and traditional subsistence uses of fish and wildlife by rural residents on public lands (and waters). Notably, "[e]arly drafts of Title VIII protected only subsistence uses by [Alaska Natives]. When the State advised Congress that the Alaska Constitution might bar the enforcement of a preference extended only to Natives, Congress broadened the preference to include all 'rural residents'" at the State's behest. *Kenaitze Indian Tribe v. Alaska*, 860 F.2d 312, 313 n.1 (9th Cir. 1988) (noting the irony of the State's "subsequent narrowing of the definition of 'rural residents' to exclude the native villages" at issue in that case) (quoting 126 CONG. REC. 29,278-79 (1980) (statement of Rep. Udall)).

Although the subsistence priority was expanded to include rural residents, the economic and cultural survival of Alaska Natives was the principal driver of why Congress enacted Title VIII.[7] Congress recognized that because the "continuation of

---

[7]  16 U.S.C. § 3111(4); *see also* 126 CONG. REC. 29,278 (1980) (statement of Rep. Udall) ("Although the Federal and State subsistence management system established in the bill is racially neutral, it is important to recognize that the primary beneficiaries of the subsistence title and the other provisions in the bill relating to subsistence management are the Alaska Native people. . . . the subsistence title would not be included in the bill if non-Native subsistence activities were the primary focus of concern. Rather, the subsistence title and the other subsistence provisions are included in recognition of the ongoing responsibility of the Congress to protect the opportunity for continued subsistence uses in Alaska by the Alaska Native people, a responsibility consistent with our well recognized constitutional authority to manage Indian affairs.").

the opportunity for subsistence uses of resources on public and other lands in Alaska is threatened by the increasing population of Alaska . . . [and] by increased accessibility of remote areas containing subsistence resources," it was necessary "to protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents." 16 U.S.C. § 3111(3)-(4). Congress also invoked its plenary power to manage "Native affairs" in Title VIII, *id.* § 3111(4), and Representative Udall "lodged a detailed discussion of the pending [final] bill in the Congressional Record," in which he noted Title VIII "recognize[s] the responsibility of the Federal government to protect the . . . continuation of subsistence uses by the Alaska Native people." *John v. United States*, 1994 WL 487830, at *21, app. n.2 (D. Alaska Mar. 30, 1994); 126 CONG. REC. 29,278-79 (1980).

Importantly, Congress also included in ANILCA's Title VIII an offer to the State: the option of managing subsistence on federal public lands—in addition to the authority it already had over State and private lands—if the State enacted a law of general applicability containing the same rural subsistence priority. 16 U.S.C. § 3115(d). The ability to manage a unified statewide system was, and remains, the State's incentive to comply with Title VIII's provisions.

Despite the passage of Title VIII, attacks on Alaska Native subsistence were far from over, and the decades of conflict following the passage of ANILCA are often referred to as the "subsistence wars."[8]

**B.    *McDowell* Holds that the Rural Subsistence Priority Violates the Alaska Constitution.**

After efforts throughout the 1980s urging the State to seize the opportunity offered by Title VIII and enact a statute of general applicability containing a rural subsistence priority, the Alaska State Legislature finally passed such a law in 1986. *McDowell v. State*, 785 P.2d 1, 1-2 (Alaska 1989). Unfortunately, just a few years later, the Alaska Supreme Court held in *McDowell* that the Alaska Constitution does not allow for a rural subsistence priority. *Id.* at 9. Following *McDowell*, the State repeatedly requested stays of the operative effect of that decision under ANILCA (i.e., federal management of the rural subsistence priority to effectuate Title VIII), promising Congress that it could resolve the issue through a constitutional amendment. *John*, 1994 WL 487830, at *4. Despite a series of congressional moratoria, guarantees of federal appropriations, and tireless advocacy by the Native

---

[8]  *E.g.*, Brief for Ahtna, Inc., as *Amicus Curiae* 23, *Sturgeon v. Frost (Sturgeon II)*, 587 U.S. 28 (2019); *see also* 2-JSER-513–14 (describing inflammatory language used to attack Alaska Native subsistence). AFN hereby incorporates the Statement of the Case in Ahtna's Brief, which details the history of State closures of subsistence fishing, including Congress's concern about the Copper River subsistence wars over salmon in enacting Title VIII of ANILCA. *See also* AVCP Br., Statement of Case.

community and many others, the State did not pass a constitutional amendment. 2-JSER-356–60.

**C.    The *Katie John* Trilogy and the State's Repeated Efforts to Undermine Title VIII's Subsistence Protections.**

After *McDowell*, and the State's failed efforts to comply with Title VIII's pathway for unified State subsistence management in Alaska, the federal government implemented initial subsistence management regulations in 1990.[9] Because the federal regulations initially excluded navigable waters from the subsistence priority, Alaska Native plaintiffs led by Ahtna elders Katie John and Doris Charles filed suit in 1990 challenging the federal government's decision that its Title VIII regulatory authority did not extend to navigable waters. *John*, 1994 WL 487830. The State also sued, initially claiming that ANILCA gave the federal government no power of direct management on *any* lands or waters in Alaska, and the cases were consolidated. *Katie John I*, 72 F.3d at 701. In 1994, the U.S. District Court for the District of Alaska held that all navigable waters encompassed by the navigational servitude were public lands for the purposes of federal subsistence management authority under Title VIII. *John*, 1994 WL 487830, at *14-18.

---

[9]  Temporary Subsistence Management Regulations for Public Lands in Alaska, 55 Fed. Reg. 27,114 (June 29, 1990). The regulations, with very few changes, became permanent in 1992: Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, and C, 57 Fed. Reg. 22,940 (May 29, 1992).

The State appealed and argued before this Court that "ANILCA's definition of public lands excludes all navigable waters because the federal government does not hold title to them by virtue of the navigational servitude or the reserved water rights doctrine." *Katie John I*, 72 F.3d at 702. In a 1995 opinion that became known as *Katie John I*, this Court held that "the definition of public lands includes those navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine." *Id.* at 703-04. The State petitioned the U.S. Supreme Court for certiorari, but was denied. *Alaska v. Babbitt*, 516 U.S. 1036 (1996).

In response to *Katie John I*, the federal government conducted a rulemaking identifying the navigable waters that the United States has interests in pursuant to the reserved water rights doctrine; that final rule went into effect in 1999 ("1999 Rule").[10] The State again sued, resulting in another appeal to the Ninth Circuit challenging yet again the existence of a sufficient federal interest in navigable waters necessary to allow a subsistence priority to fish, where it received an *en banc* hearing. *John v. United States (Katie John II)*, 247 F.3d 1032 (9th Cir. 2001).

---

[10] Subsistence Management Regulations for Public Lands in Alaska, Subparts A, B, C, and D, Redefinition to Include Waters Subject to Subsistence Priority, 64 Fed. Reg. 1276 (Jan. 8, 1999) (codified as amended at 50 C.F.R. pt. 100). Implementation was delayed for three years because the State again asked Congress for additional time to achieve compliance with Title VIII. 2-JSER-356.

13

The *en banc* court issued a decision affirming *Katie John I*, in a per curiam opinion known as *Katie John II*. *Id.* at 1033. Judge Tallman, joined by two other judges, wrote an opinion concurring in the judgment, reasoning that because Congress was exercising its authority under the Commerce Clause, "federal protection of traditional subsistence fishing [should extend] to *all* navigable waters within the State of Alaska, not just to waters in which the United States has a reserved water right." *Id.* at 1034. Judge Rymer also wrote separately to express concern that the State had "two bites at the same apple," suggesting that the challenge should have been precluded because it "rais[ed] precisely the same issue on this appeal as [the Ninth Circuit] heard and determined [in *Katie John I*]." *Id.* at 1050-51. After meeting with Katie John at her traditional fishery, then Alaska Governor Tony Knowles decided not to petition the Supreme Court to review the decision. "We must stop a losing legal strategy that threatens to make a permanent divide among Alaskans," said Knowles, "Therefore, I cannot continue to oppose in court what I know in my heart to be right." 2-JSER-538.

Years later, the State did an about-face and decided to challenge the 1999 Rule anew, this time arguing that too many waters had been included. *John v. United States (Katie John III)*, 720 F.3d 1214, 1223-24 (9th Cir. 2013). In *Katie John III*, this Court concluded that the federal government had correctly applied *Katie John I* in its use of the reserved water rights doctrine to identify which waters in its 1999

Rule are "public lands" for the purpose of Title VIII's rural subsistence priority—those navigable waters running through federal lands, primarily the conservation system units ("CSUs"), and waters appurtenant to those lands. *Id.* at 1230-31. The State's petition for certiorari to the Supreme Court was denied. *Alaska v. Jewell*, 572 U.S. 1042 (2014).

After more than three decades of litigation, finality in the *Katie John* cases seemingly put the dispute over the Title VIII subsistence fishing priority to rest. Federal and State management authority had been clearly delineated, and Title VIII continued to provide a path for the State to legitimately assume authority over unified management via a State constitutional amendment allowing it to implement the rural subsistence priority. 16 U.S.C. § 3115(d).

## D.  The Supreme Court Interprets an Exception in ANILCA Section 103(c) in *Sturgeon v. Frost*.

*Sturgeon* began when hovercraft user, John Sturgeon, challenged the National Park Service's ("Park Service") authority to apply its nationwide hovercraft regulations on the Nation River within the Yukon-Charley Rivers National Preserve in Alaska. The matter made its way to the Supreme Court, twice, with the *Sturgeon* Court ultimately agreeing that the Park Service lacked the authority to enforce hovercraft regulations applicable to navigable waters in park lands outside of Alaska

because of an exception in ANILCA Section 103(c).[11] The Supreme Court reasoned that *Sturgeon* did not address "ANILCA's subsistence-fishing provisions," as argued by John Sturgeon and the State of Alaska's amicus brief, and left the "holdings that the Park Service may regulate subsistence fishing on navigable waters" from *Katie John* undisturbed. *Sturgeon II*, 587 U.S. at 45 n.2.

Post-*Sturgeon* the State began to attack Title VIII, despite previously representing to the Supreme Court that *Katie John* remained good law. One of the State's attempts at diminishing Title VIII was issuing fishing orders that conflicted with Federal closures to protect the rural subsistence priority under the premise that it, not the federal government, had management authority over subsistence fisheries on the Kuskokwim River within the Yukon Delta National Wildlife Refuge. 3-ER-334–73. In 2022, the federal government responded to the State's unlawful orders purporting to issue subsistence fishing openings on the Kuskokwim to all Alaskans by suing the State for interfering with federal management of subsistence fisheries. 1-ER-11–15. Multiple parties representing the interests of Alaska Native peoples,

---

[11]  *See Sturgeon II*, 587 U.S. at 46 ("If Sturgeon lived in any other State, his suit would not have a prayer of success. . . . Section 103(c) of ANILCA makes it so. . . . that section provides that even when non-public lands—again, including waters— are geographically within a national park's boundaries, they may not be regulated as part of the park.").

including the Alaska Federation of Natives ("AFN"), intervened as plaintiffs to protect the Title VIII rural subsistence priority. 1-ER-4–5.

In opposing Plaintiffs' motion for summary judgment and cross-moving for summary judgment, the State argued for the first time that *Katie John* was no longer good law, and that *Sturgeon* mandated an outcome that eliminates the rural subsistence priority in Title VIII. 1-ER-19–21. The District Court rejected this argument and entered judgment for Plaintiffs. 1-ER-2–32. The State appealed. 3-ER-417–22.

### E.   Eliminating the Rural Subsistence Priority for Fishing in Title VIII Would Have Grave Consequences.

"As it has for thousands of years, the subsistence way of life remains today the foundation of [Alaska] Native culture, the predominant focus of village activity and the mainstay of the rural economy."[12] When subsistence resources are taken away—as has happened in the past under State jurisdiction—the result is economic and cultural catastrophe for the families who rely on those resources. 2-JSER-353.

For many Alaska Native peoples living in rural villages, preserving their ways of life and ensuring their food security depends on their ability to subsistence fish.

---

[12] Alaska National Interest Lands-Part I: Hearings on H.R. 39 and H.R. 2219 Before the H. Subcomm. on Fisheries and Wildlife Conservation & the Env't of the Comm. on Merch. Marine and Fisheries, 96th Cong. 670 (1979) (statement of Morris Thompson, President of AFN).

17

Alaska Department of Fish and Game ("ADF&G") research shows that 95% of households in rural Alaska consume subsistence-caught fish. 2-JSER-437. Moreover, ADF&G's 2020 subsistence harvest report calculated that subsistence fisheries provide 56.8% of the wild foods harvested by rural residents for subsistence purposes, with salmon comprising the largest portion of the total harvest at 32.3%. 2-JSER-440. And while the Alaska Native population makes up a substantial portion of the population of all rural areas in the state,[13] in the most remote, roadless regions, the Alaska Native population comprises the large majority: 82%.[14] Subsistence, and fish in particular, feeds many of those communities and is an integral part of community relationships. When subsistence resources—or the legal right to harvest them—are taken away, they cannot be replaced by substitutes.[15]

Without the legal protection of Title VIII's rural subsistence priority, as upheld by the *Katie John* decisions*, Alaska Native food security will be significantly

---

[13]  2-JSER-467 (approximately 55% of the population of all rural areas in the state).

[14]  2-JSER-541; 2-JSER-540 (containing U.S. Census Bureau data showing the Alaska Native population makes up 96.9% of the Kusilvak Census Area, 88.5% of the Bethel Census Area, 88.1% of the Northwest Arctic Borough, 82.6% of the Nome Census Area, 79.9% of the Dillingham Census Area, and 77.2% of the Yukon-Koyukuk Census Area).

[15]  The cost to replace wild food harvests (both fish and game) in rural Alaska is estimated to be about $170-$340 million annually, or about $97-$193 million to just replace the 56.8% comprised of fish. 2-JSER-440.

threatened: allowing the State to apply its "all Alaskans" policy on navigable waters running through federal lands, as identified in the 1999 Rule, will further diminish subsistence resources when there is already a shortage of fish. Furthermore, the *Katie John* cases provide a "fragile equilibrium" that ended the subsistence wars of the 1980s and 90s. *See* Brief for Ahtna, Inc., as *Amicus Curiae* 26, *Sturgeon II*, 587 U.S. 28. That balance must be preserved to give effect to Title VIII of ANILCA.

## SUMMARY OF THE ARGUMENT

The State's arguments fail for multiple reasons.

**I.**     This Court should easily reject the State's argument that the long-standing *Katie John* decisions meet the high standard of being "clearly irreconcilable" with *Sturgeon*. As stated by the *Sturgeon* Court, the *Katie John* decisions were left "undisturbed"; *Sturgeon* instead reflected a failed attempt to expand the reserved water rights doctrine, which is limited to the purpose of the reservation, to give the federal government plenary regulatory authority over the Nation River.

And, contrary to the State's argument, "title" in a reserved water right is not necessary for it to be "public land" subject to the subsistence priority under ANILCA. As a matter of law, such federal reserved interests preempt state ownership of submerged lands. And in any event, the federal government reserved from the State's title a property interest in "fishing rights" to be held in trust for

Alaska Natives in the Statehood Act, and the State disclaimed any interest in those property rights. Title is not needed, but title to the reserved rights necessary to effectuate a fishing subsistence priority in *all* navigable waters in Alaska for purposes of Title VIII is held by the federal government.

II.     Because Congress clearly intended to enact a rural subsistence priority in Title VIII, the State is really attacking the source of power for this legislation, rather than attacking the proper interpretation of ANILCA. This Court in the *Katie John* cases held that a federal reserved water right provided the source of power for Congress to enact the rural subsistence priority found in Title VIII. Regardless of whether this Court holds that *Katie John* remains good law, this Court could conclude that there are alternative grounds supporting Federal authority to regulate subsistence fishing in navigable waters. Congress's invocation of its powers under the Property Clause, Commerce Clause, and plenary authority over Native Affairs provides constitutional authority for Congress to protect subsistence fishing in navigable waters under Title VIII. These alternative sources establish that the federal government has the power and authority to regulate navigable waters for purposes of carrying out its trust responsibilities to Alaska Natives, even where the State holds title to submerged lands beneath those navigable rivers.

## STANDARD OF REVIEW

Whether *stare decisis* applies is a question of law reviewed de novo. *In re Nat'l Collegiate Athletic Ass'n Athletic Grant-in-Aid Cap Antitrust Litig.*, 958 F.3d 1239, 1252 (9th Cir. 2020), *aff'd*, 594 U.S. 69 (2021). This Court "may affirm the district court's judgment on any basis supported by the record." *Valdez v. Rosenbaum*, 302 F.3d 1039, 1043 (9th Cir. 2002).

## ARGUMENT

## I.  *KATIE JOHN* IS CONTROLLING PRECEDENT.

"Overturning a long-standing precedent is never to be done lightly, and particularly not 'in the area of statutory construction, where Congress is free to change [an] interpretation of its legislation.'" *United States v. Heredia*, 483 F.3d 913, 918 (9th Cir. 2007) (quoting *Ill. Brick Co.* v. *Illinois*, 431 U.S. 720, 736 (1977)). If this Court concludes that *Katie John* and *Sturgeon* are not "clearly irreconcilable," then *Katie John* remains controlling precedent regarding the rural subsistence fishing priority in Title VIII of ANILCA. The State's reliance on *Loper Bright Enterprises v. Raimondo* does not change this analysis.[16] 144 S. Ct. 2244, 2273 (2024) ("[W]e do not call into question prior cases that relied on the *Chevron* framework. The holdings of those cases that specific agency actions are lawful . . . are still subject to

---

[16] *See also* Fish Commission Br., Argument I.B.

statutory *stare decisis*")*.* As the "proponent of overruling precedent" the State has failed to meet its "heavy burden of persuading the Court that changes in society or in the law dictate that the values served by *stare decisis* yield in favor of a greater objective." *Vasquez v. Hillery*, 474 U.S. 254, 266 (1986).

## A.    The State Cannot Meet Its High Burden To Have This Court Overrule *Katie John* As Clearly Irreconcilable with *Sturgeon*.

The District Court correctly held that the *Katie John* cases are not clearly irreconcilable with *Sturgeon*. 1-ER-20–21. A panel is "bound by prior panel decisions . . . and can only reexamine them when their 'reasoning or theory' of that authority is 'clearly irreconcilable' with the reasoning or theory of intervening higher authority." *Rodriguez v. AT&T Mobility Servs. LLC*, 728 F.3d 975, 979 (9th Cir. 2013) (quoting *Miller v. Gammie*, 335 F.3d 889, 893 (9th Cir. 2003) (en banc)). "The test requires [the panel] to look at more than the surface conclusions of the competing authority." *Id.* "This is a high standard." *Lair v. Bullock*, 697 F.3d 1200, 1207 (9th Cir. 2012) (internal quotation marks omitted). "It is not enough for there to be 'some tension' between the intervening higher authority and the prior circuit precedent." *Id.* (quoting *United States v. Orm Hieng*, 679 F.3d 1131, 1140 (9th Cir. 2012)). "Instead, [courts] focus on the respective bases for those decisions to determine whether [the] reasoning so undercuts the principles on which [precedent] relied that [the] prior decision cannot stand." *Rodriguez*, 728 F.3d at 980. "Nothing short of 'clear irreconcilability' will do," *Close v. Sotheby's, Inc.*, 894 F.3d 1061,

1074 (9th Cir. 2018), meaning that if this Court "can apply [circuit] precedent consistently with that of the higher authority, [it] must do so." *United States v. Eckford*, 77 F.4th 1228, 1233 (9th Cir. 2023) (quoting *Avilez v. Garland*, 69 F.4th 525, 533 (9th Cir. 2023)).

**B.    *Katie John* and the Reserved Water Rights Doctrine Cases it Relies on Remain Good Law.**

In *Katie John I*, this Court held that "the definition of public lands includes those navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine." 72 F.3d at 703-04. And in *Katie John III*, this Court concluded that the federal government had correctly applied *Katie John I* in its use of the reserved water rights doctrine to identify which waters in its 1999 Rule are "public lands" for purposes of Title VIII's rural subsistence priority—those navigable waters running through federal lands, primarily the CSUs, and waters appurtenant to those lands. 720 F.3d at 1222-24, 1229-31. Although Congress has amended other provisions of ANILCA in the intervening years, it has not limited the application of Title VIII. Given the clear Congressional intent behind the subsistence priority in Title VIII, as discussed at length in the *Katie John* trilogy, and the

retroactive adoption of these cases by Congress, this Court's reasoning is sound and remains good law today.[17]

Just as the federal government in *Sturgeon* impermissibly tried to leverage its reserved water right for the purposes of subsistence in Title VIII to give it broad regulatory authority not tied to those purposes, the State now tries to impermissibly leverage *Sturgeon* to exclude from ANILCA's definition of "public lands" the very reserved water right necessary to fulfill the purposes of Title VIII. Despite not relying on the exclusion from federal regulation in Section 103(c) at issue in *Sturgeon*,[18] the State now cherry picks language from *Sturgeon* to once again attack the rural subsistence priority upheld by *Katie John*. This argument fails for various reasons.

---

[17] It is well established that when Congress passes "positive legislation" that adopts an agency interpretation, that is "persuasive evidence that the interpretation is the one intended by Congress," the courts must "deem that construction virtually conclusive." *Commodity Futures Trading Com'n v. Schor*, 478 U.S. 833, 846 (1986); *see also Tex. Dep't of Hous. & Cmty. Affairs v. Inclusive Communities Project, Inc.*, 576 U.S. 519, 536 (2015) (Congress's decision to amend statute but leave "operative language" is "convincing support" that "Congress accepted and ratified" such interpretation).

[18] 16 U.S.C. § 3103(c) reads, in part, "Only those lands within the boundaries of any conservation system unit which are public lands (as such term is defined in this Act) shall be deemed to be included as a portion of such unit. No lands which, before, on, or after December 2, 1980, are conveyed to the State, to any Native Corporation, or to any private party shall be subject to the regulations applicable solely to public lands within such units."

Contrary to the State's arguments, *Sturgeon* does not undermine the federal government's authority to protect subsistence under Title VIII. *Sturgeon* "held that the Park Service could not apply its hovercraft ban to the disputed waters within park boundaries in Alaska" under Section 103(c), a statutory provision that is "unique to ANILCA, which was itself borne out of Alaska's unique history and geography." *San Francisco Herring Ass'n v. U.S. Dep't of the Interior*, 33 F.4th 1146, 1155 (9th Cir. 2022) (citing *Sturgeon II*, 587 U.S. at 32-39). Section 103(c) "exempt[s] non-public lands, including waters, from the Park Service's ordinary regulatory authority." *Sturgeon II*, 587 U.S. at 48. *Sturgeon* thus held only that Section 103(c) excludes inholdings in Alaska from the broad regulatory authority that the Park Service usually has under its Organic Act over *all lands and waters* within the geographic boundaries of a park system unit regardless of ownership, including navigable waters.[19] *Id.* at 48-49. The narrow exception in Section 103(c) is irrelevant here because ANILCA itself specifically prioritizes subsistence in Alaska: dedicating an entire title to it. 16 U.S.C. §§ 3111-3126. Nothing in the language of

---

[19]  The regulation at issue was created pursuant to the National Park Service Organic Act, which allows the Park Service's general rules and regulations to apply to non-federal lands, including navigable waters, within the boundaries of a park system unit, unless they are "in conflict" with any unit-specific law. 54 U.S.C. § 100755(a). As noted in *Sturgeon II*, "the Secretary, acting through the Director of the Park Service, has broad authority under the [Organic Act] to administer both lands and waters within all system units in the country." 587 U.S. at 38.

Section 103(c), or *Sturgeon's* interpretation of that provision in the context of general Park Service regulations enacted pursuant to its Organic Act, undermine the specific federal authority provided for in another title of ANILCA itself, i.e., Title VIII's rural subsistence fishing priority.[20]

In *Cappaert v. United States*, the Supreme Court confirmed that the federal "[r]eservation of water rights is empowered by the Commerce Clause, Art. I, § 8, which permits federal regulation of navigable streams, and the Property Clause, Art. IV, § 3, which permits federal regulation of federal lands." 426 U.S. 128, 138 (1976). In *Katie John I*, 72 F.3d at 703, this Court relied on the reserved water rights doctrine as articulated in *Cappaert* and evaluated whether "those waters are necessary to accomplish the purposes for which the land was reserved," which is entirely consistent with the standard articulated by *Sturgeon*. 587 U.S. at 43-44. In Title VIII Congress established a rural subsistence priority, which "clearly indicate[s] that subsistence uses include subsistence fishing," and "subsistence fishing has traditionally taken place in navigable waters." *Katie John I*, 72 F.3d at 702 (citing 16 U.S.C. § 3113). The federal government therefore "has an interest by virtue of

---

[20]  *Sturgeon II*, 587 U.S. at 47-49 (holding the "legal fiction" that State or private interests within a park system unit are "deemed" not to be part of that unit under Section 103(c) creates an exception to only those "regulations applicable solely to public lands within such units," i.e., general regulations enacted under the Organic Act).

the reserved water rights doctrine" in navigable waters necessary to carry out the subsistence fishing priority. *Id.* at 703-04.

The State now argues that ANILCA's exception in Section 103(c) swallows the entire rule. It argues that in addition to being free from the Park Service's general regulatory authority under the Organic Act over all navigable waters within a park system unit,[21] the federal government has *no* interest in those waters that justifies *any* federal control for *any* purpose,[22] not even for the purpose of carrying out the subsistence priority established in ANILCA itself. The State misinterprets *Sturgeon*. *Sturgeon's* holding does not mean the federal reserved water right does not provide for federal authority for the specific subsistence purposes described in Title VIII of ANILCA. Indeed, in not reaching the issue and assuming for purposes of argument that a federal reserved water right was an ownership interest, the Supreme Court reasoned that "[u]nder ANILCA's definition, the 'public land' at issue would consist

---

[21] "The Secretary 'shall prescribe such regulations as [he] considers necessary or proper for the use and management of System units. And he may, more specifically, issue regulations concerning 'boating and other activities on or relating to water located within System units.' § 100751(b). Those statutory grants of power make no distinctions based on the ownership of either lands or waters (or lands beneath waters)." *Sturgeon II*, 587 U.S. at 38.

[22] *Contra Sturgeon II*, 587 U.S. at 53 ("By adding 'solely,' Congress made clear that the exemption granted was not from such generally applicable regulations. Instead, it was from rules applying only in national parks—*i.e.,* the newly looming Park Service rules.").

only of the Federal Government's specific 'interest' in the River—that is, its reserved water right," and that it would "not give the Government plenary authority over the waterway to which it attaches," especially where the Government had not argued that hovercraft regulation was "related to safeguarding the water," in other words, the subsistence fishing priority in Title VIII. *Sturgeon II*, 587 U.S. at 44-45.

The State's argument further attempts to call into question the longstanding reserved water rights doctrine to carry out the purposes of federal reservations in Alaska. Op. Br. 27, 31-32. As explained by *Sturgeon*, however, it is well established that "when the Federal Government withdraws its land from the public domain and reserves it for a federal purpose, the Government, by implication, reserves appurtenant water then unappropriated to the extent needed to accomplish the purpose of the reservation." *Sturgeon II*, 587 U.S. at 43 (quoting *Cappaert*, 426 U.S. at 138). The Court noted that, for example, the reserved water rights doctrine has long been applied to accomplish the purpose of the land reservation, such as protecting the water necessary for a tribe to farm or for fish to survive, and further could be applied to protect a river from "pollution or other similar harm." *Id.* at 43-45 (citing *Winters v. United States*, 207 U.S. 564, 576-77 (1908); *Cappaert*, 426 U.S. at 147). As the Court concluded, the general, nationwide hovercraft regulation at issue, however, was not tied to achieving the purpose of the reservation—and in fact

28

did not even address an activity occurring in water—thus efforts to justify this as an "interest" in a "purported" reserved water right, failed. *Id.* at 44.

Critically, although *Sturgeon* reasonably concluded that attempting to extend the reserved water rights doctrine to justify enforcing the Park Service's general hovercraft regulations was a bridge too far, it agreed with the State's amicus brief, and expressly did "not disturb the Ninth Circuit's holdings that the Park Service may regulate subsistence fishing on navigable waters." *Id.* at 45 & n.2 ("Even if the United States holds title to a reserved water right in the Nation River, that right . . . cannot prevent Sturgeon from wafting along the River's surface toward his preferred hunting ground."). Taken to its logical extreme, the State's argument is that the federal government has *no* federal interest, including reserved rights, in navigable waters in Alaska that take precedence over Alaska's ownership of submerged lands, period.[23] This is obviously wrong. In their concurring opinion, Justices Sotomayor and Ginsburg specifically noted the limits of *Sturgeon*: "[t]he Court holds *only* that

_____

[23] The State's argument also conflicts with this Court's recent decisions confirming reserved fishing rights outside the Metlakatla reservation. *E.g., Metlakatla Indian Cmty. v. Dunleavy*, 58 F.4th 1034, 1047 (9th Cir. 2023) (concluding "off-reservation fishing rights" were consistent with Congress's expectation that the community would be able to "support themselves" based on their current and future needs); *see also Metlakatla Indian Cmty. v. Dunleavy*, 2024 U.S. Dist. LEXIS 102138, *10-27 (D. Alaska June 7, 2024) (rejecting State's arguments attacking these rights on remand as inconsistent with Ninth Circuit decision confirming reserved rights).

the National Park Service may not regulate the Nation River as if it were within Alaska's federal park system, *not* that the Service lacks *all* authority over the Nation River." *Sturgeon II,* 587 U.S. at 59 (emphasis added). "A reading of ANILCA . . . that left the Service with no power whatsoever over navigable rivers in Alaska's parks would be untenable in light of ANILCA's other provisions . . . . Congress would not have set out this aim and simultaneously deprived the Service of all means to carry out the task." *Id.*

**C.    The State's Reliance on "Title" to Constrain the Waters Subject to the Rural Subsistence Fishing Priority Is Misplaced.**

Starting with the incorrect and oversimplified concept that the State must have exclusive and plenary regulatory authority over all navigable waters in Alaska because it holds "title" to submerged lands beneath all such waters under the equal footing doctrine, the State wrongly concludes that the federal government cannot enforce its Title VIII rural subsistence priority because it has no "titled" interest in the navigable waters running through CSUs in Alaska. The State's conclusory analysis of *Sturgeon* is that "navigable waters were *not* 'public land' under the reserved water rights doctrine" under ANILCA because "the United States cannot have 'title' to a reserved water right." Op. Br. 3.

This superficial analysis, which is not grounded in the rules of statutory construction, leads to an absurd result, and is easily rejected. According to the State, Congress intended to allow subsistence only on the federal government's *titled*

30

interests, and because the federal government does not have a *titled* interest to navigable waters running through federal lands, Congress could not have intended to have a rural priority for subsistence fishing on those waters. The State makes this argument despite specific language in Title VIII extending the subsistence priority to "*fish* and wildlife" on "public lands" that includes both "waters, and interests therein." 16 U.S.C. §§ 3111(3)-(5) (emphasis added), 3102(1)-(3). Just as it has in prior cases, the State "has attempted to take away what Congress has given, adopting a creative redefinition of the [term "public lands"], a redefinition whose transparent purpose is to protect commercial and sport fishing interests." *Kenaitze Indian Tribe*, 860 F.2d at 318 (criticizing the State's attempt to redefine "rural").

The State's analysis focuses on the conclusion it would like this Court to reach, rather than "[t]he starting point for [the] interpretation of a statute [which] is always its language." *United States v. Gallegos*, 613 F.3d 1211, 1214 (9th Cir. 2010) (quoting *United States v. Fei Ye*, 436 F.3d 1117, 1120 (9th Cir. 2006)). Here, ANILCA expressly prioritizes a subsistence right to both fish and wildlife in Alaska: dedicating an entire title with its own findings and statement of policy to the protection of rural subsistence.[24] 16 U.S.C. §§ 3111, 3112.

---

[24] Title VIII discusses "fish" throughout, *e.g.*, 16 U.S.C. §§ 3111-3114, 3125-3126, and specifically requires that the Secretary "undertake research on fish" and report on "the status of fish . . . populations on public lands that are subject to subsistence

Despite Congress's clear intent to provide continued opportunities for subsistence fishing, the State would read out of the definition of "public lands" any federal interest, including a fishing right in navigable waters. The definitional language in ANILCA does not support this reading. Section 102 of ANILCA, 16 U.S.C. § 3102, defines "public lands," and included terms, as follows:

> (1) The term "land" means lands, *waters, and interests therein.*
>
> (2) The term "Federal land" means lands the title to which is in the United States after December 2, 1980.
>
> (3) The term "public lands" means land situated in Alaska which, after December 2, 1980, are Federal lands, except [land selected by the State or granted to the State under the Alaska Statehood Act, or any other provision of federal law, land selected by an ANC under ANCSA, and lands referred to in ANCSA § 19(b), 43 U.S.C. § 1618(b)]. (emphasis added).
>
> Thus, although the term "land" includes "lands, *waters, and interests therein,*"

this language is meaningless according to the State because there can be no "titled" interest in the very waters subject to ANILCA's subsistence priority for fishing.[25]

--------

uses." *Id.* §§ 3122, 3123. ANILCA further defines "fish and wildlife" to include aquatic species such as any "fish," "amphibian," "mollusk," or "crustacean." 16 U.S.C. § 3102(17).

[25] *See, e.g.*, *People of Togiak v. United States,* 470 F. Supp. 423, 424-28 (D.D.C. 1979) (rejecting construction of Marine Mammal Protection Act that was "wholly at odds" with overall statutory purpose of allowing takings "for subsistence purposes by Alaskan natives"); *Hibbs v. Winn*, 542 U.S. 88, 101 (2004) ("A statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant").

Op. Br. 31-33. This is wrong as a matter of both logic and statutory interpretation, as well as to what "titled" rights the State and federal government hold.

First, title to submerged lands is not necessary. This Court has confirmed the "federal primacy of reserved water rights," such that "state water rights are preempted by federal reserved rights." *Agua Caliente Band of Cahuilla Indians v. Coachella Valley Water Dist.*, 849 F.3d 1262, 1272 (9th Cir. 2017); *see also United States v. Winans*, 198 U.S. 371, 381 (1905) (characterizing reserved fishing rights of the Yakima Indian Nation to conduct fishing off-reservation as "a servitude upon every piece of land as though described therein"). In *Amoco Production Co. v. Village of Gambell*, the Supreme Court in addressing Title VIII of ANILCA "reject[ed] the assertion that the phrase 'public lands,' in and of itself, has a precise meaning, without reference to a definitional section or its context in a statute."[26] The intent of Congress is paramount, and *Sturgeon* did not hold otherwise.

---

[26] 480 U.S. 531, 548 n.15 (1987). The *Amoco* Court refused to decide that the federal government did not have "title" to "any 'interests'" in the Outer Continental Shelf ("OCS") on the argument now proffered by the State, and expressed doubt to such a lack of interest. *Id.* ("The United States may not hold 'title' to the submerged lands of the OCS, but we hesitate to conclude that the United States does not have 'title' to any 'interests therein.' Certainly, it is not clear that Congress intended to exclude the OCS by defining public lands as 'lands, waters, and interests therein' 'the title to which is in the United States.'").

Second, and more importantly, the federal government did indeed reserve title to fishing rights, in addition to other federal rights, when conveying title to submerged lands to the new State of Alaska. As background, a decade *before* Statehood, the Supreme Court held in the context of protecting Alaska Native rights to fishing that the United States held "title to the uplands and waters in question" and so "[t]he fisheries as well as the uplands [were] subject to its present control."[27]

Congress in enacting the Statehood Act, then carved out certain federal interests from the "title" which would pass to the newly formed State. Under the Statehood Act, which incorporated the SLA, the State did not receive exclusive or plenary authority over navigable waters or fishing rights in those waters. For one, as the Supreme Court has already confirmed, the federal government retained ownership to the "lands withdrawn or otherwise set apart as refuges or reservations for the protection of wildlife" under Section 6(e) of the Statehood Act, including the submerged tidal lands in reservations such as Glacier Bay National Park, and title did not transfer to the State. *Alaska v. United States*, 545 U.S. 75, 104-110 (2005).

---

[27] *Hynes v. Grimes Packing Co*., 337 U.S. 86, 111 & n.35 (1949) ("That Congress had power to make the reservation inclusive of the adjacent waters and submerged land as well as the upland needs little more than statement. All were the property of the United States and within a district where the entire dominion and sovereignty rested in the United States and over which Congress had complete legislative authority." (quoting *Alaska Pacific Fisheries v. United States*, 248 U.S. 78, 87 (1918))).

And more critical to the analysis here, the United States in the Statehood Act recognized its trust responsibility to Alaska Natives, and reserved "right and title . . . to any lands or other property (*including fishing rights*), the right or title to which may be held by any Indians, Eskimos, or Aleuts (hereinafter called natives) *or is held by the United States in trust for said natives*."[28] Recognizing that the federal government retained these rights, the State in Article XII, Section 12 of the Alaska Constitution expressly disclaimed any interest in these property rights reserved by the federal government, including those rights held in trust for Alaska Natives, including "fishing rights."[29] Thus, the federal government retained and reserved title and ownership to the fishing rights in waters in Alaska necessary to provide for the fishing subsistence rights granted in ANILCA.[30]

---

[28] Pub. L. No. 85-508, § 4, 72 Stat. 339, 339 (1958) (emphasis added). And in the SLA, the United States further retained "all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce [and] navigation." 43 U.S.C. § 1314(a).

[29] Alaska Const. art. XII, §12 ("The State of Alaska and its people forever disclaim all right and title in or to any property belonging to the United States or subject to its disposition, and not granted or confirmed to the State [under the Statehood Act]. The State and its people further disclaim all right or title in or to any property, *including fishing rights*, the right or title to which may be held by or for any Indian, Eskimo, or Aleut, or community thereof, as that right or title is defined in the act of admission." (emphasis added)); *see also Aquilar*, 424 F. Supp. at 435-36 (addressing Statehood Act and Alaska Constitution).

[30] "A common idiom describes property as a 'bundle of sticks' -- a collection of individual rights which, in certain combinations, constitute property." *United States*

Only a handful of Western states have enabling acts that reserve rights in favor of Indian tribes, but none have reservations that specifically state they reserve rights held by the federal government in trust, let alone fishing rights.[31] In interpreting Section 4 of the Statehood Act, and noting that the Statehood Act's "fishing-rights provision is unique to Alaska," and "was included because fishing rights are of vital importance to Indians in Alaska," the Supreme Court concluded that "[t]he disclaimer of right and title by the State" was a disclaimer of a proprietary interest. *Organized Village of Kake v. Egan*, 369 U.S. 60, 66-69 (1962). The federal government in "[t]he Statehood Act retained 'absolute jurisdiction and control' of Indian 'property (including fishing rights).'" *Id.* at 62-63. Based on this reservation, the Supreme Court previously rejected the State's arguments that the Statehood Act transferred "control of all fishing" to the State: the "legislative history makes clear

---

*v. Craft*, 535 U.S. 274, 278 (2002). The United States reserved the property of "fishing rights" to hold in trust in Section 4 of the Statehood Act, and the State disclaimed its right and title to such property; thus this "stick" was removed from the bundle and the State never received such right or title at Statehood.

[31] "Indeed, every State admitted between the years 1889 and 1912 entered with such a disclaimer." *Idaho v. United States*, 533 U.S. 262, 285 n.2 (2001) (Rehnquist, J., dissenting) (citing N.D. Const., Art. 16, § 2 (1889); S.D. Const., Art. XXII, § 18 (1889); Mont. Const., Ordinance I (1889); Wash. Const., Art. XXVI, § 2 (1889); Wyo. Const., Ordinance § 3 (1889); Utah Const., Art. III (1894); Okla. Const., Art. I, § 3 (1906); N. M. Const., Art. XXI, § 2 (1910); Ariz. Const., Art. XX, par. 4 (1910)).

that the transfer of jurisdiction over fishing was subject to rights reserved in § 4."
*Metlakatla Indian Community v. Egan*, 369 U.S. 45, 58 (1962) (citing S. Rep. No.
1929, 81st Cong., 2d Sess. 2 (1950)). The Court further rejected the notion that this
reservation only addressed the limited recognized Indian rights at the time of
Statehood: "Clearly this section does not protect only 'recognized' Indian rights –
those the taking of which would be compensable by the United States. Committee
reports demonstrate the aim of Congress to preserve the status quo as to a broader
class of 'right,' including, in the case of land, mere possession or occupancy." *Id*.

Even though this "precision employed in the Alaska Statehood Act"
specifically reserving lands and other property, including fishing rights, held by the
United States in trust for Alaska Natives is unique even among the Western states
whose enabling acts include fewer specific reservations, the courts have confirmed
that title to the federal reservations held in trust for tribes still did not pass to those
other western states under the equal footing doctrine. Thus, in *Idaho v. United States*,
the Supreme Court held that the federal government held title to submerged lands
underneath certain navigable waters in Idaho in trust for an Indian tribe, where
Idaho's Enabling Act reserved such interests: "A right to control the lakebed and

adjacent waters was traditionally important to the Tribe, which emphasized in its petition to the Government that it continued to depend on fishing."[32] 533 U.S. at 274.

And this Court, in *United States v. Milner*, held that the State of Washington did not receive and had disclaimed its interests to certain tidelands the federal government held in trust for the Lummi Tribe: "And while Congress admitted Washington on an equal footing, it also recognized the validity of the executive order reservation by requiring Washington state to 'forever disclaim all right and title . . . to all lands . . . owned or held by any Indian or Indian tribes." 583 F.3d 1174, 1185-86 (9th Cir. 2009) (internal citation omitted). Again, this Court noted that the tribes "depended heavily on fishing and digging for shellfish as a means of subsistence," and that "the reservation of the tidelands thus served to promote the tribe's access to fishing and shellfish, and the welfare of the tribe more generally." *Id.* at 1186.

The State's argument that *Sturgeon* overruled the *Katie John* cases is conclusory, superficial, and wrong. Although the State insists *Katie John* was not the best interpretation of Title VIII and asks this Court to consider its meaning anew, the State does even not bother to discuss the language of Title VIII or that the

---

[32] The dissent in criticizing the holding that possessory title to the submerged lands was held in trust, indicated it would have limited its holding to "a right to fish and travel the waters rather than withholding for the Tribe's benefit perpetual title in the underlying lands." 533 U.S. at 287 (Rehnquist, J., dissenting).

definition of "public lands" includes "waters, and the interests therein." Op. Br. 29-39. And although the State is wrong that "title" to a water right is required, the State further does not address that the United States reserved title to the property of fishing rights to hold in trust for Alaska Natives at Statehood, and that the State disclaimed these fishing rights in the Alaska Constitution.

The State cannot read the disclaimer clause out of its Constitution, nor undo "ANILCA's grand bargain." *Sturgeon II*, 587 U.S. at 51. The reserved water right in "waters within and adjacent to federal reservations," is not an abstraction. *Katie John III*, 720 F.3d at 1245. Rather, as the Supreme Court long ago recognized in *Arizona v. California*, it is essential to the survival of Native peoples. 373 U.S. 546, 598-99 (1963) ("It is impossible to believe that when Congress created the great Colorado River Indian Reservation and . . . other reservations they were unaware that most of the lands were of the desert kind—hot, scorching sands—and that water from the river would be essential to the life of the Indian people and to the animals they hunted and the crops they raised."). The State's pernicious view of the reserved water rights underlying the subsistence priority in Title VIII frustrates Congress's clear intent to provide a rural subsistence priority to fish and fails as a matter of law.

II.    **ALTERNATIVELY, CONGRESS INVOKED A TRIFECTA OF CONSTITUTIONAL POWERS IN TITLE VIII THAT REINFORCE THE FEDERAL GOVERNMENT'S AUTHORITY TO MANAGE SUBSISTENCE FISHERIES.**

In enacting Title VIII of ANILCA, Congress made plain that it was using every arrow in its constitutional quiver to "protect and provide the opportunity for continued subsistence uses on the public lands by Native and non-Native rural residents," expressly invoking three sources of authority in doing so: its "constitutional authority over Native affairs," and its authority under the Property Clause and the Commerce Clause. 16 U.S.C. § 3111(4). When Congress is legislating pursuant to its powers—here, its combined Commerce Clause, Property Clause, and Native affairs powers—"state law is naturally preempted to the extent of any conflict with a federal statute," including in areas of law, such as hunting and fishing, that are traditionally left to the states. *Brackeen*, 599 U.S. at 287.

"'Customary and traditional' subsistence fishing occurs primarily on navigable waters" and "[f]ishing Alaska's navigable, salmonid-bearing waters has sustained Alaska's native populations since time immemorial." *Katie John II*, 247 F.3d at 1036 (Tallman, J., concurring) (listing cases). "Given the crucial role that navigable waters play in traditional subsistence fishing, it defies common sense to conclude that, when Congress indicated an intent to protect traditional subsistence fishing, it meant only the limited subsistence fishing that occurs in non-navigable

40

waters," or even to navigable waters within and appurtenant to CSUs, as limited by the 1999 Rule. *Id.*

If this Court accepts the State's invitation to revisit the *Katie John* decisions, and concludes that the federal reserved water right is insufficient to give the federal government authority over the subsistence fishing priority in Title VIII, these other sources of constitutional authority invoked by Congress ensure that the federal government's authority to regulate pursuant to ANILCA's subsistence priority extends to fish in *all* navigable waters in Alaska.[33]

## A.    The Federal Government Has The Authority to Provide A Rural Subsistence Priority to Fish Under The Property Clause.

The Property Clause provides further foundation for the federal government's plenary power to regulate federal lands. U.S. CONST. art. IV, § 3, cl. 2; *see also Utah Div. of State Lands v. United States*, 482 U.S. 193, 201 (1987) (explaining "[t]he Property Clause grants Congress plenary power to regulate and dispose of land"). The Property Clause "in broad terms, gives Congress the power to determine what are 'needful' rules 'respecting' the public lands." *Kleppe v. New Mexico*, 426 U.S. 529, 539 (1976). Courts have recognized the "expansiveness" of that power: "the

---

[33] Of note, *Sturgeon II* did not address any theory besides the reserved water rights doctrine. 587 U.S. at 43; *see also id.* at 63 n.3 (Sotomayor, J., concurring) (explaining the Court did not address the United States' navigational servitude) (citing 43 U.S.C. § 1314).

power over the public land thus entrusted to Congress is without limitations." *United States v. Gardner*, 107 F.3d 1314, 1318 (9th Cir. 1997) (listing cases). The Supreme Court has held that "the 'complete power' that Congress has over public lands necessarily includes the power to regulate and protect the wildlife living there." *Kleppe*, 426 U.S. at 540-41. As discussed above, the Federal Government reserved all property rights necessary to fulfill its trust responsibilities to Alaska Native people, expressly including fishing rights, when transferring title to submerged lands beneath certain navigable rivers to the State under the Statehood Act, effectively clouding the title the State received under the SLA.[34] Under the Property Clause, the Title VIII rural priority to fish extends to *all* navigable rivers in Alaska.

But even if the Federal Government had *no* interest in certain navigable rivers or the submerged lands beneath them, the Federal Government has the authority under the Property Clause to regulate those rivers running through federal lands, and the waters appurtenant thereto. The Supreme Court has confirmed the Property Clause provides "congressional power to regulate conduct *on private land* that affects the public lands." *Kleppe*, 426 U.S. at 538 (emphasis added). Thus, Congress has the power to regulate waters appurtenant to public lands to provide a subsistence priority to fish under the Property Clause.

---

[34] *See supra* Argument I.C.

42

In *Sturgeon*, the Court pointed out that Sturgeon would absolutely have lost his case if he were in the lower-48, without the Section 103(c) Alaska-specific exception in ANILCA: "[T]he Park Service freely regulates activities on all navigable (and some other) waters 'within [a park's] boundaries'—once more, 'without regard to . . . ownership.'" *Sturgeon II*, 587 U.S. at 38. In *Katie John III*, this Court upheld that the "public lands" subject to Title VIII's rural subsistence priority were those navigable waters running through federal lands, primarily the CSUs, and waters appurtenant to those lands. 720 F.3d at 1245. If, without considering Section 103(c), the Park Service has broad regulatory authority under the Property Clause over such waters as provided in the Organic Act, Congress can certainly provide a subsistence priority in those very same waters under that same source of constitutional power even if this Court were to conclude that there was no federal interest in those waters sufficient to make them "public lands" as defined by ANILCA.[35] The exception to general federal regulation in Section 103(c) simply does not apply because the rural priority to fish is set forth in Title VIII of ANILCA and ANILCA-specific regulations. The Property Clause provides an alternative

---

[35] "[T]he Court expressly does not decide whether the Service may regulate navigable waters running through Alaska's parks as an adjunct to its authority over the parks themselves." *Sturgeon II*, 587 U.S. at 65 (Sotomayor, J., concurring).

source of constitutional power to uphold *Katie John* and the rural subsistence priority to fish in Title VIII.

**B.    The Commerce Clause and the Navigational Servitude Provide Authority to Regulate Subsistence Fishing in All Navigable Waters in Alaska Regardless of Ownership of Submerged Lands.**

The State's Opening Brief jumps straight from rejecting the reserved water rights doctrine of *Katie John* to insisting that "the Kuskokwim River 'did not become subject to new regulation by the happenstance of ending up within a national park.'" Op. Br. 33 (quoting *Sturgeon II*, 587 U.S. at 58). Fatal to the State's argument, however, is that the federal government's power under the Commerce Clause is not defined by "the happenstance of ending up within a national park," nor is it dependent upon ownership of the underlying submerged lands. Instead, consistent with the SLA, the United States retained "all its navigational servitude and rights in and powers of regulation and control of said lands and navigable waters for the constitutional purposes of commerce [and] navigation" which are "paramount to" ownership. 43 U.S.C. § 1314(a). Even "[i]f title to submerged lands passed to Alaska, the Federal Government would still retain significant authority to regulate" activities such as fishing "by virtue of its dominant navigational servitude, other aspects of the Commerce Clause, and even the treaty power." *Alaska*, 545 U.S. at 116-17 (Scalia, J., concurring in part and dissenting in part). The United States had the powers of regulation and control of navigable waters for the purposes of

44

commerce and navigation before the enactment of ANILCA, and continued to do so in enacting Title VIII of ANILCA.

The Supreme Court has referred to navigable waters as "the public property of the nation" insofar as "[t]he power to regulate commerce comprehends [federal] control for that purpose, and to the extent necessary." *United States v. Rands*, 389 U.S. 121, 122-23 (1967) (quoting *Gilman v. Philadelphia*, 70 U.S. 713, 724-25 (1866)). Properly understood, the exercise of the Commerce Clause power is "not an invasion of any private property rights in the stream or the lands underlying it." *United States v. Cherokee Nation of Oklahoma*, 480 U.S. 700, 708 (1987) (quoting *Rands*, 389 U.S. at 123).

As *Sturgeon* reasoned, "rivers function as the roads of Alaska, to an extent unknown anyplace else in the country. Over three-quarters of Alaska's 300 communities live in regions unconnected to the State's road system." 587 U.S. at 57. And, "[i]t is beyond dispute that taking fish from waters within the State of Alaska substantially affects interstate commerce" such that "Congress has 'power under the Commerce Clause to regulate the taking of fish in state waters.'" *Katie John II*, 247 F.3d at 1035 (Tallman, J., concurring) (quoting *Douglas v. Seacoast Prods., Inc.,* 431 U.S. 265, 281-82 (1977))*.* Relatedly, the navigational servitude describes "the paramount interest of the United States in navigation and the navigable waters of the

45

nation." *United States v. Certain Parcels of Land*, 666 F.2d 1236, 1238 (9th Cir. 1982).

As Judge Tallman stated in his comprehensive concurrence in *Katie John II*, 247 F.3d at 1034-44, looking to the Commerce Clause as the basis for federal regulation of Alaska's navigable waters would remedy the "inherently unsatisfactory" holding in *Katie John I*, 72 F.3d at 704. Title VIII is the *only* section of ANILCA that invokes the Commerce Clause, and "[t]he Commerce Clause confers a unique position upon the Government in connection with navigable waters."[36] If this Court reconsiders *Katie John I*, the Court must also reconsider whether the Commerce Clause, and relatedly the navigational servitude,[37] "extend[s] federal protection of traditional subsistence fishing to *all* navigable waters within

---

[36] *Rands*, 389 U.S. at 122; s*ee also United States v. Virginia Elec. & Power Co*., 365 U.S. 624, 627-28 (1961). Because the federal government did not argue that the navigational servitude was the source of its power in *Sturgeon II*, the Court did not address this power in its opinion. *Sturgeon II*, 587 U.S. at 63 n.3 (Sotomayor, J., concurring) (noting Court did not address "whether navigable waters may qualify as 'public lands' because the United States has title to some interest other than an interest in reserved water rights" and that the "United States did not press the argument that the Federal Government functionally holds title to the requisite interest because of the navigational servitude.").

[37] The federal navigational servitude is squarely within the Commerce Clause's constitutional limits. *See Kaiser Aetna v. United States*, 444 U.S. 164, 177 (1979).

the State of Alaska," as Judge Tallman stated in his concurrence in *Katie John II*, 247 F.3d at 1034-35.

Although the State implies it has exclusive regulatory authority over navigable waters in Alaska, this is not and has never been the case. When Congress passed the SLA it also "expressly 'retained all of its . . . rights in and powers of regulation and control of . . . navigable waters for the constitutional purposes of commerce.'" *Id.* (quoting 43 U.S.C. § 1314(a)). *Sackett v. EPA* recently confirmed that navigable waters, and waters connected to those waters are "waters of the United States" for purposes of the Clean Water Act. 598 U.S. 651, 678 (2023). And while states may hold concurrent regulatory authority over navigable waters and the natural resources within them, federal authority preempts conflicting state authority.[38] Stated another way, and as relevant here, "[a]lthough the State of [Alaska] arguably continues to have some interest in the original bed and banks of the [Kuskokwim River] and the portions of the [Kuskokwim] River which were

_____

[38] *Katie John II*, 247 F.3d at 1035 (Tallman, J., concurring); *see also PPL Montana, LLC v. Montana*, 565 U.S. 576, 591 (2012) (under the equal footing doctrine, states gain title within their borders to the beds of navigable waters and may "allocate and govern those lands according to state law subject only to the paramount power of the United States"); *id.* at 593 (recognizing that the "federal commerce power . . . extends beyond navigation"); *Utah Div. of State Lands*, 482 U.S. at 202 ("[E]ven if the land under navigable water passes to the State, the Federal Government may still control, develop, and use the waters for its own purposes.").

navigable when [Alaska] entered the Union, this does not give it the exclusive right to regulate non-Indian hunting and fishing," where Congress provided for federal management of fishing in ANILCA under the Commerce Clause as well as other provisions of our Constitution. *Cassidy v. United States,* 875 F. Supp. 1438, 1452-53 (E.D. Wash. 1994) (holding Congress gave the Federal Government the right to regulate fishing and hunting by all users, including non-Indians as well as Indians, and that the Federal Government had the ability to delegate this authority to a tribe).

ANILCA provides a clear statement from Congress that it was exercising its Commerce Clause power to affect areas traditionally falling under state authority, specifying that Title VIII of ANILCA is the only portion that "is intended to enlarge or diminish the responsibility and authority of the State of Alaska for management of fish and wildlife." 16 U.S.C. § 3202(a); *see also Katie John II*, 247 F.3d at 1037 (Tallman, J., concurring).

As explained by Judge Tallman, *Katie John I* incorrectly "approved an interpretation of ANILCA that seized on a single, undefined term—'title'—and, as a result, limited ANILCA's protection of subsistence fishing." *Id.* at 1034. Because the Commerce Clause applies to all navigable rivers in Alaska, and not just those running through federal lands and waters appurtenant thereto, the Title VIII subsistence priority should apply to all navigable rivers in Alaska, and not just those currently in the federal rules upheld by *Katie John III*.

**C.     Congress Invoked its Trust Responsibility and Authority Over Native Affairs in Enacting Title VIII.**

As the Supreme Court has repeatedly acknowledged, "the United States[] [has a] unique historical relationship with Alaska Natives." *Yellen v. Confederated Tribes of the Chehalis Reservation*, 594 U.S. 338, 342 (2021) (listing cases). As discussed in depth above, the United States and the State of Alaska recognized the federal government's trust responsibility to Alaska Natives leading up to Statehood, with express provisions in both the Statehood Act and the Alaska Constitution "recogniz[ing] the paramount interest in certain lands in the Natives through the control of the United States as trustee and the paramount interest in other lands in the United States for itself."[39] *Aguilar*, 424 F. Supp. at 436 (citing *Organized Village of Kake*, 369 U.S. 60). Both foundational documents recognized and confirmed the federal government's reservation of fishing rights to be held in trust for the benefit of Alaska Natives.

Congress then invoked its "constitutional authority over Native affairs" in enacting Title VIII of ANILCA to provide for a rural subsistence priority to fulfill its trust responsibility. 16 U.S.C. § 3111(4). As outlined in *Haaland v. Brackeen*, there are at least three sources of constitutional power supporting Congress's

---

[39] *See also supra* Argument I.C.

authority over Native affairs. 599 U.S. at 272-76. First, under the Indian Commerce Clause, Congress has the "power to regulate commerce with the Indian tribes, and such power is superior and paramount to the authority of any State." *Dick v. United States*, 208 U.S. 340, 353 (1908). *Brackeen* confirms the Indian Commerce Clause allows legislation "to reach not only trade, but certain 'Indian affairs' too." 599 U.S. at 273 (quoting *Cotton Petroleum Corp. v. New Mexico*, 490 U.S. 163, 192 (1989)). Second, the Treaty Clause provides the second source of power, allowing Congress "'to legislate on problems of Indians' pursuant to pre-existing treaties." *Id.* at 274 (quoting *Antoine v. Washington*, 420 U.S. 194, 203 (1975)). Third, Congress's well-established power to legislate with respect to Native peoples is inherent in the Constitution and is "muscular" and "plenary and exclusive." *Id.* at 272-76. "Finally, the 'trust relationship between the United States and the Indian people' informs the exercise of legislative power." *Id.* at 274 (quoting *United States v. Mitchell*, 463 U.S. 206, 225-26 (1983)). Pursuant to that relationship, "the Federal Government has 'charged itself with moral obligations of the highest responsibility and trust' toward Indian tribes." *Id.* at 275 (quoting *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 176 (2011)).

Alaska Natives held aboriginal title to all lands that are now Alaska, and had the right to hunt, fish, and gather on all lands and waters in Alaska.[40] And when the State took title to certain submerged lands under the Statehood Act, it did so subject to both the "fishing rights" held by Alaska Natives directly, and the fishing rights "held by the United States in trust for said natives."[41] Although ANCSA ultimately extinguished aboriginal title, it did not change or extinguish the federal government's trust responsibilities or reservations made to carry out those responsibilities.[42] 43 U.S.C. § 1603(b). In enacting Title VIII, Congress intended to fulfill the promises it made to Alaska Natives as part of its trust obligations. Congress declared "in order to fulfill the policies and purposes of the Alaska Native Claims Settlement Act and as a matter of equity, it is necessary for the Congress to invoke its constitutional authority over Native affairs . . . to protect and provide the opportunity for continued subsistence uses on the public lands." 16 U.S.C. § 3111(4). Title VIII further stated Congress's intent to ensure continued "Native physical, economic, traditional, and cultural existence." *Id.* § 3111(1).

---

[40] *See supra* Statement of Case, Section A.

[41] *See supra* Argument I.C; *see also* Ahtna Br., Argument II.

[42] *Metlakatla Indian Community v. Dunleavy* recently discussed the difference between aboriginal title and federal reserved interests. 2024 U.S. Dist. LEXIS 102138, *9-18.

Congress's invocation of its power over Native affairs in Title VIII plainly weds the federal government's management of the subsistence priority to its special relationship with Alaska Natives.[43] Unlike the rest of the United States, where there are reservations allowing for subsistence activities, Alaska was once again different. In extinguishing aboriginal title in Alaska, and consistent with its trust reservations in the Statehood Act, the Federal Government undoubtedly took on a heightened trust responsibility to ensure that Alaska Native subsistence was protected. *See Adams v. Vance*, 570 F.2d 950, 953 n.3 (D.C. Cir. 1978) (explaining ANCSA "extinguished aboriginal fishing rights, but the Congressional intent was apparently to quiet title to land rather than to end the still-intact obligation of the United States as trustee to protect the subsistence of the Eskimos."). The legislative history of ANCSA confirms that Congress intended that lands conveyed under the Act, as well as State and federal policies, be used to promote and maintain Alaska Native subsistence. 1971 U.S.C.C.A.N. 2247, 2250; CASE & VOLUCK at 46. And to ensure its promise to protect Alaska Native subsistence was fulfilled, Congress then enacted Title VIII—specifically invoking its plenary power over Native affairs and referring

---

[43] *E.g.*, *Cherokee Nation v. Georgia,* 30 U.S. 1 (1831) (voiding state statutes affecting the Cherokee Nation, holding such state laws "repugnant to" the Constitution, laws, and treaties of the United States); *Eric v. Secretary of U.S. Dep't of Housing and Urban Development*, 464 F. Supp. 44, 46 (D. Alaska 1978) ("This common law doctrine applies to Alaska Natives").

to ANCSA. 16 U.S.C. § 3111(4). The extension of the subsistence priority to all rural residents does not diminish the federal government's trust responsibility, which applies anywhere that federal or state actions may affect Native peoples or tribes. *E.g.*, COHEN'S HANDBOOK § 5.04[3][a], at 412-13.

As highlighted by *People of Togiak v. United States*, the trust responsibility is at its greatest force when federal law preempts improper State attempts to regulate Native subsistence activities. CASE & VOLUCK at 290 (citing 470 F. Supp. 423). And that trust responsibility requires the Federal Government to protect Alaska Native "subsistence resources" specifically, including "against interference by the State[]." *People of Togiak*, 470 F. Supp. at 426-28; *cf. Parravano v. Babbitt*, 70 F.3d 539, 545-46 (9th Cir. 1995) (upholding emergency regulation limiting non-Indian fishing to protect tribal fishing rights). *People of Togiak* held that a construction of the Marine Mammal Protection Act ("MMPA") that would leave Alaska Native subsistence subject to "State regulation inconsistent with the substantive federal plan" would contravene "the comprehensive scheme" and Congressional purpose of the MMPA, in violation of the trust responsibility to Alaska Native peoples. 470 F. Supp. at 428-29.

The present situation, where "[t]he State is now dissatisfied with the consequences of one of [the] promises" that the United States made to Native peoples is an "old and familiar story." *Washington State Dep't of Licensing v.*

*Cougar Den, Inc.*, 586 U.S. 347, 377 (2019) (Gorsuch, J., concurring). Because of its dissatisfaction with the provisions of Title VIII, the State again seeks to "reverse the promise the United States made," *id.* at 376, as well as the State's own agreement that it would disclaim any interest in the fishing rights and other property held in trust by the United States as a condition of Statehood, and such property would be subject to disposition by the United States. And while Congress possesses "the authority to breach its own promises" to hold property in trust, that power "belongs to Congress alone" and "States have no authority." *McGirt v. Oklahoma*, 591 U.S. 894, 903 (2020).

Put bluntly, the State cannot void Title VIII, in which Congress's purpose was to fulfill its trust responsibility to Alaska Natives, because that would render Congress's protection of Alaska Native subsistence "essentially an empty promise." *Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 206 (1999). Congress's intent to protect traditional Alaska Native subsistence is contravened when the State purports to open subsistence fisheries to all users in a manner that conflicts with the rural subsistence priority in Title VIII of ANILCA. And the State's position that no rural subsistence priority to fish exists after *Sturgeon* is a direct attack on the federal government's plenary authority over Native affairs, including to ensure the continued existence of Alaska Native peoples which Congress found was tied to subsistence fishing rights. The State's position, if allowed to prevail,

54

would destroy the federal government's ability to fulfill its trust responsibility to Alaska Native peoples, flying in the face of two centuries of federal jurisprudence declaring federal plenary power over Native affairs.

Taken as a whole, Title VIII's invocation of Congress's constitutional authority over Native affairs, the Property Clause, and the Commerce Clause, its explicit purpose of protecting subsistence uses "essential to Native physical, economic, traditional, and cultural existence," and the importance of navigable waters for subsistence fishing in Alaska easily leads to the conclusion that the scope of federal authority extends to all navigable rivers in Alaska. 16 U.S.C. § 3111.

## III.    FEDERAL LAW PREEMPTS CONFLICTING STATE LAW.

Although the State now attempts to attack the substance of the 2021 and 2022 Federal emergency actions, 3-ER-334–37; 3-ER-343–45, this is not at issue on appeal.[44] Nor is the State's briefing touting its "all Alaskans" policy as superior to the rural subsistence priority. *See* Op. Br. 7-11, 22-25. Instead, what is relevant is that the State purportedly issuing subsistence fishing orders under its "all Alaskans" approach directly undermines the federal rural subsistence priority set forth by Congress in ANILCA. The Supremacy Clause "render[s] invalid" state law that

---

[44] This issue was not addressed before the district court, nor is it relevant to the two legal issues raised by the State's Opening Brief.

"frustrates the full effectiveness of federal law." *Perez v. Campbell*, 402 U.S. 637, 652 (1971); *see also Brackeen*, 599 U.S. at 286-87. Rather than attempting an end run around Title VIII, the State should amend its Constitution to allow compliance with Title VIII if it wishes to manage all fisheries in Alaska.

Second, the State's arguments that members of the Federal Subsistence Board were improperly appointed in violation of the Appointments Clause and that the Board's orders therefore have no effect are meritless and should be rejected.[45]

## CONCLUSION

The judgment of the district court should be affirmed.

Date: October 25, 2024

CASHION GILMORE & LINDEMUTH

*/s/ Jahna M. Lindemuth*
Jahna M. Lindemuth (AK Bar No. 9711068)
Cashion Gilmore & Lindemuth
510 L Street, Suite 601
Anchorage, Alaska 99501
Phone: (907) 222-7932
Fax: (907) 222-7938
jahna@cashiongilmore.com

---

[45] To avoid duplicative briefing, AFN hereby incorporates the Fish Commission Br., Argument II.

Scott M. Kendall (AK Bar No. 0405019)
Cashion Gilmore & Lindemuth
510 L Street, Suite 601
Anchorage, Alaska 99501
Phone: (907) 222-7932
Fax: (907) 222-7938
scott@cashiongilmore.com

*Attorneys for Intervenor-Plaintiff-Appellee*
Alaska Federation of Natives

## STATEMENT OF RELATED CASES

Under Circuit Rule 28-2.6, I certify that I am unaware of any related cases currently pending in this Court.

Date:  October 25, 2024

CASHION GILMORE & LINDEMUTH


*/s/ Jahna M. Lindemuth*
Jahna M. Lindemuth

*Attorneys for Intervenor-Plaintiff-Appellee*
Alaska Federation of Natives

## CERTIFICATE OF COMPLIANCE

Under Fed. R. App. P. 32(g), I certify that:

This brief complies with the type-volume limits of Circuit Rule 32-1(a) because it contains 13,884 words, excluding the parts of the brief exempted by Circuit Rule 32-1(c) and Fed. R. App. Proc. 32(f).

This brief complies with the typeface requirements of Fed. R. App. Proc. 32(a)(5) and the type style requirements of Fed. R. App. Proc. 32(a)(6) because it has been prepared in a proportionately spaced typeface using Microsoft Word Version 16.90 in 14-point Times New Roman font.

Date:  October 25, 2024

CASHION GILMORE & LINDEMUTH


*/s/ Jahna M. Lindemuth*
Jahna M. Lindemuth

*Attorneys for Intervenor-Plaintiff-Appellee*
Alaska Federation of Natives

59

## CERTIFICATE OF SERVICE

I certify that on October 25, 2024, I electronically filed this brief with the

Clerk of the Court using the CM/ECF system, serving all counsel of record

Date:  October 25, 2024

CASHION GILMORE & LINDEMUTH

*/s/ Jahna M. Lindemuth*
Jahna M. Lindemuth

*Attorneys for Intervenor-Plaintiff-Appellee*
Alaska Federation of Natives