No. 24-2251

IN THE UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

UNITED STATES OF AMERICA,
*Plaintiff - Appellee,*

KUSKOKWIM RIVER INTER-TRIBAL FISH COMMISSION; ASSOCIATION
OF VILLAGE COUNCIL PRESIDENTS; BETTY MAGNUSON; IVAN M.
IVAN; AHTNA TENE NENE; AHTNA, INC.; ALASKA FEDERATION OF
NATIVES,
*Intervenor-Plaintiffs - Appellees,*

v.

STATE OF ALASKA; STATE OF ALASKA DEPARTMENT OF FISH AND
GAME; DOUG VINCENT-LANG, in his official capacity as Commissioner of the
Alaska Department of Fish & Game,
*Defendants - Appellants.*

_____

On appeal from the U.S. District Court
For the District of Alaska, Anchorage
No. 1:22-cv-54-SLG
Hon. Sharon L. Gleason

APPELLANTS' REPLY BRIEF

TREG TAYLOR
   ATTORNEY GENERAL

Margaret Paton-Walsh
Aaron C. Peterson
   Assistant Attorneys General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
(907) 269-5232
margaret.paton-walsh@alaska.gov
aaron.peterson@alaska.gov

J. Michael Connolly
Steven C. Begakis
Zachary P. Grouev
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
steven@consovoymccarthy.com
zach@consovoymccarthy.com

*Attorneys for the State of Alaska, et al.*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................... iii

INTRODUCTION ............................................................................ 1

ARGUMENT ................................................................................... 7

I. This Court is not procedurally barred from reaching the merits of the dispute. .......................................................................... 7

    A. The State's arguments are not barred by issue preclusion. ....... 7

        1. Issue preclusion does not apply because there has been a change in the legal context ................................................. 8

        2. Issue preclusion does not apply for additional reasons. ............... 13

    B. The State's arguments are not barred by claim preclusion. ..................... 20

        1. Claim preclusion does not apply because the State brought no "claims" and there is no "identity of claims." ........................... 21

        2. Claim preclusion does not apply for additional reasons. ............... 24

    C. The State's arguments are not barred by judicial estoppel. ..................... 26

        1. Judicial estoppel does not apply because Alaska was not a party in *Sturgeon II*. ................................................................. 27

        2. Judicial estoppel does not apply for additional reasons. ............... 29

    D. The State's arguments are not barred by the federal statute of limitations for suits against the United States. ........................... 33

        1. The federal statute of limitations does not bar the State's arguments because the State did not sue the United States. .......... 34

        2. The federal statute of limitations does not apply for additional reasons. ...................................................................... 36

II. The State's orders are not preempted because the Kuskokwim River is not "public land" under ANILCA ...................................... 36

    A. The Kuskokwim River is not "public land" under the reserved water rights doctrine ....................................................... 37

        1. *Katie John*'s holding that navigable waters are "public land" under the reserved water rights doctrine is not binding on this Court. .... 38

        2. *Katie John*'s reserved-water-rights holding cannot be upheld on alternative grounds. ....................................................... 47

i

3. Congress did not ratify *Katie John I* or the United States' interpretation of "public lands." ..................................... 58

B. The Kuskokwim River is not "public land" under the Commerce Clause or the navigational servitude............................................. 66

C. The Kuskokwim River is not "public land" under the Property Clause ...................................................................................... 69

D. The Kuskokwim River is not "public land" under Congress's authority over Native Affairs ..................................................... 70

III. The State's orders are not preempted because the FSB's members are unconstitutionally appointed. ................................................................. 77

A. The FSB's members are unconstitutionally appointed because the FSB is not established "by Law." ............................................... 77

B. The FSB's members are "principal" officers who were not appointed by the President with the advice and consent of the Senate................. 85

C. The FSB's constitutional defects are fatal to the United States' claims....................................................................................... 91

CONCLUSION ....................................................................................... 93

CERTIFICATE OF COMPLIANCE ....................................................... 94

CERTIFICATE OF SERVICE ................................................................ 95

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Abbey v. United States,*
   112 F.4th 1141 (9th Cir. 2024) ................................................................ 41

*Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.,*
   475 F.3d 1080 (9th Cir. 2007) .............................................................. 8, 9

*Alabama v. USACE,*
   704 F. Supp. 3d 20 (D.D.C. 2023) .......................................................... 18

*Alaska v. Babbitt ("Katie John I"),*
   72 F.3d 698 (9th Cir. 1995) ............................................................ passim

*Alaska v. Native Vill. of Venetie Tribal Gov't,*
   522 U.S. 520 (1998) ................................................................................ 76

*Alexander v. Sandoval,*
   532 U.S. 275 (2001) .................................................................. 58, 59, 62

*Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue,*
   926 F.3d 1061 (9th Cir. 2019) ................................................................ 36

*Alvarado-Ochoa v. Ashcroft,*
   73 F. App'x 230 (9th Cir. 2003) ........................................................ 25, 26

*Am. Cas. Co. of Reading, Pa. v. Sentry Fed. Sav. Bank,*
   867 F. Supp. 50 (D. Mass. 1994) ............................................................ 15

*Americredit Fin. Servs., Inc. v. Lyons,*
   No. 19-cv-1045, 2022 WL 135420 (M.D. Tenn. Jan. 13, 2022) ................ 21

*AMG Cap. Mgmt., LLC v. FTC,*
   593 U.S. 67 (2021) .................................................................................. 58

*Amoco Prod. Co. v. Vill. of Gambell, Alaska,*
   480 U.S. 531 (1987) ............................................................................ passim

*Arizona v. Navajo Nation,*
   599 U.S. 555 (2023) ................................................................................ 73

*Arizona v. Tohono O'odham Nation,*
   818 F.3d 549 (9th Cir. 2016) .................................................................. 31

*Artichoke Joe's Cal. Grand Casino v. Norton,*
   353 F.3d 712 (9th Cir. 2003) .................................................................. 72

*Atascadero State Hosp. v. Scanlon*,
    473 U.S. 234 (1985) ........................................................... 45, 46

*Atl. Cleaners & Dyers, Inc. v. United States*,
    286 U.S. 427 (1932) ................................................................. 48

*B & B Hardware, Inc. v. Hargis Indus., Inc.*,
    575 U.S. 138 (2015) ................................................................. 18

*Barnes v. FAA*,
    865 F.3d 1266 (9th Cir. 2017) ................................................. 78

*Barroso v. Gonzales*,
    429 F.3d 1195 (9th Cir. 2005) ................................................. 37

*Bd. of Trs. of IBT Loc. 863 Pension Fund v. C&S Wholesale Grocers, Inc.*,
    5 F. Supp. 3d 707 (D.N.J. 2014) ............................................. 52

*BedRoc Ltd., LLC v. United States*,
    541 U.S. 176 (2004) ................................................................. 51

*Benko v. Quality Loan Serv. Corp.*,
    789 F.3d 1111 (9th Cir. 2015) ................................................. 48

*Brown v. Davenport*,
    596 U.S. 118 (2022) ........................................................... 40, 41

*CBN Corp. v. United States*,
    176 Ct. Cl. 861 (1966) ............................................................ 10

*Chaney-Snell v. Young*,
    98 F.4th 699 (6th Cir. 2024) ................................................... 31

*Chi. Truck Drivers, Helpers & Warehouse Union (Indep.) Pension Fund v.*
    *Century Motor Freight, Inc.*,
    125 F.3d 526 (7th Cir. 1997) ................................................... 17

*Chickasaw Nation v. United States*,
    534 U.S. 84 (2001) ............................................................. 72, 73

*City of Angoon v. Hodel*,
    803 F.2d 1016 (9th Cir. 1986) ................................................. 68

*City of Saint Paul, Alaska v. Evans*,
    344 F.3d 1029 (9th Cir. 2003) ............................................. 35, 36

*Coeur D'Alene Tribe of Idaho v. Hammond*,
    384 F.3d 674 (9th Cir. 2004) ................................................... 20

*Colautti v. Franklin,*
439 U.S. 379 (1979) ................................................................ 48

*Coleman v. Cal. Bd. of Prison Terms,*
228 F. App'x 673 (9th Cir. 2007) .......................................... 19

*Collins v. Alaska,*
823 F.2d 329 (9th Cir. 1987) ................................................. 13

*Conroy v. Aniskoff,*
507 U.S. 511 (1993) ................................................................ 72

*Coors Brewing Co. v. Méndez-Torres,*
562 F.3d 3 (1st Cir. 2009) ............................................... 10, 12

*Ctr. for Biological Diversity v. Hamilton,*
385 F. Supp. 2d 1330 (N.D. Ga. 2005) ................................. 15

*Demaree v. Fulton Cty. Sch. Dist.,*
515 F. App'x 859 (11th Cir. 2013) ........................................ 20

*Donziger v. United States,*
143 S.Ct. 868 (2023) .............................................................. 79

*Douglas v. Xerox Bus. Servs., LLC,*
875 F.3d 884 (9th Cir. 2017) ................................................. 62

*Duenas v. Garland,*
78 F.4th 1069 (9th Cir. 2023) ................................................ 84

*Duvall v. Att'y Gen. of the U.S.,*
436 F.3d 382 (3d Cir. 2006) .................................................. 16

*Edmond v. United States,*
520 U.S. 651 (1997) .......................................................... 82, 86

*Env't Def. v. EPA,*
369 F.3d 193 (2d Cir. 2004) ............................................. 16, 17

*Farkas v. Rich Coast Corp.,*
No. 14-cv-272, 2017 WL 10311283 (M.D. Pa. Dec. 29, 2017) .................................. 33

*Finn v. Cobb Cty. Bd. of Elections & Registration,*
111 F.4th 1312 (11th Cir. 2024) ............................................ 29

*Firebaugh Canal Co. v. United States,*
203 F.3d 568 (9th Cir. 2000) ................................................. 65

*Flores v. Life Ins. Co. of N. Am.*,
　No. 22-55779, 2024 WL 222265 (9th Cir. Jan. 22, 2024) ........................... 24

*Foster-Fountain Packing Co. v. Haydel*,
　278 U.S. 1 (1928) ............................................................................................. 53

*Foti v. McHugh*,
　247 F. App'x 899 (9th Cir. 2007) .................................................................... 26

*Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*,
　240 F.3d 534 (6th Cir. 2001) .......................................................................... 12

*Fresh Del Monte Produce Inc. v. Del Monte Foods, Inc.*,
　No. 13-cv-8997, 2016 WL 236249 (S.D.N.Y. Jan. 20, 2016) ...................... 25

*Gallagher & Kennedy, P.A. v. City of Phoenix*,
　No. 23-15938, 2024 WL 4003040 (9th Cir. Aug. 30, 2024) ....................... 31

*Garcon v. Van Reeth*,
　511 F. App'x 877 (11th Cir. 2013) .................................................................. 24

*Garity v. APWU Nat'l Lab. Org.*,
　828 F.3d 848 (9th Cir. 2016) ................................................................... 21, 23

*Gilman v. Philadelphia*,
　70 U.S. 713 (1865) ........................................................................................... 69

*GoE3 LLC v. Eaton Corp.*,
　798 F. App'x 998 (9th Cir. 2020) .................................................................... 91

*Golden Gate Way, LLC v. Enercon Servs., Inc.*,
　No. 20-cv-3077, 2020 WL 4804933 (N.D. Cal. Aug. 18, 2020) ................ 34

*GP Vincent II v. Est. of Beard*,
　68 F.4th 508 (9th Cir. 2023) ........................................................................... 21

*Gregory v. Ashcroft*,
　501 U.S. 452 (1991) ......................................................................................... 45

*Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*,
　959 F.3d 178 (5th Cir. 2020) ............................................................................ 9

*GST Tuscon Lightwave, Inc. v. City of Tuscon*,
　No. 97-15328, 1998 WL 42251 n.1 (9th Cir. Feb. 2, 1998) ........................ 28

*Guedes v. ATF*,
　920 F.3d 1 (D.C. Cir. 2019) ............................................................................ 92

*Guess?, Inc. v. Russell,*
No. 16-cv-780, 2016 WL 1620119 n.2 (C.D. Cal. Apr. 18, 2016) .............................. 12

*Haitian Ctrs. Council, Inc. v. McNary,*
969 F.2d 1350 (2d Cir. 1992) ................................................................ 18

*Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.,*
28 F.4th 35 (9th Cir. 2022) ............................................. 30, 31, 32, 33

*Hawai'i Papaya Indus. Ass'n v. Cty. of Hawaii,*
666 F. App'x 631 (9th Cir. 2016) ......................................................... 37

*Hercules Carriers, Inc. v. Fla. DOT,*
768 F.2d 1558 (11th Cir. 1985) ........................................................... 20

*Hill v. City of Fountain Valley,*
70 F.4th 507 (9th Cir. 2023) ....................................................... 81, 91

*Hobbs ex rel. Hobbs v. Zenderman,*
542 F. Supp. 2d 1220 (D.N.M. 2008) ................................................ 16

*Hoonah Indian Ass'n v. Morrison,*
170 F.3d 1223 (9th Cir. 1999) ................................................. *passim*

*Hynes v. Grimes Packing Co.,*
337 U.S. 86 (1949) ............................................................................. 50

*Hynix Semiconductor Inc. v. Rambus Inc.,*
No. 00-cv-20905, 2009 WL 292205 (N.D. Cal. Feb. 3, 2009) .................................. 18

*In re Excise Tax Litig.,*
No. 21-cv-39, 2024 WL 3552580 (D.V.I. July 26, 2024) ........................................... 20

*In re Grand Jury Investigation,*
916 F.3d 1047 (D.C. Cir. 2019) .......................................................... 86

*In re Greenberg,*
626 B.R. 554 (S.D. Cal. 2021) ............................................................ 22

*In re Hunt,*
124 B.R. 200 (N.D. Tex. 1991) ........................................................... 21

*In re Megan-Racine Assocs., Inc.,*
176 B.R. 687 (N.D.N.Y. 1994) ........................................................... 28

*In re Stevens,*
15 F.4th 1214 (9th Cir. 2021) ............................................................. 48

*Jama v. ICE*,
543 U.S. 335 (2005) ........................................................................... 62

*John v. United States ("Katie John II")*,
247 F.3d 1032 (9th Cir. 2001) ........................................ 2, 46, 59, 72

*John v. United States ("Katie John III")*,
720 F.3d 1214 (9th Cir. 2013) .................................................. *passim*

*Keyes v. Lynch*,
214 F. Supp. 3d 267 (M.D. Pa. 2016) .................................................. 10

*Kingdom v. Biden*,
No. 21-cv-243, 2021 WL 4956507 (D. Haw. Sept. 30, 2021) ................... 28

*Kleppe v. New Mexico*,
426 U.S. 529 (1976) ........................................................................... 70

*Lair v. Bullock*,
798 F.3d 736 (9th Cir. 2015) .............................................................. 67

*Lair v. Bullock*,
697 F.3d 1200 (9th Cir. 2012) ............................................................ 43

*Latta v. Otter*,
771 F.3d 456 (9th Cir. 2014) .............................................................. 40

*Lofstad v. Raimondo*,
117 F.4th 493 (3d Cir. 2024) .............................................................. 88

*Loper Bright Enters. v. Raimondo*,
144 S.Ct. 2244 (2024) ................................................................ *passim*

*Lucero v. Holland*,
902 F.3d 979 (9th Cir. 2018) .............................................................. 32

*Lucia v. SEC*,
585 U.S. 237 (2018) ..................................................................... 26, 92

*Lucky Brand Dungarees, Inc. v. Marvel Fashions Grp., Inc.*,
590 U.S. 405 (2020) ..................................................................... 22, 23

*Luna Perez v. Sturgis Pub. Sch.*,
598 U.S. 142 (2023) ....................................................................... 5, 52

*Lutz v. Int'l Ass'n of Machinists & Aerospace Workers*,
121 F. Supp. 2d 498 (E.D. Va. 2000) .................................................. 17

*McDowell v. State*,
785 P.2d 1 (Alaska 1989) ...................................................................53, 57, 61

*Metalkatla Indian Cmty. v. Dunleavy*,
58 F.4th 1034 (9th Cir. 2023) ......................................................... 54

*Meza-Carmona v. Garland*,
113 F.4th 1163 (9th Cir. 2024) ....................................................... 48

*Midwest Operating Eng'rs Welfare Fund v. Allied Stone*,
175 F. Supp. 3d 945 (N.D. Ill. 2016) ............................................. 22

*Miller v. Gammie*,
335 F.3d 889 (9th Cir. 2003) .....................................................40, 67

*Miller-Wohl Co., Inc. v. Comm'r of Labor & Indus., State of Mont.*,
694 F.2d 203 (9th Cir. 1982) .......................................................... 28

*Minnesota v. Mille Lacs Band of Chippewa Indians*,
526 U.S. 172 (1999) ......................................................................... 74

*Monongalia Cty. Coal Co. v. United Mine Workers of Am., Int'l Union*,
416 F. Supp. 3d 587 (N.D. W.Va. 2019) ........................................ 24

*Montana v. United States*,
440 U.S. 147 (1979) ......................................................................... 13

*Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*,
577 U.S. 136 (2016) .....................................................................51, 52

*Montrose Med. Grp. Participating Sav. Plan v. Bulger*,
243 F.3d 773 (3d Cir. 2001) ........................................................... 27

*Murray v. Mayo Clinic*,
934 F.3d 1101 (9th Cir. 2019) ........................................................ 43

*Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*,
260 F.3d 1365 (Fed. Cir. 2001) ...................................................... 14

*New Edge Network, Inc. v. FCC*,
461 F.3d 1105 (9th Cir. 2006) ..........................................27, 29, 30, 31

*New Hampshire v. Maine*,
532 U.S. 742 (2001) ......................................................................... 30

*Norvell v. BCBS Ass'n*,
699 F. App'x 760 (9th Cir. 2017) ..................................................9-10

*Pa. Dep't of Pub. Welfare v. HHS*,
 80 F.3d 796 (3d Cir. 1996).................................................................82, 83

*Pegram v. Herdrich*,
 530 U.S. 211 (2000) ....................................................................... 27

*People of Vill. of Gambell v. Clark ("Gambell I")*,
 746 F.2d 572 (9th Cir. 1984) ...........................................................71, 72

*Perez v. Mortg. Bankers Ass'n*,
 575 U.S. 92 (2015) ......................................................................... 80

*Perry v. Blum*,
 629 F.3d 1 (1st Cir. 2010) ............................................................... 32

*Pharm. Care Mgmt. Ass'n v. D.C.*,
 522 F.3d 443 (D.C. Cir. 2008)......................................................12, 16, 17

*ProShipLine Inc. v. Aspen Infrastructures Ltd.*,
 609 F.3d 960 (9th Cir. 2010) .........................................................22, 23, 24

*Quiñones Candelario v. Postmaster Gen. of the U.S.*,
 906 F.2d 798 (1st Cir. 1990) ........................................................... 18

*Rivera v. Orion Marine Grp. Inc.*,
 509 F. Supp. 3d 926 (S.D. Tex. 2020) ............................................49-50

*Rotec Indus., Inc. v. Mitsubishi Corp.*,
 348 F.3d 1116 (9th Cir. 2003) ......................................................... 26

*Ruiz v. Snohomish Cty. Pub. Util. Dist. No. 1*,
 824 F.3d 1161 (9th Cir. 2016) ......................................................... 25

*Sackett v. EPA*,
 598 U.S. 651 (2023) ...................................................................... *passim*

*Santa Maria City Firefighters Union v. City of Santa Maria*,
 No. 19-cv-1964, 2022 WL 2198707 (C.D. Cal. Feb. 9, 2022).................... 21

*Schaffner v. Monsanto Corp.*,
 113 F.4th 364 (3d Cir. 2024) .......................................................... 9

*Segal v. AT&T*,
 606 F.2d 842 (9th Cir. 1979) .........................................................9, 10

*Seila Law LLC v. CFPB*,
 591 U.S. 197 (2020) .....................................................................26, 79

*Seneca Nation of Indians v. New York,*
    26 F. Supp. 2d 555 (W.D.N.Y. 1998) ............................................ 16

*Smith v. Ortiz,*
    234 F. App'x 698 (9th Cir. 2007) ................................................ 17

*State Farm Mut. Auto Ins. Co. v. Duel,*
    324 U.S. 154 (1945) .................................................................... 25

*State of Idaho Potato Comm'n v. G&T Terminal Packaging, Inc.,*
    425 F.3d 708 (9th Cir. 2005) ...................................................... 19

*State v. United Cook Inlet Drift Ass'n,*
    895 P.2d 947 (Alaska 1995) ........................................................ 16

*Stratman v. Leisnoi, Inc.,*
    545 F.3d 1161 (9th Cir. 2008) .................................................... 75

*Stringfellow Mem'l Hosp. v. Azar,*
    317 F. Supp. 3d 168 (D.D.C. 2018) ............................................ 60

*Sturgeon v. Frost,*
    872 F.3d 927 (9th Cir. 2017) ................................................ 2, 28

*Sturgeon v. Frost ("Sturgeon II"),*
    587 U.S. 28 (2019) ............................................................ *passim*

*Sunrise Coop., Inc. v. USDA,*
    891 F.3d 652 (9th Cir. 2018) ........................................................ 5

*SWANCC v. USACE,*
    531 U.S. 159 (2001) ........................................................... *passim*

*Tanzin v. Tanvir,*
    592 U.S. 43 (2020) ...................................................................... 48

*Tarrant Reg'l Water Dist. v. Herrmann,*
    569 U.S. 614 (2013) .................................................................... 53

*Teledyne Indus., Inc. v. NLRB,*
    911 F.2d 1214 (6th Cir. 1990) .................................................... 27

*Tex. Brine Co., LLC v. Am. Arb. Ass'n, Inc.,*
    955 F.3d 482 (5th Cir. 2020) ...................................................... 52

*Tingley v. Ferguson,*
    47 F.4th 1055 (9th Cir. 2022) .................................................... 67

*Totemoff v. State,*
    905 P.2d 954 (Alaska 1995) ............................................................ 2, 17, 69, 74

*Trump v. United States,*
    603 U.S. 593 (2024) ............................................................................ *passim*

*Tucker v. Comm'r of Internal Revenue,*
    135 T.C. 114 (2010) .................................................................................. 82

*TVA v. Hill,*
    437 U.S. 153 (1978) ............................................................................. 65, 66

*U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.,*
    720 F.3d 1174 (9th Cir. 2013) .................................................................. 44

*U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v.*
    *BCBS of Ga., Inc.,*
    755 F. Supp. 1040 (S.D. Ga. 1990) ......................................................... 16

*United States v. Arpaio,*
    951 F.3d 1001 (9th Cir. 2020) .................................................................... 8

*United States v. Arthrex, Inc.,*
    594 U.S. 1 (2021) ................................................................................ *passim*

*United States v. Atl. Richfield Co.,*
    612 F.2d 1132 (9th Cir. 1980) .................................................................. 75

*United States v. Baldon,*
    956 F.3d 1115 (9th Cir. 2020) .................................................................. 43

*United States v. California,*
    529 F. Supp. 303 (E.D. Cal. 1981) .......................................................... 15

*United States v. Certain Parcels of Land,*
    666 F.2d 1236 (9th Cir. 1982) .................................................................. 68

*United States v. Concord Mgmt. & Consulting LLC,*
    317 F. Supp. 3d 598 (D.D.C. 2018) ............................................. 79, 81, 83

*United States v. Gay,*
    967 F.2d 322 (9th Cir. 1992) .................................................................... 72

*United States v. Humphries,*
    850 F. App'x 586 (9th Cir. 2021) ............................................................. 27

*United States v. Janssen,*
    73 M.J. 221 (C.A.A.F. 2014) ............................................................. 79, 82

*United States v. Jicarilla Apache Nation,*
    564 U.S. 162 (2011) ................................................................. 73

*United States v. Kim,*
    806 F.3d 1161 (9th Cir. 2015) ................................................ 32

*United States v. Kirilyuk,*
    29 F.4th 1128 (9th Cir. 2022) ................................................ 67

*United States v. Lindsey,*
    634 F.3d 541 (9th Cir. 2011) .................................................. 43

*United States v. Lopez,*
    514 U.S. 549 (1995) ................................................................. 68

*United States v. Maurice,*
    26 F. Cas. 1211 (C.C. Va. 1823) ............................................ 79

*United States v. Mendoza,*
    464 U.S. 154 (1984) .......................................................... 18, 19

*United States v. Meza-Rodriguez,*
    798 F.3d 664 (7th Cir. 2015) .................................................. 39

*United States v. Michigan,*
    940 F.2d 143 (6th Cir. 1991) .................................................. 28

*United States v. Pinillos-Prieto,*
    419 F.3d 61 (1st Cir. 2005) ............................................... 26, 36

*United States v. Stauffer Chem. Co.,*
    464 U.S. 165 (1984) ................................................................. 18

*United States v. Trump,*
    No. 23-cr-80101, 2024 WL 3404555 (S.D. Fla. July 15, 2024) ............................ 79, 84

*United States v. Twin City Power Co.,*
    350 U.S. 222 (1956) ................................................................. 68

*United States v. W. Pac. R.R. Co.,*
    352 U.S. 59 (1956) ................................................................... 34

*United States v. Windsor,*
    570 U.S. 744 (2013) ................................................................. 40

*United Steelworkers of Am. v.*
*Ret. Income Plan for Hourly-Rated Emps. of ASARCO, Inc.,*
    512 F.3d 555 (9th Cir. 2008) .................................................. 31

*USFS v. Cowpasture River Pres. Ass'n,*
  590 U.S. 604 (2020) .................................................................. 45, 53

*USPS v. Am. Postal Workers Union, AFL-CIO,*
  893 F.2d 1117 (9th Cir. 1990) ........................................................ 36

*Util. Air Regul. Grp. v. EPA,*
  573 U.S. 302 (2014) ...................................................................... 49

*Valladolid v. Pac. Operations Offshore, LLP,*
  604 F.3d 1126 (9th Cir. 2010) ............................................. 40, 41, 42

*Varnadore v. Sec'y of Lab.,*
  141 F.3d 625 (6th Cir. 1998) ..................................................... 82, 83

*Weeks v. Bayer,*
  246 F.3d 1231 (9th Cir. 2001) ........................................................ 91

*Weiss v. United States,*
  510 U.S. 163 (1994) ...................................................................... 79

*Wild Fish Conservancy v. EPA,*
  331 F. Supp. 3d 1210 (W.D. Wash. 2018) ...................................... 23

*Willy v. Admin. Rev. Bd.,*
  423 F.3d 483 (5th Cir. 2005) ......................................................... 82

*Witt v. Dep't of Air Force,*
  527 F.3d 806 (9th Cir. 2008) ......................................................... 44

*Wyler Summit P'ship v. Turner Broad. Sys., Inc.,*
  235 F.3d 1184 (9th Cir. 2000) ....................................................... 30

*Young v. U.S. ex rel. Vuitton et Fils S.A.,*
  481 U.S. 787 (1987) ...................................................................... 79

**Statutes & Other Authorities:**

U.S. Const., art. II, §2, cl. 2 .............................................................. 78

U.S. Const., art. IV, §3, cl. 2 ............................................................. 70

5 U.S.C. §3395 ................................................................................ 90

5 U.S.C. §3592 ................................................................................ 90

16 U.S.C. §3102 ........................................................ 2., 11, 47, 68, 74

16 U.S.C. §3111 ................................................................... 54, 55, 76

16 U.S.C. §3124 .............................................................................. 83

28 U.S.C. §2401 ................................................................................33, 34, 36

42 U.S.C. §913 ................................................................................................ 83

43 U.S.C. §1603 .............................................................................................. 75

5 C.F.R. §317.901 ........................................................................................... 90

50 C.F.R. §100.10 ........................................................................................... 90

Fed. R. Civ. Proc. 8 ....................................................................................... 22

Fed. R. Civ. Proc. 56 ..................................................................................... 22

126 Cong. Rec. 29279 (Nov. 12, 1980) ....................................................... 72

143 Cong. Rec. S11259 (Oct. 28, 1997) ...................................................... 64

57 Fed. Reg. 22940 (May 29, 1992) ...................................................1, 56, 59

64 Fed. Reg. 1276 (Jan. 8, 1999) .....................................................60, 65, 84

89 Fed. Reg. 83622 (Oct. 17, 2024) ....................................................... *passim*

Pub. L. 92-203, 85 Stat. 688 (Dec. 18, 1971) ............................................ 75

Pub. L. 85-508, 72 Stat. 339 (July 7, 1958) ............................................... 74

Pub. L. 81-109, 63 Stat. 203 (June 20, 1949) ............................................ 81

Pub. L. 96-487, 94 Stat. 2371 (Dec. 2, 1980) ............................................ 57

Pub. L. 105-83, 111 Stat. 1543 (Nov. 14, 1997) ........................... 58, 61, 62, 85

Pub. L. 105-277, 112 Stat. 2681 (Oct. 21, 1998) ............................ 58, 63, 65, 85

S. Rep. 96-413 (Nov. 14, 1979) .................................................................... 72

Barbara L. Schwemle et al., Cong. Rsch. Serv. 7-5700, *The Debate Over Selected Presidential Assistants and Advisors: Appointment, Accountability, and Congressional Oversight* 40 (2009) ................................................................... 79

*Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248 (1989) .................................................................................................. 89

*The Constitution of the United States of America, Analysis and Interpretation*, 92d Cong., 2d Sess. 523 (1973) ......................................................................... 78

David K. Hausman, *Reviewing Administrative Review*, 38 Yale J. Reg. 1059 (2021) .......................................................................................................... 90

E. Garrett West, *Congressional Power Over Office Creation*, 128 Yale L.J. 166 (Oct. 2018) .................................................................................................. 79

GAO, *Alaska Land Management: Resolving Ownership of Submerged Lands*
(July 27, 2023) ............................................................................... 55

Kevin Sholette, *The American Czars*, 20 Cornell J.L. & Pub. Pol'y 219 (2010) ............. 83

*Limitations on Presidential Power to Create a New Executive Branch Entity*, 9 Op.
O.L.C. 76 (1985) ..........................................................................78, 79

Off. of Subsistence Mgmt., *Federal Subsistence Fisheries Regulations*, DOI
(Apr. 1, 2021) ............................................................................... 56

*Officers of the United States Within the Meaning of the Appointments Clause*,
31 Op. O.L.C. 73 (2007) ..................................................................79, 80

Restatement (Second) of Judgments §28 .................................... 10, 13, 14, 15

Restatement (Third) of Property (Servitudes) §1.2 ........................................ 74

Saikrishna B. Prakash, *Fragmented Features of the Constitution's Unitary Executive*,
45 Willamette L. Rev. 701 (2009) ......................................................... 79

Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* (2012) .................48, 50, 51

Steven G. Calabresi & Gary Lawson, *Why Robert Mueller's Appointment as
Special Counsel Was Unlawful*, 95 Notre Dame L. Rev. 87 (2019) ..........................79, 82

U.S.C. Reorg. Plan No. 3 of 1950 ...................................................... 80, 81

U.S.C. Reorg. Plan No. 2 of 1953 ...................................................... 80, 81

Wright & Miller, 16AA Fed. Prac. & Proc. Juris. §3975.1 (5th ed.) ............................ 32

Wright & Miller, 18 Fed. Prac. & Proc. Juris. §4418 (3d ed.) ........................................ 12

Wright & Miller, 18 Fed. Prac. & Proc. Juris. §4425 (3d ed.) ............................9, 10, 13

Wright & Miller, 18B Fed. Prac. & Proc. Juris. §4477 (3d ed.) ...................................... 27

**INTRODUCTION**

*Katie John I* has never been on strong footing. The *Katie John I* majority conceded that its opinion was "inherently unsatisfactory." *Alaska v. Babbitt* ("*Katie John I*"), 72 F.3d 698, 704 (9th Cir. 1995). The majority recognized that its holding—"public lands" include navigable waters in which the United States has "reserved water rights"—gave no "meaning to the term 'title' in the definition of the phrase 'public lands.'" *Id.* The majority's opinion provided almost no textual analysis to support its holding. *See id.* And it certainly never claimed to have found the "'best reading'" of the statute. *Loper Bright Enters. v. Raimondo*, 144 S.Ct. 2244, 2266 (2024). Yet the majority went along with the Secretaries' recently changed interpretation because it was "reasonable" under *Chevron* and supposedly reflected the "intent" of Congress, even though ANILCA "makes no reference to navigable waters" at all. *Katie John I*, 72 F.3d at 702-04.

Those who have rejected or criticized the reasoning of *Katie John I* are legion. They include, among others:

- The Secretary of Interior and the Secretary of Agriculture;[1]
- Judge Hall in dissent in *Katie John I*;[2]

---

[1] 57 Fed. Reg. 22940, 22942, 22952 (May 29, 1992) (concluding that "public lands" do not include Alaska's navigable waters because the United States "does not generally own title to the submerged lands beneath navigable waters in Alaska").

[2] 72 F.3d at 706 (Hall, J., dissenting) ("The majority embraces the doctrine of reserved water rights … [But] [t]he federal government can only reserve waters running over land that it owns. … Because Alaska has title to its navigable waters under the Submerged Lands Act, the United States cannot reserve these waters.").

- The Alaska Supreme Court;[3]
- Half of the Ninth Circuit sitting en banc in *Katie John II*;[4]
- The entire panel in *Katie John III*;[5] and
- Two Ninth Circuit judges in *Sturgeon*.[6]

In *Sturgeon v. Frost*, 587 U.S. 28 (2019), the Supreme Court removed any doubt that *Katie John*'s reasoning is unsound. In a unanimous opinion, the Court held that navigable waters were *not* "public land" under the reserved water rights doctrine. *Id.* at 42-45. "Public lands" are "lands, waters, and interests therein … the title to which is in the United States." 16 U.S.C. §3102(1)-(3). But the United States cannot have "title" to a reserved water right, and even if it could, such a right would not give the United States "plenary authority over the waterway," but only the right to protect the "amount" or

---

[3] *Totemoff v. State*, 905 P.2d 954, 964-68 (Alaska 1995) ("[W]e find that neither the navigational servitude nor reserved water rights bring navigable waters within ANILCA's definition of 'public lands.'").

[4] *John v. United States* ("*Katie John II*"), 247 F.3d 1032, 1034 (9th Cir. 2001) (Tallman, J., concurring in the judgment) ("The reserved water rights doctrine [relied on in *Katie John I*] is mentioned nowhere in the statute."); *id.* at 1044-50 (Kozinski, J., dissenting) ("Because ANILCA defines public lands as 'lands, waters, and interests' to which the United States holds title, the federal government's reserved water right is simply not sufficient to turn waters subject to that right into public lands.").

[5] *John v. United States* ("*Katie John III*"), 720 F.3d 1214, 1245 (9th Cir. 2013) ("*Katie John I* was a problematic solution to a complex problem, in that it sanctioned the use of a doctrine ill-fitted to determining which Alaskan waters are 'public lands' to be managed for rural subsistence priority under ANILCA.").

[6] *Sturgeon v. Frost*, 872 F.3d 927, 937-38 (9th Cir. 2017) (Nguyen, J., concurring) (noting that a "reserved water right" is only "the right to a sufficient *volume* of water for use in an appropriate federal purpose" and advocating for abandoning *Katie John I* "[r]ather than continuing to shove a square peg into a hole we acknowledge is round").

"volume" of water needed to accomplish the reservation's purpose. *Sturgeon II*, 587 U.S. at 42-45. That reasoning controls this case.

But it's not just *Sturgeon* that has eviscerated the reasoning of *Katie John I*. The majority's atextual opinion was made possible only through heavy reliance on *Chevron* deference. *Katie John I*, 72 F.3d at 703-04. Yet that mode of interpretation has been outlawed too. In *Loper Bright*, the Supreme Court held that courts cannot defer to an agency's interpretation but must instead "use every tool at their disposal to determine the best reading of the statute." 144 S.Ct. at 2266. If an interpretation "is not the best, it is not permissible." *Id.* Moreover, since *Katie John I*, the Supreme Court has made clear that Congress cannot regulate a State's waters without "exceedingly clear language." *Sackett v. EPA*, 598 U.S. 651, 679-80 (2023). Yet the *Katie John I* majority never found such language. Indeed, it conceded that ANILCA "makes no reference to navigable waters" at all. *Katie John I*, 72 F.3d at 702.

Would *Katie John I* have come out the same way today? Not a chance. Navigable waters cannot become "public land" based on reserved water rights; this Court cannot defer to the Secretaries' atextual interpretation of ANILCA; and there is no exceedingly clear language from Congress commanding the federal government to regulate the State's waters.

Given the new landscape, it is no surprise that the United States and the four sets of Intervenors (KRITFC, AVCP, AFN, and Ahtna) have taken a kitchen-sink approach to this case. Little of their briefs—spanning 273 pages in total—is devoted to

3

a textual analysis for why the Kuskokwim River could be "public land" under the reserved water rights doctrine. Instead, the United States and Intervenors urge this Court to bar the State from making its arguments at all; to ignore *Sturgeon*'s reasoning because of a single footnote in the opinion; and to find that the Kuskokwim River is "public land" based on alternative arguments that were either rejected in *Katie John I* or are so far-fetched that this Court never even addressed them in the *Katie John* trilogy. All these arguments fail.

**Procedural Arguments**. Appellees lob various procedural arguments as to why this Court, unlike the district court, should not reach the merits of this dispute. None has merit. The State's arguments are not barred by issue preclusion because the Supreme Court's "intervening decisions" in *Sturgeon*, *Loper Bright*, and *Sackett* changed the "legal context" of *Katie John I*. The State's arguments are not barred by claim preclusion because the State has brought no claims, and, even if it had, there is no "identity of claims" between the United States' claims here and the State's claims in *Katie John*. The State's arguments are not judicially estopped by its amicus brief in *Sturgeon II* because judicial estoppel applies only to *parties*, not amici. And the State's arguments are not barred by the statute of limitations for "civil action[s] commenced against the United States," because the State did not sue the United States. Yet these reasons are just the tip of the iceberg. There are many other reasons why issue preclusion, claim preclusion, judicial estoppel, and the statute of limitations do not apply, which the State briefed below but Appellees never address on appeal.

4

*"Public Lands" and ANILCA*. As explained, *Sturgeon* forecloses any argument that the Kuskokwim River is "public land" under the reserved water rights doctrine. Appellees urge this Court to ignore *Sturgeon*'s reasoning solely because of one footnote in *Sturgeon*. Appellees claim that the Supreme Court affirmatively held in this footnote that *Katie John I* is still good law because "public lands" can be given a different definition in Title VIII of ANILCA than in Title I of ANILCA. But the Supreme Court made no such holding: The footnote simply makes clear that "ANILCA's subsistence-fishing provisions" were "not at issue in th[e] case." *Sturgeon II*, 587 U.S. at 45 n.2. The Supreme Court has repeatedly cautioned lower courts against the precise reasoning that Appellees urge here—overreading stray comments to assume that the Supreme Court reached issues that were never presented. Unlike *Sturgeon*, ANILCA's subsistence provisions *are* at issue here. So this Court must determine whether *Katie John I* can survive in light of *Sturgeon*'s on-point discussion of "public lands" and reserved water rights.

The Court cannot, as Plaintiffs urge, disregard the statutory text in favor of Congress's supposed "purpose." The "best way to give effect to the purpose of Congress is to give effect to the words of the statute." *Sunrise Coop., Inc. v. USDA*, 891 F.3d 652, 658 (9th Cir. 2018). Laws are "the product of compromise," and so it is "quite mistaken to assume" that any interpretation that expands ANILCA's reach must be the law. *Luna Perez v. Sturgis Pub. Sch.*, 598 U.S. 142, 150 (2023). Given the State's ownership of navigable waters and its existing protections for subsistence fishing, Congress's

decision to limit ANILCA's reach to "public lands" is eminently reasonable. Nor is there any evidence—let alone "overwhelming evidence," *SWANCC v. USACE*, 531 U.S. 159, 169 n.5 (2001)—that Congress ratified *Katie John I* through two 1990s appropriations bills. The Intervenors' remaining arguments for why the Kuskokwim River is "public land" are either foreclosed by precedent or easily rejected.

*The Appointments Clause*. The Appointments Clause requires that all "officers of the United States" must have their positions established "by Law." Appellees don't dispute that members of the Federal Subsistence Board are "officers of the United States." And Appellees recognize that no statute—either ANILCA or any other law—expressly creates the FSB. That should end the matter. When the Founders used the term "by Law," they meant "'by statute,'" not by regulation. *Trump v. United States*, 603 U.S. 593, 645 (2024) (Thomas, J., concurring) (citing cases). And even if Congress could delegate its power of office creation to an agency, it did not "clearly" do so here. *Id.* at 648. None of the various "housekeeping" statutes that Appellees cite provide clear authority for the Secretaries to create and appoint new officer positions.

Appellees' claims also fail because the FSB members are improperly appointed "principal" officers. Just days before the United States' brief was due, the Secretaries published new rules governing the FSB to try to bolster their arguments that FSB members are "inferior" officers. But the same problems remain. The Secretaries do not exercise administrative oversight over the FSB, and the FSB can effectively issue final decisions. The rules still provide no mechanism for affected parties to appeal to the

Secretaries, and many FSB orders (like the emergency orders here) will happen so quickly that they will be effectively unreviewable. Further, the FSB members are subject to no term limits and five of them can be removed only "for cause." Because FSB members were not Senate confirmed, their orders could never preempt the State's actions.

The Court should reverse the decision below.

## ARGUMENT

### I. This Court is not procedurally barred from reaching the merits of the dispute.

Although the district court reached the merits of this dispute, Appellees present various procedural theories for why this Court should not. They contend (mostly in cursory fashion) that the State's arguments are barred by issue preclusion, claim preclusion, judicial estoppel, and a federal statute of limitations. The Court should reject these arguments for the same reasons that the district court did. Yet there are many other reasons why Appellees' arguments fail, all of which were pointed out below by the State but never addressed by Appellees on appeal.

#### A. The State's arguments are not barred by issue preclusion.

The United States and KRITFC assert that the State is barred from arguing that "public lands" excludes navigable waters because, under the doctrine of issue preclusion, this is an issue of law that was "addressed and decided" by "the *Katie John*

7

trilogy." USA Br. 33-36; KRITFC Br. 38-39.[7] The district court rightly rejected this argument, finding that issue preclusion does not apply because "*Sturgeon* constitutes a 'change in the legal context.'" 1-ER-18. The State below also provided five additional reasons why issue preclusion does not apply. *See* Dkt. 122 at 9-12, 15-19. The United States and KRITFC never address these arguments in their briefs. The Court can affirm the district court on any of these grounds.

### 1. Issue preclusion does not apply because there has been a change in the legal context.

The district court correctly found that issue preclusion does not apply because "*Sturgeon* constitutes a 'change in the legal context.'" 1-ER-18. "As a general proposition, the doctrine of collateral estoppel (or issue preclusion) prevents relitigation of issues actually litigated and necessarily decided, after a full and fair opportunity for litigation, in a prior proceeding." *Af-Cap, Inc. v. Chevron Overseas (Congo) Ltd.*, 475 F.3d 1080, 1086 (9th Cir. 2007) (cleaned up). Although issue preclusion technically applies

---

[7] In their preclusion arguments, the United States and KRITFC refer generally to the "*Katie John* trilogy," "*Katie John* litigation," and "*Katie John* cases." USA Br. 34-35; KRITFC Br. 38-39. But *Katie John III* could not have any preclusive effect here. Whether navigable waters are "public land" under ANILCA was not "actually litigated" in *Katie John III*, was not "determined by a valid and final judgment," and was not "essential to the judgment." *United States v. Arpaio*, 951 F.3d 1001, 1006 (9th Cir. 2020) (cleaned up); *see Katie John III*, 720 F.3d at 1223-24, 1245 ("The current litigation includes two consolidated challenges to the 1999 Rules. … *Katie John I* remains the law of this circuit, and we, like the secretaries, must apply it as best we can."). And *Katie John II*, of course, was the same case as *Katie John I*. The State therefore discusses *Katie John I* as the relevant case for the preclusion analysis. That said, the State's arguments apply equally to the "*Katie John* trilogy" generally.

to "'an issue of fact *or law*,'" the doctrine has "'never been applied to issues of law with the same rigor as to issues of fact.'" *Id.* (emphasis in original) (quoting *Segal v. AT&T*, 606 F.2d 842, 845 (9th Cir. 1979)). Issue preclusion rarely applies to issues of law because (1) it can "delay desirable growth of legal principles"; (2) it can be "unjust to preclude reargument of questions of law that would be open to challenge by other litigants"; (3) reexamining issues of law "ordinarily is less burdensome than reopening issues of fact" and "is more likely to produce improved results"; and (4) the "interests of courts and litigants" can be "protected adequately by the flexible principles of stare decisis." Wright & Miller, 18 Fed. Prac. & Proc. Juris. §4425 (3d ed.); *see, e.g.*, *Af-Cap*, 475 F.3d at 1086 (refusing to apply issue preclusion because it would "'foreclos[e] [the Ninth Circuit] from an opportunity to reconsider the applicable rule, and thus to perform [its] function of developing the law'"); *Gruver v. La. Bd. of Supervisors for La. State Univ. Agric. & Mech. Coll.*, 959 F.3d 178, 182 n.3 (5th Cir. 2020) ("[A] reason why issue preclusion does not typically apply to pure questions of law is that the more flexible doctrine of stare decisis provides enough stability and protection against unnecessary litigation burdens."); *Schaffner v. Monsanto Corp.*, 113 F.4th 364, 378 (3d Cir. 2024) ("Applying issue preclusion to a pure question of law … risks impeding a court from discharging 'its function of developing the law.'").

Issue preclusion does not apply if "'[t]he issue is one of law and … a new determination is warranted in order to take account of an intervening change in the applicable legal context.'" *Norvell v. BCBS Ass'n*, 699 F. App'x 760, 761 (9th Cir. 2017)

(quoting *Segal*, 606 F.2d at 845); *see, e.g.*, *Coors Brewing Co. v. Méndez-Torres*, 562 F.3d 3, 11 (1st Cir. 2009); Fed. Prac. & Proc. Juris. §4425 ("Preclusion … may be defeated by showing … that there has been a substantial change in the legal climate suggesting a new understanding of the governing legal rules that may require a different application."); Restatement (Second) of Judgments §28(2) & cmt. c (1982) ("[A]n intervening change in the relevant legal climate may warrant reexamination of the rule of law applicable as between the parties."). This exception is a low bar that many legal developments can satisfy. Courts have refused to apply issue preclusion in light of, among other things, "'an intervening judicial declaration, a modification or clarification of legal principles as enunciated in intervening decisions[,] and an alteration in a pertinent statutory interpretation.'" *Keyes v. Lynch*, 214 F. Supp. 3d 267, 276 (M.D. Pa. 2016) (listing cases); *see* Fed. Prac. & Proc. Juris §4425 ("[T]hese standards do not mean that the earlier decision must have been overruled or that the second ruling be inconsistent with the first. The … language means rather that the second court should be freed from the prior determination if there has been some marked advance or alteration in relevant orientation, approach, reasoning[,] or principles." (cleaned up) (quoting *CBN Corp. v. United States*, 176 Ct. Cl. 861, 865 (1966)). Similarly, "Supreme Court clarification of issues that had been debated or uncertain in the lower courts is … a proper justification for avoiding preclusion." Fed. Prac. & Proc. Juris §4425. Even the "mere general growth of a body of law may defeat preclusion." *Id.*

As the district court correctly recognized, the "'change in the applicable legal context'" exception is on all fours here. 1-ER-18. As explained in the State's opening brief and further below, *Katie John I* is neither binding nor persuasive after *Sturgeon*. In *Katie John I*, the Ninth Circuit concluded—with little analysis and relying on *Chevron* deference—that "public land" under ANILCA includes those "navigable waters in which the United States has an interest by virtue of the reserved water rights doctrine." 72 F.3d at 703-04. But this holding is incompatible with the Supreme Court's (unanimous) holding in *Sturgeon* two decades later. *Infra* pp. 37-43. Writing for the Court, Justice Kagan *rejected* the argument that a navigable river was "public land" because "the United States has 'title' to an 'interest' in the Nation River, under what is called the reserved-water-rights doctrine." *Sturgeon II*, 587 U.S. at 43-44 (quoting 16 U.S.C. §3102)). There is no doubt that *Katie John* would come out differently now after *Sturgeon*.

The United States and KRITFC argue that this preclusion exception does not apply because *Sturgeon* did not change the law. USA Br. 35; KRITFC Br. 39. They argue that *Sturgeon*'s "actual holding" was "that a hovercraft regulation does not sufficiently implicate the United States' reserved water rights" and so *Sturgeon* does not affect the "narro[w]" issue of who has "authority to administer Title VIII on navigable waters in Alaska." USA Br. 35. That reading of *Sturgeon* is wrong, as explained below. *Infra* pp. 37-43. Yet issue preclusion is inapplicable even if the Court ultimately decides that *Katie John* remains good law and controls this case. The "change in the applicable legal context" exception is a low bar. "'[R]econsideration should be freely available whenever

a *cogent claim* is made that the law has changed'" because "'[p]rinciples of stare decisis afford sufficient protection against undue efforts to avoid preclusion on this score.'" *Coors Brewing*, 562 F.3d at 12 (quoting Wright & Miller, 18 Fed. Prac. & Proc. Juris. §4418 (3d ed.)) (emphasis added).

Courts thus routinely apply this exception even when the intervening decision does not change the outcome of the case. *See, e.g.*, *Franklin Cty. Convention Facilities Auth. v. Am. Premier Underwriters, Inc.*, 240 F.3d 534, 550, 552 (6th Cir. 2001) (rejecting issue preclusion because the Supreme Court's decision in "*Eastern Enterprises* signals a change in the legal climate," but then holding that "*Eastern Enterprises* has no precedential effect on this case"); *Pharm. Care Mgmt. Ass'n v. D.C.*, 522 F.3d 443, 447 (D.C. Cir. 2008) (rejecting issue preclusion because legal developments "may change the legal analysis," while "express[ing] no opinion on the merits of the [legal] issue"); *Guess?, Inc. v. Russell*, No. 16-cv-780, 2016 WL 1620119, at *3 n.2 (C.D. Cal. Apr. 18, 2016) ("[W]hile the Court is ultimately unpersuaded that this purported change in the law alters the reasoning in the Court's prior order, an intervening change in the law is a well-recognized exception to collateral estoppel."). Indeed, that is exactly what the district court did below. The State made a "cogent" argument that *Sturgeon* changed the legal climate. *Infra* pp. 37-43. The presence of four groups of intervenors and hundreds of pages of briefing (much of which advance alternative arguments for affirmance) should remove any doubt that *Sturgeon* changed the "legal context" for defining "public lands" under ANILCA.

And it's not just *Sturgeon* that changed the legal context. As explained further below, *see infra* pp. 43-45, *Katie John I* depended heavily on *Chevron* deference, *see* 72 F.3d at 703-04, which the Supreme Court has overturned, *see Loper Bright*, 144 S.Ct. 2244. And *Katie John I* never asked whether there was "'exceedingly clear language'" indicating that Congress intended to regulate fishing in the State's waters, an inquiry that is required after *Sackett v. EPA*. 598 U.S. at 679. Appellees never address either opinion in their preclusion analysis. Yet there is no question that these opinions caused "'some marked advance or alteration in relevant orientation, approach, reasoning[,] or principles.'" Fed. Prac. & Proc. Juris. §4425.

### 2. Issue preclusion does not apply for additional reasons.

Before the district court, the State provided five additional reasons why issue preclusion does not apply. *See* Dkt. 122 at 9-12, 15-19. Yet Appellees surprisingly never address them before this Court. Issue preclusion is inapplicable for these reasons too.

***First***, the scope of "public land" under ANILCA is a pure issue of law and "the two actions involve claims that are substantially unrelated." Restatement (Second) of Judgments §28(2). "'Where, for example, a court in deciding a case has enunciated a rule of law, the parties in a subsequent action *upon a different demand* are not estopped from insisting that the law is otherwise, merely because the parties are the same in both cases.'" *Montana v. United States*, 440 U.S. 147, 162 (1979) (emphasis in original)); *Collins v. Alaska*, 823 F.2d 329, 332 n.4 (9th Cir. 1987) (same); *see also* Fed. Prac. & Proc. Juris. §4425 (discussing "the rule that preclusion does not attach to pure questions of law,

unmixed with any common elements of fact"). "[I]f the issue is one of the formulation or scope of the applicable legal rule, and if the claims in the two actions are substantially unrelated, the more flexible principle of stare decisis is sufficient to protect the parties and the court from unnecessary burdens." Restatement (Second) of Judgments §28 cmt. b. "A rule of law declared in an action between two parties should not be binding on them for all time, especially as to claims arising after the first proceeding has been concluded, when other litigants are free to urge that the rule should be rejected." *Id.* Such preclusion could "unduly delay needed changes in the law and might deprive a litigant of a right that the court was prepared to recognize for other litigants in the same position." *Id.* This exception "applies with particular force when the issue to be re-litigated involves … 'the formulation or scope' of a statute or applicable legal rule." *Nat'l Org. of Veterans' Advocs., Inc. v. Sec'y of Veterans Affs.*, 260 F.3d 1365, 1373 (Fed. Cir. 2001) (quoting Restatement (Second) of Judgments §28 cmt. b).

Here, there is no question that Appellees seek preclusion of a pure issue of law—whether navigable waters are "public land" under ANILCA. And "the two actions involve claims that are substantially unrelated." Restatement (Second) of Judgments §28(2). The United States' and Intervenors' claims have little in common with the State's claims in *Katie John I*:

- The cases are far apart in time—the United States and Intervenors filed their lawsuits *30 years* after the State filed its lawsuit in *Katie John. See Alaska v. Babbitt*, No. 92-cv-264 (D. Alaska).

- The cases arise from different disputes—the State in *Katie John I* challenged federal regulations issued in 1992, but the United States and Intervenors here challenge "Defendants' emergency orders purporting to open harvest on the public waters of the Kuskokwim River during the federal closure in 2021 and 2022." U.S. Compl. 24 (Dkt. 1); KRITFC Compl. 7 (Dkt. 12-1); AVCP Compl. 5 (Dkt. 41); AFN Compl. 6 (Dkt. 97); Ahtna Compl. 7 (Dkt. 38-1).

- The claims are brought by different parties—by the State in *Katie John I*, and by the United States and various individuals and groups here. *See Katie John III*, 720 F.3d at 1221-24; *Katie John I*, 72 F.3d at 701. Only AFN brought (unrelated) claims in both cases.

- The cases involve different causes of action—the State in *Katie John I* sued under the APA, but the United States and Intervenors sue for preemption. *See id.*

Simply put, this case and *Katie John I* have none of the substantial overlap in facts and claims that could justify preclusion on an issue of law. Courts regularly decline to apply issue preclusion in similar circumstances. *See, e.g.*, *Am. Cas. Co. of Reading, Pa. v. Sentry Fed. Sav. Bank*, 867 F. Supp. 50, 57 (D. Mass. 1994) (no issue preclusion over an issue of law involving insurance policies with "identical terms" because they were "different policies"); *United States v. California*, 529 F. Supp. 303, 310 n.13 (E.D. Cal. 1981) (no issue preclusion over an issue of law about a statute of limitations involving different bodies of water); *Ctr. for Biological Diversity v. Hamilton*, 385 F. Supp. 2d 1330, 1335 (N.D. Ga. 2005) (no issue preclusion over a "pure question of law" because the two cases "involve[d] a different species designated as endangered"). Issues of law can be addressed by "the more flexible principle of stare decisis." Restatement (Second) of Judgments §28 cmt. b.

15

*Second*, the "public nature of the issues presented counsels against strict application of collateral estoppel." *Env't Def. v. EPA*, 369 F.3d 193, 203 (2d Cir. 2004); *Pharm. Care*, 522 F.3d at 447 (issue preclusion not appropriate because it would "freeze the development of the law in an area of substantial public interest"); *see also Duvall v. Att'y Gen. of the U.S.*, 436 F.3d 382, 390-91 (3d Cir. 2006) (issue preclusion "was borne of equity and is therefore 'flexible,' bending to satisfy its underlying purpose in light of the nature of the proceedings"). The scope of ANILCA is not a narrow issue about, say, a breach of contract between two private parties. Everyone agrees that this issue "concerns a matter of great public importance." *Env't Def.*, 369 F.3d at 203; *see also State v. United Cook Inlet Drift Ass'n*, 895 P.2d 947, 953 (Alaska 1995) ("eligibility to participate in subsistence … fishing" is a "questio[n] of general interest" in Alaska). Issue preclusion is "especially" inappropriate here because "the issue involves a question of statutory constructio[n] and is therefore an issue of general interest." *Hobbs ex rel. Hobbs v. Zenderman*, 542 F. Supp. 2d 1220, 1225 (D.N.M. 2008); *Seneca Nation of Indians v. New York*, 26 F. Supp. 2d 555, 569 (W.D.N.Y. 1998) ("[C]ollateral estoppel is less favored when the issue to be precluded is a legal one, and least favored when it is one of statutory construction."); *U.S. ex rel. Stinson, Lyons, Gerlin & Bustamante, P.A. v. BCBS of Ga., Inc.*, 755 F. Supp. 1040, 1046 (S.D. Ga. 1990) (same).

And this legal question is not going away. As the United States recognized below, Alaskans need certainty about the scope of ANILCA. Dkt. 70 at 14-16. In this situation, the "traditional concerns about relieving the parties of the costs of litigation and

16

conserving judicial resources" must give way to the public interest in resolving this hotly debated legal issue. *Env't Def.*, 369 F.3d at 203. The harsh medicine of issue preclusion is simply not appropriate given the important public policy issues at stake.

**Third**, "concern[s] about consistency and fairness" counsel against preclusion. *Chi. Truck Drivers, Helpers & Warehouse Union (Indep.) Pension Fund v. Century Motor Freight, Inc.*, 125 F.3d 526, 532 (7th Cir. 1997). Again, questions about the meaning of "public land" after *Sturgeon* are not going away. They will be front and center the next time someone is prosecuted for violating a federal order on navigable waters. *See Smith v. Ortiz*, 234 F. App'x 698 (9th Cir. 2007) (issue preclusion does not apply when "the party to be estopped was not a party to or in privity with a party to the prior action."); *cf. Totemoff*, 905 P.2d at 962-63 (rejecting preclusion of "public lands" issue in prosecution for misconduct on navigable waters). But if *Katie John*'s interpretation of "public lands" is "given collateral estoppel effect" here, then "only the [State], but not other[s] … would be precluded from" arguing that "public lands" do not include navigable waters. *Lutz v. Int'l Ass'n of Machinists & Aerospace Workers*, 121 F. Supp. 2d 498, 504 (E.D. Va. 2000). "As a pure question of law," the definition of "public lands" in ANILCA "might result in one answer when [the State] asks the question but another answer when the question is asked by anyone else." *Chi. Truck Drivers*, 125 F.3d at 532. Such "anomalous results" are another reason to deny preclusion. *Lutz*, 121 F. Supp. 2d at 504.

**Fourth**, applying issue preclusion would not aid judicial economy, a key purpose of this judicially created doctrine. *See, e.g.*, *Pharm. Care*, 522 F.3d at 447 (rejecting

preclusion because the plaintiff trade association "could readily avoid the estoppel consequence of a loss by having one or more of its members bring the lawsuit"). "Issue preclusion must be evaluated in light of the policy concerns underlying the doctrine. … There is no justification for applying collateral estoppel, which is a flexible, judge-made doctrine, in situations where the policy concerns underlying it are absent." *Alabama v. USACE*, 704 F. Supp. 3d 20, 76-77 (D.D.C. 2023) (cleaned up) (quoting *United States v. Stauffer Chem. Co.*, 464 U.S. 165, 176 (1984) (White, J., concurring in the result)); *see also Quiñones Candelario v. Postmaster Gen. of the U.S.*, 906 F.2d 798, 802 (1st Cir. 1990) ("*[R]es judicata* should not be invoked when its application would not serve its underlying purposes or goals."). Because issue preclusion does not apply to the claims brought by KRITFC, AVCP, and Ahtna, as explained below, the Court must resolve this question of statutory interpretation regardless. Thus, no "judicial resources would be saved by collaterally estopping [the State] from litigating this issue." *Haitian Ctrs. Council, Inc. v. McNary*, 969 F.2d 1350, 1356-57 (2d Cir. 1992), *rev'd on other grounds*, 509 U.S. 155. Nor does it save any party resources, another purpose of issue preclusion. *See, e.g., B & B Hardware, Inc. v. Hargis Indus., Inc.*, 575 U.S. 138, 140 (2015) ("issue preclusion is designed to prevent" litigation that "wastes litigants' resources"); *United States v. Mendoza*, 464 U.S. 154, 158 (1984) ("Collateral estoppel … serves to 'relieve parties of the cost and vexation of multiple lawsuits.'"). The parties have now fully briefed the statutory issue, and it is ripe for resolution. *See Hynix Semiconductor Inc. v. Rambus Inc.*, No. 00-cv-20905, 2009 WL 292205, at *6 (N.D. Cal. Feb. 3, 2009) (issue preclusion not applicable when

18

it "would generate no efficiency for the court or the parties"). Applying issue preclusion thus serves none of the doctrine's purposes.

*Fifth*, at a minimum, issue preclusion does not apply to the claims of KRITFC, AVCP, and Ahtna because those groups and individuals were not parties to the *Katie John* litigation. *See Alaska v. Norton*, No. 92-cv-264 (D. Alaska); *John v. United States*, No. 90-cv-484 (D. Alaska). These Intervenors apparently seek "nonmutual offensive collateral estoppel," which is when "a plaintiff seeks to prevent a defendant from relitigating an issue that the defendant previously litigated unsuccessfully against a different party." *State of Idaho Potato Comm'n v. G&T Terminal Packaging, Inc.*, 425 F.3d 708, 713 & n.3 (9th Cir. 2005). But nonmutual collateral estoppel does not apply against a state government or state officials. In *United States v. Mendoza*, the Supreme Court held that "nonmutual offensive collateral estoppel did not apply against the federal government so as to preclude relitigation of the issues in that case." *Id.* at 713 (footnote omitted) (citing *Mendoza*, 464 U.S. at 162). That is because "the government differs from private litigants in the geographic breadth of its litigation and in the nature of the issues it pursues." *Id.* This Court has held that "*Mendoza*'s rationale applies with equal force" to any "attempt to assert nonmutual … collateral estoppel against … a state." *Id.* at 714; *see also Coleman v. Cal. Bd. of Prison Terms*, 228 F. App'x 673, 675-76 (9th Cir. 2007) (holding that the "prisoners cannot use the district court's opinion in this case as offensive nonmutual collateral estoppel against" the California Board of Prison Terms because "offensive nonmutual collateral estoppel [does not apply] against the [state]

government"); *Demaree v. Fulton Cty. Sch. Dist.*, 515 F. App'x 859, 863-65 (11th Cir. 2013) ("[S]tate governments are not subject to offensive, non-mutual collateral estoppel." (citing *Hercules Carriers, Inc. v. Fla. DOT*, 768 F.2d 1558, 1579 (11th Cir. 1985)); *Coeur D'Alene Tribe of Idaho v. Hammond*, 384 F.3d 674, 689-90 (9th Cir. 2004) (no preclusion against "Commissioners, sued in their official capacity," because "the Supreme Court [in *Mendoza*] rejected … collateral estoppel against the government"); *In re Excise Tax Litig.*, No. 21-cv-39, 2024 WL 3552580, at *5 (D.V.I. July 26, 2024) (collecting cases). Accordingly, at a minimum, issue preclusion does not apply to KRITFC's, AVCP's, and Ahtna's claims.

## B. The State's arguments are not barred by claim preclusion.

KRITFC and the United States (in one paragraph) contend that the State's Appointments Clause arguments are barred by claim preclusion because the State could have "challeng[ed] the existence and function of the [FSB] under the Appointments Clause … in *Katie John III*." USA Br. 45-46; KRITFC Br. 44-49. The State below identified six reasons why claim preclusion is inapplicable. *See* Dkt. 122 at 19-25. KRITFC responds to two of the State's arguments, contending that claim preclusion can apply even though the State has raised no "claims," and asserting that there is an "identity of claims" between lawsuits. KRITFC Br. 44-49; *see also* USA Br. 45-46. These two arguments are unpersuasive, and claim preclusion fails for four other reasons, none of which the United States or KRITFC ever address.

1. **Claim preclusion does not apply because the State brought no "claims" and there is no "identity of claims."**

Claim preclusion "'bars litigation in a subsequent action of any claims that were raised or could have been raised in the prior action.'" *GP Vincent II v. Est. of Beard*, 68 F.4th 508, 514 (9th Cir. 2023). Claim preclusion applies only when there is "'(1) an identity of claims; (2) a final judgment on the merits; and (3) identity or privity between the parties.'" *Garity v. APWU Nat'l Lab. Org.*, 828 F.3d 848, 855 (9th Cir. 2016).

Claim preclusion does not apply for a simple reason: The State has brought no "claims." The State and its officials are the *defendants*, and they are raising *arguments* for why the United States and Intervenors should not prevail on their preemption claims. The United States and KRITFC, as the plaintiffs, want to use claim preclusion "to preclude Defendant[s] as a matter of law from defeating Plaintiff[s'] claim[s]." *Americredit Fin. Servs., Inc. v. Lyons*, No. 19-cv-1045, 2022 WL 135420, at *5 (M.D. Tenn. Jan. 13, 2022). But claim preclusion "acts *defensively*, to preclude … [a] claim," not offensively to "*prevail on* [a] claim." *Id.* (emphasis in original); *see In re Hunt*, 124 B.R. 200, 205 (N.D. Tex. 1991) ("*Res judicata* does not preclude relitigation of individual issues or defenses; it cuts off reprosecution of *claims* and *causes of action*, and is thus understood to be a doctrine of claim preclusion." (emphasis added)); *Santa Maria City Firefighters Union v. City of Santa Maria*, No. 19-cv-1964, 2022 WL 2198707, at *4 n.5 (C.D. Cal. Feb. 9, 2022) (same); *Midwest Operating Eng'rs Welfare Fund v. Allied Stone*, 175 F. Supp. 3d 945, 949 (N.D. Ill. 2016) (same).

Appellees point to *Lucky Brand Dungarees, Inc. v. Marvel Fashions Grp., Inc.*, 590 U.S. 405 (2020), arguing that the State "cannot escape preclusion simply because a formerly available claim has now become a defense." USA Br. 45-46 (citing *Lucky Brand*, 590 U.S. at 412-13); KRITFC Br. 48-49 (same). But the Supreme Court in *Lucky Brand* pointedly "refused to recognize a stand-alone doctrine of 'defense preclusion.'" *In re Greenberg*, 626 B.R. 554, 561 (S.D. Cal. 2021) (quoting *Lucky Brand*, 590 U.S. at 412); *see Lucky Brand*, 590 U.S. at 413 n.2 (noting that "[t]here may be good reasons to question any application of claim preclusion to defenses" but that "this Court need not determine when (if ever) applying claim preclusion to defenses may be appropriate, because a necessary predicate—identity of claims—is lacking"). Nor has the Ninth Circuit recognized "defense preclusion," to the State's knowledge. Moreover, even if defense preclusion were possible, it would presumably apply only to the "affirmative defenses" identified in Rule 8(c), such as "assumption of risk," "fraud," "laches," "statute of frauds," and "statute of limitations." Fed. R. Civ. Proc. 8(c). The State asserted none of those affirmative defenses. It instead moved for summary judgment because "there is no genuine dispute as to any material fact and the [State] is entitled to judgment as a matter of law." Fed. R. Civ. Proc. 56(a).

At any rate, even if the State's arguments could somehow be designated as "claims," there is no "'identity of claims.'" *ProShipLine Inc. v. Aspen Infrastructures Ltd.*, 609 F.3d 960, 968 (9th Cir. 2010); *see Lucky Brand*, 590 U.S. at 413 n.2. To determine whether there is an "identity of claims," courts consider four factors: "'(1) whether the

two suits arise out of the same transactional nucleus of facts; (2) whether rights or interests established in the prior judgment would be destroyed or impaired by prosecution of the second action; (3) whether the two suits involve infringement of the same right; and (4) whether substantially the same evidence is presented in the two actions.'" *ProShipLine*, 609 F.3d at 968. The party asserting claim preclusion "'must carry the burden of establishing all necessary elements.'" *Garity*, 828 F.3d at 855. "Though all four factors are considered, reliance on the transactional nucleus element is especially appropriate because the element is outcome determinative." *Id.* (cleaned up). Whether two suits arise out of the "'same transactional nucleus'" depends on "'whether they are related to the same set of facts and *whether they could conveniently be tried together*.'" *Id.* (emphasis in original).

As to the first factor, the United States' and Intervenors' claims arose from "Defendants' emergency orders purporting to open harvest on the public waters of the Kuskokwim River during the federal closure in 2021 and 2022." Dkt. 1 at 24. These preemption claims "could not have been tried in" the *Katie John* trilogy, *ProShipLine*, 609 F.3d at 968, because the 2021 and 2022 federal orders on the Kuskokwim River occurred *after* those cases, *see, e.g.*, *Flores v. Life Ins. Co. of N. Am.*, No. 22-55779, 2024 WL 222265, at *3 (9th Cir. Jan. 22, 2024) ("[B]ecause *Flores II* accrued after Flores filed the operative complaint in *Flores I* and the claims could not have been brought together, claim preclusion does not apply."); *Wild Fish Conservancy v. EPA*, 331 F. Supp. 3d 1210, 1219 (W.D. Wash. 2018) (no claim preclusion, despite "overlapping facts and law,"

23

because "without a time machine, the instant case, which challenges a 2011 action, could not have been brought in 2008"); *Monongalia Cty. Coal Co. v. United Mine Workers of Am., Int'l Union*, 416 F. Supp. 3d 587, 594 (N.D. W.Va. 2019) (no claim preclusion, despite "similar" facts, because the "the two events … occurred three years apart"); *Garcon v. Van Reeth*, 511 F. App'x 877, 881 (11th Cir. 2013) (no claim preclusion where the relevant events occurred "several years apart"). As explained, the suits have little in common. *Supra* pp. 14-15.

The remaining three "identity of claims" factors are also absent. The State's Appointments Clause arguments do not undermine any "rights or interests" or "infring[e]" any rights that were established in *Katie John III*; the State's Appointments Clause arguments merely dispute the proper enforcer of ANILCA (it is the Secretaries, not the FSB). *ProShipLine*, 609 F.3d at 968. And "'substantially the same evidence is [not] presented in the two actions,'" *id.*; *Katie John* involved a legal challenge to regulations while these cases concern FSB orders from 2021 and 2022. *See* 3-ER-332–73 (2021 and 2022 administrative record); 3-ER-322–30 (declaration of ADF&G Commissioner). The composition of the FSB and other rules governing the FSB also have changed since *Katie John*, as discussed below. *Infra* p. 85.

### 2. Claim preclusion does not apply for additional reasons.

There are four other reasons why claim preclusion should not apply. The State made these arguments below. Dkt. 122 at 23-25. Yet neither the United States nor Intervenors respond to them in their briefs.

*First*, claim preclusion does not apply to the State's arguments against KRITFC, AVCP, and Ahtna because they were not parties in the *Katie John* litigation. *Supra* p. 19. Claim preclusion requires "'identity or privity between parties.'" *Ruiz v. Snohomish Cty. Pub. Util. Dist. No. 1*, 824 F.3d 1161, 1164 (9th Cir. 2016). The State's arguments thus could never be precluded as to the claims brought by KRITFC, AVCP, and Ahtna. Intervenors ignore this obvious defect in their argument. *See* KRITFC Br. 44-49.

*Second*, applying claim preclusion would not "'serve the aims of fairness and efficient judicial administration,'" the core purposes of claim preclusion. *Fresh Del Monte Produce Inc. v. Del Monte Foods, Inc.*, No. 13-cv-8997, 2016 WL 236249, at *6 (S.D.N.Y. Jan. 20, 2016). Claim preclusion is a "'flexible doctrin[e]'" that should not be "'mechanically applied'" even if "'some of the formal prerequisites for application are present.'" *Id.* Because claim preclusion does not apply to the claims brought by KRITFC, AVCP, and Ahtna, no efficiency is gained by applying it to the State's identical arguments against the claims brought by the United States and AFN. Nor would it be fair to prohibit the State from making these arguments when any other litigant could raise these issues of law in future litigation. *See supra* p. 17.

*Third*, even if the elements of claim preclusion were satisfied, there is a "traditional exception to res judicata 'where between the time of the first judgment and the second there has been an intervening decision or a change in the law creating an altered situation.'" *Alvarado-Ochoa v. Ashcroft*, 73 F. App'x 230, 231 (9th Cir. 2003) (quoting *State Farm Mut. Auto Ins. Co. v. Duel*, 324 U.S. 154, 162 (1945)). Here, most of

the key Supreme Court cases on this issue were decided within the last few years, including *Lucia v. SEC*, 585 U.S. 237 (2018), *Seila Law LLC v. CFPB*, 591 U.S. 197 (2020), and *United States v. Arthrex, Inc.*, 594 U.S. 1 (2021). These are "'intervening decision[s]'" since *Katie John III* and a "'change in the law creating an altered situation.'" *Alvarado-Ochoa*, 73 F. App'x at 231.

**Finally**, claim preclusion does not apply to the State's ANILCA arguments. KRITFC appears to assert in a one-sentence footnote (with no reasoning in support) that the State's statutory arguments under ANILCA are barred by claim preclusion. KRITFC Br. 16 n.63. This undeveloped argument is waived. *See, e.g.*, *Foti v. McHugh*, 247 F. App'x 899, 901 n.2 (9th Cir. 2007) ("'The summary mention of an issue in a footnote, without reasoning in support of the … argument, is insufficient to raise the issue on appeal.'"). And any such argument would fail for the same reasons discussed above. Even if the argument had merit, it would not apply to the United States because the United States never made the argument below or on appeal. *See Rotec Indus., Inc. v. Mitsubishi Corp.*, 348 F.3d 1116, 1119 (9th Cir. 2003) ("'Claim preclusion is an affirmative defense which may be deemed waived if not raised in the pleadings.'"); *United States v. Pinillos-Prieto*, 419 F.3d 61, 67 n.5 (1st Cir. 2005) ("[E]ach [party] forfeit[s] the issues that he did not himself raise."). The State's arguments are not barred by claim preclusion.

## C. The State's arguments are not barred by judicial estoppel.

The United States and KRITFC briefly assert that the State's statutory arguments under ANILCA are barred by judicial estoppel. USA Br. 29-30; KRITFC Br. 40. The

district court correctly rejected this argument, finding that judicial estoppel does not apply to the State because it participated in *Sturgeon II* only as an amicus curiae. This Court can also affirm for five other reasons, which the State raised below and the United States and Intervenors never address here.

### 1. Judicial estoppel does not apply because Alaska was not a party in *Sturgeon II*.

This Court "review[s] for abuse of discretion the district court's decision … declining to apply judicial estoppel." *United States v. Humphries*, 850 F. App'x 586, 587 (9th Cir. 2021). The district court found that "judicial estoppel does not apply because the State was not a party in *Sturgeon* and … not in privity with either party involved in *Sturgeon*." 1-ER-19. This was correct and not an abuse of discretion.

"Judicial estoppel is an extraordinary remedy that should be employed only when a party's inconsistent behavior would otherwise result in a miscarriage of justice." *Montrose Med. Grp. Participating Sav. Plan v. Bulger*, 243 F.3d 773, 784 (3d Cir. 2001) (cleaned up). Judicial estoppel "'is often the harshest remedy' that a court can impose for inequitable conduct," *id.*, and is "applied with caution to avoid impinging on the truth-seeking function of the court," *Teledyne Indus., Inc. v. NLRB*, 911 F.2d 1214, 1218 (6th Cir. 1990).

Judicial estoppel applies only to "parties." *See Pegram v. Herdrich*, 530 U.S. 211, 227 n.8 (2000); *New Edge Network, Inc. v. FCC*, 461 F.3d 1105, 1114 (9th Cir. 2006); Wright & Miller, 18B Fed. Prac. & Proc. Juris. §4477 (3d ed.). But the State was not a

"party" in *Sturgeon II*; it intervened as a plaintiff in *Sturgeon I*, but its complaint was dismissed for lack of standing, so it participated in *Sturgeon II* only as an amicus curiae. *See Sturgeon*, 872 F.3d at 929. It is hornbook law that "[a]n amicus curiae is not a party to litigation." *Miller-Wohl Co., Inc. v. Comm'r of Labor & Indus., State of Mont.*, 694 F.2d 203, 204 (9th Cir. 1982); *GST Tuscon Lightwave, Inc. v. City of Tuscon*, No. 97-15328, 1998 WL 42251, at *3 n.1 (9th Cir. Feb. 2, 1998) ("[A]n amicus curiae is not a party to the litigation, and we are not bound to provide relief to the amicus apart from the relief appropriate to the actual parties." (citation omitted)); *Kingdom v. Biden*, No. 21-cv-243, 2021 WL 4956507, at *1 (D. Haw. Sept. 30, 2021) ("[An] amicus may not assume the functions of a party and may not initiate, create, extend, or enlarge the issues."); *cf. In re Megan-Racine Assocs., Inc.*, 176 B.R. 687, 694 (N.D.N.Y. 1994) ("Hudson's amicus status does not make it a party to the proceedings, thus, neither collateral estoppel nor *res judicata* can be applied to bind Hudson.").

The "classic role of amicus curiae" is to "assis[t] in a case of general public interest, supplemen[t] the efforts of counsel, and dra[w] the court's attention to law that escaped consideration." *Miller-Wohl*, 694 F.2d at 204. Thus, an amicus curiae has "never been recognized, elevated to, or accorded the full litigating status of a named party or a real party in interest." *United States v. Michigan*, 940 F.2d 143, 165 (6th Cir. 1991) (citing *Miller-Wohl*, 694 F.2d at 204); *see, e.g.*, *Finn v. Cobb Cty. Bd. of Elections & Registration*, 111 F.4th 1312, 1316-17 (11th Cir. 2024). Indeed, when the State filed an amicus brief in the Ninth Circuit in *Sturgeon*, the United States urged the Ninth Circuit to ignore the

State's arguments that "ha[d] not been presented by the parties to this litigation" because "[t]his Court generally does not review issues raised only by an *amicus curiae*." Federal Appellees' Response to Supplemental Brief for the State of Alaska, *Sturgeon II*, 2016 WL 6081578, at *4 n.2 (C.A.9).

Neither the United States nor KRITFC provides a single case in which judicial estoppel was applied against an amicus curiae. USA Br. 29-30; KRITFC Br. 40. Because judicial estoppel applies only to "parties," the doctrine is inapplicable here.

### 2. Judicial estoppel does not apply for additional reasons.

Judicial estoppel does not apply for five additional reasons. ***First***, "judicial estoppel does not preclude the [State] from changing its interpretation" of ANILCA because "public policy considerations allow the government to change its position in ways that might be inappropriate if merely a matter of private interest." *New Edge Network*, 461 F.3d at 1114. This Court's opinion in *New Edge Network, Inc. v. FCC* is directly on point. There, the FCC had argued before the Supreme Court that "the language of §252(i) [of the Telecommunications Act] was unambiguous," but "the FCC's current position [was] that §252(i) [was] ambiguous." *Id.* Because the FCC was a government agency, this Court held that "judicial estoppel [did] not preclude the FCC from changing its interpretation of [the statute]." *Id.* So too here. Indeed, applying judicial estoppel here would be especially ironic because the State's attempt to preserve *Katie John* in *Sturgeon* was *itself* a change in position. The State's longstanding position

was that "public lands" did not include "navigable waters." *See, e.g.*, *Katie John III*, 720 F.3d at 1221-24.

 **Second**, judicial estoppel doesn't apply because the State's position here is not "'clearly inconsistent with its earlier position.'" *Harbor Breeze Corp. v. Newport Landing Sportfishing, Inc.*, 28 F.4th 35, 40 (9th Cir. 2022). The State's primary argument in its amicus brief in *Sturgeon* was that "[t]he *Katie John* decisions [were] not at issue in [Sturgeon's] appeal," and so the Supreme Court did not need to "directly address the prior circuit holdings in order to resolve this appeal." Alaska Amicus Br. 29, *Sturgeon II*, 2018 WL 4063284 (U.S.). But this Court *does* need to address the continued validity of the *Katie John* decisions here. *Wyler Summit P'ship v. Turner Broad. Sys., Inc.*, 235 F.3d 1184, 1190 (9th Cir. 2000) (judicial estoppel "'may apply'" only if "a litigant's current position is manifestly inconsistent with a prior position such as to 'amount to an affront to the court'"). These positions are not inconsistent.

 **Third**, judicial estoppel does not apply because there is no "'risk of inconsistent court determinations.'" *New Edge Network*, 461 F.3d at 1114 (quoting *New Hampshire v. Maine*, 532 U.S. 742, 751 (2001)); *see, e.g.*, *New Hampshire*, 532 U.S. at 755 ("We cannot interpret 'Middle of the River' in the 1740 decree to mean two different things along the same boundary line."). For judicial estoppel to apply, the party must have "'succeeded in persuading a court to accept that party's earlier position.'" *Harbor Breeze*, 28 F.4th at 40. The only possible argument that the Supreme Court accepted in *Sturgeon* was that "ANILCA's subsistence-fishing provisions" were "not at issue" and so the

Court need not "disturb the Ninth Circuit's holdings." *Sturgeon II*, 587 U.S. at 45 n.2; *compare with* Alaska Amicus Br. 29-35, *Sturgeon II*, 2018 WL 4063284 (U.S.).

Because the Supreme Court adopted nothing else from the State's brief in *Sturgeon II*, there is no possible risk of inconsistent court determinations. Nothing the Court does here will contradict the fact that "ANILCA's subsistence-fishing provisions" were "not at issue" in *Sturgeon*. *Sturgeon II*, 587 U.S. at 45 n.2; *see, e.g.*, *Gallagher & Kennedy, P.A. v. City of Phoenix*, No. 23-15938, 2024 WL 4003040, at *2 (9th Cir. Aug. 30, 2024) ("[T]he City argued that the subcontractors' claims were not ripe, which is not inconsistent with its current position that G&K did not incur the subcontractors' costs."); *Chaney-Snell v. Young*, 98 F.4th 699, 713 (6th Cir. 2024) ("'clearly inconsistent' positions" must be "impossible-to-reconcile"); *see also New Edge Network*, 461 F.3d at 1114 (same); *United Steelworkers of Am. v. Ret. Income Plan for Hourly-Rated Emps. of ASARCO, Inc.*, 512 F.3d 555, 563-64 (9th Cir. 2008) (same).

To the contrary, a ruling for the State would be in *harmony* with *Sturgeon* because the two opinions would consistently interpret ANILCA. *See infra* pp. 37-57. Nor can the Court infer that the Supreme Court accepted any of the State's other arguments. *Arizona v. Tohono O'odham Nation*, 818 F.3d 549, 559 (9th Cir. 2016) (second judicial estoppel factor not satisfied because "the arbitrator expressed no view" on the argument that was made); *Perry v. Blum*, 629 F.3d 1, 11 (1st Cir. 2010) ("The showing of judicial acceptance must be a strong one. … 'The insistence upon a court having

accepted the party's prior inconsistent position ensures that judicial estoppel is applied in the narrowest of circumstances.'" (listing cases)).

**Fourth**, judicial estoppel does not apply because the State's amicus brief has not given the State an unfair advantage here. Judicial estoppel applies only when "'the party seeking to assert an inconsistent position would derive an unfair advantage or impose an unfair detriment on the opposing party if not estopped.'" *Harbor Breeze*, 28 F.4th at 40. But the State "did not gain any advantage or impose a detriment" on the United States; "[i]nstead, the [State] made [Sturgeon's] case *more challenging*." *Lucero v. Holland*, 902 F.3d 979, 988 (9th Cir. 2018) (emphasis added). *Katie John I*'s reasoning was wafer thin, supported mainly by deference under *Chevron* and a focus on ANILCA's supposed purpose. If the State had been solely focused on prevailing in *Sturgeon*, the far easier thing to do would have been to ignore or jettison *Katie John*—not to try to save it.

Moreover, as AFN points out, "John Sturgeon and the State of Alaska's amicus brief" made the same argument, both telling the Supreme Court that it could rule for Sturgeon without addressing *Katie John*. AFN Br. 16; *see also* Wright & Miller, 16AA Fed. Prac. & Proc. Juris. §3975.1 (5th ed.) ("In ordinary circumstances, an amicus will not be permitted to raise issues not argued by the parties."). The United States and Intervenors thus are in "no worse position now than [they] would have been" if the State had not made its arguments in *Sturgeon*. *United States v. Kim*, 806 F.3d 1161, 1167-68 (9th Cir. 2015).

*Finally*, the United States cannot benefit from judicial estoppel because it lacks the "clean hands necessary to impose equitable judicial estoppel." *Farkas v. Rich Coast Corp.*, No. 14-cv-272, 2017 WL 10311283, at *9 (M.D. Pa. Dec. 29, 2017), *R&R adopted*, 2018 WL 4643234 (M.D. Pa. Mar. 26, 2018); *see Harbor Breeze*, 28 F.4th at 40 (no judicial estoppel where "each side may have opportunistically shifted its arguments"). "[J]udicial estoppel is an equitable doctrine and like all equitable doctrines is subject to the maxim in equity that a party seeking equitable relief should proceed before the court with clean hands." *Farkas*, 2017 WL 10311283, at *9. "Thus, it is a prerequisite to asserting judicial estoppel that the party asserting judicial estoppel be blameless and free from any assertion of inconsistent litigation positions." *Id.* But the United States' arguments in *Sturgeon* were the *exact opposite* of those it is making now. In *Sturgeon*, the United States repeatedly argued that the term "public lands" cannot be given "one meaning in the context of the subsistence-use-related sections of ANILCA and a different meaning" elsewhere. United States Br. 49, *Sturgeon II*, 2018 WL 4381223 (U.S.); *see* Alaska Br. 21. Now it argues that the term "public lands" has different meanings in different contexts. USA Br. 26-30. The United States cannot invoke judicial estoppel against the State given these inconsistent statements.

### D. The State's arguments are not barred by the federal statute of limitations for suits against the United States.

KRITFC alone asserts that the State's Appointments Clause arguments are barred by 28 U.S.C. §2401, "the six-year statute of limitations on claims against the

federal government." KRITFC Br. 13, 49-53.[8] The district court correctly rejected this argument because Section 2401 applies only to claims brought by a plaintiff, not arguments made by a defendant. 1-ER-17 n.56. Section 2401 does not apply for two other reasons, both of which the State raised below and KRITFC never addresses.

### 1. The federal statute of limitations does not bar the State's arguments because the State did not sue the United States.

Section 2401 provides that "every civil action commenced against the United States shall be barred unless the complaint is filed within six years after the right of action first accrues." 28 U.S.C. §2401(a). On its face this provision bars only a "civil action commenced against the United States." But the State did not sue the United States. Nor does the State even have counterclaims against the United States. Instead, the State has raised *arguments* for why it is entitled to judgment as a matter of law. Section 2401 simply has no application here. *Cf. Golden Gate Way, LLC v. Enercon Servs., Inc.*, No. 20-cv-3077, 2020 WL 4804933, at *2 (N.D. Cal. Aug. 18, 2020) ("A cause of action is not the same thing as an affirmative defense. 'To use the statute of limitations to cut off the consideration of a particular defense in the case is quite foreign to the policy of preventing the commencement of stale litigation.'" (quoting *United States v. W. Pac. R.R. Co.*, 352 U.S. 59, 72 (1956)). The district court thus correctly found that this limitations period does not apply to the State. 1-ER-17 n.56.

---

[8] Before the district court, KRITFC argued that Section 2401 also barred the State's ANILCA arguments." Dkt. 109 at 21. KRITFC has now abandoned that argument on appeal. KRITFC Br. 49.

KRITFC contends that the State's arguments should be treated as time-barred "claims" under *City of Saint Paul, Alaska v. Evans*, 344 F.3d 1029, 1035 (9th Cir. 2003). KRITFC Br. 51-53. But that case has no application here. There, this Court held that a city's defenses were time-barred under Alaska law because the city had brought "a time-barred declaratory judgment action, wait[ed] for the defendant to assert its interests in the form of a counterclaim, and then rais[ed] the identical time-barred claims as defenses." *City of St. Paul*, 344 F.3d at 1031. This Court refused to allow the city to "evade the limitations statut[e]" through this "jurisdictional jujitsu." *Id.* The City was the "aggressor in this litigation" because it "initiated the lawsuit" and "'disturbed the equilibrium between the parties' by first challenging the validity of the Agreement in court." *Id.* at 1035. The defendants' counterclaims were filed only "in response to the City's claims, not as affirmative claims for relief." *Id.* And the "City's defenses to [the defendants'] counterclaims [were] mirror images of its time-barred claims." *Id.* Although the longstanding "maxim [is] that a statute of limitations should be used only as a shield, not a sword," *id.* at 1033, in these circumstances, the City had "abandoned its right to seek solace in the status of a defendant," *id.* at 1036.

None of those unique facts are present here. The State did not "initiat[e] the lawsuit"; the United States did. *Id.* at 1035. Nor is the State "simultaneously or in parallel litigatio[n] seeking affirmative recovery on an identical claim." *Id.* Indeed, even the State's abandoned counterclaims did not implicate the "public lands" and navigable

waters issue. 3-JSER-605–08. There is simply no similar evidence of the "subterfuge" that occurred in *City of Saint Paul*. 344 F.3d at 1035.

### 2. The federal statute of limitations does not apply for additional reasons.

KRITFC's argument fails for two other reasons, neither of which KRITFC addresses. ***First***, even if KRITFC's argument had merit, the United States "waived this non-jurisdictional defense by failing to assert it." *Altera Corp. & Subsidiaries v. Comm'r of Internal Revenue*, 926 F.3d 1061, 1075 n.6 (9th Cir. 2019); *see, e.g.*, *USPS v. Am. Postal Workers Union, AFL-CIO*, 893 F.2d 1117, 1122 (9th Cir. 1990). The United States thus cannot benefit from KRITFC's statute-of-limitations argument. *Pinillos-Prieto*, 419 F.3d at 67 n.5 ("[E]ach [party] forfeit[s] the issues that he did not himself raise.").

***Second***, even if KRITFC's argument had merit, the statute of limitations would not apply to the State's arguments against Intervenors' claims. Section 2401 applies only to "civil action[s] commenced against *the United States*." 28 U.S.C. §2401(a) (emphasis added). Section 2401 thus could never bar the State's arguments against the Intervenors' claims.

## II. The State's orders are not preempted because the Kuskokwim River is not "public land" under ANILCA

On the key issue in this case—the meaning of "public land" under ANILCA—Appellees spend most their energy urging this Court to blind itself to *Sturgeon*'s analysis of "public land" and reserved water rights. They take this tactic (being hyper-focused on a single footnote in the opinion) because it is impossible to square the reasoning of

*Katie John I* with the reasoning of *Sturgeon*. The United States cannot have "title" to a reserved water right and, even if it could, this right would never allow it to mandate subsistence fishing. The Intervenors—but not the United States—offer alternative arguments for why the Kuskokwim River is "public land" under ANILCA. But these arguments all fail; indeed, they were either already rejected in *Katie John I* or are so novel that they were never even presented to this Court.[9]

### A. The Kuskokwim River is not "public land" under the reserved water rights doctrine

Appellees argue that the navigable waters within the Yukon Delta National Wildlife Refuge are "public lands" because the United States has "title" to an "interest" through its "reserved water rights" in the Kuskokwim River. USA Br. 36-38; KRITFC Br. 26-27; Ahtna Br. 23, 28-30; AFN Br. 23-30; AVCP Br. 28-34. Importantly, Appellees do not dispute that this argument fails if the definition of "public lands" articulated by the Supreme Court in *Sturgeon* applies. *See id.* For good reason. *See* Alaska Br. 29-33. *Sturgeon* held that the Nation River was not "public land" because the United States cannot have "title" to reserved water rights. *Sturgeon II*, 587 U.S. at 43-45. And

---

[9] The Court should reject the United States' bizarre request for "an opportunity to provide its position" on additional "alternative arguments for sustaining the Board's authority over navigable waters." USA Br. 42 n.6. Appellees "waiv[e] [any] argument by not raising it … in their answering brief on appeal," *Hawai'i Papaya Indus. Ass'n v. Cty. of Hawaii*, 666 F. App'x 631, 633 n.2 (9th Cir. 2016), and an argument is "'deemed waived if it is raised for the first time in a supplemental brief,'" *Barroso v. Gonzales*, 429 F.3d 1195, 1203 (9th Cir. 2005). More briefing is unnecessary in any event. Every conceivable argument for upholding the decision below has been exhaustively covered—in more than 273 pages of briefing—by the other Appellees.

even if the United States could have "title" to reserved water rights, that would give it the power only to take or maintain a specific "'amount of water,'" *id.*, which does not apply to the dispute over fishing here.

Appellees instead present four arguments for affirming the district court's reserved-water-rights holding: (1) this Court can ignore the reasoning of *Sturgeon* because the Supreme Court in footnote two said that the opinion did not "disturb" the *Katie John* opinions; (2) the term "public land" can be given a different meaning in Title VIII of ANILCA than elsewhere in the statute; (3) one of the purposes of ANILCA was to protect subsistence fishing and so its requirements should extend to navigable waters; and (4) Congress ratified the Court's decision in *Katie John I* through two appropriation bills in the late 1990s. None of these arguments is persuasive.

> **1.** **_Katie John_'s holding that navigable waters are "public land" under the reserved water rights doctrine is not binding on this Court.**

**1.** Appellees' primary argument is that *Katie John* remains good law because the Supreme Court in footnote two of *Sturgeon* said that it would not "'disturb'" the *Katie John* trilogy. USA Br. 28 (quoting *Sturgeon II*, 587 U.S. at 45 n.2); KRITFC Br. 16-18; Ahtna Br. 3-4, 24-30; AFN Br. 29-30; AVCP Br. 27-29. According to Appellees, the Supreme Court, through footnote two, affirmatively held that the definition of "public lands" "can and should be interpreted differently in the Title VIII context than for other parts of ANILCA." Ahtna Br. 29; *see* USA Br. 28-29 ("[T]he Supreme Court did

not resolve *how* the decisions can be reconciled, but the Court's determination is predicated on the possibility that they *could* be.").

But this is not how the Supreme Court operates. The Supreme Court would never make such an important ruling so casually. Whether "public lands" include "navigable waters" is a highly controversial issue which many courts, parties, and amici have debated at length for decades. *See generally* Alaska Br. 15-22. Indeed, Appellees have devoted a whopping 124 pages—presenting myriad legal theories and arguments—to arguing why "public lands" must include "navigable waters." Yet according to Appellees, the Supreme Court resolved this "incredibly complex issue," *Katie John I*, 72 F.3d at 704 (Hall, J., dissenting), offhandedly in a footnote—even while admitting that the question was "not at issue in this case," *Sturgeon II*, 587 U.S. at 45 n.2. This Court should not "place more weight on these passing references than the [Supreme] Court itself did." *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015).

The far more reasonable interpretation of *Sturgeon* footnote two is the one put forth by the State: The Supreme Court simply made clear that it was not addressing whether "the Park Service may regulate subsistence fishing on navigable waters" because "ANILCA's subsistence-fishing provisions" were "not at issue in th[e] case."

*Sturgeon II*, 587 U.S. at 45 n.2; *see* Alaska Br. 38-39. It therefore remains for this Court to determine whether the "theory [and] reasoning" of *Katie John* survives after *Sturgeon*.[10]

Appellees contend that the Supreme Court must have reached the merits of the issue here because it said, "we do not *disturb*" instead of "we do not *decide*." Ahtna Br. 22, 27 & n.18; *see* USA Br. 28. Again, that is not a reasonable reading of footnote two; the Supreme Court does not decide weighty questions that are "not at issue in [the] case." *Sturgeon II*, 587 U.S. at 45 n.2. Nor should this Court interpret the word "disturb" as an intent to break with normal practice. The Supreme Court has "long stressed that the language of an opinion is not always to be parsed as though we were dealing with the language of a statute." *Brown v. Davenport*, 596 U.S. 118, 141 (2022) (cleaned up); *see Valladolid v. Pac. Operations Offshore, LLP*, 604 F.3d 1126, 1131-32 (9th Cir. 2010) ("We do not blindly … follow an unconsidered statement simply because it was uttered by the Supreme Court."). "Yet that is exactly what [Appellees] ask of [this Court]." *Brown*, 596 U.S. at 141. Appellees would have this Court determine that the Supreme Court

---

[10] Appellees have no answer to this Court's response to *United States v. Windsor*, 570 U.S. 744 (2013), in *Latta v. Otter*, 771 F.3d 456 (9th Cir. 2014). *See* Alaska Br. 38-39. In *Windsor*, the Supreme Court went "out of its way" to stress that its "opinion and its holding [were] confined" to the facts before it. 570 U.S. at 775; *id.* at 776 (Roberts, C.J., dissenting). Yet that did not stop this Court in *Latta* from refusing to follow earlier Supreme Court precedent that was directly on point. Just as in *Windsor*, the Supreme Court in *Sturgeon* "did not reach the question [at issue] here because it was not presented to it." *Latta*, 771 F.3d at 466 n.6. So this Court too must independently decide whether the "theory [and] reasoning" of *Katie John* survives after *Sturgeon*, *Loper-Bright*, and *Sackett*. *Miller v. Gammie*, 335 F.3d 889, 900 (9th Cir. 2003).

affirmatively endorsed *Katie John* "on the basis of a handful of sentences"—in a footnote, no less—where the Supreme Court "had no reason to pass on the argument." *Id.* This Court cannot take "stray comments and stretch them beyond their context— all to justify an outcome inconsistent with [the Supreme] Court's reasoning and judgments and with Congress's instructions." *Id.*; *see Valladolid*, 604 F.3d at 1132 (refusing to be bound by a Supreme Court footnote where the issue was "not before the Court" and there was "no analysis or reasoning behind the Court's statement"); *Abbey v. United States*, 112 F.4th 1141, 1149 (9th Cir. 2024) (refusing to "ignor[e] th[e] broader context of the [Supreme Court's] decisions" and follow "pluck[ed] out language" from the Court's opinions). Appellees' argument that the Supreme Court already decided this issue is all the more implausible because *Sturgeon* cannot be reasonably harmonized with *Katie John*, as explained below. *See infra* pp. 37-65.

The Supreme Court did not "endors[e]" any arguments made by the State and Ahtna in their amicus briefs about reserved water rights and navigable waters. Ahtna Br. 29. To the contrary, those *amicus* briefs *support* the State's reading of footnote two. In *Sturgeon*, the State argued that the Court did not need to address ANILCA's subsistence provisions because that issue was not before the Court. According to the State's brief:

> The *Katie John* decisions are not at issue in this appeal; the Question Presented concerns only Mr. Sturgeon's non-subsistence use of the Nation River, which does not fall within or implicate Title VIII at all. Neither party has asked this court to overrule or reconsider *Katie John* in

connection with Mr. Sturgeon's case. Thus, this Court need not directly
address the prior circuit holdings in order to resolve this appeal.

Alaska Amicus Br. 29, *Sturgeon II*, 2018 WL 4063284 (U.S.); *see also* Ahtna Amicus Br.
30-31, *Sturgeon II*, 2018 WL 3952032 (U.S.) ("Critically, no party to the instant litigation
seeks to overturn the *Katie John* trilogy …. [B]ecause [Title VIII] is not at issue in this
appeal, any decision by this Court should leave undisturbed the subsistence priority
established by the *Katie John* decisions."). That argument—the Supreme Court "need
not directly address the prior circuit holdings in order to resolve this appeal," Alaska
Amicus Br. 29, *Sturgeon II*, 2018 WL 4063284 (U.S.)—is exactly the position the
Supreme Court adopted. And while the two amicus briefs provided theories for why
"public lands" can have a different meaning for Title VIII, the Supreme Court never
adopted those arguments. If this Court does not follow "unconsidered" statements in
an opinion, it certainly cannot follow unconsidered *citations* that lack any "analysis or
reasoning." *Valladolid*, 604 F.3d at 1132.

**2.** The Intervenors (but not the United States) contend that, even without
footnote two, *Katie John* is not "clearly irreconcilable" with intervening authority because
its holding can be binding for different reasons than those articulated in *Katie John I*.
KRITFC Br. 18-20; Ahtna Br. 29-30. But this sort of retroactive tinkering is not
permitted under *Miller*. In evaluating whether this Court's precedent is "clearly
irreconcilable" with intervening precedent, the Court must consider the "'overall
analytical framework'" of the earlier case and "'focus on the *reasoning and analysis* in

support of a holding, rather than the holding alone.'" *United States v. Lindsey*, 634 F.3d 541, 550 (9th Cir. 2011) (emphasis in original); *see, e.g.*, *United States v. Baldon*, 956 F.3d 1115, 1121 (9th Cir. 2020) ("Our [prior] opinion rested on the analytical distinction between substantial and minimal force. This distinction no longer exists [due to intervening authority]."); *Murray v. Mayo Clinic*, 934 F.3d 1101, 1105 (9th Cir. 2019) ("Because *Head*'s reasoning is clearly irreconcilable with *Gross* and *Nassar*, we overrule *Head*'s holding."). Here, the theory and reasoning of *Katie John I* are incompatible with *Sturgeon*, and the *Katie John* panel did not base its holding on any of the arguments Appellees now put forth. *Compare Katie John I*, 72 F.3d at 701-04, *with infra* pp. 47-66. So while Appellees may present their new arguments as a reason why this Court should affirm the judgment below, these arguments cannot be a reason for why this Court is bound by *Katie John. See, e.g., Lindsey*, 634 F.3d at 550.

In any event, even if *Miller* permitted Appellees to raise new arguments to support the earlier opinion's holding, *Katie John* still would be "clearly irreconcilable" with *Sturgeon*. This Court is bound by its prior precedent only if the earlier opinion's reasoning and analysis can be "'reasonably harmonized'" with the intervening authority. *Lair v. Bullock*, 697 F.3d 1200, 1206 (9th Cir. 2012). As explained further below, none of Appellees' arguments allows for the opinions to be "reasonably harmonized" with one another. *Infra* pp. 37-57.

**3.** If there were any doubt that *Katie John* is no longer good law, it was removed after *Loper Bright*. Appellees recognize that this Court in *Katie John I* never claimed to

adopt the "single, best meaning" of ANILCA, *Loper Bright*, 144 S.Ct. at 2266, but instead found only that the Secretaries' interpretation was "reasonable" under "the *Chevron* framework." USA Br. 31. And there is no question that the "theory [and] reasoning" of *Katie John I* depended heavily on *Chevron*, as the Court's discussion of reserved water rights contained almost no textual analysis. *See Katie John I*, 72 F.3d at 703-04 (adopting the Secretaries' interpretation in conclusory fashion).

Appellees argue that *Loper Bright* is irrelevant because the Supreme Court stated that "'the holdings of [prior] cases that specific agency actions are lawful … are still subject to statutory *stare decisis* despite [the Supreme Court's] change in interpretive methodology.'" USA Br. 31 (quoting *Loper Bright*, 144 S.Ct. at 2273); *see* AVCP Br. 36; KRITFC Br. 30. But the State is not seeking to overturn *Katie John* based on "[m]ere reliance on *Chevron*." *Loper Bright*, 144 S.Ct. at 2273. *Loper Bright* is one of *multiple reasons* why *Katie John* is no longer good law. *See* Alaska Br. 33-35; *see, e.g.*, *Witt v. Dep't of Air Force*, 527 F.3d 806, 820 & n.10 (9th Cir. 2008) (noting that "[o]ther intervening Supreme Court decisions have also weakened the rationale" of earlier precedent); *U.S. ex rel. Air Control Techs., Inc. v. Pre Con Indus., Inc.*, 720 F.3d 1174, 1176-78 (9th Cir. 2013) (collecting a series of Supreme Court precedents that, put together, show that an earlier circuit decision was "clearly irreconcilable with intervening higher authority"). Appellees must show that the "theory [and] reasoning" of *Katie John* are compatible with *Sturgeon*. Before *Loper Bright*, Appellees could have tried to use the crutch of *Chevron* deference to reconcile the two opinions. But *Loper Bright* eliminates that argument, since

there is no question that *Katie John I* did not articulate the "single, best meaning" of ANILCA. *Loper Bright*, 144 S.Ct. at 2266.

**4.** The United States does not dispute that the clear-statement rule in *Sackett* applies to this case. USA Br. 32-33. That is because *Sackett* requires "'exceedingly clear language'" if Congress wishes to "'significantly alter the balance between federal and state power'" and the "[r]egulation of ... water use lies at the core of traditional state authority." *Sackett*, 598 U.S. at 679-80 (quoting *USFS v. Cowpasture River Pres. Ass'n*, 590 U.S. 604, 621-22 (2020)). The United States also does not dispute that *Katie John I* never identified "'exceedingly clear language'" in ANILCA authorizing the federal government to impose a rural subsistence priority on State-owned navigable waters. *Id.*; *see, e.g.*, USA Br. 13, 32-33. Quite the opposite. *Katie John I* explicitly recognized that ANILCA "makes no reference to navigable waters" at all. 72 F.3d at 702.

Yet the United States contends that *Sackett* is irrelevant because it is not "intervening authority" under *Miller*. USA Br. 33. According to the United States, *Sackett* "relied on a pair of earlier decisions that in turn relied on authority dating to the 1980s": specifically, *Atascadero State Hospital v. Scanlon*, 473 U.S. 234, 243 (1985) and *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991). *See* USA Br. 33. Thus, according to the United States, *Sackett* merely articulated "general principles that have been established for decades." *Id.* But these principles were not "established" then, as the debate between Judge Tallman and Judge Kozinski in *Katie John II* demonstrates. Citing *Atascadero* and *Gregory*, Judge Kozinski argued that ANILCA's subsistence priority did not apply to navigable

waters because Congress did not make this intention "'unmistakably clear in the language of the statute.'" *Katie John II*, 247 F.3d at 1044-45 (Kozinski, J., dissenting) (quoting *Atascadero*, 473 U.S. at 242). But Judge Tallman disagreed, arguing that *Atascadero* and *Gregory* were inapplicable because these opinions required "a more rigorous application of the clear statement rule" *only* for cases "involv[ing] Eleventh Amendment immunity … and state self-governance." *Id.* at 1042 (Tallman, J., concurring in the judgment). The clear-statement rule in *Atascadero* and *Gregory*, according to Judge Tallman, did not "appl[y] to any federal regulation that reaches navigable waters." *Id.* at 1043.

*Sackett* makes clear that Judge Kozinski was right and *Katie John I* was wrong. This Court cannot apply a watered-down clear-statement rule that "constru[es] [ANILCA] in accordance with its express purpose." *Id.* at 1042-43 (Tallman, J., concurring in the judgment). The same "super-strong clear statement" from *Atascadero* and *Gregory* applies to this dispute. *Id.* Yet *Katie John* openly admits that ANILCA "makes no reference to navigable waters." 72 F.3d at 702. The theory and reasoning of *Katie John I* are irreconcilable with *Sackett*.[11]

---

[11] AVCP argues that the clear statement rule does not apply because "the regulation of Alaska Native subsistence activities, including fishing, has never been a traditional power of the State." AVCP Br. 38. That is wrong, as the State has long regulated subsistence fishing. *See* Alaska Br. 10-11; *infra* p. 53. Moreover, Congress "expressly rejected the proposition that the subsistence provision was only for Natives." *Hoonah Indian Ass'n v. Morrison*, 170 F.3d 1223, 1228-29 (9th Cir. 1999); *see infra* pp. 70-73.

46

### 2. *Katie John*'s reserved-water-rights holding cannot be upheld on alternative grounds.

The United States and Intervenors put forth alternative arguments for why *Katie John*'s reserved-water-rights holding can be upheld. None is persuasive.

**1.** Appellees first argue that this Court can give the term "public lands" two different meanings—one meaning in Title VIII of ANILCA and a different meaning throughout the rest of the statute. USA Br. 38-39; KRITFC Br. 18-19, 21-22, 26-27; Ahtna Br. 29-30; AVCP Br. 29-35. But the text and structure of ANILCA strongly disfavor this reading. Congress carefully defined "public lands" and explicitly stated where its definition would (and would not) apply. In Section 102 of ANILCA, entitled "Definitions," Congress defined many terms, including "public lands." 16 U.S.C. §3102. Section 102 instructs that these definitions shall apply when the terms are "used in this Act." *Id.* The only exception is when the terms are used in "titles IX and XIV" of ANILCA; in those titles, the terms have the "same meaning as they have in the Alaska Native Claims Settlement Ac[t] and the Alaska Statehood Act." *Id.* As the United States correctly concedes, "ANILCA's definition of 'public lands' applies throughout the statute," including in both Title I and Title VIII. USA Br. 38; *see Amoco Prod. Co. v. Vill. of Gambell, Alaska*, 480 U.S. 531, 546 n.13 (1987) ("Section 102 [of ANILCA] provides that the definitions apply to the entire Act, except … in Title IX … and in Title XIV.").

This Court, then, would need to conclude that even though Congress formally defined "public lands" and instructed that the definition should be used throughout the

Act (except in Titles IX and XIV), Congress wanted the term to have a different meaning in Title VIII than elsewhere in the statute. That is not the "best reading" of the statute. *Loper Bright*, 144 S.Ct. at 2266. There is a strong "presumption" that the same meaning of "public lands" applies throughout ANILCA. *Atl. Cleaners & Dyers, Inc. v. United States*, 286 U.S. 427, 433 (1932) ("[T]here is a natural presumption that identical words used in different parts of the same act are intended to have the same meaning."); *In re Stevens*, 15 F.4th 1214, 1218 (9th Cir. 2021) (refusing to "violat[e] the canon that identical words are presumed to have the same meaning"); *Benko v. Quality Loan Serv. Corp.*, 789 F.3d 1111, 1118 (9th Cir. 2015) ("We assume that, in CAFA, the word 'significant' is used consistently and with the same meaning."); *Meza-Carmona v. Garland*, 113 F.4th 1163, 1167 (9th Cir. 2024) ("'A word or phrase is presumed to bear the same meaning throughout a text.'" (quoting Scalia & Garner, *Reading Law: The Interpretation of Legal Texts* 170 (2012))).

This presumption is especially powerful here because Congress explicitly defined "public lands." "'When a statute includes an explicit definition, [the Court] must follow that definition,' even if it varies from a term's ordinary meaning." *Tanzin v. Tanvir*, 592 U.S. 43, 47 (2020). "As a rule, a definition which declares what a term 'means' excludes any meaning that is not stated." *Colautti v. Franklin*, 439 U.S. 379, 392-93 & n.10 (1979) (cleaned up). Here, the Supreme Court has already articulated whether and how "public lands" can include "reserved water rights." *Sturgeon II*, 587 U.S. at 43-45. That same meaning controls throughout ANILCA.

Appellees recognize the hurdles they face, conceding that "statutory terms usually carry the same meaning across a statute." USA Br. 39 (citing *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302 (2014)); KRITFC Br. 21. Yet Appellees contend that "public lands" should have two different meanings because "context" requires it. *Id.* But this statutory presumption of uniformity is not easily overcome. For example, in *Utility Air* the Supreme Court departed from this statutory presumption only because it was "plain as day" that a term carried a narrower meaning in certain provisions of the statute and because applying the same meaning would be "incompatible" with the statute's "regulatory structure." *Id.* at 317, 320. That is not the case here.

The United States and Intervenors assert that the Supreme Court in footnote two of *Sturgeon* held that the term "public lands" should have two different meanings. USA Br. 30 (arguing that *Sturgeon* defined "public lands" only "with respect to Section 103(c)"); KRITFC Br. 16 (arguing that *Sturgeon* addressed "public lands" solely "for purposes of *Title I* of ANILCA"); AFN Br. 25 (arguing that *Sturgeon* carved out a "narrow exception in Section 103(c)"). Again, the Supreme Court did no such thing. The Supreme Court merely noted that ANILCA's subsistence-fishing provisions were "not at issue in this case" and so the Court was "not disturb[ing] the Ninth Circuit's holdings" in *Katie John*. *Sturgeon II*, 587 U.S. at 45 n.2. The Supreme Court *never* held that "public lands" can have two different meanings. The Supreme Court never even hinted that its discussion of "public lands" and reserved water rights turned on the location of the term in Title I of ANILCA. *See Sturgeon II*, 587 U.S. at 43-45; *cf. Rivera v. Orion Marine*

*Grp. Inc.*, 509 F. Supp. 3d 926, 936 (S.D. Tex. 2020) (applying *Sturgeon* in a different context involving reserved water rights).

Contra AVCP, the Supreme Court in footnote 15 of *Amoco* did not "admonish" that "public lands" has no "'precise meaning'" and must turn on the "'context in the statute.'" AVCP Br. 50-51 (quoting *Amoco*, 480 U.S. at 548 n.15). The Supreme Court in *Amoco* simply "reject[ed] the assertion" that the phrase "public lands" had a universal meaning *outside the statute* that the Court should use. *Amoco*, 480 U.S. at 548 n.15 ("We also reject the assertion that the phrase 'public lands,' *in and of itself*, has a precise meaning, without reference to *a* definitional section or its context in *a* statute." (emphasis added) (citing *Hynes v. Grimes Packing Co.*, 337 U.S. 86, 114-16 (1949) (refusing to give the undefined term "public lands" a "meaning from the dictionary or even from dissimilar statutes"))). The footnote in *Amoco* reflects the general rule that it is "very rare" for "a defined meaning [to] be replaced with another permissible meaning of [a] word on the basis of other textual indications"; instead, "the definition is virtually conclusive." *Reading Law* 228.

The State's position, after all, is the same one the United States took in *Sturgeon*. *See* Alaska Br. 21, 37-38. Because ANILCA "contains a definitional section that sets out the meaning of 'public lands' throughout ANILCA," the statute "forecloses" the argument that the term "public lands" can be given "one meaning in the context of the subsistence-use-related sections of ANILCA and a different meaning" elsewhere. United States Br. 49, *Sturgeon II*, 2018 WL 4381223 (U.S.); *see also* United States Br. in

Opp. 17, *Sturgeon II*, 2018 WL 2129796 (U.S.) (same). The Supreme Court ultimately disagreed with the United States that "public lands" include navigable waters, USA Br. 30, but it never disputed that "public lands" has the same meaning throughout ANILCA.

**2.** Appellees argue that their interpretation should be adopted because it aligns with the "purpose" of ANILCA. USA Br. 40-42; KRITFC Br. 22-25. First, the supposed "purpose" of a statute cannot override the plain meaning of the text. "The preeminent canon of statutory interpretation requires [the Court] to presume that the legislature says in a statute what it means and means in a statute what it says there." *BedRoc Ltd., LLC v. United* States, 541 U.S. 176, 183 (2004) (cleaned up). "Vague notions of a statute's 'basic purpose' are inadequate to overcome the words of its text regarding the *specific* issue under consideration." *Montanile v. Bd. of Trs. of Nat'l Elevator Indus. Health Benefit Plan*, 577 U.S. 136, 150 (2016) (cleaned up); *see Reading Law* 343 (discussing the "false notion that the spirit of a statute should prevail over its letter").

In any event, Congress could not have intended for "public lands" to encompass navigable waters with reserved water rights. As this Court has recognized, *Katie John* created a "problematic" and "ill-fitted" test for "determining which Alaskan waters are 'public lands.'" *Katie John III*, 720 F.3d at 1245. After *Katie John I*, the Secretaries were forced to undertake fact-intensive inquiries (that generated an entirely new round of litigation) to determine where the United States had "reserved water rights." *Id.* at 1222 (recognizing that the application of the reserved water rights doctrine imposed an

"'extraordinary administrative burden'"). By contrast, "it isn't exactly difficult to imagine that a rational Congress might have sought" to create a bright-line definition for "public lands" that exclude navigable waters. *Luna Perez*, 598 U.S. at 150; *see Tex. Brine Co., LLC v. Am. Arb. Ass'n, Inc.*, 955 F.3d 482, 486 (5th Cir. 2020) ("We are not the final editors of statutes, modifying language when we perceive some oversight … 'Congress may well have adopted [a] requirement … to both limit gamesmanship and provide a bright-line rule …  which is clearly more easily administered than a fact-specific inquiry.'"); *cf. Bd. of Trs. of IBT Loc. 863 Pension Fund v. C&S Wholesale Grocers, Inc.*, 5 F. Supp. 3d 707, 720 (D.N.J. 2014) ("Just because the application of … bright line rules sometimes leads to harsh outcomes does not mean that courts may deviate from them whenever doing so seems fair.").

True, applying the subsistence priority to navigable waters would extend ANILCA's reach. But "it is quite mistaken to assume … that any interpretation of a law that does more to advance a statute's putative goal must be the law." *Luna Perez*, 598 U.S. at 150 (cleaned up). "Laws are the product of 'compromise,' and no law 'pursues its purposes at all costs.'" *Id.* (cleaned up). "Had Congress sought to" apply the subsistence priority more broadly to State-owned navigable waters, it easily "could have drafted" ANILCA to do that. *Montanile*, 577 U.S. at 150.

Deferring to ANILCA's supposed "purpose" is especially dubious here because Congress must "'enact exceedingly clear language'" before it strips Alaska of its "traditional state authority" to regulate its waters. *Sackett*, 598 U.S. at 679 (quoting

*Cowpasture*, 590 U.S. at 621-22); *see also Tarrant Reg'l Water Dist. v. Herrmann*, 569 U.S. 614, 632 (2013) ("silence in compacts touching on the States' authority to control their waters" leads to the "'inference'" that "'each State was left to regulate'" its own waters); *Foster-Fountain Packing Co. v. Haydel*, 278 U.S. 1, 11 (1928) (States have the traditional "power to contro[ll] the game and fish within [their] borders … in [their] sovereign capacity as representative of the people"). If providing a federal subsistence priority on navigable waters was ANILCA's "primary purpose" as Appellees claim, *e.g.,* KRITFC Br. 11, Congress would have made that clear. Yet ANILCA "makes no reference to navigable waters" at all. *Katie John I*, 72 F.3d at 702.

That ANILCA does not reach navigable waters owned by the State is not surprising given the state regulatory regime that was in place when ANILCA was enacted. In 1978, two years before ANILCA was passed, Alaska adopted a law protecting subsistence fishing throughout the State, including on navigable rivers. *See* ch. 151 SLA 1978 (codified at AS §16.05); *id.* §1 ("The legislature … determines that it is in the public interest to clearly establish subsistence use as a priority use of Alaska's fish and game resources and to recognize the needs, customs and traditions of Alaskan residents."); *McDowell v. State*, 785 P.2d 1, 2 (Alaska 1989) ("The 1978 statute established that subsistence hunting and fishing had priority over other uses of fish and game stocks."). Congress's decision to extend ANILCA's reach only to "public lands"—*i.e.*, "lands, waters, and interests therein … the title to which is in the United States"—is

not surprising given the legal protections for subsistence hunting and fishing already in place.

Further, both the Supreme Court and this Court have rejected Appellees' characterization of ANILCA's supposed "purpose." "ANILCA's primary purpose was to complete the allocation of federal lands in the State of Alaska," not to establish a subsistence priority for Natives. *Amoco*, 480 U.S. at 549. And while Congress created a subsistence priority, "Congress clearly did not state in ANILCA that subsistence uses are always more important" than other interests; "rather, it expressly declared that preservation of subsistence resources is *a* public interest." *Id.* at 546 (emphasis in original). Congress also "expressly rejected the proposition that the subsistence provision was only for Natives." *Hoonah Indian*, 170 F.3d at 1228-29. ANILCA "says that its purpose is to protect 'subsistence uses by rural residents of Alaska, including *both* Natives and non-Natives.'" *Id.* (quoting 16 U.S.C. §3111(1)) (emphasis in original). There "could not be a plainer declaration that Congress was not passing Indian legislation." *Id.*[12]

Following the plain text of ANILCA also would not "void Title VIII['s]" subsistence priority. AFN Br. 54; *see also* USA Br. 41; KRITFC Br. 11, 20, 24-25; AVCP

---

[12] Because ANILCA is not Indian legislation, *Metalkatla Indian Community v. Dunleavy*, 58 F.4th 1034 (9th Cir. 2023), does not require the Court to "infer" anything in Appellees' favor. AVCP Br. 33; *see Metalkatla Indian Cmty.*, 58 F.4th at 1042-44 (applying the "Indian Canon of Construction"); *see also infra* pp. 70-73.

Br. 34-35, 38. Congress was not "merely waving its hand in the general direction" of Alaskan lands and waters when it "defined the scope of ANILCA" to apply only to "public lands." *Amoco*, 480 U.S. at 548. Congress specifically supported "continued subsistence uses *on the public lands*." 16 U.S.C. §3111(4) (emphasis added); *see also id.* §3111(1) ("Congress finds and declares that … the continuation of the opportunity for subsistence uses by rural residents of Alaska, including both Natives and non-Natives, *on the public lands* … is essential." (emphasis added)). Ruling for the State does nothing to undermine subsistence activities on these lands. The United States owns about 60% of the total area of Alaska, an astounding 222 *million* acres. 2-ER-169. Significant subsistence hunting, trapping, and other activities occur on these lands. *See, e.g.*, Dkt. 111-5 at 9-10 (discussing subsistence hunting of moose, caribou, and deer).

Nor would the State's definition "entirely eliminate the subsistence fishing protections enshrined in Title VIII." KRITFC Br. 20; AVCP Br. 38 (arguing that Title VIII won't "have any effect" unless it includes all navigable waters). The United States has title to many non-navigable lakes and waterways; Alaska "contains over 12,000 rivers and more than 3 million lakes, with over 14 percent of the state's total square miles consisting of waterways." GAO, *Alaska Land Management: Resolving Ownership of Submerged Lands* at 1 (July 27, 2023), bit.ly/3RvLVdx. "Many of these waterways and the submerged lands beneath them … are managed by the federal government, which is the largest landowner in Alaska." *Id.* These waters have long provided opportunities for subsistence fishing. *See id.* at 2 (noting that "[o]wnership of submerged lands has a

number of implications for the users of these waterways, such as … individuals carrying out subsistence fishing, including Alaska Natives"); Off. of Subsistence Mgmt., *Federal Subsistence Fisheries Regulations* at 60, 67, DOI (Apr. 1, 2021), bit.ly/41jJv6l (discussing subsistence fishing opportunities for non-navigable "lakes and ponds"); 57 Fed. Reg. at 22941 (establishing rules governing subsistence fishing on "all non-navigable waters located on all public lands"). And, as explained above, state law has long provided subsistence fishing opportunities on navigable rivers. *Supra* pp. 53-54.

Even if it mattered to the statutory analysis, Intervenors are unequivocally wrong to assert that a ruling for the State will be "devastating" for "Alaska Native subsistence users" and "rural subsistence users." AVCP Br. 34-35. Again, nothing will change for rural subsistence users, including Alaska Natives, because state law *mandates* that ADF&G prioritize subsistence fishing over other uses. AS §16.05.258; Alaska Br. 7-9. Indeed, a ruling for the State would likely lead to *more* subsistence fishing opportunities for Alaska natives because state law (unlike ANILCA) does not limit subsistence fishing to "rural" residents. *Id.* As this Court has recognized, "many of the Native Alaskans who feed their families in significant part by hunting and fishing live in the larger towns and cities, not in the rural areas, so they do not get the benefit of the 'rural residents' preference." *Hoonah Indian*, 170 F.3d at 1229. As of 2016 "more than 52.4 percent of Alaska Native peoples [were] living in non-subsistence areas of Alaska." 3-ER-285. Alaska Natives (both rural and urban) would have the right to return to the Kuskokwim

56

River and elsewhere to continue practicing the traditions and customs of their culture. *See McDowell*, 785 P.2d at 9.

**3.** Appellees argue that Section 303 of Title III is an "independent refuge-specific basis on which the Court could more narrowly affirm" because this provision "provides that the Refuge 'shall' be managed to provide 'the opportunity for continued subsistence uses by local residents'" and this "statutory direction" "is not limited by the definition of 'public lands.'" USA Br. 42-43 (quoting Pub. L. 96-487, §303(b)(7)(iii), 94 Stat. 2371 (Dec. 2, 1980)); KRITFC Br. 27; AVCP 31. But Section 303 of ANILCA is not an "independent statutory direction" on subsistence. USA Br. 42. It "establish[es] or redesignate[s]" various areas of land as "units of the National Wildlife Refuge System" and it describes "[t]he *purposes*" of each new land unit. Pub. L. 96-487, §303; *see, e.g., id.* §303(7)(B) ("The purposes for which the Yukon Delta National Wildlife Refuge is established and shall be managed include ...."). The subsistence priority that applies on public land is contained in Title VIII of ANILCA, not Title III. *See id.* §804. And even if Section 303 did impose an independent subsistence priority, it wouldn't apply here because the State owns the Kuskokwim River, not the United States. *Id.* §303(7)(A) ("The Yukon Delta National Wildlife Refuge shall consist of [three existing federal refuges], including lands, waters, interests, and whatever submerged lands, if any, were retained in Federal ownership at the time of statehood."). Appellees do not dispute that "'[t]itle to the bed of the river'—including within the Yukon Delta National Wildlife Refuge—'transferred to the State of Alaska' when it entered the Union." Alaska

Br. 9-10 (quoting 2-ER-156); *see also* Alaska Br. 31. Section 303 thus provides no alternative basis for this Court to affirm.

### 3. Congress did not ratify *Katie John I* or the United States' interpretation of "public lands."

**1.** The United States argues that Congress "ratified or acquiesced in" this Court's decision in *Katie John I* when it adopted appropriation acts in 1997 and 1998 that amended ANILCA but did not overrule this Court's decision.[13] USA Br. 43-44; KRITFC Br. 30-38. But the Supreme Court has rejected this line of reasoning. When "Congress has not comprehensively revised a statutory scheme but has made only isolated amendments," the Supreme Court "ha[s] spoken … bluntly: It is impossible to assert with any degree of assurance that congressional failure to act represents affirmative congressional approval of [a] [c]ourt's statutory interpretation." *Alexander v. Sandoval*, 532 U.S. 275, 292 (2001) (cleaned up); *see also AMG Cap. Mgmt., LLC v. FTC*, 593 U.S. 67, 81 (2021) (two Congressional amendments to a statute's "venue, joinder, and service rules, not its remedial provisions … tell us nothing about [Congressional ratification of] the words 'permanent injunction'"). The amendments made in the 1997 and 1998 appropriations acts were temporal and minor—indeed, they all expired shortly after they were adopted. *See* Pub. L. 105-83, §316(d); Pub. L. 105-277, Div. A, §339(b).

---

[13] *See* Department of the Interior and Related Agencies Appropriations Act, 1998, Pub. L. 105-83, §316(b), 111 Stat. 1543 (Nov. 14, 1997); Omnibus Consolidated and Emergency Supplemental Appropriations Act, 1999, Pub. L. 105-277, Div. A, §339(a), 112 Stat. 2681 (Oct. 21, 1998).

These minor amendments thus could never "ratify" this Court's decision. Indeed, when this Court examined the issue en banc just a few years later in *Katie John II*, not a single judge ever asserted that Congress had already ratified the opinion in *Katie John I*. *See Katie John II*, 247 F.3d at 1032-50.

KRITFC tries to avoid *Sandoval* by claiming that Congress "ratified the Secretary's interpretation of 'public lands'" that the United States put forth in *Katie John I* because the appropriations acts temporarily amended ANILCA without addressing the definition of "public lands." KRITFC Br. 30-38; *see Katie John I*, 72 F.3d at 701 (noting that the United States took the position at "oral argument … that public lands include those navigable waters in which the federal government has an interest under the reserved water rights doctrine"). But this sleight of hand fails too. The same principles from *Sandoval* apply. It is "'impossible to assert with any degree of assurance that congressional failure to act represents' affirmative congressional approval" of the United States' arguments from *Katie John I*. *Sandoval*, 532 U.S. at 292. The plain text of ANILCA—not Congress's failure to act through appropriations acts—controls this case.[14]

---

[14] There is no "agency interpretation" that Congress could have ratified through the 1997 and 1998 appropriations acts other than the arguments made by the United States in *Katie John I*. In 1992, the Secretaries promulgated a rule stating that "public lands" did *not* extend to Alaska's navigable waters. 57 Fed. Reg. at 22942, 22952. So any "ratification" of that interpretation could not make the Kuskokwim River "public land." In 1999, the Secretaries promulgated a new rule that said public lands include navigable waters "where the Federal Government holds a reserved water right or holds title to

**2.** Even if Congressional inaction could ratify an agency interpretation, that did not happen here. Without "overwhelming evidence of acquiescence, [courts] are loath to replace the plain text and original understanding of a statute with an amended agency interpretation." *SWANCC*, 531 U.S. at 169 & n.5. Here, neither appropriation act provides any evidence—let alone "overwhelming evidence," *id.*—that Congress was ratifying and endorsing the United States' position in *Katie John I*.

**The 1997 Appropriations Act.** Congress did not endorse *Katie John I* in the 1997 Appropriations Act. Quite the opposite. Congress *prohibited* the Secretaries from adopting any new rules to impose a subsistence priority on navigable waters owned by the State of Alaska. Congress's goal was to give the State time to amend its constitution, not to codify this Court's holding in *Katie John I*.

In Section 316(a), Congress established a "moratorium on federal management" that prohibited the Secretaries from using any funds "prior to December 1, 1998 to issue or implement final regulations, rules, or policies pursuant to title VIII of [ANILCA] to assert jurisdiction, management, or control over the navigable waters transferred to the State of Alaska pursuant to the Submerged Lands Act of 1953 or the

---

the waters or submerged lands." 64 Fed. Reg. 1276 (Jan. 8, 1999). But that final rule was promulgated *after* the 1997 and 1998 appropriations acts. And while the Secretaries issued a *proposed* rule before the 1998 appropriations act (but after the 1997 appropriations act), a proposed rule is not an official agency interpretation. *See, e.g., Stringfellow Mem'l Hosp. v. Azar*, 317 F. Supp. 3d 168, 185 (D.D.C. 2018) ("Agencies are free—indeed, they are encouraged—to modify proposed rules as a result of the comments they receive." (cleaned up)).

Alaska Statehood Act of 1959." Pub. L. 105-83, §316(a). In Section 316(b)(3), Congress found that "the subsistence law of the State of Alaska (AS 16.05) [had] accomplished the goals of Congress and requirements of this Act in providing subsistence use opportunities for rural residents of Alaska, both Alaska Native and non-Alaska Native." *Id.* §316(b)(3)(B). This State law, however, was found to violate the Alaska constitution in *McDowell*, and "the people of Alaska have not been given the opportunity to vote on … an amendment" to "restore the validity of the State law through an amendment to the Alaska Constitution." *Id.* Accordingly, the Secretary of Interior was "required to manage fish and wildlife for subsistence uses on all public lands in Alaska because of the failure of State law to provide a rural preference." *Id.* Moreover, "the Ninth Circuit Court of Appeals determined in [*Katie John I*] that the subsistence priority required on public lands under section 804 of this Act applies to navigable waters in which the United States has reserved water rights as identified by the Secretary of the Interior." *Id.* Congress found this new federal power highly problematic: "[M]anagement of fish and wildlife resources by State governments has proven successful in all 50 States, including Alaska, and the State of Alaska should have the opportunity to continue to manage such resources on all lands, including public lands." *Id.* Accordingly, it was "necessary to amend portions of this Act to restore the original intent of Congress to protect and provide for the continued opportunity for subsistence uses on public lands for Alaska Native and non-Alaska Native rural residents through *the management of the State of Alaska.*" *Id.* (emphasis added).

In line with these findings, Congress made minor amendments to ANILCA in the 1997 appropriations act "only for the purposes of determining whether the [anticipated] State's laws provide for" the various requirements of ANILCA. *Id.* §316(d). If Alaska did not adopt these laws by December 1, 1998, however, the amendments in Section 316(b) would be repealed. *Id.* Because the State did not pass such laws, the amendments to ANILCA were repealed.

The 1997 appropriations act thus did not "ratify" this Court's interpretation of "public lands" in *Katie John I*. Its sole purpose was to give the State time to amend its constitution after *McDowell*—not to codify this Court's holding in *Katie John I*. Not a single provision in the 1997 appropriations act (or even a single piece of legislative history) indicates that Congress approved of or endorsed *Katie John I*. Congressional inaction is not the same as Congressional ratification. *Sandoval*, 532 U.S. at 292.

Appellees argue that because the 1997 appropriations act mentioned *Katie John I*, Congress must have meant to endorse the Ninth Circuit's interpretation of "public lands." *See* KRITFC Br. 32-33; USA Br. 43. But Congress did no such thing; it merely recounted as background that this Court had issued *Katie John I* in 1995. *See* Pub. L. 105-83, §316(b). That Congress knew that there was a case called *Katie John I* does not mean that Congress implicitly endorsed the Ninth Circuit's analysis. Nor was *Katie John I* "'settled'" or "unquestioned" such that this Court "must presume Congress … endorsed it." *Jama v. ICE*, 543 U.S. 335, 349 (2005); *compare with Douglas v. Xerox Bus. Servs., LLC*, 875 F.3d 884, 887-89 (9th Cir. 2017) (pointing to a "longstanding

62

administrative construction" that was adopted "just over a year and a half after the statute was passed in 1938" and only "[b]ecause the traditional tools of statutory construction [did] not conclusively resolve the … question"). In November 1997, *Katie John I* was merely a decision on interlocutory appeal; the *Katie John* litigation was still ongoing, and the whole issue would be revisited less than five years later by the Ninth Circuit en banc in *Katie John II*. *See Katie John III*, 720 F.3d at 1221-24 (recounting the procedural history).[15]

**The 1998 Appropriations Act.** Appellees' argument that Congress ratified *Katie John I* through the 1998 appropriations act is even weaker. The 1998 appropriations act stated only that the Secretaries "may [not], prior to December 1, 2000, implement or enforce any final rule, regulation, or policy pursuant to title VIII of [ANILCA] to manage and to assert jurisdiction, authority, or control over land, water, and wild, renewable resources, including fish and wildlife, in Alaska for subsistence uses" except in certain locations. Pub. L. 105-277, Div. A, §339(a)(1). That's it. Congress never mentioned the Secretaries' proposed rule, discussed *Katie John*, or said anything else remotely related to navigable waters and reserved water rights. The 1998 appropriations

---

[15] KRITFC's attempt to argue that Congress ratified only *Katie John I*'s reserved water rights holding—but not its navigational servitude holding—further shows the flimsiness of the ratification argument. KRITFC Br. 38 n.136. The truth is that Congress ratified nothing from *Katie John I* in these appropriations bills.

act thus is not "overwhelming evidence of acquiescence [in] … an amended agency interpretation." *SWANCC*, 531 U.S. at 169 n.5.

Like the 1997 appropriations act, the point of the 1998 appropriations act was simply to preserve the possibility of State management of ANILCA after *McDowell*—not to codify federal control over navigable rivers. Senator Murkowski described the provision as "extending a moratorium preventing a Federal takeover of the management of Alaska's fisheries" so that Alaskans could "put a solution on the ballot in November 1998." 143 Cong. Rec. S11259 (Oct. 28, 1997), bit.ly/4falvro. As Senator Murkowski explained, "avoiding a Federal takeover of fish and game management is simply critical in my State. When Alaska became a State, Alaskans were united in our desire to take over the management of our fish and game. Many Alaskans still have vivid memories of the disaster of Federal control. Alaska salmon runs plummeted to 25 million fish with Federal bureaucrats in control in Washington, DC. Under State management, our runs are increasing and have approached 200 million in the last few years." *Id.* It is inconceivable that a provision designed to avoid the "disaster of Federal control" over "the management of our fish and game," *see id.*, was actually an implicit endorsement of federal control over the State's navigable waters. Indeed, Appellees do not cite a single statement from any member of Congress—much less a "clear statement" in the statutory text—to support their ratification argument. *See Sackett*, 598 U.S. at 679-80; *see also SWANCC*, 531 U.S. at 172-73 ("Congress does not casually authorize administrative agencies to interpret a statute to push the limit of congressional

authority," especially "where the administrative interpretation alters the federal-state framework by permitting federal encroachment upon a traditional state power").

The United States finally argues that Congress approved of *Katie John I* because the 1998 appropriations act "provided $11 million to implement the Secretaries' regulations" starting on December 1, 2000. USA Br. 44 (citing Pub. L. 105-277). To start, the 1998 appropriations act could not have allocated funds specifically to "implement the Secretaries' regulations." *Id.* The Secretaries' regulations were not promulgated until January 8, 1999, *see* 64 Fed. Reg. 1276—three months *after* the 1998 appropriations act. Instead, the 1998 act merely appropriated money to the agencies to implement *all* of Title VIII of ANILCA. *See* Pub. L. 105-277, 112 Stat. 2681-251 (providing funds "[f]or necessary expenses of bureaus and offices of the Department of the Interior to manage federal lands in Alaska for subsistence uses under the provisions of Title VIII of [ANILCA]"); *id.* at 112 Stat. 2681-271 (similar).

Nor can the Court assume that Congress endorsed *Katie John I* through an appropriation bill. The Supreme Court has long cautioned that the mere appropriation of funds cannot change substantive law. *See TVA v. Hill*, 437 U.S. 153, 190-91 (1978); *see also, e.g., Firebaugh Canal Co. v. United States*, 203 F.3d 568, 575 (9th Cir. 2000) (appropriation riders did not implicitly repeal statutory obligation). "When voting on appropriations measures, legislators are entitled to operate under the assumption that the funds will be devoted to purposes which are lawful and not for any purpose forbidden." *TVA*, 437 U.S. at 190 "Without such an assurance, every appropriations

measure would be pregnant with prospects of altering substantive legislation, repealing by implication any prior statute which might prohibit the expenditure." *Id.* "Not only would this lead to the absurd result of requiring Members to review exhaustively the background of every authorization before voting on an appropriation, but it would flout the very rules the congress carefully adopted," including that "'[n]o appropriation shall … *chang[e] existing law.*'" *Id.* at 190-91. Simply put, this case is governed by the text of ANILCA, not by minor provisions in two omnibus appropriations bills from the 1990s.

### B. The Kuskokwim River is not "public land" under the Commerce Clause or the navigational servitude

**1.** AFN argues that the "Commerce Clause and the Navigational Servitude provide authority to regulate subsistence fishing in all navigable waters in Alaska regardless of ownership of submerged lands." AFN Br. 44-48. AVCP adds that the "[n]avigational servitude is both a power and property interest that supports the federal government's regulatory authority over subsistence fishing in navigable waters." AVCP Br. 43-49. Both these arguments are foreclosed by Ninth Circuit precedent. In *Katie John I*, this Court "reject[ed] the argument that Congress expressed its intent to exercise its Commerce Clause powers to regulate subsistence fishing in all Alaskan navigable waters." 72 F.3d at 703. *Katie John I* also "reject[ed] the argument that the navigational servitude is an 'interest … the title to which is in the United States,' such that all navigable waters are public lands within the meaning of ANILCA." *Id.*

AFN asserts that "[i]f this Court reconsiders *Katie John I*, [it] must also reconsider whether the Commerce Clause, and relatedly the navigational servitude," require classifying "'*all* navigable waters within the State of Alaska'" as "public lands" under ANILCA. AFN Br. 46-47. But "the reasoning or theory" of this part of *Katie John I* is not "clearly irreconcilable with the reasoning or theory of intervening higher authority." *Miller*, 335 F.3d at 893; *see, e.g.*, *Tingley v. Ferguson*, 47 F.4th 1055, 1073 (9th Cir. 2022) (concluding that a Supreme Court decision "abrogated only … part of" a prior Ninth Circuit opinion); *Lair v. Bullock*, 798 F.3d 736, 747-48 (9th Cir. 2015) (same). Neither AFN nor AVCP identifies any intervening authority that overrules the Commerce Clause or navigational servitude holdings from *Katie John I*. Nor could they. Nothing in *Sturgeon* or *Sackett* undermines those holdings. And this Court did not rely on *Chevron* deference in *Katie John I* to reach those holdings. *See Katie John I*, 72 F.3d at 702-03. Indeed, it couldn't have, as the argument was put forward only by the private parties, not the Secretaries. *See id.* at 701 (noting that only "Katie John argued that public lands include virtually all navigable waters, by virtue of the federal navigational servitude"), 702 (discussing the parties' arguments). Because *Katie John I* "'squarely addressed'" this issue, this Court is bound by that decision. *United States v. Kirilyuk*, 29 F.4th 1128, 1135 (9th Cir. 2022).

**2.** Appellees' arguments fail even as a matter of first impression. AFN spills much ink arguing that the Commerce Clause gives the United States the "power" to implement a subsistence priority on navigable waters. *See* AFN Br. 44-48. But whether

the United States has this power is irrelevant; what matters is whether Congress, in fact, imposed a subsistence priority on navigable waters under ANILCA. Because the Kuskokwim River is not "public land," the subsistence priority does not apply. 16 U.S.C. §3102(1)-(3); *Sturgeon II*, 587 U.S. at 38-45. In any event, "[b]ecause the impact of ANILCA's subsistence priority in Alaskan navigable waters would not 'substantially affect' interstate commerce, this priority cannot be upheld under the Commerce Power." *Katie John I*, 72 F.3d at 707 (Hall, J., dissenting) (quoting *United States v. Lopez*, 514 U.S. 549, 59 (1995)).

AVCP at least tries to follow the statutory text, arguing that the navigational servitude is "an interest in navigable waters, the title to which is held by the federal government." AVCP Br. 43-49. But the navigational servitude is not "lands, waters, [or] interests therein … the title to which is in the United States." 16 U.S.C. §3102(1)-(3). The navigational servitude derives from the Commerce Clause and is "'a concept of power, not of property.'" *Katie John I*, 72 F.3d at 702 (quoting *United States v. Certain Parcels of Land*, 666 F.2d 1236, 1238 (9th Cir. 1982)); *see also United States v. Twin City Power Co.*, 350 U.S. 222, 224-25 (1956) (same). The United States thus cannot "hold title to it." *Katie John I*, 72 F.3d at 702; *see City of Angoon v. Hodel*, 803 F.2d 1016, 1027 n.6 (9th Cir. 1986) ("Since the United States does not hold title to the navigational servitude, the servitude is not 'public land' within the meaning of ANILCA.").

AVCP and AFN never address *Certain Parcels of Land*. And their only response to *City of Angoon* is that its discussion of the navigational servitude is either dicta or

"inconsistent" with *Amoco*. AVCP Br. 50 & n.16. But this Court correctly rejected this argument in *Katie John I*. 72 F.3d at 702-03. As the Court recognized, *City of Angoon*'s reasoning is binding, and *Amoco*'s discussion of "'title'" and "'any interests therein'" was "dictum, indicat[ing] only that, while the United States may not hold title to land, it may hold title to interests (*e.g.*, mineral rights) in that land." *Id.*

Contra AVCP, the Supreme Court did not find that the navigational servitude is "'the public property of the nation.'" AVCP Br. 44, 46, 51 (quoting *Gilman v. Philadelphia*, 70 U.S. 713, 724-25 (1865)). The Court stated that "*navigable waters of the United States …* are the public property of the nation," such that that Congress has "the power to keep them open and free from any obstruction to their navigation." *Gilman*, 70 U.S. at 724-25 (emphasis added). AVCP also provides no precedent showing that the United States has "title" to a navigational servitude under ANILCA, meaning "'fee ownership of property'" or "'possessory interests' in property like those granted by a lease." *Sturgeon II*, 587 U.S. at 43-44 (quoting *Totemoff*, 905 P.2d at 965). Neither the Commerce Clause nor the navigational servitude provides any support for Appellees' position.

## C. The Kuskokwim River is not "public land" under the Property Clause

AFN argues that "even if the Federal Government had *no* interest in certain navigable rivers or the submerged lands beneath them, the Federal Government has the authority under the Property Clause to regulate those rivers running through federal lands, and the waters appurtenant thereto." AFN Br. 42. But again, whether the United

States has the "authority" to regulate navigable rivers in Alaska under the Property Clause is irrelevant; the question is whether the Kuskokwim River qualifies as "public lands" under ANILCA. AFN never explains how the Property Clause somehow makes the Kuskokwim River "public lands" under ANILCA.

In any event, the Property Clause does not give the United States the power to regulate the Kuskokwim River. The Property Clause states that "Congress shall have Power to dispose of and make all needful Rules and Regulations respecting the Territory or other Property belonging to the United States." U.S. Const. art. IV, §3, cl.2. But the United States does not own the Kuskokwim River—Alaska does. *See* Alaska Br. 31; USA Br. 36-37; *Sturgeon II*, 587 U.S. at 42. The Property Clause thus does not affect this case.[16]

### D. The Kuskokwim River is not "public land" under Congress's authority over Native Affairs

**1.** AVCP argues that "Title VIII [of ANILCA] is Indian legislation enacted to benefit Alaska Natives," and so "the definition of public lands 'must be liberally construed in favor of establishing Indian rights.'" AVCP Br. 41. But this Court has already rejected that argument. In *Hoonah Indian Association v. Morrison*, this Court held

---

[16] Contra AFN (at 42), the Property Clause does not authorize Congress to regulate private lands merely because private conduct "'affects the public lands'"; a regulation of private land must at least be necessary "for the protection of the federal property." *Kleppe v. New Mexico*, 426 U.S. 529, 538 (1976). And even if "affects the public lands" were the standard, there is no evidence that subsistence fishing in the Kuskokwim "affects" any lands owned by the United States in any way.

that ANILCA is *not* Indian legislation. 170 F.3d at 1228-29. As this Court explained, ANILCA "expressly states that it is for the benefit of rural subsistence users, regardless of whether they are members of tribes." *Id.* at 1228. ANILCA "says that its purpose is to protect 'subsistence uses by rural residents of Alaska, including *both* Natives and non-Natives.'" *Id.* "There could not be a plainer declaration that Congress was not passing Indian legislation." *Id.* That ANILCA "may benefit Natives more than others does not make it Indian legislation, any more than legislation affecting snowmobiles and river boats is Indian legislation because of the greater importance of snowmachines and boats than automobiles in the many villages unconnected with the highway system." *Id.* at 1229.

AVCP recognizes that this Court in *Hoonah Indian* "held that Title VIII is *not* Indian legislation and should not be interpreted pursuant to the Indian canons." AVCP Br. 42 n.13. Yet AVCP urges the Court to ignore *Hoonah Indian* and instead follow the reasoning of an *earlier* opinion, *People of Village of Gambell v. Clark* ("*Gambell I*"), 746 F.2d 572, 581 (9th Cir. 1984) (deploying the Indian canon to support its judgment that ANILCA §810 extends to the Outer Continental Shelf), *rev'd in Amoco*, 480 U.S. at 555. But the Court in *Hoonah Indian* already rejected this argument. 170 F.3d at 1228 n.3. In *Amoco*, the Supreme Court "'reject[ed] the Ninth Circuit's reliance [in *Gambell I*] on the familiar rule of statutory construction that doubtful expressions must be resolved in favor of Indians.'" *Id.* (quoting *Amoco*, 480 U.S. at 555); *see Amoco*, 480 U.S. at 555 (reversing "[t]he judgment of the Ninth Circuit with respect to … the applicability of

ANILCA §810 to the OCS"). Because there has been no intervening Supreme Court decision undermining the theory or reasoning of *Hoonah Indian*, this Court is bound to follow that opinion. *United States v. Gay*, 967 F.2d 322, 327 (9th Cir. 1992); *see, e.g., Artichoke Joe's Cal. Grand Casino v. Norton,* 353 F.3d 712, 729 (9th Cir. 2003) (relying on *Hoonah Indian*); *Katie John II*, 247 F.3d at 1036 (Tallman, J., concurring in the judgment) (same).

AVCP appears to realize the inevitable, as much of its argument is that *Hoonah Indian* was wrongly decided. *See* AVCP Br. 42 n.13 (arguing that *Hoonah Indian* was "based on [a] false premise" and "overlooks" statutory provisions). But the Court correctly rejected *Gambell I*'s reasoning, which was based entirely on a quote from Representative Udall. *See Gambell I*, 746 F.2d at 581 (citing 126 Cong. Rec. 29279 (Nov. 12, 1980) (Rep. Udall)). Because Representative Udall's statements were "not part of the statute passed by both houses and signed by the President," relying on them would be "'the equivalent of entering a crowded cocktail party and looking over the heads of the guests for one's friends.'" *Hoonah Indian*, 170 F.3d at 1228 (quoting *Conroy v. Aniskoff*, 507 U.S. 511, 519 (1993) (Scalia, J., concurring in the judgment)); *see also id.* (discussing more persuasive legislative history that Congress sought to protect subsistence uses for all "rural residents," Native and non-Native alike (quoting S. Rep. 96-413 (Nov. 14, 1979))). *Hoonah Indian* was correctly decided.

In any event, even if the Court were required to construe Title VIII liberally (which it isn't), it still can't ignore the plain language of the text. *See Chickasaw Nation v.*

*United States*, 534 U.S. 84, 88-89 (2001) (refusing to apply the Indian canon when "[t]he language of the statute is too strong to bend as the Tribes would wish"). And there is still no "clear statement" that Congress intended to regulate navigable waters. *Sackett*, 598 U.S. at 680. The Indian canon could never trump the clear-statement rule here. *See Chickasaw Nation*, 534 U.S. at 95 (refusing to give preference to the "pro-Indian canon" over a clear statement rule where it involved the "interpretation of a congressional statute rather than an Indian treaty"); *see also Arizona v. Navajo Nation*, 599 U.S. 555, 572 (2023) (Thomas, J., concurring) (expressing doubt over the validity of "freestanding pro-Indian canons that authorize courts to depart from the ordinary rules of statutory interpretation").

**2.** Ahtna and AFN argue that the Kuskokwim River is "public land" because the United States holds "title" to "federal reserved fishing rights held in trust for Alaska Natives." Ahtna Br. 31-49; *see also* AFN Br. 50-55. In all the cases to address Title VIII—including the *Katie John* trilogy, the *Sturgeon* opinions, and *Totemoff*—this novel argument has never been addressed. For good reason. It fails on multiple grounds.

First, neither Ahtna nor AFN provide any evidence that the United States has "fishing rights" on the Kuskokwim River that it is holding "in trust for Alaska Natives." "The Government assumes Indian trust responsibilities only to the extent it expressly accepts those responsibilities by statute." *United States v. Jicarilla Apache Nation*, 564 U.S. 162, 177 (2011). Ahtna points to Section 4 of the Statehood Act. *See* Ahtna Br. 33; *see also* AFN Br. 51 & n.42. But that provision does not create any fishing rights; it merely

addresses how to handle property that already is "held by the United States in trust for said natives." Alaska Statehood Act, Pub. L. 85-508, §4, 72 Stat. 339 (July 7, 1958). There also is no question that Alaska Natives do not have "fishing rights" in all of Alaska's navigable waters. *See Totemoff*, 905 P.2d at 966 ("States have traditionally had the power to govern hunting and fishing in their navigable waters. Regulation of hunting and fishing is a traditional concern of the states."). And even if Alaska Natives once had fishing rights on parts of the Kuskokwim River (though Ahtna points to nothing in the record to support this), there is no evidence that any such rights were "held by the United States in trust" for Alaska Natives.

Second, even if the United States were holding these fishing rights in trust for Alaska Natives, these rights are not "interests … the title to which is in the United States." 16 U.S.C. §3102. In ANILCA, "the term 'title' applies to fee ownership of property and (sometimes) to 'possessory interests' in property like those granted by a lease." *Sturgeon II*, 587 U.S. at 43-44 (cleaned up) (quoting *Totemoff*, 905 P.2d at 965). But fishing rights, like reserved water rights, are "usufructuary" in nature. *Id.* at 43; *see Minnesota v. Mille Lacs Band of Chippewa Indians*, 526 U.S. 172, 176 (1999) (describing a tribe's "hunting, fishing, and gathering rights" under a treaty as "usufructuary rights"); *see also* Restatement (Third) of Property (Servitudes) §1.2(d) ("Easements and *profits [à prendre]* are not possessory interests in land. … [They are] considered a nonpossessory interest in land because [they] generally authorize[] limited uses of the burdened

74

property for a particular purpose."). The United States thus cannot have "title" to these rights. *Sturgeon II*, 587 U.S. at 43-44.

Third, even if the United States had "title" to these fishing rights, they were extinguished by the Alaska Native Claims Settlement Act (ANCSA), Pub. L. 92-203, §4, 85 Stat. 688 (Dec. 18, 1971), codified at 43 U.S.C. §1603. Congress enacted ANCSA to "'resolve land disputes between the federal government, the state of Alaska, Alaskan Natives, and non-native settlers,'" a result Congress wanted "accomplished rapidly, with certainty, in conformity with the real economic and social needs of Natives, and without litigation." *Stratman v. Leisnoi, Inc.*, 545 F.3d 1161, 1163 (9th Cir. 2008) (cleaned up). Congress could not have been clearer about how it planned to accomplish this task: "All aboriginal titles, if any, and claims of aboriginal title in Alaska based on use and occupancy, including submerged land underneath all water areas, both inland and offshore, and including *any aboriginal hunting or fishing rights that may exist*, are hereby extinguished." 43 U.S.C. §1603(b) (emphasis added). Ahtna claims that Congress carved out "fishing rights held in trust by the United States" from ANCSA's reach. Ahtna Br. 47. But that is not a fair reading of the statute. *See United States v. Atl. Richfield Co.*, 612 F.2d 1132, 1136 (9th Cir. 1980) (43 U.S.C. §1603 "'is to be broadly construed to eliminate such claims and titles as any basis for any form of direct or indirect challenge to land in Alaska'"). Eliminating "[a]ll aboriginal titles" and "claims" thereto while preserving a complex web of derivative trust interests (that Ahtna says are themselves held in title) is not just an odd result; it is incompatible with ANCSA's goal of reliably

settling Alaskan land claims. *See also Alaska v. Native Vill. of Venetie Tribal Gov't*, 522 U.S. 520, 534 (1998) (noting that one of ANCSA's "primary purposes" was to "end paternalism in federal Indian relations").

Fourth, "fishing rights held in trust for Alaska Natives" could never make a river "public land" because ANILCA is not limited to Alaska Natives. The subsistence priority applies to all "rural residents," which "'include *both* Natives and non-Natives.'" *Hoonah Indian*, 170 F.3d at 1229 (quoting 16 U.S.C. §3111(1)). Ahtna's construction would mean that only Alaska Natives would receive this benefit—other rural residents who lacked these "fishing rights" could not receive these subsistence rights. That would contradict ANILCA's command that Title VIII apply to "*both* Natives and non-Natives'" alike. *Id.*

**3.** AFN (at 49-55) spills yet more ink discussing Congress's supposed "intent to protect traditional Alaska Native subsistence." As explained above, providing subsistence fishing rights to Alaska Natives was not ANILCA's primary purpose. Indeed, AFN never even mentions *Hoonah Indian*. At any rate, AFN's point appears to be that this Court should ignore ANILCA's text in favor of Congress's supposed "purpose." But AFN makes no case for why the Kuskokwim River is somehow "public land" under ANILCA because of Congress's "constitutional authority over Native affairs." Because ANILCA's subsistence priority is not limited to Alaska Natives, the United States' authority over Native affairs does not affect this case.

### III. The State's orders are not preempted because the FSB's members are unconstitutionally appointed.

The United States does not dispute that the FSB's orders cannot preempt State orders if the FSB members are not properly appointed. *See* Alaska Br. 40-42. Nor does the United States dispute that FSB members are "officers of the United States." *See id.* at 23, 42-43. The only questions, then, are whether the FSB members' positions are established "by Law" and whether the FSB members are "principal" officers. The State is entitled to judgment if it prevails on either issue. The United States' new request for a third chance to cure these problems through rulemaking or ratification fails.

### A. The FSB's members are unconstitutionally appointed because the FSB is not established "by Law."

The United States recognizes that neither ANILCA nor any other statute expressly creates the FSB or its members' positions. USA Br. 56. Indeed, not one line of the United States Code ever mentions the Federal Subsistence Board. That should be the end of the matter. Alaska Br. 43-44. "By requiring that Congress create federal offices 'by Law,' the Constitution imposes an important check against the President— he cannot create offices at his pleasure." *Trump*, 603 U.S. at 643 (Thomas, J., concurring). The FSB flouts this important constitutional check, and the United States' arguments otherwise would bless a broad executive power of office creation reminiscent of King George III's. Because the FSB's members are "officers" whose positions are not established "by Law," they are improperly appointed under the Appointments Clause.

77

In its Summary of the Argument, the United States casually asserts (without citation) that "Alaska's argument is contingent on classifying Board members as principal officers." USA Br. 23. That is plainly wrong. All officers—whether inferior or principal—must have their positions established "by Law." U.S. Const. art. II, §2, cl.2; *see* Alaska Br. 43-49. Even KRITFC recognizes that "[u]nder the Appointments Clause, positions held by officers of the United States must be established 'by Law.'" KRITFC Br. 41 (quoting U.S. Const. art. II, §2, cl.2). Thus, even if the Court determines that FSB members are not "principal" officers, the State still prevails if those members' positions are not established "by Law." Any argument to the contrary has also been waived because the United States never developed the argument. *See Barnes v. FAA*, 865 F.3d 1266, 1271 n.3 (9th Cir. 2017).

The United States focuses on the word "vest" in the Appointments Clause. *See* USA Br. 56 (quoting U.S. Const. art. II, §2, cl.2). It is unclear what argument, if any, the United States is making. The State does not dispute that "Congress may by Law vest the Appointment of such inferior Officers … in the Heads of Departments." U.S. Const. art. II, §2, cl.2. But all offices (inferior or principal) must first be "established by Law." *Id.* The Appointments Clause "'distinguishes between the *creation* of an office and *appointment* thereto.'" *Limitations on Presidential Power to Create a New Executive Branch Entity*, 9 Op. O.L.C. 76, 77 (1985) (quoting *The Constitution of the United States of America, Analysis and Interpretation*, 92d Cong., 2d Sess. 523 (1973) (emphasis added)); *see* Alaska Br. 45-47. Congress can "vest the Appointment" of inferior officers in the Heads of Departments;

but it cannot delegate the ability to *create* an office in the first instance. That power is exclusively reserved for the legislature. *See* Alaska Br. 45-47.

The United States claims that the State's position "rests primarily on law reviews, not law." USA Br. 56. Not true. To be sure, many distinguished scholars agree with the State.[17] But courts have adopted this view too,[18] as have multiple Supreme Court justices.[19] The Office of Legal Counsel[20] and the Congressional Research Service[21] are

---

[17] *See, e.g.*, Steven G. Calabresi & Gary Lawson, *Why Robert Mueller's Appointment as Special Counsel Was Unlawful*, 95 Notre Dame L. Rev. 87, 101-02 & n.79 (2019); E. Garrett West, *Congressional Power Over Office Creation*, 128 Yale L.J. 166, 173, 180 (Oct. 2018); Saikrishna B. Prakash, *Fragmented Features of the Constitution's Unitary Executive*, 45 Willamette L. Rev. 701, 719 (2009).

[18] *United States v. Trump*, No. 23-cr-80101, 2024 WL 3404555, *6-8 (S.D. Fla. July 15, 2024); *United States v. Concord Mgmt. & Consulting LLC*, 317 F. Supp. 3d 598, 618 (D.D.C. 2018); *United States v. Janssen*, 73 M.J. 221, 224-25 (C.A.A.F. 2014); *United States v. Maurice*, 26 F. Cas. 1211, 1213 (C.C. Va. 1823) (Marshall, C.J.).

[19] *Trump*, 603 U.S. at 643 (Thomas, J., concurring); *Seila Law*, 591 U.S. at 266 (Kagan, J., concurring in the judgment in part and dissenting in part) ("what kinds of officers ... the Executive Branch requires" is a "decision[] in the legislature's hands"); *Weiss v. United States*, 510 U.S. 163, 187 n.2 (1994) (Souter, J., concurring) ("[T]he Framers added language to both halves of the Appointments Clause specifically to address the concern that the President might attempt unilaterally to create and fill federal offices."); *Maurice*, 26 F. Cas. at 1213; *see also Young v. U.S. ex rel. Vuitton et Fils S.A.*, 481 U.S. 787, 815 n.1 (1987) (Scalia, J., concurring in the judgment) (explaining that a federal rule of criminal procedure cannot "confer Article II appointment authority, since it is a Rule of court rather than an enactment of Congress"); *Donziger v. United States*, 143 S.Ct. 868, 869 (2023) (Gorsuch, J., dissenting from denial of *certiorari*, joined by Kavanaugh, J.) (same).

[20] *Limitations on Presidential Power*, 9 Op. O.L.C. at 77; *Officers of the United States Within the Meaning of the Appointments Clause*, 31 Op. O.L.C. 73, 117 (2007).

[21] Barbara L. Schwemle et al., Cong. Rsch. Serv. 7-5700, *The Debate Over Selected Presidential Assistants and Advisors: Appointment, Accountability, and Congressional Oversight* 40 (2009).

likewise in line with the State. It is the United States whose novel position finds little support.

The United States briefly tries to defend the district court's primary holding—*i.e.*, that regulations can create an office "by Law." USA Br. 55-56. But the only argument that the United States can muster is the general statement that regulations "issued through the notice-and-comment process … have the force and effect of law." *Id.* (cleaned up) (quoting *Perez v. Mortg. Bankers Ass'n*, 575 U.S. 92, 96 (2015)). This principle—that properly promulgated regulations are legally binding—has nothing to do with the Appointments Clause. *See, e.g.*, *Perez*, 575 U.S. at 96 (distinguishing interpretive rules from substantive rules under the APA). When the Founders used the term "'by Law,'" they meant "'by statute,'" not by regulation. *Trump*, 603 U.S. at 645 (Thomas, J., concurring) (citing cases); *see* Alaska Br. 44-47. The Appointments Clause "provide[s] that offices not recognized by the Constitution itself 'shall be established by Law,' thus *lodging in Congress* ultimate authority over the creation of most offices." *Officers of the United States*, 31 Op. O.L.C. at 117 (emphasis added).

Looking for alternative sources of authority, the United States points to three acts of Congress: the Reorganization Act of 1949, the Reorganization Plan No. 3 of 1950, and the Reorganization Plan No. 2 of 1953. To start, two of these arguments are brand new: the United States never argued below that either the Reorganization Act of 1949 or the Reorganization Plan No. 2 of 1953 gave it statutory authority to create the FSB. *See* Dkt. 101 at 32-34. These arguments thus are waived on appeal. *See Hill v. City*

*of Fountain Valley*, 70 F.4th 507, 515 (9th Cir. 2023). In any event, none of these statutes create (or even mention) the Federal Subsistence Board. Indeed, they were enacted into law more than three decades *before* ANILCA, and years before Alaska even joined the union.

Nor do these acts authorize the Secretaries to create the FSB, even if the Constitution permitted such a delegation. Contra the United States, nothing in the Reorganization Act of 1949 "provides the Secretaries with general authority to establish offices and appoint officers." USA Br. 57. The act merely "provide[s] for the reorganization of Government agencies" when the President "prepare[s] a reorganization plan … as to which he has made findings … and transmit[s] such plan … to the Congress." Pub. L. 81-109, §3, 63 Stat. 203 (June 20, 1949). This act has no application here.

The Reorganization Plans of 1950 and 1953 fare no better. Both permit the Secretaries to "from time to time make such provisions as [they] shall deem appropriate authorizing the performance by any other officer, or by any agency or employee, of the [Departments] of any function of the Secretar[ies]." U.S.C. Reorg. Plan No. 3 of 1950, §2; U.S.C. Reorg. Plan No. 2 of 1953, §4(a). These are simple "'housekeeping statute[s]'" that authorize the Secretaries to carry out their responsibilities. *Concord Mgmt.*, 317 F. Supp. 3d at 622. But the "power to 'keep house' … is not the same as the power to 'build the house' by appointing officers." *Id.*; *cf. Edmond v. United States*, 520 U.S. 651, 655-57 (1997) (statute that did not contain "any mention of the 'appointment' of

[officers],” but only conferred “the power to ‘assign’ officers to a particular task” did not authorize appointment). These provisions certainly do not “clearly creat[e]” the FSB under the clear-statement rule, *Trump*, 603 U.S. at 648 (Thomas, J., concurring), a textual canon that the United States never disputes applies, *see* Alaska Br. 47-48. Interpreting the Reorganization Plans as broadly as the United States proposes would “rea[d] out of the Constitution the phrase ‘established by Law’” by empowering the executive branch to “both creat[e] and fil[l] [a] position, which is the chief danger against which the clause is a safeguard.” *Tucker v. Comm’r of Internal Revenue*, 135 T.C. 114, 158 (2010).

None of the out-of-circuit precedent the United States cites is persuasive. *See* USA Br. 57-58 (citing *Willy v. Admin. Rev. Bd.*, 423 F.3d 483 (5th Cir. 2005); *Varnadore v. Sec’y of Lab.*, 141 F.3d 625 (6th Cir. 1998); *Pa. Dep’t of Pub. Welfare v. HHS*, 80 F.3d 796 (3d Cir. 1996)). Although *Willy* and *Varnadore* found that the Secretary of Labor had the authority to appoint individuals to the Administrative Review Board, neither “opinio[n] suggests that any party had argued that the positions under review were not ‘established by Law.’ Rather, the parties and the courts seem to have assumed that if the positions existed, then the positions were ‘established by Law.’” *Tucker*, 135 T.C. at 157-58. Nor did either court find “clea[r]” authorization from Congress. *Trump*, 603 U.S. at 648 (Thomas, J., concurring); Alaska Br. 47-48. The reasoning of these opinions also has been roundly criticized. *Tucker*, 135 T.C. at 157-58; *Janssen*, 73 M.J. at 224; Calabresi & Lawson, *Why Robert Mueller’s Appointment as Special Counsel Was Unlawful*, 95

Notre Dame L. Rev. at 106 n.121 ("*Willy* was obviously wrong."); Kevin Sholette, *The American Czars*, 20 Cornell J.L. & Pub. Pol'y 219, 239-40 (2010) (*Willy*'s reasoning is "inconsistent with case law and the Constitution"). Indeed, *Varnadore* addressed this question in a single unreasoned sentence. *See* 141 F.3d at 632. And the statute at issue in *Pennsylvania Department of Public Welfare* has no similar analog in ANILCA. There, the Third Circuit found appointment authority through 42 U.S.C. §913, which authorizes the HHS Secretary to "'appoint and fix the compensation of such officers and employees and to make such expenditures as may be necessary for carrying out the functions of the Secretary under [Chapter 7 of Title 42].'" 80 F.3d at 804 (quoting 42 U.S.C. §913). ANILCA contains no equivalent grant of authority. *Contrast* 42 U.S.C. §913, *with* 16 U.S.C. §3124 (providing only that the Secretaries "shall prescribe such regulations as are necessary and appropriate to carry out [their] responsibilities under this subchapter").

The United States (like the district court) contends that Section 814 of ANILCA, titled "Regulations," gives the Secretaries the power to create the FSB because it allows them to "prescribe such regulations as are necessary and appropriate to carry out [their] responsibilities under this subchapter." 16 U.S.C. §3124. But this argument fails. *See* Alaska Br. 47-49. Like the Reorganization Plans, Section 814 is simply a "'housekeeping statute'" that authorizes the Secretaries to carry out their responsibilities, and the "power to 'keep house' … is not the same as the power to 'build the house' by appointing officers." *Concord Mgmt.*, 317 F. Supp. 3d at 622. Section 814 does not create

83

the FSB, or even mention officers at all. It is *Section 805* of ANILCA that identifies the individuals who will implement ANILCA—an inconvenience the United States ignores entirely. *See* Alaska Br. 48-49. And Section 814 certainly does not "clearly creat[e]" the FSB, a point the United States also ignores. *Trump*, 603 U.S. at 648 (Thomas, J., concurring); *Trump*, 2024 WL 3404555, at *9 n.17 (Congress "knows how to speak clearly in the appointment context").[22]

Finally, KRITFC argues that the FSB members were established "by Law" because Congress "ratified the regulatory scheme creating the Board through the 1997 and 1998 contingent amendments." KRITFC Br. 41. But this argument fails for several reasons. Most obvious, the "regulatory scheme" establishing the Board has changed since 1998. *See, e.g.*, 64 Fed. Reg. 1276 (Jan. 8, 1999) (amending the rules to modify the FSB's substantive authority); 89 Fed. Reg. 83622 (Oct. 17, 2024) (amending the rules to add three public member seats to the FSB, change the appointment process for the new public members, and create a sliding scale for the FSB's quorum). Congress could not ratify a "regulatory scheme" that did not yet exist. Moreover, even if the timeline were different, the argument fails for the same reasons discussed above. *Supra* pp. 58-66. Neither appropriation act says a word about the Federal Subsistence Board. *See* Pub. L.

---

[22] *Duenas v. Garland* is not relevant here. There, the "key question" was "whether Immigration Judges and BIA members are principal or inferior officers"; this Court said nothing at all about whether their offices were "established by Law." 78 F.4th 1069, 1073 (9th Cir. 2023). If anything, *Duenas* supports the State's arguments. The Court specifically found that "Congress authorized the Attorney General to enact the regulations establishing the BIA." *Id.* at 1073 n.2 (emphasis added). No such statutory authorization exists here.

105-83, §316; Pub. L. 105-277, Div. A, §339. And there is no "overwhelming evidence of acquiescence" in the FSB. *SWANCC*, 531 U.S. at 169 & n.5. The need for such strong evidence is particularly important here because core legislative powers are at stake. *See Trump*, 603 U.S. at 645-46 (Thomas, J., concurring) (discussing the historical reasons for giving Congress the office-creation power). Because the FSB members are "officers" whose positions were not established "by Law," they were not properly appointed.

### B. The FSB's members are "principal" officers who were not appointed by the President with the advice and consent of the Senate.

On October 17, 2024, days before the United States' brief was due in this Court, the Secretaries published new rules changing the composition of the FSB (adding three new "public members" to be "nominated or recommended by federally recognized Tribal governments in Alaska") and stating that the Secretaries "retain their existing authority" to remove FSB members and override the Board's actions. *See* 89 Fed. Reg. at 83628; *see also* USA Br. 47 (claiming the new rules "affirmed" the Secretaries' powers). Although these actions were an obvious attempt to turn FSB members into "inferior" officers, the Secretaries never even acknowledged this litigation in their final rules. *See generally* 89 Fed. Reg. 83622. Despite these last-minute changes, however, FSB members are still "principal" officers who were not properly appointed.

The United States argues that FSB members are inferior officers because "the Secretaries established the Board" and so could "'abolis[h]'" the Board by rescinding

their rules "'at any time.'" USA Br. 48-49. But this theoretical possibility is insufficient to make the FSB members "inferior" officers. Under *Arthrex*, the Court must assess "how much power [the FSB] exercises free from control by a superior" and whether there is "direction and supervision" by the Secretaries. 594 U.S. at 16-18; *see also Edmond*, 520 U.S. at 662-63 ("It is not enough that other officers may be identified who formally maintain a higher rank, or possess responsibilities of a greater magnitude. … '[I]nferior officers' are officers whose work is directed and supervised at some level by [principal officers]."). The mere possibility of promulgating new rules to abolish the entire FSB is not sufficient "direction and supervision." *Arthrex*, 594 U.S. at 16-18. Indeed, the United States provides no example where the Secretaries proposed or even contemplated abolishing the FSB.[23]

The United States insists (at 49-50) that the Secretaries can provide effective administrative oversight over the FSB because, according to their new rules, they have authority to "modify, disapprove, or stay any action taken by the Board." 89 Fed. Reg. at 83623. But for reasons unknown, the Secretaries' new rules still provide no mechanism for parties to challenge the FSB's decisions. *See* USA Br. 51 (acknowledging that the Secretaries' regulations do not "outline an express mechanism for review and approval of Board actions"). The Supreme Court has stressed that "adequate

---

[23] The United States relies on *In re Grand Jury Investigation*, 916 F.3d 1047 (D.C. Cir. 2019), but that case was decided before *Arthrex* and thus is not persuasive.

supervision entails review of decisions issued by inferior officers." *Arthrex*, 594 U.S. at 19. But how can the Secretaries effectively review FSB decisions if parties before the FSB have no way to seek the Secretaries' review? Indeed, despite operating for decades, it doesn't appear that the Secretaries have ever vetoed or modified any FSB decision.

Contra the United States, the FSB does issue certain orders that are effectively "unreviewable." USA Br. 52. For "emergency actions" (like the 2021 and 2022 orders issued here) the FSB's orders have immediate effect whenever the FSB "determines that the situation calls for" it. 89 Fed. Reg. at 83628. Consider the June 17, 2021 order issued by the FSB. *See* 1-FedSER-196–97. That order authorized federally qualified subsistence users to use gillnets in "federal public waters in the main stem of the Kuskokwim River" on June 19—just two days after the order was issued. *Id.* How could this order possibly be meaningfully reviewed by the Secretaries? The Secretaries' rules provide no mechanism for an affected party to bring this issue to the Secretaries' immediate attention. And even if they did, the Secretaries are under no obligation to issue a decision "modify[ing], disapprov[ing], or stay[ing]" the action within any time frame. 89 Fed. Reg. at 83623. The Secretaries could let June 19 come and go, and the FSB's decision would be the final word—without any review whatsoever.[24]

---

[24] Even if non-emergency FSB orders could be effectively reviewed (which, again, is speculative), that would not make FSB members inferior officers. Emergency actions are powerful orders, as this case demonstrates. "As with many poisons, a little unconstitutional power is deadly." *Lofstad v. Raimondo*, 117 F.4th 493, 499, 501 (3d Cir.

The United States argues that the Secretaries oversee the FSB members as a factual matter. USA Br. 50-52. But *Arthrex* makes clear that any behind-the-scenes oversight is irrelevant. 594 U.S. at 16. The Appointments Clause "demand[s]" clear "lines of accountability" because there must be a "transparent decision for which a politically accountable officer must take responsibility." *Id.* Here, the regulations put *the FSB* in charge of implementing ANILCA, not the Secretaries. That is what matters.

Even if nonpublic oversight mattered, the Secretaries still do not "'direc[t] and supervis[e]'" the FSB as a factual matter. *Id.* at 13. In its opening brief, the State explained why the district court's factual findings were not supported by the record. *See* Alaska Br. 51-52. The United States tellingly has no response. Instead, the United States points to a *different* email in the record to buttress the district court's findings. USA Br. 50 (citing 1-FedSER-12–13). But that argument fares no better. In this email, the "Senior Adviser for Alaskan Affairs" in the Department of the Interior does nothing more than ask the "Assistant Regional Director [of] Subsistence" in the U.S. Fish & Wildlife Service Alaska Region to "please pause or defer [certain] Board actions" pending the resolution of a lawsuit against the FSB. 1-FedSER-12–13. Indeed, the individual references a prior email "requesting"—not ordering—a "temporary pause in

_____

2024) (concluding that members of a fishing council were principal officers even though some of their powers were purely advisory).

Board activities." *Id.* This email exchange is paltry evidence that the Secretaries in fact "'direc[t] and supervis[e]'" the FSB. *Arthrex*, 594 U.S. at 13.

The United States asserts (without evidence) that "[t]here is nothing unusual or surprising about a board comprised of the Secretaries' appointees, including five members from within their agencies, acting consistently with Secretaries' policy choices." USA Br. 50-51. But the premise is wrong. The FSB is *not* "comprised of the Secretaries' appointees." Because FSB members are not subject to term limits, their tenures often span multiple presidencies and multiple Secretaries of Interior and Agriculture.[25] *See* Alaska Br. 13-14. The 2024 amendments only make things worse, as the Secretaries have further delegated the power to nominate the FSB's "public members" to outside entities. *See* 89 Fed. Reg. at 83628 (requiring three "public members" to be "nominated or recommended by federally recognized Tribal governments in Alaska"); *Common Legislative Encroachments on Executive Branch Authority*, 13 Op. O.L.C. 248, 250 & n.5 (1989) (requiring "the President (or other executive officials) [to] appoint persons who will exercise significant authority under the laws of the United States from lists submitted by … other persons not appointed in accordance with the Appointments Clause" would be unconstitutional). That the Secretaries never

---

[25] Although the rules now authorize the Secretaries to impose term limits, the Secretaries have never done so. 89 Fed. Reg. at 83628. Nor is there any indication that they plan to. *See id.* at 83625 (finding "no compelling reason" to require term limits for FSB members).

overrule the FSB—many of whom were picked by their predecessors—thus *is* surprising. Indeed, when other agencies allow for higher review, reversal is far more frequent. For example, the Social Security Appeals Council grants review of between 16% and 25% of all decisions from Administrative Appeals Judges, and when it does it issues a favorable decision for the appellant 97% of the time. *See* David K. Hausman, *Reviewing Administrative Review*, 38 Yale J. Reg. 1059, 1080 (2021).

Finally, the United States does not dispute that five of the FSB members can be removed only "for cause." See USA Br. 53-55; Alaska Br. 15 & n.2, 52. The United States points out that these members can be removed for "unsuccessful performance," USA Br. 55 (citing 5 U.S.C. §3592), and can be transferred or reassigned if certain conditions are satisfied, *id.* (citing 5 U.S.C. §3395; 5 C.F.R. §317.901). But what matters is that these laws limit the Secretaries' power of removal. *See* Alaska Br. 52. Simply put, if the Secretaries don't like what these FSB members are doing, the Secretaries cannot remove them at will and install others who will carry out the Secretaries' agenda. The FSB members thus cannot be "'meaningfully controlled' by the threat of removal." *Arthrex*, 594 U.S. at 17. The United States is wrong to argue otherwise.[26]

---

[26] That a majority of the FSB (6 of the 11 members) are "public members" does not eliminate this problem. Because the FSB can issue orders with a quorum of five or six members (depending on the FSB's size), the FSB could operate entirely through officers who can be removed only for cause. *See* 89 Fed. Reg. at 83628; *see also* 50 C.F.R. §100.10(d)(3) (FSB can issue orders if "a majority of voting members are in agreement").

## C. The FSB's constitutional defects are fatal to the United States' claims.

In a last-ditch effort, the United States urges this Court to "vacate and remand for further proceedings to enable ratification or rulemaking" so the Secretaries can try to remedy any "defect[s] in the Board's structure." USA Br. 59-60. The United States has waived this argument. *See Hill*, 70 F.4th at 515. The United States never argued below that it should have an opportunity to cure the defects in the Board's structure through ratification or rulemaking. *See generally* Dkt. 101 at 31-40. In any event, the United States' argument fails.

To start, even if ratification or rulemaking could cure the constitutional problems (they cannot) the United States has done neither. Plaintiffs generally do not get a second chance to prevail on their case after losing on summary judgment. *See, e.g.*, *GoE3 LLC v. Eaton Corp.*, 798 F. App'x 998, 999 (9th Cir. 2020) (plaintiff not entitled to a "'second bite at the apple'" to "provide additional evidence" in support of its summary judgment opposition (quoting *Weeks v. Bayer*, 246 F.3d 1231, 1236 (9th Cir. 2001)). The only case the United States cites in support is one in which the government ratified an action *before* the appellate court ruled on the merits. *See Guedes v. ATF*, 920 F.3d 1, 6 (D.C. Cir. 2019) (Attorney General "independently ratified [a rule] shortly after taking office"). Appointments Clause remedies also are "designed … to create incentives to raise Appointments Clause challenges." *Lucia*, 585 U.S. at 251 n.5 (cleaned up). The United States' novel rule would eviscerate those incentives, as no party would ever raise an

Appointments Clause defense if the remedy was perpetual limbo in district court pending the government's attempts to comply with the Constitution. The United States cannot ask this Court to rule but then request yet another chance to prevail.

The Secretaries likely never "ratified" the FSB's 2021 and 2022 orders because doing so would have had no effect on this litigation. Unlike other Appointments Clause challenges, this dispute is not solely about the lawfulness of completed actions. *See, e.g.,* *Guedes*, 920 F.3d 1. The district court, at the United States' request, issued *prospective* relief requiring the State to comply with the FSB's *future* orders. *See* 1-ER-32. Ratifying the FSB's 2021 and 2022 orders thus would not resolve the dispute; going forward, the State would still be forced to comply with the orders of FSB members who were not properly appointed. The State cannot be bound by future orders from unlawfully appointed officers.

The Secretaries also could not cure the FSB's constitutional problems through future rulemaking. Only Congress—not the Secretaries—can establish officer positions "by Law." Alaska Br. 44-47. No rulemaking or regulation could possibly cure that constitutional problem. And the United States identifies no steps it would take to make the FSB members "inferior" officers instead of "principal" officers. USA Br. 59-60. That isn't surprising. The new regulations the Secretaries issued in October—days before the United States' brief was filed—were an obvious attempt to cure the constitutional deficiencies with the FSB. Yet the FSB members are still "principal" officers. If the Secretaries wish to undertake yet another attempt to put the FSB's house

in order, they can do so. But a hypothetical rulemaking cannot prevent judgment in the State's favor.

## CONCLUSION

The Court should reverse the district court and vacate the permanent injunction.


Dated: December 16, 2024

Respectfully submitted,

TREG TAYLOR
  ATTORNEY GENERAL

 /s/ J. Michael Connolly
J. Michael Connolly
Steven C. Begakis
Zachary P. Grouev
Consovoy McCarthy PLLC
1600 Wilson Boulevard, Suite 700
Arlington, VA 22209
(703) 243-9423
mike@consovoymccarthy.com
steven@consovoymccarthy.com
zach@consovoymccarthy.com

 /s/ Margaret Paton-Walsh
Margaret Paton-Walsh
Aaron C. Peterson
    Assistant Attorneys General
Department of Law
1031 West Fourth Avenue, Suite 200
Anchorage, AK 99501
(907) 269-5232
margaret.paton-walsh@alaska.gov
aaron.peterson@alaska.gov

*Attorneys for the State of Alaska, et al.*

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

### Form 8. Certificate of Compliance for Briefs

**9th Cir. Case Number(s)**  24-2251

I am the attorney or self-represented party.

**This brief contains 25,652 words,** including 0 words manually counted in any visual images, and excluding the items exempted by FRAP 32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

[ ] complies with the word limit of Cir. R. 32-1.

[ ] is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

[ ] is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3). 1

[ ] is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

[ ] complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

        [ ] it is a joint brief submitted by separately represented parties.
        [ ] a party or parties are filing a single brief in response to multiple briefs.
        [ ] a party or parties are filing a single brief in response to a longer joint brief.

[ ] complies with the length limit designated by court order dated _____.

[XX] is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** */s/ J. Michael Connolly*  **Date** December 16, 2024

## CERTIFICATE OF SERVICE

I certify that on December 16, 2024, I electronically filed this brief with the Clerk

of the Court using the CM/ECF system, serving all counsel of record.

Dated: December 16, 2024

*/s/ J. Michael Connolly*
J. Michael Connolly